POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE LILIEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>OLAPLEX HOLDINGS, INC., JUE WONG, ERIC TIZIANI, TIFFANY WALDEN, CHRISTINE DAGOUSSET, TRICIA GLYNN, DEIRDRE FINDLAY, JANET GURWITCH, MARTHA MORFITT, DAVID MUSSAFER, EMILY WHITE, MICHAEL WHITE, and PAULA ZUSI,<br><br>Defendants. | Case No.<br><br>__CLASS ACTION__<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>__DEMAND FOR JURY TRIAL__ |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

Plaintiff Leslie Lilien ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Olaplex Holdings, Inc. ("Olaplex" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal securities class action on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Olaplex common stock pursuant and/or traceable to the Company's initial public offering conducted on or around September 30, 2021 (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") (the

"Class"). The claims in this action arise from Olaplex's materially misleading Offering Documents (defined below) issued in connection with the IPO.

2.     Olaplex was founded in 2014 and is headquartered in Santa Barbara, California. Olaplex manufactures and sells hair care products. The Company offers hair care shampoos and conditioners for use in treatment, maintenance, and protection of hair. Olaplex purports to participate in the "prestige segment" of the haircare market, which the Company claims is "expected to be the fastest growing segment of the global haircare market from 2020 to 2025."

3.     On August 27, 2021, Olaplex filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on September 29, 2021 (the "Registration Statement").

4.     On October 1, 2021, Olaplex filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").

5.     Pursuant to the IPO, Olaplex issued 73,700,000 shares of its common stock to the public at the Offering price of $21.00 per share for approximate proceeds of $1,466,445,750 to the Company, after applicable underwriting discounts and commissions.

6.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2

make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) macro-economic pressures and competition in the haircare market were more robust than the Company had represented to investors; (ii) accordingly, the Company was unlikely to maintain its sales and revenue momentum; and (iii) as a result, it was unlikely that the Company would be able to achieve the financial and operational growth projected in the Offering Documents; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

7.      On September 29, 2022, a Piper Sandler analyst downgraded Olaplex to Neutral from Overweight, stating that her work revealed that "competition and misinformation pose growing risks to the company."  In addition, the analyst indicated that she anticipated investments in marketing and education were needed to offset the headwinds and that "little room for valuation upside given the risks at play."

8.       On this news, Olaplex's stock price fell $1.33 per share, or 12.15%, to close at $9.62 per share on September 29, 2022.

9.      Then, on October 18, 2022, Olaplex issued a press release in which "the Company revised its guidance for the 2022 fiscal year".  Olaplex said it now expects fiscal year 2022 revenue between $704 million and $711 million, significantly down from its prior guidance range of $796 million to $826M.  Olaplex stated that "[t]he Company's

updated guidance primarily reflects a slowdown in sales momentum that it attributes to macro-economic pressures, increased competitive activity including discounting, and a moderation in new customer acquisition, as well as inventory rebalancing across certain customers which the Company believes are in response to these same macro-economic pressures."

10.    On this news, Olaplex's stock price fell $5.55 per share, or 56.69%, to close at $4.24 per share on October 19, 2022.

11.    As of the time this complaint was filed, the price of Olaplex common stock continues to trade below the Offering price of $21.00 per share, damaging investors.

12.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Olaplex's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

15.    Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b).  Olaplex is headquartered in this Judicial District, Defendants conduct business

in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

17.     Plaintiff, as set forth in the attached Certification, acquired Olaplex common stock at artificially inflated prices pursuant and/or traceable to the Offering Documents for the Company's IPO and was damaged thereby.

18.     Olaplex is a Delaware corporation.  Olaplex's securities trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "OPLX."

19.     Defendant JuE Wong ("Wong") was at the time of the IPO the Company's President, Chief Executive Officer, and a Director.  Defendant Wong signed or authorized the signing of the Offering Documents filed with the SEC.

20.     Defendant Eric Tiziani ("Tiziani") was at the time of the IPO the Company's Chief Financial Officer.  Defendant Tiziani signed or authorized the signing of the Offering Documents filed with the SEC.

21.     Defendant Tiffany Walden ("Walden") was at the time of the IPO the Chief Operating Officer, Chief Legal Officer, and Secretary and Director of the Company.

Defendant Walden signed or authorized the signing of the Offering Documents filed with the SEC.

22.     Defendant Christine Dagousset ("Dagousset") was at the time of the IPO a Director of the Company.  Defendant Dagousset signed or authorized the signing of the Offering Documents filed with the SEC.

23.     Defendant Tricia Glynn ("Glynn") was at the time of the IPO a Director of the Company.   Defendant Glynn signed or authorized the signing of the Offering Documents filed with the SEC.

24.     Defendant Deirdre Findlay ("Findlay") was at the time of the IPO a Director of the Company.  Defendant Findlay signed or authorized the signing of the Offering Documents filed with the SEC.

25.     Defendant Janet Gurwitch ("Gurwitch") was at the time of the IPO a Director of the Company.  Defendant Gurwitch signed or authorized the signing of the Offering Documents filed with the SEC.

26.     Defendant Martha Morfitt ("Morfitt") was at the time of the IPO a Director of the Company.  Defendant Morfitt signed or authorized the signing of the Offering Documents filed with the SEC.

27.     Defendant David Mussafer ("Mussafer") was at the time of the IPO a Director of the Company.  Defendant Mussafer signed or authorized the signing of the Offering Documents filed with the SEC.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

28.     Defendant Emily White ("E. White") was at the time of the IPO a Director of the Company.  Defendant E. White signed or authorized the signing of the Offering Documents filed with the SEC.

29.     Defendant Michael White ("M. White") was at the time of the IPO a Director of the Company.  Defendant M. White signed or authorized the signing of the Offering Documents filed with the SEC.

30.     Defendant Paula Zusi ("Zusi") was at the time of the IPO a Director of the Company.  Defendant Zusi signed or authorized the signing of the Offering Documents filed with the SEC.

31.     Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussafer, E. White, M. White, and Zusi are sometimes referred to herein collectively as the "Individual Defendants."

32.     As managers, executive officers and/or major shareholders of the Company, the Individual Defendants participated in the solicitation and sale of Olaplex stock in the IPO for their own benefit and the benefit of Olaplex.  The Individual Defendants were key members of the IPO working group and executives of Olaplex who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

## SUBSTANTIVE ALLEGATIONS

### Background

33.     Olaplex was founded in 2014 and is headquartered in Santa Barbara, California.  Olaplex manufactures and sells hair care products.  The Company offers hair care shampoos and conditioners for use in treatment, maintenance, and protection of hair. Olaplex purports to participate in the "prestige segment" of the haircare market, which the Company claims is "expected to be the fastest growing segment of the global haircare market from 2020 to 2025."

34.     On August 27, 2021, Olaplex filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on September 29, 2021.

35.     On October 1, 2021, Olaplex filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

36.     Pursuant to the IPO, Olaplex issued 73,700,000 shares of its common stock to the public at the Offering price of $21.00 per share for approximate proceeds of $1,466,445,750 to the Company, after applicable underwriting discounts and commissions.

## **Materially False and Misleading Statements in the Offering Documents**

37.    In discussing the Company's brand, the Offering Documents stated, in relevant part:

### *Science-Backed Brand that Attracts a Loyal and Engaged Community*

We offer science-backed solutions that improve hair health and are trusted by stylists and consumers. We identify our consumers' most relevant haircare concerns in collaboration with our passionate and highly engaged community of professional hairstylists and consumers, and strive to address them through our proprietary technology and innovation capabilities. Our deep roots in the professional haircare community and strong ties with our global network of hairstylists creates a continuous feedback loop, providing unique insight into the hair health goals and concerns of our consumers. Our hairstylists are our strongest advocates; they have grown with our business since our founding in 2014, and through mutual support we have empowered them to connect with their clients and to champion our brand through an engaged and active social community. This community also provides insight into consumer needs and positions OLAPLEX to leverage our research and development platform to respond to consumers' demands for improved hair health by creating high-quality products that result in healthy, beautiful hair. Results have validated our approach. We believe that over 90% of our consumers think OLAPLEX products make their hair healthier, which we believe is among the highest ratings compared to competitors in this category. Moreover, we believe OLAPLEX's professional net promoter score of 71% as of April 2021 is the highest in our brand category and well above the average score in our category. ***The quality of our products, combined with our community-driven approach to engaging with both professional hairstylists and our consumers, have created a strong and loyal following for OLAPLEX that we believe provides a unique competitive advantage and foundation for growth***.

(Emphasis added.)

38.    Further, in discussing the Company's channel strategy, the Offering Documents stated, in relevant part:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

9

We have developed a cohesive and synergistic distribution strategy that leverages the strength of each of our channels, including the specific attributes of each channel as depicted below, and our strong digital capabilities that we apply across our omni-channel sales platform.

\*\*\*

Our professional channel, which includes both products used by hairstylists in-salon and products sold by hairstylists to consumers for use at home, comprised 55% of our 2020 total net sales and grew 59% from 2019 to 2020. The professional channel serves as the foundation for our brand, validating the quality of our products and influencing our consumers' purchasing decisions.

In 2018, as OLAPLEX continued to grow, we established our retail presence through expansion into the DTC channel and specialty retail channel (principally Sephora), both of which have continued to grow as we have developed our omni-channel platform. Our specialty retail channel grew 75% from 2019 to 2020, representing 18% of our 2020 total net sales. Our DTC channel, comprised of OLAPLEX.com and sales through third-party e-commerce platforms, grew 260% from 2019 to 2020, and represented 27% of our 2020 total net sales. This channel also provides us with the opportunity to engage directly with our consumers to help create a feedback loop that drives our decisions around new product development.

39.   Next, in discussing the Company's financial performance, the Offering Documents stated, in relevant part:

**Robust Financial Performance**

The strength of our business model and ability to scale have created a compelling financial profile characterized by revenue growth and very strong profitability over the past two years that we believe is among the best in our industry. Our net sales increased from $148.2 million in 2019 to $282.3 million in 2020, representing a 90% increase. Our net income decreased from $60.9 million in 2019 to $39.3 million in 2020, representing a 36% decrease, primarily as a result of interest expense on debt incurred in January 2020 upon the Acquisition (as defined herein), and our adjusted net income increased

from $100.5 million in 2019 to $131.1 million in 2020, representing a 30% increase. We have also experienced robust adjusted EBITDA growth over the past year, increasing our adjusted EBITDA from $100.5 million in 2019 to $199.3 million in 2020, representing a 98% increase, and an increase in our adjusted EBITDA margins from 68% in 2019 to 71% in 2020. We have continued to see strong momentum in our business, with net sales increasing from $99.6 million for the six months ended June 30, 2020 to $270.2 million for the six months ended June 30, 2021, representing an increase of 171%, and net income increasing from a net loss of $22.4 million for the six months ended June 30, 2020 to net income of $94.9 million for the six months ended June 30, 2021. Our adjusted EBITDA margins continue to be robust, remaining at 71% for the six months ended June 30, 2021.

40.     In discussing the Company's market opportunity, the Offering Documents stated, in relevant part:

### Haircare Represents a Large, Growing Market

Haircare represents a large, addressable market and presents significant opportunities for growth. In 2020, the market was sized at $77 billion globally and is expected to grow at a compound annual rate of ~6% from 2020 to 2025. OLAPLEX participates in the prestige segment of the market, which is expected to be the fastest growing segment of the global haircare market from 2020 to 2025.

### Consumers are Increasingly Focused on Health and Wellness

In particular, we focus on hair health, a key driver of our consumers' purchasing decisions. Our first area of focus was damaged hair, among the most important components of hair health, which we addressed through our proprietary bond building technology. We believe approximately 91% of U.S. women do something every day to damage their hair, such as coloring, chemical services, heat styling, washing and brushing, which we believe has driven strong demand for our bond-building products.

Several significant tailwinds support the long-term growth prospects of the haircare market. The way our consumers feel about their hair has a strong impact on how they perceive themselves; we believe that continued focus on

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

11

personal appearance and wellness will drive increased spend in the category. We believe consumers are also becoming increasingly health-conscious, generating a high demand for clean, technology-backed beauty products that achieve results, and that the importance of hair health has driven increased willingness among our consumers to invest in premium-quality products. Our offerings, which are able to deliver results after the first use, position us well to meet this rising consumer demand.

### Innovative, Consumer-Connected Brands Are Taking Share

As consumers increasingly demand high-performance, innovative solutions for hair health, we believe that the haircare industry is ripe for disruption. Heritage beauty brands have lost market share to innovative, consumer-connected brands that are more agile and better equipped to meet evolving consumer needs. According to Euromonitor, the top three haircare companies globally (by retail sales) have lost over 430 basis points of market share since 2015. This dynamic has created a significant opportunity for OLAPLEX to gain market share. Increasing focus on hair health also provides significant runway for future growth as we extend our product offering to focus on providing other haircare solutions.

41.     In discussing the Company's purported strengths, the Offering Documents stated, in relevant part:

### Beloved Brand with Passionate and Loyal Consumer Following

Our dedication to providing science-driven solutions has created an engaged consumer base that we believe advocates authentically for the quality of our products. Our unique relationship with stylists and active involvement with them through digital forums, OLAPLEX Pro App and as brand ambassadors has driven community engagement that has fostered loyalty among the consumer community as well. We continue to build loyal relationships with elite hairstylists and brand ambassadors who educate our consumers, test our products, participate in our brand campaigns and introduce our products to their clientele, and who have leadership influence and reach throughout the hairstylist community. We believe our products' quality and ability to deliver visible results after first use, coupled with our solutions-based product system, has led to deep penetration within the purchasing habits of our consumers. We

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

12

believe consumers who purchase at least one OLAPLEX product on average have purchased over 3.5 other products from our product suite in the last twelve months. We believe this broad cross-purchasing activity demonstrates that consumers are using our products as part of a broader haircare regimen.

Furthermore, our consumers have continued to engage with the OLAPLEX brand online. As of August 31, 2021, the OLAPLEX hashtag has been used over 12.3 million times across social media platforms by our community of professional hairstylists and consumers who create their own content about their haircare regimen. In the past year, we had exceptional engagement with our Instagram community of over 2 million followers as of July 31, 2021, which generated over 2.4 million likes and an average of approximately 13,000 story views a day. Our passionate consumer base is also demonstrated by our presence on TikTok where our videos have been viewed over 1.5 million times between April and September 2021, and, as of September 2021, videos using the OLAPLEX hashtag have been viewed over 350 million times since the hashtag first appeared on the platform.

*** 

### Synergistic Omni-Channel Strategy and Market Leadership Across Channels

Our integrated channel strategy across the professional, specialty retail and DTC channels creates a powerful feedback loop that reinforces consumer spending across channels. Our digital capabilities support each of our channels and provide us with direct touchpoints with our consumers. We believe that our professional channel provides credibility as a trusted source of product recommendation to our consumers, thereby supporting our specialty retail and DTC channels by serving as an introduction to our brand. We believe that approximately 35% of our consumers purchase OLAPLEX products after being introduced to the product by their hairstylist. Once this introduction is made, our consumers often begin purchasing our products through our specialty retail and DTC channels. We offer our retail partners a curated portfolio of highly productive products with incremental benefits, which contrasts starkly with many brands' broad assortments. Our specialty retail and DTC presence allows us to reach our consumers everywhere they shop, and drives revenue to professional hairstylists when clients seek professional-strength OLAPLEX treatments in the salon to complement at-

home use. This cycle has driven significant cross-channel shopping opportunities and is supported by our digital initiatives: for example, we believe nearly 50% of our customers that purchase product on OLAPLEX.com have also purchased OLAPLEX products in retail locations and 40% have also purchased in a salon. Our ability to succeed across channels is a hallmark of our business model. For example, in 2020, OLAPLEX was the #1 haircare brand at Sephora based on sales and five of our products were the best selling in their respective categories at Beauty Systems Group ("BSG"). In addition, we believe that during July 2021 our No. 0 + No. 3 kit and No. 5 solutions were two of the top ten haircare products sold on Amazon. Our global brand resonance and community of stylists allows us to leverage this integrated channel strategy internationally as well, with strong footholds within professional communities supported by presence in key specialty retailers and recent expansion into DTC.

42.     In discussing the Company's growth strategies, the Offering Documents stated, in relevant part:

***Grow Brand Awareness and Household Penetration***

There is significant opportunity to continue to grow brand awareness and educate consumers about OLAPLEX and the benefits of our solution-based regimen. We believe that only 45% of prestige haircare consumers have aided awareness of OLAPLEX compared to a competitor peer median of 69%. Additionally, we believe only 11% of overall beauty consumers surveyed at Sephora have aided awareness of the Olaplex brand. We further believe our powerful and highly-engaged digital community and network of brand advocates will allow us to reach new consumers rapidly. As of July 31, 2021, our digital community included more than 100 brand advocates, including licensed cosmetologists supporting our content creation, two professional-dedicated communities on social media consisting of over 230,000 hairstylists and several company-operated accounts including on Instagram, TikTok, Facebook and other social media platforms, where we have demonstrated robust followership and engagement. We plan to continue to grow our social media engagement by increasing our digital marketing spend and expanding our capabilities to interact with our consumers through OLAPLEX.com and other digital channels. We also plan to grow our brand awareness by continuing to deepen our relationships within the professional community.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

14

We believe these efforts to expand awareness and household penetration will enable the OLAPLEX brand to continue growing in the future.

***Continue to Grow OLAPLEX Through Existing Points of Distribution***

We plan to drive sustained growth in our core channels by increasing repeat purchase rates and brand awareness. As we have expanded, we have demonstrated our ability to drive continued growth with existing customers, as evidenced by our products generating a compound annual growth rate of 134% in sell-through sales from 2018 to 2020 in Sephora, which we believe to be well in excess of our competitors. In addition, our core products represented four of the top ten selling products at Sephora during June 2021. Within specialty retail, our low penetration levels among Sephora customers and relatively limited brand awareness provide us with strong growth opportunities in their existing locations. Within the professional channel, we intend to expand our consumer base of professional hairstylists by growing our brand ambassador community and increasing adoption of our professional-only offerings. Furthermore, within our DTC channel, we continue to see opportunities to enhance OLAPLEX.com, including our recently developed hair diagnostic platform to engage and educate our consumers. Since we began offering our online diagnostic platform in October 2020, over one million unique consumers have taken the OLAPLEX hair diagnostic test and shared their haircare needs with us.

43.     Finally, in discussing the Company' approach to competition, the Offering Documents stated, in relevant part:

The continued strength of our brand and products is based on our ability to compete with other companies in our industry. We compete primarily by:

- developing quality products with innovative performance features;

- educating consumers, retail customers and salon professionals about the benefits of our products;

- anticipating and responding to changing consumer, retail customer and salon professional demands in a timely manner, including the timing of new product introductions and line extensions;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

15

- offering products at compelling and accessible price points across channels and geographies;

- maintaining favorable brand recognition;

- developing and sustaining our relationships with our key customers;

- ensuring product availability through effective planning and replenishment collaboration with our customers;

- leveraging e-commerce, social media and the influence of our brand ambassadors and developing an effective omni-channel strategy to optimize the opportunity for consumers to interact with and purchase our products both on-line and in brick and mortar outlets;

- attracting and retaining key personnel;

- maintaining and protecting our intellectual property;

- maintaining an effective manufacturing and distributor network; and

- obtaining and retaining sufficient retail display and floor space, optimal in-store positioning and effective presentation of our products on retailer's shelves.

44.    The statements referenced in ¶¶ 37-43 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) macro-economic pressures and competition in the haircare market were more robust than the Company had

represented to investors; (ii) accordingly, the Company was unlikely to maintain its sales and revenue momentum; and (iii) as a result, it was unlikely that the Company would be able to achieve the financial and operational growth projected in the Offering Documents; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

### The Truth Begins to Emerge

45.     On September 29, 2022, a Piper Sandler analyst downgraded Olaplex to Neutral from Overweight, stating that her work revealed that "competition and misinformation pose growing risks to the company."  According to the analyst, calls to 150 hair salons across the U.S. suggest Olaplex could be losing a mid-to-high single digit percentage of share in salons, and other hair repair brands like K18 are rising in turn. Finally, the analyst indicated that she anticipated investments in marketing and education were needed to offset the headwinds and that "little room for valuation upside given the risks at play."

46.     On this news, Olaplex's stock price fell $1.33 per share, or 12.15%, to close at $9.62 per share on September 29, 2022.

47.     Then, on October 18, 2022, Olaplex issued a press release in which "the Company revised its guidance for the 2022 fiscal year".  Olaplex said it now expects fiscal year 2022 revenue between $704 million and $711 million, significantly down from

its prior guidance range of $796 million to $826M.  In addressing the revised guidance, the press release stated, in relevant part:

> The Company's updated guidance primarily reflects a slowdown in sales momentum that it attributes to macro-economic pressures, increased competitive activity including discounting, and a moderation in new customer acquisition, as well as inventory rebalancing across certain customers which the Company believes are in response to these same macro-economic pressures.
>
> JuE Wong, OLAPLEX's President and Chief Executive Officer, commented: "We are disappointed to lower our fiscal 2022 guidance. As an agile business, we have already identified and put actions in place to accelerate demand. We remain focused on executing our long-term growth strategy and are confident that our competitive advantages: our powerful brand, patent-protected science-based technology, proven innovation model, strong community of stylists and end-consumers, and synergistic omnichannel model, have us well positioned to navigate during this dynamic period and to be powerfully positioned in the future. Overall, we continue to expect fiscal 2022 to represent another significant year of strong growth, profitability and cash generation."

48.     On this news, Olaplex's stock price fell $5.55 per share, or 56.69%, to close at $4.24 per share on October 19, 2022.

49.     As of the time this complaint was filed, the price of Olaplex common stock continues to trade below the Offering price of $21.00 per share, damaging investors.

50.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Olaplex's securities, Plaintiff and other Class members have suffered significant losses and damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Olaplex common stock in the IPO or purchased Olaplex common stock thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO and were damaged thereby.  Excluded from the Class are Defendants, the officers and managers of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and managers of the Company have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable.   Since the IPO, the Company's securities have actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Olaplex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

19

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants as alleged herein;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Olaplex securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 11 of the Securities Act Against All Defendants)**

58.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

59.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

60.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

make the statements made not misleading, and omitted to state material facts required to be stated therein.

61.    Olaplex is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

62.    As issuer of the shares, Olaplex is strictly liable to Plaintiff and the Class for the misstatements and omissions.

63.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

64.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

65.    Plaintiff acquired Olaplex shares pursuant and/or traceable to the Offering Documents for the IPO.

66.    Plaintiff and the Class have sustained damages.  The value of Olaplex common stock has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

**(Violations of Section 15 of the Securities Act Against the Individual Defendants)**

67.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

68.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against the Individual Defendants.

69.     The Individual Defendants, by virtue of their offices, managership, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Olaplex within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Olaplex to engage in the acts described herein.

70.     The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

71.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 17, 2022                     Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

***Attorney for Plaintiff***