# EXHIBIT A

**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (SBN 270796)
rprongay@glancylaw.com
CHARLES H. LINEHAN (SBN 307439)
clinehan@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495

*Liaison Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement*
*System and the Proposed Class*

**LABATON SUCHAROW LLP**
CAROL C. VILLEGAS (*pro hac vice*)
cvillegas@labaton.com
IRINA VASILCHENKO (*pro hac vice*)
ivasilchenko@labaton.com
LISA M. STREJLAU (*pro hac vice*)
lstrejlau@labaton.com
DANIELLE IZZO (*pro hac vice*)
dizzo@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement System* ~~*And*~~

~~*and*~~ *Lead Counsel for the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE LILIEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>OLAPLEX HOLDINGS, INC., JUE WONG, ERIC TIZIANI, TIFFANY WALDEN, CHRISTINE DAGOUSSET, TRICIA GLYNN, DEIRDRE FINDLAY, JANET | No. 2:22-cv-08395-~~CAS-MAA~~<u>SVW(SKx)</u><br><br><u>CLASS ACTION</u><br><br><u>**REVISED** CONSOLIDATED CLASS</u><br> <u>ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u> |

GURWITCH, MARTHA MORFITT, DAVID MUSSAFER, EMILY WHITE, MICHAEL WHITE, ~~and~~ PAULA ZUSI, ADVENT INTERNATIONAL GPE IX LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-B LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-C LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-F LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-G LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-H LIMITED PARTNERSHIP ADVENT INTERNATIONAL GPE IX-I LIMITED PARTNERSHIP ADVENT INTERNATIONAL GPE IX-A SCSP, ADVENT INTERNATIONAL GPE IX-D SCSP, ADVENT INTERNATIONAL GPE IX-E SCSP, ADVENT INTERNATIONAL GPE IX STRATEGIC INVESTORS SCSP, ADVENT PARTNERS GPE IX LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-A LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX CAYMAN LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-A CAYMAN LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-B CAYMAN LIMITED PARTNERSHIP, MOUSSERENA, L.P., GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., BOFA SECURITIES, INC., EVERCORE GROUP L.L.C., JEFFERIES LLC, RAYMOND JAMES & ASSOCIATES, INC., COWEN AND COMPANY, LLC, PIPER SANDLER & CO., TRUIST SECURITIES, INC., TELSEY ADVISORY GROUP LLC, DREXEL HAMILTON, LLC, and LOOP CAPITAL MARKETS LLC

　　　　　Defendants.

**DEMAND FOR JURY TRIAL**

Courtroom: ~~8D~~10A
Judge: Hon. ~~Christina A. Snyder~~Stephen V. Wilson

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS MAA~~SVW(SKx)

**TABLE OF CONTENTS**

**Page**

I.  NATURE OF THE ACTION .......................................................... 1

II.  JURISDICTION AND VENUE .................................................... 8

III.  PARTIES ............................................................................... 8

    A.  Lead Plaintiff ................................................................... 8

    B.  Defendants ........................................................................ 9

        1.  The Corporate Defendant .......................................... 9

        2.  The Individual Defendants ......................................... 9

        3.  The Selling Stockholder Defendants ........................... 12

        4.  The Underwriter Defendants ....................................... 15

    C.  Relevant Third Parties ....................................................... 20

IV.  SUBSTANTIVE ALLEGATIONS ............................................... 21

    A.  History of Olaplex and Its Business .................................... 21

    B.  Brand Trust, Influencer Marketing, and Olaplex's Online Reputation Are Crucial to Its Success ................................ 26

    C.  Olaplex Is Required to Comply With Various U.S. and International Regulations Regarding Product Safety, Advertising, and Labeling ..................................................................... 33

    D.  In Late 2020, the E.U. Bans the Chemical Lilial ................. 35

    E.  Unbeknownst to Consumers and Investors, a Key Olaplex Product Contains Lilial, Prompting Olaplex to Quietly Remove the Ingredient Before the IPO Due to the E.U. Ban ............. 37

    F.  Olaplex's IPO ................................................................. ~~47~~46

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS MAA~~SVW(SKx)

i

G.    The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information ......... 4847

     1.    The Offering Documents Failed to Disclose and Misrepresented Significant Risks Regarding the Impact of Laws and Regulations on Olaplex's Business ................ 4948

     2.    The Offering Documents Contained Misstatements and Omissions About the Strength of Olaplex's Brand Reputation and Social Media Community Engagement ............ 57

     3.    The Offering Documents Contained Misstatements and Omissions About Competition and Related Risks ............ 65

     4.    The Offering Documents Contained Misstatements and Omissions About the "Clean" Nature of Olaplex's Products ... 7574

H.    Post-IPO Events Demonstrate That the Offering Documents Were Materially False and Misleading at the Time of the Offering ......... 8079

     1.    November 10, 2021 – Olaplex Reports First Post-IPO 3Q 2021 Quarterly Results ............ 80

     2.    In Early 2022, Olaplex's Social Media Community and the Market Focuses on the Lilial Issue ............ 8281

     3.    March 8, 2022 – Olaplex Reports 4Q and FY 2021 Quarterly Results ............ 87

     4.    May 11, 2022 – Olaplex Reports 1Q 2022 Quarterly Results ............ 9291

     5.    Negative Publicity Surrounding Olaplex and Lilial Continues Later in 2022 ............ 9493

     6.    August 9, 2022 – Olaplex Reports 2Q 2022 Quarterly Results ............ 9796

     7.    In Fall 2022, Olaplex's Brand Reputation Continues to Erode and Negative Press Escalates as Concerns Grow That Lilial and Other Ingredients in Its Products May Cause Hair Loss ............ 9897

8.    October 18, 2022 – Olaplex Provides Disappointing "Business Update" and Preliminary 3Q 2022 Quarterly Results ............................................................... ~~105~~104

9.    November 9, 2022 – Olaplex Reports 3Q 2022 Financial Results and Affirms Disappointing Sales Slowdown ............ ~~108~~107

10.    The Damage From the Lilial Issue to Olaplex's Brand Reputation and Related Legal and Financial Consequences Continue Into 2023 ............................................. ~~111~~110

V.    CLASS ALLEGATIONS ............................................................... ~~120~~119

VI.    CAUSES OF ACTION ............................................................... ~~122~~121

COUNT I FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT Against Defendant Olaplex, the Individual Defendants, and the Underwriter Defendants ............................................................... ~~122~~121

COUNT II FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT Against All Defendants ............................... ~~125~~124

COUNT III FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT Against the Selling Stockholder Defendants and the Individual Defendants ............................................................... ~~127~~126

VII.    PRAYER FOR RELIEF ............................................................... ~~128~~127

VIII.    JURY TRIAL DEMANDED ............................................................... ~~129~~128

Lead Plaintiff Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff"), individually and on behalf of a class of all similarly situated persons and entities, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, the investigation undertaken by Court-appointed Lead Counsel, Labaton Sucharow LLP, which included a review and analysis of: (i) regulatory filings made by Olaplex Holdings, Inc. ("Olaplex," or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company website and marketing materials; (iv) price and volume data for Olaplex common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former Olaplex employees; (viii) consultation with digital marketing, cosmetics industry, and other experts; and (ix) other publicly available material and data. Lead Counsel's investigation into the factual matters alleged herein continues, and many of the relevant facts are known only by the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.     NATURE OF THE ACTION

1.     Congress passed the Securities Act in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929. The Securities Act requires that those who sell securities to the investing public do so on the basis of accurate and fulsome disclosures. Further, the Securities Act creates liability for false and misleading statements made in connection with public securities offerings in order to protect investors and maintain confidence in our public markets.

2.      Defendant Olaplex is a luxury haircare products manufacturer whose success was, and is, heavily dependent on its brand reputation.  Further, Olaplex's publicly stated "mission," was "to inform and keep [consumers'] health front and center," and sell only products that were "clean,"—*i.e.*, free of any potential toxins or allergens.  As discussed herein, however, Olaplex had not been transparent with investors and consumers at the time of the Company's IPO[1] about significant safety risks posed by a chemical ingredient, which was banned in the European Union ("E.U.") due to its links to infertility, in one of Olaplex's key products.  Indeed, just a few months before Olaplex's IPO, the Company had quietly removed this problematic ingredient from this product in light of the E.U. ban, without disclosing any of this to investors or consumers.   Ultimately, this failure to operate transparently negatively impacted the Company's brand reputation, competitive position, and sales, which in turn lead to significant declines in Olaplex's stock price, and thus, significant losses to the Company's shareholders who purchased its stock in connection with the IPO.

3.      Olaplex describes itself as a premium haircare brand aimed at repairing damaged hair through its patented bis-aminopropyl diglycol dimaleate ("bis-amino") ingredient.  While the Company is based in California and the U.S. represents its largest market, Olaplex has a large international presence, selling its products world-wide.  Olaplex prides itself on its purported ability to grow sales through its active and loyal digital community, including through social media marketing, partnerships with hairstylists and salons, and relationships with key customers, like the cosmetics retailor Sephora.

4.      In August 2020 (prior to Olaplex's IPO), the E.U. amended its consumer protection regulations to ban the chemical butylphenyl methylpropional,

---

[1] The "IPO" or the "Offering" refers to Olaplex's initial public offering, conducted on or about September 29, 2021, in which it sold 84,755,000 shares of Olaplex common stock to the public at a price of $21 per share, including an underwriter overallotment of 11,055,000 shares (the "IPO," or the "Offering").

known as lilial, which is a fragrance ingredient used in cosmetics, due to significant safety concerns—specifically, studies showing that lilial is linked to infertility and risks to reproductive organs. The E.U. ban on lilial was set to take effect on March 1, 2022, just five months after Olaplex's IPO.

5. Unbeknownst to consumers and investors, the No. 3 Hair Perfector—Olaplex's self-proclaimed "*hero*"[2] product that was a best-seller for the Company, and thus, crucial to its bottom line—contained lilial. Accordingly, the E.U. ban on lilial required Olaplex to stop selling its No. 3 product containing lilial in the E.U. by March 1, 2022. While lilial was not banned in the U.S., Olaplex recognized the potential safety risks, and thus, reputational harm associated with using lilial in its products. Thus, in Spring 2021, Olaplex decided to reformulate its No. 3 product to remove lilial world-wide, which was not disclosed at this time. As confirmed by multiple sources, including the Company's later admissions and former Olaplex employees, this removal took place in June 2021, just three months before the IPO. Nevertheless, Olaplex also continued selling old stock of the No. 3 product that still contained lilial at the time of the IPO, and for months afterward, as it also later admitted.

6. Olaplex, however, did not inform investors or consumers alike that the Company had decided to remove this dangerous ingredient from its best-selling product, nor that it was still selling old stock containing it, despite prior assurances that Olaplex would prioritize transparency surrounding its ingredients and consumers' health. Because of this stark departure from Olaplex's stated mission, significant damage to the Company's brand reputation was inevitable. In particular, given Olaplex's heavy reliance on social media for its marketing and prior success, the Company's use of lilial put Olaplex at a much greater risk of social media backlash from its highly engaged digital community.

[2] Unless otherwise noted, emphasis is added throughout.

7. Despite this June 2021 product reformulation and the significant likelihood of reputational harm related to the Company's use of lilial in its purportedly "clean" products, the Offering Documents (as defined herein) did not disclose to investors any of these material, adverse facts about the lilial issue and its adverse impact on the Company's business. Instead, the Offering Documents vaguely warned of various *potential* future risks, including that Olaplex was subject to some unspecified international laws and regulations that "*could*" or "*may*" require it to reformulate a product to remove a problematic ingredient, and that such regulatory actions "*may*" or "*could*" negatively impact the Company's brand reputation and sales. However, the Offering Documents failed to disclose that such risks, in fact, had *already* materialized by the time of the IPO—*i.e.*, in the form of the E.U. ban on lilial that had prompted the Company to quietly remove the ingredient in its key No. 3 product shortly before the IPO—or were significantly likely to occur as a result of the ban—*i.e.*, the reputational damage and adverse impact on sales once consumers learned of the lilial issue.

8. Further, the Offering Documents misleadingly touted the strength of Olaplex's brand reputation and digital community engagement as key growth drivers and "competitive advantages"—without disclosing the already-existing lilial issue, which jeopardized the Company's positive social media presence and reputation, and therefore, competitive position and growth.

9. Additionally, the Offering Documents falsely represented that Olaplex products were "clean," when in fact its top product contained this chemical that the E.U. had classified as a *reprotoxic* substance—*i.e.*, it can be harmful to fertility and fetal development—as well as a skin allergen, which can lead to allergic reactions like scalp irritation, and ultimately, hair loss. Indeed, although Olaplex had reformulated the No. 3 product in June 2021, just a few months before the IPO, the

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

4

Company still sold old stock of the product containing lilial at the time of and for months after the IPO (as Olaplex later admitted).

10. The inevitable social media backlash related to Olaplex's use of lilial began to circulate on February 27, 2022 with a video posted on TikTok by a beauty influencer flagging the E.U. lilial ban and questioning the safety of Olaplex's products that had contained this ingredient. This video immediately went viral and ignited a furor across social media and related negative publicity calling attention to Olaplex's failure to inform consumers about the presence and removal of lilial in its No. 3 product. The Company immediately responded on social media and in the press, admitting that its No. 3 product had until recently contained lilial and attempted to do "damage control" as its brand image rapidly deteriorated. But it was too little, too late.

11. As this lilial news continued to spread online in the following days, the damage to Olaplex's brand reputation and credibility with consumers only continued to mount. Notably, on March 3, 2022, a group of consumers filed a class action lawsuit in Canada alleging that Olaplex had failed to inform them of significant safety risks with its No. 3 product due to the Company's use of lilial.

12. On March 8, 2022, Defendant Wong, Olaplex's Chief Executive Officer ("CEO"), directly addressed the lilial controversy on the Company's earnings call attempting to allay consumers' and investors' concerns. As analysts directly questioned her about the lilial issue's impact on the Company's sales, Defendant Wong noted that it was too soon to tell, but acknowledged that this was a key concern that Defendants were closely "monitoring" "from all angles" and "on all fronts."

13. The lilial issue continued to plague Olaplex in the ensuing months and inevitably led to waning demand for the Company's products as the negative social media reaction and publicity destroyed Olaplex's brand credibility and consumer

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

5

trust in the safety and efficacy of its products.  This consumer backlash, therefore, immediately began to impact sales, particularly as growing competition took advantage of this reputational fallout to steal customers from Olaplex.  Indeed, two former Olaplex employees confirm that the lilial issue, as compounded by intensifying competition, was a substantial factor in the Company's sales troubles that began in Spring 2022.

14.    The bad press and social media persisted in the summer of 2022, with publications like *Vogue Business*, for example, wondering if "***after viral infertility memes, can Olaplex bounce back?***" in discussing the brand's struggle with the lilial issue.  The article described the lilial controversy as an "***overnight disaster***" for the Company's reputation, noting that Olaplex's "viral marketing machine on social media," which was "core to the brand" was now "threatening it." Indeed, it quoted Defendant Wong as admitting that ***social media was "a double-edged sword"*** that could "'***elevate***'" *a company but also 'disrupt it.'*"  In fact, Olaplex's active digital community, which had turned against the Company after the lilial news, continued to disrupt it throughout 2022.  Olaplex customers increasingly began to complain online about hair damage and hair loss from using Olaplex products given reports that lilial was also an allergen that could cause such problems.  For example, in July 2022, Olaplex customers created a Facebook group called: "Olaplex Hair Loss/Hair Damage?" devoted to this topic, which rapidly gained thousands of members.

15.    The Company's reputational harm, slowing demand, and competitive pressures stemming from the lilial issue came to a head on September 29, 2022, when Piper Sandler analysts downgraded Olaplex shares due to the "risks" that increasing "competition and misinformation [*i.e.*, the lilial controversy and related customer complaints of hair loss]" posed to the Company.  Indeed, the analyst report attributed "***[t]he quick spread of misinformed infertility concerns arising from the lilial ingredient in No. 3***" to Olaplex's "~6%" stock drop "the day the issue was

brought to the public eye via social media."   The report also highlighted that Olaplex's competitors had capitalized on this persisting negative publicity to take market share from the Company.

16.   A few weeks later, on October 18, 2022, Olaplex held a business update call to discuss its preliminary financial results for the third quarter of 2022.  These results included a dramatic, continued sales slowdown, which the Company attributed in part to "increased competitive activity *and a moderation in new customer acquisition*[.]"  The Company also lowered its revenue guidance by *over $100 million* due to this waning consumer demand.  On this news, Olaplex's stock price fell nearly *57%* to close at $4.24 on October 19, 2022.

17.   Additional information regarding the severe impact of the lilial issue on the Company's reputation and sales continued to emerge in late 2022 and early 2023 as demand for Olaplex products continued to decline and manifest itself in deteriorating financial results.  Indeed, the Company's sales growth slowdown that began after the lilial news in early 2022 turned into an outright decline by early 2023, as illustrated in the following chart:

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

7



18.   Ultimately, in the wake of the lilial issue's reputational and financial fallout on the Company's business, Olaplex's stock plummeted **72.6%** from its offering price of $21.00 per share to close at $5.75 on November 17, 2022, the date that this action was filed.

## II.   JURISDICTION AND VENUE

19.   The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

20.   This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

21.   Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b), (c), and (d).   Many of the acts and transactions that constitute violations of law complained of herein, including the

dissemination to the public of untrue statements of material facts, occurred in this District.

22.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.    PARTIES

### A.    Lead Plaintiff

23.    As set forth in the Certification filed in this Action on January 17, 2023 (ECF No. 27-1), Lead Plaintiff ATRS purchased Olaplex common stock pursuant and traceable to the Offering Documents.  Lead Plaintiff purchased Olaplex common stock at a time when the only shares offered in the IPO were in the market.  Lead Plaintiff suffered damages as a result of the violations of the securities laws alleged herein.  In particular, Lead Plaintiff purchased Olaplex common stock pursuant and traceable to the Registration Statement, including 73,034 shares purchased in the IPO from Goldman Sachs & Co. LLC, at the IPO price of $21.00 and without commission because of the underwriting discount paid to Goldman Sachs & Co. LLC as a selling underwriter in connection with this sale, and has been damaged thereby.  On February 27, 2023, the Court appointed ATRS Lead Plaintiff in this Action (ECF No. 59).

### B.    Defendants

#### 1.    The Corporate Defendant

24.    Defendant Olaplex is a Delaware corporation headquartered at 1187 Coast Village Road, Suite 1-520, Santa Barbara, California, 93108.  Olaplex claims to be a premium, *i.e.*, luxury, haircare brand aimed at repairing damaged hair through its patented bis-amino ingredient.  Olaplex produces and sells a suite of eleven products, each of which contains its patented bis-amino formula, aimed at

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

9

protecting and rebuilding broken bonds in the fibers of hair damaged by natural and chemical wear and tear.  Olaplex's stock is listed under the ticker symbol "OLPX" and is traded on Nasdaq Global Select Market ("NASDAQ").

### 2.   The Individual Defendants

25.   Defendant JuE Wong ("Wong") was the CEO of Olaplex at all relevant times, including at the time of the IPO, and continuing through the present.  She became the CEO in January 2020 and was elevated to President, CEO, and member of the Board of Directors in August 2021.  Defendant Wong reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.  Before joining Olaplex, Defendant Wong gained significant experience in the beauty industry, leading cosmetics companies with a digital and technology-driven approach, including cosmetics companies like Moroccanoil Inc., Elizabeth Arden, and StriVectin.

26.   Defendant Eric Tiziani ("Tiziani") was the Chief Financial Officer ("CFO") of Olaplex at all relevant times, including at the time of the IPO, and continuing through the present.  Defendant Tiziani joined Olaplex in June 2021 and has served as CFO since August 2021.  Defendant Tiziani reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.  Before joining Olaplex, Defendant Tiziani served in various finance leadership roles, including most recently as CFO at Unilever, a global consumer products company, for over 21 years.

27.   Defendant Tiffany Walden ("Walden") was the Chief Operating Officer ("COO") of Olaplex at all relevant times, including at the time of the IPO.  Defendant Walden joined Olaplex in approximately 2016.  Defendant Walden reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.  On October 18, 2022, in the wake of significant negative publicity about Olaplex's products and disappointing financial

performance, Olaplex announced Defendant Walden's sudden resignation, effectively immediately.

28.    Defendant Christine Dagousset ("Dagousset") was the Chair of Olaplex's Board of Directors at all relevant times, including at the time of the IPO. Defendant Dagousset reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

29.    Defendant Tricia Glynn ("Glynn") was the Lead Director of Olaplex's Board of Directors and a Managing Director at Advent International Corporation at all relevant times, including at the time of the IPO. Defendant Glynn reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

30.    Defendant Deirdre Findlay ("Findlay") was a Director on Olaplex's Board of Directors at all relevant times, including at the time of the IPO. Defendant Findlay reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

31.    Defendant Janet Gurwitch ("Gurwitch") was a Director on Olaplex's Board of Directors and an Operating Partner at Advent International Corporation at all relevant times, including at the time of the IPO. Defendant Gurwitch reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

32.    Defendant Martha Morfitt ("Morfitt") was a Director on Olaplex's Board of Directors at all relevant times, including at the time of the IPO. Defendant Morfitt reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

33.    Defendant David Mussafer ("Mussafer") was a Director on Olaplex's Board of Directors and Chairman and Managing Partner of Advent International Corporation at all relevant times, including at the time of the IPO. Defendant

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

11

Mussafer reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

34.   Defendant Emily White ("E. White") was a Director on Olaplex's Board of Directors at all relevant times, including at the time of the IPO.  Defendant E. White reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

35.   Defendant Michael White ("M. White") was a Director on Olaplex's Board of Directors and a Principal at Advent International Corporation at all relevant times, including at the time of the IPO.  Defendant M. White reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.

36.   Defendant Paula Zusi ("Zusi") was a Director on Olaplex's Board of Directors at all relevant times, including at the time of the IPO.  Defendant Zusi reviewed and contributed to the Offering Documents and signed the Company's Registration Statement filed with the SEC.  Defendant Zusi's consulting firm, Global Retail Advisors, LLC, provides consulting to Advent International Corporation.

37.   Defendants Wong, Tiziani, Walden, Dagousset, Glynn, Findlay, Gurwitch, Morfitt, Mussaffer, E. White, M. White, and Zusi are collectively referred to hereinafter as the "Individual Defendants."

38.   Each of the Individual Defendants signed and participated in the preparation of the Offering Documents (as defined herein) and in the making of the materially inaccurate, misleading, and incomplete statements in the Offering Documents alleged herein.  Each of the Individual Defendants reviewed, edited, approved, and disseminated to investors the Offering Documents and the IPO's roadshow presentations, talking points, and scripts.  Along with the Underwriter Defendants, the Individual Defendants also conducted the roadshows to solicit the purchase of Olaplex's common stock in the IPO.  Each of the Individual Defendants

signed the Offering Documents, prepared and disseminated the Offering Documents and the IPO's roadshow materials, participated in the IPO, and solicited the purchase of Olaplex common stock in the IPO to serve their financial interests, as significant Olaplex stockholders, and those of the Company.

### 3.      The Selling Stockholder Defendants

39.      Defendant Advent International GPE IX Limited Partnership was a Selling Stockholder in the IPO.  Prior to the IPO, Advent International GPE IX Limited Partnership directly held 206,912,767 shares of Olaplex common stock.

40.      Defendant Advent International GPE IX-B Limited Partnership was a Selling Stockholder in the IPO.  Prior to the IPO, Advent International GPE IX-B Limited Partnership directly held 41,923,316 shares of Olaplex common stock.

41.      Defendant Advent International GPE IX-C Limited Partnership was a Selling Stockholder in the IPO.  Prior to the IPO, Advent International GPE IX-C Limited Partnership directly held 17,020,708 shares of Olaplex common stock.

42.      Defendant Advent International GPE IX-F Limited Partnership was a Selling Stockholder in the IPO.  Prior to the IPO, Advent International GPE IX-F Limited Partnership directly held 18,202,501 shares of Olaplex common stock.

43.      Defendant Advent International GPE IX-G Limited Partnership was a Selling Stockholder in the IPO.  Prior to the IPO, Advent International GPE IX-G Limited Partnership directly held 58,761,537 shares of Olaplex common stock.

44.      Defendant Advent International GPE IX-H Limited Partnership was a Selling Stockholder in the IPO.  Prior to the IPO, Advent International GPE IX-H Limited Partnership directly held 67,528,504 shares of Olaplex common stock.

45.      Defendant Advent International GPE IX-I Limited Partnership was a Selling Stockholder in the IPO.  Prior to the IPO, Advent International GPE IX-I Limited Partnership directly held 37,525,721 shares of Olaplex common stock.

46. Defendant Advent International GPE IX-A SCSp was a Selling Stockholder in the IPO. Prior to the IPO, Advent International GPE IX-A SCSp directly held 62,066,782 shares of Olaplex common stock.

47. Defendant Advent International GPE IX-D SCSp was a Selling Stockholder in the IPO. Prior to the IPO, Advent International GPE IX-D SCSp directly held 12,950,613 shares of Olaplex common stock.

48. Defendant Advent International GPE IX-E SCSp was a Selling Stockholder in the IPO. Prior to the IPO, Advent International GPE IX-E SCSp directly held 26,826,744 shares of Olaplex common stock.

49. Defendant Advent International GPE IX Strategic Investors SCSp was a Selling Stockholder in the IPO. Prior to the IPO, Advent International GPE IX Strategic Investors SCSp directly held 1,427,044 shares of Olaplex common stock.

50. Defendant Advent Partners GPE IX Limited Partnership was a Selling Stockholder in the IPO. Prior to the IPO, Advent Partners GPE IX Limited Partnership directly held 1,093,287 shares of Olaplex common stock.

51. Defendant Advent Partners GPE IX-A Limited Partnership was a Selling Stockholder in the IPO. Prior to the IPO, Advent Partners GPE IX-A Limited Partnership directly held 1,586,039 shares of Olaplex common stock.

52. Defendant Advent Partners GPE IX Cayman Limited Partnership was a Selling Stockholder in the IPO. Prior to the IPO, Advent Partners GPE IX Cayman Limited Partnership directly held 6,382,532 shares of Olaplex common stock.

53. Defendant Advent Partners GPE IX-A Cayman Limited Partnership was a Selling Stockholder in the IPO. Prior to the IPO, Advent Partners GPE IX-A Cayman Limited Partnership directly held 662,263 shares of Olaplex common stock.

54. Defendant Advent Partners GPE IX-B Cayman Limited Partnership was a Selling Stockholder in the IPO. Prior to the IPO, Advent Partners GPE IX-B Cayman Limited Partnership directly held 17,616,097 shares of Olaplex common stock.

55.    Defendants Advent International GPE IX Limited Partnership, Advent International GPE IX-B Limited Partnership, Advent International GPE IX-C Limited Partnership, Advent International GPE IX-F Limited Partnership, Advent International GPE IX-G Limited Partnership, Advent International GPE IX-H Limited Partnership, Advent International GPE IX-I Limited Partnership, Advent International GPE IX-A SCSp, Advent International GPE IX-D SCSp, Advent International GPE IX-E SCSp, Advent International GPE IX Strategic Investors SCSp, Advent Partners GPE IX Limited Partnership, Advent Partners GPE IX-A Limited Partnership, Advent Partners GPE IX Cayman Limited Partnership, Advent Partners GPE IX-A Cayman Limited Partnership, and Advent Partners GPE IX-B Cayman Limited Partnership are collectively referred to hereinafter as the "Advent Funds."

56.    Defendant Mousserena, L.P. (the "Mousse Partners")[3] was a Selling Stockholder in the IPO.  Prior to the IPO, the Mousse Partners directly held 43,873,479 shares of Olaplex common stock.

57.    Defendants the Advent Funds and the Mousse Partners are collectively referred to hereinafter as the "Selling Stockholders" or the "Selling Stockholder Defendants."  Prior to the IPO, the Selling Stockholders directly held and beneficially owned 622,359,934 shares of Olaplex common stock, or 96.1% of the total outstanding shares.  According to the Offering Documents, the Selling Stockholders sold 73,700,000 shares of Olaplex common stock at a price of $21.00 per share—prior to the full exercise of the Underwriter Defendants' (as defined *infra*) option to purchase and offer 11,055,000 additional shares—with the net proceeds going to them.  The purpose of the IPO was for the Selling Stockholder Defendants to substantially reduce their investment in Olaplex by selling their Olaplex shares to the investing public.  After the IPO, the Selling Stockholder

---

[3] Mousserena, L.P. is defined as Mousse Partners in the Offering Documents.

Defendants controlled 83% of the Company's common stock.  As a result, the Selling Stockholder Defendants controlled, and had significant influence over, the outcome of votes on all matters requiring approval of stockholders, including entering into significant corporate transactions.  Further, the Advent Funds exerted additional control and significant influence over the Company through their representatives—Defendants Glynn, Mussafer, and M. White.  As explained further above, Defendants Gurwitch and Zusi are also affiliated with the Advent Funds.

58.    Not only could the Selling Stockholder Defendants exert substantial influence over Olaplex due to their stock ownership, the Selling Stockholder Defendants exerted control over the Company by causing the Offering to occur.

59.    According to the Offering Documents, it was the Selling Stockholder Defendants that were "offering" the stock sold in the IPO.

**4.    The Underwriter Defendants**

60.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto.  Defendant Goldman Sachs acted as a representative for all of the underwriters.   In the IPO, Defendant Goldman Sachs was allocated 16,886,446 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

61.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto.  Defendant J.P. Morgan acted as a representative for all of the underwriters.  In the IPO, Defendant J.P. Morgan was allocated 14,137,489

shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

62.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto.  Defendant Morgan Stanley acted as a representative for all of the underwriters.   In the IPO, Defendant Morgan Stanley was allocated 14,137,489 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

63.    Defendant Barclays Capital Inc. ("Barclays") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto.   In the IPO, Defendant Barclays was allocated 8,639,577 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

64.    Defendant BofA Securities, Inc. ("BofA") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto.   In the IPO, Defendant BofA was allocated 3,158,571 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

65.    Defendant Evercore Group L.L.C. ("Evercore") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

17

Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Evercore was allocated 3,158,571 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

66.    Defendant Jefferies LLC ("Jefferies") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Jefferies was allocated 3,158,571 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

67.    Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Raymond James was allocated 3,158,571 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

68.    Defendant Cowen and Company, LLC ("Cowen") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Cowen was allocated 1,895,143 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

69.    Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering

Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Piper Sandler was allocated 1,895,143 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

70.   Defendant Truist Securities, Inc. ("Truist") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Truist was allocated 1,895,143 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

71.   Defendant Telsey Advisory Group LLC ("Telsey") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Telsey was allocated 631,714 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

72.   Defendant Drexel Hamilton, LLC ("Drexel Hamilton") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Drexel Hamilton was allocated 473,786 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

73.   Defendant Loop Capital Markets LLC ("Loop") was an underwriter for the IPO, serving as a financial advisor for, and assisting in, the preparation and

dissemination of the materially inaccurate, misleading, and incomplete Offering Documents, and solicited investors to purchase Olaplex stock issued pursuant thereto. In the IPO, Defendant Loop was allocated 473,786 shares of the Company's common stock, exclusive of the over-allotment option, to sell to the investing public.

74. Defendants Goldman Sachs, J.P. Morgan, Morgan Stanley, Barclays, BofA, Evercore, Jefferies, Raymond James, Cowen, Piper Sandler, Truist, Telsey, Drexel Hamilton, and Loop are collectively referred to hereinafter as the "Underwriter Defendants."

75. The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. The Underwriter Defendants' participation in the IPO, and their solicitation of purchases of Olaplex common stock in the IPO, was motivated by their financial interests. The Underwriter Defendants received over $93 million in fees and commissions in connection with their sale of Olaplex common stock in the IPO, including for the full exercise of the Underwriter Defendants' option to purchase and offer additional shares.

76. The Underwriter Defendants determined that in return for their share of the IPO's proceeds, they were willing to merchandise Olaplex common stock in the IPO. The Underwriter Defendants arranged for the roadshows prior to the IPO. During the roadshows, the Underwriter Defendants and the Individual Defendants met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

77. The Underwriter Defendants also demanded and obtained an agreement from Olaplex that the Company would indemnify and hold the Underwriter Defendants harmless against certain liabilities, including liabilities under the federal securities laws, and contribute to payments that the Underwriter Defendants may be required to make for such liabilities. The Underwriter Defendants also made certain

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

20

that Olaplex had purchased millions of dollars of Directors' and Officers' liability insurance.

78. The Underwriter Defendants assisted Olaplex and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking what is known as a "due diligence" investigation. The Underwriter Defendants were required to undertake the due diligence investigation in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Olaplex's operations and financial prospects.

79. In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's and the Selling Stockholders' lawyers, management, Directors, and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, Directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents, as detailed herein.

80. The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Lead Plaintiff and other members of the proposed Class.

### C.    Relevant Third Parties

81.    ~~CW-1 was the Chief Digital Officer at Olaplex from June 2017 until mid-2020.  He reported directly to the Company's leadership at the time (including then-majority shareholders and company founders, Dean and Darcy Christal, and, for a time, former President Rueben Carranza).[4]  CW-1 explained his responsibilities included overseeing all marketing efforts, including paid media, as well as product development.~~

81.    ~~82.~~ CW-~~2~~1 was a director at Olaplex from November 2018 through early 2023.  He oversaw product development, procurement, and sourcing, which includes bringing new products to market.[4]  CW-~~2~~1 indicated that, early in his employment, he reported directly to Defendant-CEO JuE Wong.  During the second half of his tenure, CW-~~2~~1 reported to Shah Nagree, current Senior Vice President of Operations at Olaplex, who reports to Defendant-CFO Eric Tiziani.

82.    ~~83.~~ CW-~~3~~2 was a manager at Olaplex beginning in approximately April 2022 through Fall 2022 and reported to Elisa Pospekhova, then Marketing Director for North America and APAC, who reported to Charlotte Watson, Chief Marketing Officer.  CW-~~3~~2 was responsible for managing Olaplex's marketing relationship with Sephora (and other retailers, to a lesser extent), including digital, ecommerce, and in-store marketing.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    History of Olaplex and Its Business

83.    ~~84.~~ Founded in 2014 in Santa Barbara, California, Olaplex is a premium, *i.e.*, luxury, haircare brand aimed at repairing damaged hair through its

---

[4]  ~~The Amended Complaint uses the pronoun "he" and possessive "his" in connection with former Olaplex employees to protect their anonymity regardless of their actual gender.~~

[4]  The Amended Complaint uses the pronoun "he" and possessive "his" in connection with former Olaplex employees to protect their anonymity regardless of their actual gender.

patented bis-amino ingredient.  Olaplex produces and sells a suite of eleven products—including shampoo, conditioner, and leave-in hair treatments—each of which contains its patented bis-amino formula, aimed at protecting and rebuilding broken bonds in the fibers of hair damaged by natural and chemical wear and tear. According to Olaplex, the Company offers science-backed solutions that improve hair health and are trusted by stylists and consumers.

84.    85.  Olaplex operates through three channels: (i) Professional; (ii) direct-to-consumer ("DTC"); and (iii) Specialty Retail.  These channels represented approximately 55%, 27%, and 18% of the Company's 2020 sales, respectively. First, through its Professional segment, Olaplex sells its products to hairstylists and beauty distributors for use on, and for sale to, consumers.  According to the Company, Olaplex developed this channel based on its research indicating that consumers were highly likely to purchase products recommended by their hairstylists.  Olaplex's two main distributors in the Professional channel are SalonCentric and Beauty Systems Group.  The Olaplex products sold through these and other distributors are not available through the Company's DTC and Specialty Retail channels.  Second, through the DTC segment, Olaplex sells its retail products online directly to consumers via the Company's website, Amazon, and other third-party sites.  Third, through the Specialty Retail segment, Olaplex sells its products to major cosmetics retail chains, including Sephora and Ulta Beauty.

85.    86.  Of Olaplex's eleven products, three (No. 1 Bond Multiplier; No. 2 Bond Perfector; and No. 4-1 Moisture Mask) are exclusive to Olaplex's Professional channel—meaning they can only be purchased through professional hairstylists. Olaplex began selling products in its Professional channel in 2014 and expanded into Specialty Retail and DTC in 2018.  In particular, Olaplex launched in Sephora in 2018 and subsequently became the fastest growing haircare brand in Sephora's history.  According to Olaplex, its "professional, specialty retail, and DTC channels

create[] a powerful feedback loop that reinforces consumer spending across channels." For example, consumers often purchase Olaplex products through its Specialty Retail channel following recommendations from stylists in the Company's Professional channel.

86. 87. By region, the U.S. is Olaplex's largest market, accounting for approximately 56% of the Company's sales in 2022. Nevertheless, Olaplex's international presence, which accounts for the remaining 44% of the Company's sales, spans over 100 countries and is concentrated in Western Europe—*i.e.*, countries that are part of the E.U. and the United Kingdom ("U.K."). Thus, Olaplex is subject to numerous international laws and regulations governing the cosmetics industry, including those of the E.U., as further discussed below.

87. 88. At the time of the IPO, Defendants attributed much of Olaplex's growth to its strong brand awareness, focus on distribution across multiple channels, international expansion, and product offering expansion. For example, the Offering Documents touted Olaplex's "dedication to providing science-driven solutions" as driving "community engagement that has fostered loyalty among the consumer community." The Company's relationships with third-party manufacturers and well-known retail partners, like Sephora and Ulta Beauty, were critical to Olaplex's expansion and distribution efforts.

88. 89. Olaplex's suite of products include the following:

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

24



Figure 4 Olaplex's Product Portfolio

OLAPLEX

Source: Olaplex Investor Presentation, September 2021

Of Olaplex's eleven different products, its No. 3 Hair Perfector, a pre-shampoo treatment aimed at repairing and preventing hair damage, is its most important one, as Defendants repeatedly told investors and analysts recognized.[5]  For example, on a February 28, 2023 earnings call, Defendant Wong described Olaplex's No. 3 Hair Perfector as its "*hero SKU*[,]" highlighting it as one of the Company's "*core products*" and noting the Company would "anchor" its marketing around this product.  She also stated that this product has "been very successful" for the Company in the past, and thus, "No. 3 needs to *remain top of mind*" for consumers. Indeed, on a March 8, 2022 earnings call, Defendant Wong touted that the No. 3 Hair Perfector was "*the best-selling prestige hair product*" in the U.S. in 2021, "[a]ccording to the NPD Group retail tracking data[.]"[6]  Likewise, numerous analysts—for instance, Raymond James in an October 25, 2021 analyst report and

---

[5] Olaplex does not publicly provide a breakdown of its sales by product.

[6] The NPD Group is a global market information company that provides data and analytics to businesses in the retail industry.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

25

J.P. Morgan in a November 21, 2022 analyst report—have referred to the No. 3 Hair Perfector as Olaplex's "best seller" or "best-selling" product.  Similarly, news publications focused on the beauty industry, like *Vogue Business*, for example, have also singled out the No. 3 product as crucial to Company's bottom line: "Olaplex's success has been driven by focusing on less than 10 [at that time] very effective products **with No. 3 among its best sellers**."[7]

89.   90.  Moreover, Olaplex's small product portfolio of only eleven products (currently), all focused exclusively on haircare, made it particularly vulnerable to any potential consumer demand problems.  For example, as explained by analysts from J.P. Morgan in an October 25, 2021 analyst report: "Risks to Rating and Price Target – Lack of Business Diversification: OLPX currently operates with one brand (Olaplex) in one category (haircare).  **As such, any damage to the equity of the brand** or a sudden deceleration in consumer demand for hair products **could have a disproportionately larger impact on OLPX's sales compared to beauty peers** (most of which generally operate with multi-brand portfolios in multiple categories)."  Thus, maintaining its brand equity was particularly critical for Olaplex's continued future success given this lack of product diversification.

90.   91.  Additionally, Olaplex repeatedly marketed itself to consumers and investors as a "clean" company whose products are free of any potentially toxic chemicals.  For example, Olaplex has described itself as "proud to be non-toxic, cruelty-free, **and free of all beauty industry toxins**."  Indeed, Olaplex's website adds that the Company's "**mission is to inform and keep your health front and center**." According to the Offering Documents, "[t]hese efforts are well recognized in the industry, with OLAPLEX being one of only 21 haircare brands accredited with the

---

[7] Kati Chitrakorn, *After viral infertility memes, can Olaplex bounce back?*, Vogue Business (June 22, 2022), https://www.voguebusiness.com/beauty/after-viral-tiktok-infertility-memes-can-olaplex-bounce-back.

'Clean at Sephora' designation, as of July 31, 2021."  Sephora's website explains that this designation means that a product is formulated without parabens, sulfates SLS (sodium lauryl sulfate) and SLES (sodium laureth sulfate), phthalates, mineral oils, formaldehyde, and other such toxins or allergens that have been linked to various safety concerns, and thus, restricted or banned by the E.U. and/or other countries.  Olaplex's website also states its products are "free of many common allergens."

91.    92. Taken together, these statements contributed to Olaplex's brand reputation as a "clean" cosmetics company that prioritized consumer safety and led its customers and the market to believe that Olaplex would be transparent about any potential toxins, allergens, sulfates, parabens, phthalates, phosphates, and similar additives in its products.

92.    93. Finally, although Olaplex was ostensibly the leader in the market for luxury haircare repair products, the cosmetics industry, including the haircare segment, is highly competitive.  Olaplex's main competitors include large multinational cosmetics companies that sell numerous other consumer and beauty products besides haircare, like L'Oreal S.A. and Unilever, and other smaller, independent brands, including recent market newcomers like K-18, who specialize in hair bond-building to repair damaged hair based on similar scientific solutions as Olaplex.

93.    94. At the time of the IPO, analysts recognized competition as a *potential* risk to Olaplex's business and future growth.  For example, an October 25, 2021 Barclays analyst report stressed the "[d]ownside [r]isks" of "[c]ompetition" to Olaplex's business, stating: "[W]e'd expect and anticipate others, including large well-capitalized beauty companies, will continue to innovate.  To the extent others are able to come out with products that are similarly efficacious, OLPX may have to increase its marketing and R&D spend beyond its existing plans."  Similarly, an

October 25, 2021 BofA analyst report flagged Olaplex's "[s]ingle-ingredient platform" as being "at risk to competition," explaining that Olaplex's "target for 3-4 new products per year is at risk of oversaturating the market with diminishingly differentiated products compounded by a proliferation of competitor products, many of which are already available for sale but at a drastic discount to Olaplex."  Cowen also recognized this possible risk in its October 25, 2021 analyst report classifying "competition in the market with the potential for new entrants and legacy players disrupting the market" as a "Key Risk Factor[] to Consider."

94.    95. Accordingly, at the time of the IPO, investors were highly focused on whether Olaplex could successfully fend off such intensifying competition to maintain the Company's leading competitive position and prior record sales growth. Therefore, any significant potential issues with Olaplex's products that could harm the Company's brand reputation and enable competitors to exploit to their advantage were important factors that investors were highly interested in at the time of the IPO.

### B.    Brand Trust, Influencer Marketing, and Olaplex's Online Reputation Are Crucial to Its Success

95.    96. Olaplex's brand image is focused on repairing and protecting hair from damage caused by chemical treatments, heat styling, and environmental stressors.  The brand is known for its patented bond-building technology that purportedly helps to restore and strengthen hair from the inside out, leaving it healthier, shinier, and more resilient.

96.    97. Prior to the IPO, Olaplex built a strong reputation and brand image based on innovation, effectiveness, and premium quality, with a strong focus on hair health and repair.

97.    98. Indeed, in the Offering Documents and numerous other public filings, Olaplex repeatedly touted its social media presence and community of stylists as being central to its growth and financial success.

98.   99. For example, according to the Offering Documents, "the OLAPLEX hashtag[8] has been used over 12.3 million times across social media platforms by [its] community of professional hairstylists and consumers."  In the Offering Documents, Olaplex similarly touted its social media presence, describing its status as a "[b]eloved [b]rand with [p]assionate and [l]oyal [c]onsumer [f]ollowing," particularly online, as key to its sales and marketing efforts.  The Offering Documents further illustrated this by noting Olaplex's purportedly "passionate consumer base" on newer social media platforms like TikTok:[9]

> Our dedication to providing science-driven-solutions has created an engaged consumer base that we believe advocates authentically for the quality of our products.  Our unique relationship with stylists and active involvement with them through digital forums, OLAPLEX Pro App and as brand ambassadors has driven community engagement that has fostered loyalty among the consumer community as well.  We continue to build loyal relationships with elite hairstylists and brand ambassadors who educate our consumers, test our products, participate in our brand campaigns and introduce our products to their clientele.  Our brand ambassadors also have leadership influence and reach throughout the hairstylist community which reinforces our brand positioning.

> ***

> ***Furthermore, our consumers have continued to engage with the OLAPLEX brand online.***  As of August 31, 2021, ***the OLAPLEX hashtag has been used over 12.3 million times across social media platforms by our community of professional hairstylists and consumers*** who create their own content about their haircare regimen.  In the past year, we had exceptional engagement with our Instagram community of over 2 million followers as of July 31, 2021, which generated over 2.4 million likes and an average of approximately 13,000 story views a day.  ***Our passionate consumer base is also***

---

[8] A hashtag is a word or phrase preceded by a hash sign (#), used on social media sites and applications to identify digital content on a specific topic, *e.g.*, #OLAPLEX.

[9] TikTok has become a very popular, and thus, powerful social media platform, receiving a staggering ***1.53 billion monthly users***, according to recent data. TikTok's popularity is due to a combination of factors, including its short-form video format, which has made it easy for people to create and share content, especially among younger audiences, as well as its algorithmic recommendation system, which uses machine learning to suggest videos to users based on their preferences and thus keeps them engaged on the platform.  For these reasons, TikTok has been a focus platform both for marketing and community building for global brands as it allows them to highlight their product features effectively, particularly to the younger audience, and relate to them.

*demonstrated by our presence on TikTok where our videos have been viewed over 1.5 million times* between April and September 2021, and, as of September 2021, videos using the OLAPLEX hashtag have been viewed over 350 million times since the hashtag first appeared on the platform.

99. ~~100.~~ The Offering Documents also highlighted that Olaplex's "*exceptional social media engagement*" contributes to its "*strong track-record of successful product launches*." For example, Olaplex's No. 0 product ranked as the #1 selling SKU at Sephora during the first weeks following its launch due to—according to Olaplex—the Company's "exceptional social media engagement[.]"

100. ~~101.~~ Further, the Offering Documents listed "Grow Brand Awareness" as the first of Olaplex's "Growth Strategies." In describing this growth strategy, the Company stated it would use its social media engagement to increase brand awareness, which would in turn contribute to continued future growth:

As of July 31, 2021, *our powerful digital community* include[d] more than 100 brand advocates, including licensed cosmetologists supporting our content creation, two professional-dedicated communities on social media consisting of over 230,000 hairstylists *and several company-operated accounts including on Instagram, TikTok, Facebook and other social media platforms, where we have demonstrated robust followership and engagement.* . . . We plan to continue to grow our social media engagement by increasing our digital marketing spend and expanding our capabilities to interact with our consumers through OLAPLEX.com and other digital channels.

101. ~~102.~~ Analysts similarly took note of Olaplex's focus on its digital community and reliance on social media for growing its brand reputation and marketing efforts as critical to its financial success. For example, an October 25, 2021 Barclays analyst report highlighted Olaplex's "digital community" as one of the Company's key features that set it apart from its competitors, noting that "the way Olaplex engages with and supports the professional stylist community *is highly differentiated versus other professional hair care brands*." The report explained that Olaplex's "digital community" includes "dedicated brand advocates, including licensed cosmetologists supporting content creation, two professional-dedicated communities on social media consisting of over 230,000 hairstylists and several

company-operated accounts including on Instagram, TikTok and Facebook."  The report also described Olaplex's "Olaplex Users" Facebook group as "the largest social media network community for hairstylists, consisting of 145K members, with ~12% of all stylists in the U.S. as members and 25% of users engaging daily."

102. 103. Similarly, an October 25, 2021 Piper Sandler analyst report included "*growing brand awareness*" among the "*biggest drivers of growth for OLPX*."  In the report, the Piper Sandler analysts specifically singled out Olaplex's "*superior social media presence vs. competitors (highest EMV[10] among haircare providers)*" as a key factor supporting the Company's "[s]trong [c]ompetitive [p]ositioning" and "[n]ice [g]rowth [t]rajectory."  Specifically, the report explained that the analysts had compared "the top 5 haircare brands from an EMV standpoint" and analyzed "how each compares on various media engagement platforms and web traffic."  The report found: "*Olaplex is the clear leader*, having 2.2M Instagram followers, 86.9K TikTok followers, 1.2M web visits to olaplex.com, and an average Google search ranking[11] over the last twelve months of 72/100."

103. 104. A Telsey analyst report, also dated October 25, 2021, added: "Olaplex markets through a community of eight celebrity stylists (as of June 2021), referred to as brand ambassadors.  Collectively, this influential group has over 4.5 million Instagram followers, with client rosters including Jennifer Aniston, Jennifer Lopez, Selena Gomez, and Gwyneth Paltrow."  The Telsey analysts similarly noted that "*Olaplex's growth strategy depends on increasing brand awareness*," writing that this was the number one of "[f]ive *key* growth strategies."  The report then explained that Olaplex's "*highly engaged digital community*" was important to

---

[10] In its analyst report, Piper Sandler defined EMV as "earned media value," *i.e.*, a measure of "engagement, or media buzz, with social media content that's related to a brand and created by a third party, such as an influencer."

[11] A Google search ranking demonstrates the probability of appearing on search engine result pages, *i.e.*, Google.  Thus, the higher the ranking, the more likely that this search will be seen by a larger audience.

"*continue to drive awareness*" of the brand, noting that "[t]his community is comprised of over 100 brand advocates, two professional-dedicated social media communities (over 230,000 stylists), and multiple company-operated Instagram, TikTok, and Facebook accounts." The report further elaborated on the centrality of social media to Olaplex's "brand building" efforts going forward as follows:

> Social media has enabled disruption throughout the beauty industry, in terms of: 1) proliferation of new brands; 2) importance of user-generated content (i.e., influencers and micro-influencers); and, 3) direct communication with consumers. *Given the visual nature of the beauty industry, Instagram, Facebook, YouTube, and TikTok are powerful channels.* How-to clips, before-and-after photo compares, and product comparisons are all continuously delivered in a steady stream of content. *Olaplex leverages the power of social media to its benefit,* partnering with influencers (both celebrity stylists and micro-influencers) to spread the word and power of its products. *We anticipate Olaplex continuing to successfully leverage all platforms* as a form of engagement, *brand building*, and communication.

104. ~~105.~~ Further, an October 25, 2021 BofA analyst report similarly noted that Olaplex has "*relied on low-cost social media and word of mouth to bear the brunt of traditional advertising*[,]" which the analysts believed contributed to Olaplex's "ab[ility] to achieve" the "rare" high "[a]djusted EBIDTA margins of 60%."

105. ~~106.~~ Likewise, a Morgan Stanley analyst report issued on the same date, stated:

> *Olaplex's success on social media has also helped fuel revenue growth.* The Olaplex hashtag has been used over 12.3 million times across social media platforms as of the end of the summer of 2021, the company has a following of over 2 million people on Instagram, its TikTok videos were viewed over 1.5 million times between April and September 2021; and videos using the Olaplex hashtag have been viewed over 350 million times.

106. ~~107.~~ Defendants continued to tout the importance of Olaplex's brand reputation and trust throughout and after its IPO. For example, on the Company's November 10, 2021 earnings call—the first time Olaplex addressed investors after the IPO—in response to analyst questions, Defendant Wong reiterated the importance of continuing to build trust with its online community, stating:

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

32

I think, what is important to note is, ***we are very focused on what really builds long-term growth***, and when studies have shown us that the three sources of truth, ***when it comes to brand building and marketing awareness***, first and foremost, is the – is – especially for hair, is where they want to take recommendations from their professional hair stylist. So building that community will continue to be our focus.

So with that said, the #2 area, the #2 source of truth, is product reviews and word of mouth, which is the third one, ***which means that we are already in that space through our social media engagement connection and conversion, with our performance marketing, whether it's via digital media or search engine optimization***.

We will continue all of this interactive tools to connect, engage and convert our customers. And if we continue to do that, the marketing, branding and the awareness build would just be a lot more organic as well as strategic because this is in partnerships, not only with what we are doing, but driving traffic to both online and offline retailers that we partner with.

***

I think, first and foremost, if you look at the Professional Beauty Association data, they will let you know that there are 800,000 professional health stylers, as registered with them. And we have well over 250,000 that is in a constant engagement and connection with us on our Facebook group, meaning that they are interacting with us. They are engaging with us. They are producing content for us. ***So we feel very strongly that, that continuous community built, will continue to serve us very well.***

107. 108. Indeed, multiple studies have confirmed that a company's reputation has substantial financial value. For example, research from Weber Shandwick—a leading global communications and marketing solutions firm—published on January 14, 2020, estimated that a company's corporate reputation accounts for ***63%*** of its market value. Similarly, another research report, titled "The 2018 UK Reputation Dividend Report,"[12] estimated that corporate reputation is now directly responsible for an average of 38% of market capitalization

---

[12] Reputation Dividend is a research firm specializing in reputation valuation by quantifying the value of a company's reputation based on statistical modeling. Reputation Dividend has worked with many large companies, including Aetna, Allstate, General Electric, Johnson & Johnson, MetLife, and Xerox. The cited report discusses the health of corporate reputation and its capacity to drive shareholder value in the UK's largest listed companies.

across the U.K.'s FTSE 350 Index[13]—a total of £1,062 billion (or U.S. $1,320 billion) of shareholder value.

108. ~~109.~~ Further, a company's *online* reputation is particularly important in today's digitalized world, where the internet plays a crucial role in people's lives. With over **5.1 billion** active Internet users and **4.7 billion** active social media users, the Internet has become a primary medium for sharing information.  Internet searches, *e.g.*, via Google or other top internet search engines, thus have become an essential tool for people researching everything from products to people.  A positive digital reputation, therefore, is critical because it often cements the first impression people have of a company or product.[14]

109. ~~110.~~ In turn, a negative online reputation can drastically affect a company's sales by damaging consumer trust.  Indeed, negative online reviews have a much wider reach, persist much longer, and "threaten product sales."[15] Specifically, consumers today frequently make judgments and purchasing decisions based on what they find online about the company and its products.  In fact, 54% of social media users use such platforms to research products and 71% of them are more likely to purchase products and services based on social media referrals.[16] Thus, when a consumer searches for a particular brand or product and finds negative

---

[13] "FTSE" stands for the Financial Times Stock Exchange, and the FTSE 350 Index is the U.K. equivalent of the U.S. S&P 500 Index.

[14] *See, e.g.*, Summit Ghimire, *Forbes*, "The Power of First Impressions: a Marketing Strategy That Optimizes Search for a Transformed Digital Landscape," (Mar. 11, 2022), *available at* https://www.forbes.com/sites/forbesbusinesscouncil/2022/03/11/the-power-of-first-impressions-a-marketing-strategy-that-optimizes-search-for-a-transformed-digital-landscape/?sh=6bfb3c0e159f.

[15] L. G. Pee, *Negative Online Consumer Reviews: Can the impact be mitigated?*, International Journal of Market Research 58(4):545 (July 2016).

[16] Chris Beer, *Social Browsers Engage with Brands,* GWI (June 13, 2018), *available at* https://blog.gwi.com/chart-of-the-day/social-browsers-brand/; Mike Ewing, *71% More Likely to Purchase Based on Social Media Referrals,* HUBSPOT (June 28, 2019), *available at* https://blog.hubspot.com/blog/tabid/6307/bid/30239/71-More-Likely-to-Purchase-Based-on-Social-Media-Referrals-Infographic.aspx.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

34

news articles, reviews, or social media commentary about it this makes the consumer hesitant to buy that product, which naturally leads to a decrease in the company's sales. Further, search engine algorithms often prioritize negative content, making an unfavorable narrative about a brand prominently visible on search engine results. Such a negative brand narrative amplified by the internet can also quickly become set in stone. The targeted nature of unfavorable content disseminated and amplified through the internet and social media can thus put a company's digital reputation in a state of crisis, and damages incurred by it can be compounded on a daily basis, long after the initial negative publicity first erupts.

110. ~~111.~~ Given this context—*i.e.*, Olaplex's heavy reliance on social media to cultivate and maintain its brand reputation—the Company was thus also particularly vulnerable to any reputational damage and resulting fallout on social media, wherein its active digital community could quicky turn on the Company. Indeed, as a June 22, 2022 *Vogue Business* article explained about the outcry that erupted on social media after a beauty influencer revealed Olaplex's lilial issue, as further detailed below, explained: "***Building a viral marketing machine on social media by leveraging key beauticians and hair stylist influencers was core to the brand***, and now they were threatening it." Further, the article quoted Defendant Wong admitting as much, stating: "'***The thing with social media is that it's a double-edged sword***,' Wong tells *Vogue Business* . . . '***It can elevate you***,' she says, but '***it can also be disruptive***.'"

C.    **Olaplex Is Required to Comply With Various U.S. and International Regulations Regarding Product Safety, Advertising, and Labeling**

111. ~~112.~~ As an international cosmetics manufacturer and distributor, Olaplex is governed by several regulators within the U.S. and internationally.

112. ~~113.~~ The Food and Drug Administration ("FDA") is one of the main governing bodies in the U.S. charged with regulating cosmetic products. More

broadly, the FDA is responsible for regulating the safety and efficacy of food, drugs, and cosmetics to protect public health. Thus, the FDA is the primary U.S. regulator that oversees the manufacturing and labeling of Olaplex's haircare products, which are designated as cosmetics.

113. 114. There are two FDA regulations that are of great importance to cosmetics manufacturers, like Olaplex: (i) the Food, Drug, and Cosmetic Act ("FDCA"); and (ii) the Fair Packaging and Labeling Act ("FPLA").

114. 115. The FDCA concerns the transparency and accuracy of information provided on the labels of products regulated by the FDA. Specifically, the FDCA is meant to ensure that products are not misbranded or falsely advertised. To accomplish these goals, the FDCA sets forth several packaging and labeling specifications, including requirements to display the name and place of business of the manufacturer on labels and to provide proper directions for a product's use.

115. 116. Additionally, the FPLA sets forth labeling requirements aimed at accurately identifying and describing consumer products and their ingredients. Pursuant to this statute, the FDA may promulgate various regulations to promote transparency by manufacturers to consumers.

116. 117. Despite the existence of these FDA regulations, cosmetics manufacturers in the U.S. are still left largely unsupervised when bringing products to market. Notably, manufacturers, like Olaplex, are not required to seek FDA approval prior to developing and marketing cosmetic products.

117. 118. In fact, the FDA does not require cosmetics manufacturers to provide any product development or testing information, such as product formulas or ingredient test results, before bringing cosmetic products to market. Thus, U.S. consumers are left with no choice but to depend on companies to manufacture and sell safe products, and to label products in a transparent, truthful manner.

118. 119. In addition to the FDA, various other regulatory entities in the U.S. govern cosmetics companies like Olaplex. For example, the U.S. Occupational

Safety and Health Administration ("OSHA") oversees working environments to ensure safe working conditions for laborers.  OSHA has promulgated rules to protect workers in manufacturing facilities to ensure workers are aware of the chemicals and ingredients they are exposed to when manufacturing consumer products.   For example, OSHA requires manufacturers and distributors to provide workers with Safety Data Sheets explaining the ingredients involved in the product manufacturing process and identifying any safety risks associated with those ingredients. [17]

119.  ~~120.~~ This mosaic of U.S. regulations is not particularly rigorous in preventing hazardous products or chemicals from entering the consumer market. Much of the compliance oversight is left to companies' good faith efforts to comply with the regulations.  Indeed, regulatory action in the U.S. is often retroactive in the form of recalls and subsequent bans.

120.  ~~121.~~ In contrast, the E.U. (and other countries), have taken a more stringent approach to regulating consumer food, drugs, and cosmetic products. Indeed, the E.U. has banned over 2,500 chemicals from cosmetics, while the U.S. has only banned about eleven.

121.  ~~122.~~ As a result of these efforts, the E.U. has acted as the global leader for product safety in the food, drugs, and cosmetics industry, prompting many companies world-wide, including in the U.S., to look to the E.U. for best practices.

**D.     In Late 2020, the E.U. Bans the Chemical Lilial**

122.  ~~123.~~ The E.U. has the authority to implement bans on certain chemicals from consumer products pursuant to the Classification, Labelling and Packaging

[17] OSHA's Hazard Communication Standard (29 CFR 1910.1200 *et seq.*) requires manufacturers and distributors of products containing chemicals to provide Safety Data Sheets that list all ingredients and include information about each chemical and its corresponding hazards.  For example, the OSHA Hazard Communication Standard provides, in relevant part: "If the chemical manufacturer, importer or employer preparing the safety data sheet becomes newly aware of any significant information regarding the hazards of a chemical, or ways to protect against the hazards, this new information shall be added to the safety data sheet within three months." *Id*.

("CLP") Regulation ((EC) No 1272/2008).  The CLP requires manufacturers, like Olaplex, to classify, label, and package hazardous chemicals appropriately before placing products containing the hazardous chemicals on the market.

123.  124. Much of the E.U.'s CLP regulatory decision-making is based on research and investigation by the E.U. Commission for the Scientific Committee on Consumer Safety ("SCCS").  The SCCS is the E.U. government body responsible for addressing, "questions concerning health and safety risks (notably chemical, biological, mechanical and other physical risks) of non-food consumer products (for example *cosmetic products and their ingredients* . . . )."  This scientific committee provides E.U. regulators with the testing and scientific analysis needed to promulgate rules concerning consumer safety and public health.  Accordingly, similar to the U.S. government's reliance on FDA research and findings in promulgating new regulations, the E.U. often bases its regulatory actions on SCCS studies and conclusions.

124.  125. On May 10, 2019, the SCCS issued a final opinion[18] on its investigation into the safety of a chemical called butylphenyl methylpropional, *i.e.*, lilial, which is used as a fragrance in cosmetics and other consumer products.

125.  126. This opinion addressed two questions: (i) "[d]oes the SCCS consider Butylphenyl methylpropional (p-BMHCA) safe for use as a fragrance ingredient in cosmetic leave-on and rinse-off type products . . . ?;" and (ii) "[d]oes the SCCS have any further scientific concerns with regard to the use of Butylphenyl methylpropional (p-BMHCA) as a fragrance ingredient in cosmetic leave-on and/or rinse-off type products?"

126.  127. To answer these questions, the SCCS analyzed the results of animal testing, assessments of the chemical specifications of lilial, and a

---

[18] The referenced opinion, titled, "Opinion on the safety of Butylphenyl methylpropional (p-BMHCA) in cosmetic products – Submission II," can be found at: https://health.ec.europa.eu/system/files/2021-08/sccs_o_213_0.pdf.

toxicological evaluation of lilial.  As part of the testing, male and female rats were repeatedly exposed to lilial in measured concentrations.  As a result of this exposure, scientists identified effects on both the male and female reproductive organs that negatively impacted their performance and signaled infertility risks.  Additionally, the SCCS reviewed chemical and toxicological evaluations of the chemical, which included clinical study results.

127.  128. Based on these studies, the SCCS concluded that lilial posed a risk of "*reproductive toxicity*" to humans.  For these reasons, the SCCS concluded in its report that "aggregate exposure" to lilial by consumers "*cannot be considered as safe*."

128.  129. The opinion also noted that lilial was a proven skin allergen to humans, meaning that it can cause skin irritation upon contact, noting: "[M]ainly based on clinical studies, the SCCS considers [lilial] as an 'established contact allergen in humans', an opinion it has held since 2012 (SCCS, 2012)."

129.  130. Allergic reactions in response to such allergens in hair products can cause scalp irritation or inflammation, and, if the irritation persists, it can damage hair follicles and *cause hair loss*.  For example, according to dermatologists, "if the scalp gets inflamed enough from the use of a cosmetic product, hair loss can certainly be a symptom."[19]    Further, skin irritants can cause allergic contact dermatitis, which can lead to extreme hair loss.[20]

130.  131. In August 2020, after the SCCS concluded that lilial was unsafe because of its links to infertility risks, the E.U. exercised its power under the CLP to amend the regulation and ban lilial from consumer products given these safety

---

[19] *Your Conditioner Could Actually Be Causing Hair Loss,* INSTIKS MAGAZINE (Jan. 6, 2017), *available at* https://instiks.com/your-conditioner-could-actually-be-causing-hair-loss/.

[20] Anotella Tosti, *Telogen Effluvium After Allergic Contact Dermatitis of the Scalp,* JAMA (Feb. 2001), *available at* https://jamanetwork.com/journals/jamadermatology/fullarticle/478194.

concerns.    Specifically, this August 2020 amendment classified lilial as a "*reprotoxic*" substance—meaning that it can be harmful to fertility and fetal development—and, as a result, banned lilial from use in cosmetic products in the E.U., effective March 1, 2022.

131.  132. The U.K. subsequently took similar action against lilial by setting an October 15, 2022 deadline for U.K. companies to stop distributing products containing lilial into the market, and a December 15, 2022 deadline for removing all products containing lilial off the shelves in the U.K.  Thus, Olaplex's No. 3 product would no longer be able to be sold in its formulation that contained lilial in the E.U. or U.K. after March 1, 2022 and December 15, 2022, respectively.

**E.  Unbeknownst to Consumers and Investors, a Key Olaplex Product Contains Lilial, Prompting Olaplex to Quietly Remove the Ingredient Before the IPO Due to the E.U. Ban**

132.  133. Unbeknownst to consumers and investors before the IPO, Olaplex's No. 3 product—which, as explained above, was its "hero" best-selling product crucial to Olaplex's financial success—contained the problematic ingredient, lilial, which was subject to the impending E.U. ban.

133.  134. Just a few months before the IPO, Olaplex quietly removed lilial from its No. 3 product as the E.U. ban deadline on lilial loomed.  Notably, the Offering Documents made no mention of the prior use of lilial in Olaplex's products, the product reformulation to remove lilial from the No. 3 product, the E.U.'s impending lilial ban effective March 1, 2022, or the resulting likely potential adverse impact of these issues on the Company's sales and financial prospects.

134.  135. Specifically, according to the following screenshot of the list of ingredients on the label for the No. 3 Hair Perfector posted on the Olaplex website, as of April 15, 2021 (approximately five months before the IPO), Olaplex was still manufacturing and making available for purchase its No. 3 Hair Perfector with lilial as an ingredient.[21]

[21] The information and images in this section have been identified using the digital archive service, The Wayback Machine, which periodically archives



135.  136. Just a few months later, no later than August 13, 2021[22] (approximately six weeks before the IPO), Olaplex had updated the ingredient list in the label for the No. 3 product on its website to remove lilial as an ingredient, as follows:

digital archive service, The Wayback Machine, which periodically archives webpages. Specifically, this webpage was archived on April 15, 2021; thus, this screenshot accurately depicts the webpage as of that date.

[22] Similarly, this webpage was archived by The Wayback Machine on August 13, 2021; thus, this screenshot accurately depicts the webpage as of that date.



136. ~~137.~~ Olaplex's Safety Data Sheets published on its website (as is required by law, 29 CFR 1910.1200 *et seq.*) confirm the same. In an earlier version of the Safety Data Sheet for Olaplex's No. 3 product that was previously posted on the Company's website (at least until April 20, 2021, per The WayBack Machine), and was "Updated: March 31, 2020", lilial (*i.e.*, butylphenyl methylpropional) is listed as an ingredient in the sheet's "complete ingredient list" under "Section 3 – Composition/Information on Ingredients," as follows:

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

42

SAFETY DATA SHEET –Finished Product.                    Page 1 of 5

SECTION 1 - IDENTIFICATION

Finished Product Name:
Product identifier
Product Name                OLAPLEX NO.3 HAIR PERFECTOR

Other means of identification
Product Code                5457035MV31082
Synonyms                    None
Company Name:    Olaplex, Inc.

Address:        1187 Coast Village Road, Suite #1-520
                Santa Barbara, 93108
Phone:          805-565-1269

In case of medical emergencies, please contact your local poison control center.
Transportation emergency (24 hour), contact:
CHEMTREC - Phone # 1-800-565-9300

Date: June-2014                        Updated: March 31,2020

SECTION 2 - HAZARDS IDENTIFICATION

EMERGENCY OVERVIEW:
This is a personal care or cosmetic product that is safe for consumers and other users under intended and reasonably foreseeable use.

POTENTIAL HEALTH EFFECTS:
Eye: Contact may cause mild, transient irritation. Some redness and/or stinging may occur.

Skin: Not expected to be irritating, sensitizing, photoallergenic or phototoxic when used as intended. If irritation occurs following intended use or prolonged contact it is expected to be mild and transient.

Inhalation: Not expected to be irritating to the respiratory system. Not volatile therefore limited inhalation exposure anticipated.

Ingestion: Product used as intended is not expected to cause gastrointestinal irritation. Accidental ingestion of undiluted product may cause mild gastrointestinal irritation with nausea, vomiting and diarrhea.

SECTION 3 - COMPOSITION/INFORMATION ON INGREDIENTS

The complete ingredient list for the finished product(s) is as follows:
Water (Aqua), Bis-Aminopropyl Diglycol Dimaleate, Propylene Glycol, Cetearyl Alcohol, Behentrimonium Methosulfate, Cetyl Alcohol, Phenoxyethanol, Glycerin, Hydroxyethyl Ethylcellulose, Stearamidopropyl Dimethylamine, Quaternium-91, Sodium Benzoate, Cetrimonium Methosulfate, Cetrimonium Chloride, Fragrance (Parfum), Polyquaternium-37, Tetrasodium EDTA, Butylphenyl Methylpropional, Etidronic Acid, Ascorbic Acid, Phytantriol, Tocopheryl Acetate, Aloe Barbadensis Leaf Juice, Panthenol, Simmondsia Chinensis (Jojoba) Seed Oil, Citric Acid, Potassium Sorbate

The product(s) does not contain ingredients considered hazardous as defined by OSHA, 29 CFR 1910.1200 and/or WHMIS under the HPA.

137. 138. However, Olaplex's Safety Data Sheet for its No. 3 product that is *currently* posted on its website, which stated that it was "Updated: ***June 27, 2021***," *omits* lilial, *i.e.*, butylphenyl methylpropional, as an ingredient in the sheet's "complete ingredient list," shown below:

SAFETY DATA SHEET –Finished Product

SECTION 1 - IDENTIFICATION

Finished Product Name:
Product Identifier
Product Name                    OLAPLEX NO.3 HAIR PERFECTOR

Other means of identification
Product Code                    5467035MV/31082
Synonyms                        None
Company Name:   Olaplex, Inc.
Address:        1187 Coast Village Road, Suite #1-520
                Santa Barbara, 93108
Phone:          805-565-1269

In case of medical emergencies, please contact your local poison control center.
Transportation emergency (24 hour), contact:
CHEMTREC - Phone # 1-800-565-9300

Date: June-2014                         Updated: June 27, 2021

SECTION 2 - HAZARDS IDENTIFICATION

EMERGENCY OVERVIEW:
This is a personal care or cosmetic product that is safe for consumers and other users under intended and reasonably foreseeable use.

POTENTIAL HEALTH EFFECTS:
Eye: Contact may cause mild, transient irritation. Some redness and/or stinging may occur.

Skin: Not expected to be irritating, sensitizing, photoallergenic or phototoxic when used as intended. If irritation occurs following intended use or prolonged contact it is expected to be mild and transient.

Inhalation: Not expected to be irritating to the respiratory system. Not volatile therefore limited inhalation exposure anticipated.

Ingestion: Product used as intended is not expected to cause gastrointestinal irritation. Accidental ingestion of undiluted product may cause mild gastrointestinal irritation with nausea, vomiting and diarrhea.

SECTION 3 - COMPOSITION/INFORMATION ON INGREDIENTS

The complete ingredient list for the finished product(s) is as follows:
Water (Aqua), Bis-Aminopropyl Diglycol Dimaleate, Propylene Glycol, Cetearyl Alcohol, Behentrimonium Methosulfate, Cetyl Alcohol, Phenoxyethanol, Glycerin, Hydroxyethyl Ethylcellulose, Stearamidopropyl Dimethylamine, Quaternium-91, Sodium Benzoate, Cetrimonium Methosulfate, Cetrimonium Chloride, Fragrance (Parfum), Polyquaternium-37, Tetrasodium EDTA, Benzyl Benzoate, Chloride Acid, Ascorbic Acid, Phytantriol, Tocopheryl Acetate, Aloe Barbadensis Leaf Juice, Panthenol, Simmondsia Chinensis (Jojoba) Seed Oil, Citric Acid, Potassium Sorbate

The product(s) does not contain ingredients considered hazardous as defined by OSHA, 29 CFR 1910.1200 and/or WHMIS under the HPA.

**Removing Lilial**

Thus, shortly before the IPO, in June 2021, and unbeknownst to consumers or investors, Olaplex had quietly removed lilial from its No. 3 product in response to the E.U.'s forthcoming ban.

138. ~~139.~~ Indeed, Olaplex later admitted that it removed lilial from the No. 3 product shortly before the Company's IPO. Specifically, in Olaplex's 1Q 2022

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

44

10-Q, publicly filed on May 11, 2022, about seven months after the IPO, Defendants confirmed that the reformulation of its No. 3 product occurred in June 2021—three months before the IPO:

> Our cost of sales increased $20.5 million or 83.5% to $45.0 million in the three months ended March 31, 2022 from $24.5 million in the three months ended March 31, 2021, due to a $16.9 million increase driven by a growth in sales volume, *a $4.3 million increase due to the inventory write-off and disposal costs related to unused stock of a product that the Company reformulated in June 2021 as a result of regulation changes in the E.U.  In the interest of having a single formulation for sale worldwide, the Company reformulated on a global basis and is now disposing of unused stock.*  In addition, cost of sales was partially offset by a $0.7 million decrease in the amortization of our acquired patented formulations.

139. ~~140.~~ Olaplex, however, also continued selling old stock of the No. 3 product that still contained lilial after this June 2021 reformation—including at the time of the IPO and for months afterwards.  Specifically, as further detailed below, Olaplex admitted in March 2022, that it still sold such old stock with lilial at least until January 2022.

~~141. Moreover, former employees at Olaplex confirm that the Company knew about and was actively monitoring the E.U. position on lilial due to safety concerns about the chemical long before the Company's IPO and began phasing out the ingredient from its products in Spring 2021 in response to the E.U. ban.~~

~~142. For example, CW-1, Olaplex's former Chief Digital Officer (until mid-2020 as described above), stated that he was aware of the controversy involving the ingredient lilial.  Specifically, CW-1 recalled that the issue with lilial first came to Olaplex's attention through litigation in Germany in approximately Q2 2019.  CW-1 added that the litigation was a warning that E.U. regulators may see lilial as a problem and seek to regulate or ban it.  CW-1 explained that senior leadership would have been aware of regulatory issues in Europe, and that Olaplex used a compliance and oversight consulting firm based in the Netherlands, called the Obelis Group, to assist with these types of issues.  CW-1 further elaborated that the Company took its~~

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

45

lead regarding product formulations from its largest retailers, specifically naming Sephora as the company that brought the lilial issue to Olaplex's attention. CW-1 confirmed that Olaplex's leadership team and manufacturers were kept aware of these issues.

143. Indeed, according to CW-1, the controversy over lilial would definitely have impacted the Company's marketing and sales. CW-1 noted that it is hard for companies to stay at the top in competitive markets, *and that competitors will attack the top brand on any issue they can.* CW-1 elaborated that *any potential issues regarding ingredients, any issue that causes people to say "look!", can have a serious sales impact.* CW-1 added that there was a saying in the hair and cosmetics industry that its primary ingredient is "hope;" that is, the companies sell the hope that their products will work for customers. CW-1 acknowledged that Olaplex's active ingredient didn't really work, either — he indicated that it only slightly changed the way hair would feel — but these products are marketed to make people believe that they will help.

140. 144. The Further, the account of another a former employee who worked at Olaplex *before and after the IPO* confirms that Olaplex removed the lilial ingredient from its No. 3 product before the IPO due to the E.U. ban and that the negative publicity about Olaplex's use of lilial in early 2022 subsequently materially affected Olaplex's sales in 2022.

141. 145. Specifically, CW-21, a director at Olaplex from November 2018 through early 2023 who oversaw product development, procurement, and sourcing as described above, indicated that he was familiar with the issues involving the ingredient lilial. Specifically, CW-21 stated that approximately in March 2021 (one year before the E.U. ban took effect and six months before the IPO), he was informed by a regulatory manager, whose name and exact title he could not recall but believed was a Senior Manager of Regulatory Affairs, that lilial needed to be removed as an ingredient from Olaplex's products. CW-21 recalled that he was

informed of the change in a group email.  CW-21 explained this was implemented as a "soft change," meaning Olaplex could use up its existing supply of the ingredient before phasing it out.  CW-2-1 added that it was a soft change because lilial was not banned in the U.S., which was Olaplex's largest market, so the Company could use up its existing supply before changing the formula without a problem.

142.  146. CW-21 further explained that the only real cost of implementing the removal of lilial was scrapping and reprinting the labels, since the Company could use up its existing supply before re-formulating.  CW-21 added that reformulating the product was easy, since the Company could simply remove lilial from the formula, as it was used only as a fragrance additive and not a main ingredient for the hair treatment itself.

143.  147. CW-21 further recalled that the lilial issue arose again, after the controversy about the ingredient began appearing in social media.  CW-21 described the response to the issue at that time as a *"fire drill."*[23]

144.  148. CW-21 further recalled that he started seeing *softer demand for Olaplex's products, and a drop-off in sales, in approximately Q2 of 2022*.  CW-21 added that his assessment of the softening sales in Q2 of 2022 was based on comparison to both Q2 of the previous year (2021) as well as observing month-to-month orders.  CW-21 noted that Olaplex had an entire team devoted to analyzing this information, called Planning and Inventory, in addition to its Financial Planning & Analysis staff.  Additionally, CW-21 stated that CEO Wong, Chief Transformation Officer Juliane Park, and former Chief Operating Officer Tiffany Walden, would know details regarding the impact that the lilial controversy had on sales, as they and their teams watched those figures.

---

[23] CW-21 noted that, at the time of the soft change in early 2021, he was responsible for managing that part of Olaplex's supply chain in his role as a director in Logistics.  When the issue hit social media, CW-21 advised, he was no longer responsible for managing the supply of ingredients in his role as a director in Operations.

145.   149. CW-21 also noted that every month, until 2022, he was required to increase production in order to meet increased sales demand.  CW-21 added that until his last year with the Company, he never needed to make less product from one month to the next.  In his last full year with the Company, 2022, however, CW-21 observed that suddenly Olaplex's customers were all overstocked on inventory.  According to CW-21, the overstock was primarily due to increased competition.

146.   150. Importantly, CW-21 stated Olaplex's weakening sales and inventory oversupply were caused by two factors: (1) Olaplex's failure to anticipate the existence of competition for its products; and *(2) Olaplex's failure to respond effectively to negative reports and social media about its products*.  CW-21 noted that now, "everyone" had a bond builder product like Olaplex, and so the Company is losing market share.

147.   151. The account of another former employee confirms that Olaplex's lilial controversy led to the Company's slowing sales in 2022 after the issue was disclosed.  CW-32, a marketing manager at Olaplex beginning in approximately April 2022 through Fall 2022, said that he and his colleagues in Marketing did frequently work with members of the Sales team and that he was frequently informed that the Sales teams were not performing well and were struggling.  CW-32 worked with Sammy Sawa, current Director of Sales, who reported to Tiffany Walden, the former Chief Operating Officer.

148.   152. CW-32 elaborated that, when he began working at Olaplex in April 2022, the Company was dealing with concerns reported in the media that an ingredient in its hair products, lilial, may be harmful.  CW-32 indicated that *those concerns were causing problems with the Company's sales*, and members of the Sales team asked the Marketing department to help them boost their performance.

149.   153. CW-32 recalled that the controversy over lilial began in late February or early March 2022, shortly before CW-32 started with Olaplex, and that

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

48

CW-~~3~~2 believed that *the controversy was a large factor in the Company's struggling sales.*

150. ~~154.~~ CW-~~3~~2 provided further details on the interaction of the Sales and Marketing team during his employment. CW-~~3~~2 indicated that the Sales team constantly complained to Marketing that Marketing's efforts were not generating enough sales. CW-~~3~~2's reaction to those complaints was that generating sales directly was the Sales team's job, not Marketing, and that the Sales reps misunderstood Marketing's role. CW-~~3~~2 explained that his "takeaway" from those complaints was that the Sales team was under great pressure to improve its numbers. CW-~~3~~2 added that his view was reinforced by an email that had been shared with him by a colleague in Sales, which had been sent by former COO Walden to the Sales team. CW-~~3~~2 described Walden's language in the email as "very aggressive," possibly inappropriately so, and "shocking," as it pressured the Sales team to bolster its numbers. CW-~~3~~2 added that the email was sent some time in the last two weeks of September 2022, and that Walden needed sales figures to present at an upcoming meeting of the Board of Directors. CW-~~3~~2 also characterized Walden's departure from Olaplex as sudden.

151. ~~155.~~ Moreover, CW-~~3~~2 had heard many comments from Sales staff regarding a competitor called K18 which was threatening Olaplex's market share. CW-~~3~~-2 explained that K18 was a competitive threat because its product was very similar to Olaplex. CW-~~3~~2 identified Living Proof as another significant competitor, again due to that company having a similar product. CW-~~3~~2 further noted that K18 began causing a significant loss of Olaplex's sales toward the beginning of 2022, while Living Proof was older.

152. ~~156.~~ CW-~~3~~2 further stated that he has friends who are still employed at Olaplex on the Marketing team and who have communicated to him that the Company is having issues with too much stock on hand at its retail customers. Specifically, CW-~~3~~-2 had been informed by his friends, in October or November

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

49

2022, that Olaplex had a lot of products/inventory "stuck" with retailers; so much so, in fact, that recent purchase orders had been cut.  CW-32 had also heard from current employees—two people in different departments and with different roles at the company: one in Marketing and the other in Operations—that there may have been reductions in manufacturing as well due to the glut of products.

153.  157. This glut of products due to waning consumer demand in the wake of the lilial issue was exacerbated by the Company's **pre-IPO** decision to hold significantly more months of inventory on hand[24] than Olaplex had done in the past.  Specifically, as Defendant Tiziani would later admit on August 9, 2022, almost a year after the IPO, the Company made a "strategic decision" "in the middle of last year"—*i.e.*, **mid-2021, just a few months before the IPO**—to "hold more months on hand of inventory."  Thus, starting shortly before the IPO, Olaplex began to hold more product in stock, which would adversely impact the Company's business if demand were lower than expected.  In other words, this decision would saddle the Company and its distributors with excess inventory (and associated costs) if sales slowed.  Given the then-existing E.U. ban on lilial that affected Olaplex's best-selling No. 3 product and the related significant likelihood of negative publicity and reputational damage, which would inevitably harm demand, this higher inventory position would compound the adverse impact of the lilial issue on the Company's business.  The Offering Documents, however, failed to disclose this then-existing higher inventory position and the related significant risks it represented to the Company's business—*i.e.*, Olaplex would be left saddled with unwanted extra product in the face of waning demand from the reputational and demand fallout of the lilial issue.

---

[24] "On hand" inventory refers to the amount of inventory a company has in stock. The purpose of on hand inventory is to have the correct amount of product to meet the demand from customers.  In other words, if there is not enough inventory on hand to meet demand, this can lead to unhappy customers and lost sales.  If there is too much inventory on hand, then the company will have extra unsold product (and the associated costs of manufacturing and storage for such excess inventory).

**F.      Olaplex's IPO**

154.   ~~158.~~ On or about September 29, 2021, Olaplex conducted its initial public offering, in which it sold 84,755,000 shares of Olaplex common stock to the public at a price of $21 per share, including an underwriter overallotment of 11,055,000 shares.   Upon the sale of these 84,755,000 shares, the Selling Stockholder Defendants (as identified in the Prospectus) would receive $1,686,412,612.50 in proceeds in connection with the IPO, which would reduce the Advent Funds' and Mousse Partners' stake in Olaplex common stock from 96.1% to 83%, collectively.   Defendants Goldman Sachs, J.P. Morgan, and Morgan Stanley acted as representatives of the Underwriter Defendants in the IPO.

155.   ~~159.~~ The IPO was conducted pursuant to, and the sale of Olaplex stock was solicited by, several documents filed by Defendants with the SEC and disseminated to the investing public, including (i) an August 27, 2021 registration statement on Form S-1, which, following amendment, was declared effective by the SEC on September 29, 2021 (the "Registration Statement"), and (ii) an October 1, 2021 prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus," and, together with the Registration Statement, the "Offering Documents").

156.   ~~160.~~ The Offering Documents further state that "the selling stockholders and the underwriters (and any of our or their affiliates) have not authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses filed with the Securities and Exchange Commission (the 'SEC')."

**G.      The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information**

157.   ~~161.~~ The Offering Documents were negligently prepared, and as a result, contained untrue statements of material facts, omitted material facts necessary to make the statements contained therein not misleading, and failed to make

adequate disclosures required under the rules and regulations governing the preparation of the Offering Documents.[25]

158. ~~162.~~ Sections 11 and 12(a)(2) of the Securities Act create liability against each of the Defendants for each (1) misstatement, (2) omission in contravention of an affirmative legal disclosure obligation, and (3) omission of information that is necessary to prevent existing disclosures from being misleading, in the Offering Documents.

159. ~~163.~~ Additionally, pursuant to SEC Regulation C, the Offering Documents were required to disclose material information necessary to ensure that representations in the Offering Documents were not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

160. ~~164.~~ Further, Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303 and the SEC's related interpretive releases thereto, requires issuers to disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause the issuer's financial information not to be indicative of future operating results.

161. ~~165.~~ Moreover, Defendants were also required to comply with Item 105 of Regulation S-K, 17 C.F.R. § 229.105. Specifically, Item 105 requires that the Offering Documents furnish, among other things, a discussion of the most significant factors that make the Offering speculative or risky.

---

[25] Lead Plaintiff alleges the statements highlighted in **_bold and italics_** within this Section to be false and misleading.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

52

**1.    The Offering Documents Failed to Disclose and Misrepresented Significant Risks Regarding the Impact of Laws and Regulations on Olaplex's Business**

162.  ~~166.~~ The Offering Documents failed to disclose that: (1) one of Olaplex's best-selling, key products, its "hero" No. 3 Hair Perfector, had contained an ingredient that had recently been banned by the E.U. as unsafe due to its infertility risks, with the ban set to take effect a few months after Olaplex's IPO; (2) given this upcoming ban, Olaplex had quietly reformulated the No. 3 product world-wide to remove lilial in June 2021, just a few months before the IPO; and (3) the significant risks that Olaplex's use and removal of lilial in its products posed to the Company's brand reputation and competitive positioning—which were crucial to the Company's financial success and were heavily dependent on positive social media coverage—and thereby to the Company's sales and business.

163.  ~~167.~~ Instead, the Offering Documents included numerous risk factors that were false and misleading because they warned about *potential* future risks—including that the Company was subject to numerous laws and regulations world-wide that "*could*" or "*may*" require it to remove an ingredient and reformulate and the impact such an issue "*could*" or "*may*" have on the Company's "brand reputation and image in the marketplace" and business. In reality, however, those risks had either *already* materialized, *i.e.*, in the form of the E.U. ban on lilial that affected the Company's best-selling No. 3 product that contained this ingredient—or were significantly likely to do so—*i.e.*, the resulting negative social media buzz and media publicity, consumer complaints and product liability lawsuits, associated reputational damage, declining demand as consumers pivoted away from Olaplex to competitors' products, and ultimately lost sales. In fact, the Offering Documents repeatedly, misleadingly touted Olaplex's uniquely strong brand reputation, social media presence, customer loyalty, and competitive position as key drivers of the Company's financial success without disclosing the lilial issue, which imperiled all

of these, and thus, represented a known, substantial risk or uncertainty to the Company's business that was not accurately disclosed.  As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

164.  168. For example, the Offering Documents inaccurately described as *potential*, certain risks of the impact of laws and regulations on Olaplex's business, which *could* have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events, risks, and trends or uncertainties that had *already* manifested—*i.e.*, the impending E.U. ban on lilial that prompted the Company to reformulate its best-selling No. 3 product to remove this problematic ingredient, shortly before the IPO—or were significantly likely to do so—*i.e.*, the resulting reputational damage and lost sales.  Specifically, the Offering Documents stated:

> Our products are subject to federal, state and international laws, regulations and policies that could have an adverse effect on our business, prospects, results of operations, financial condition and/or cash flows.
>
> ***Our business is subject to numerous laws, regulations and policies around the world.***  Many of these laws and regulations have a high level of subjectivity, are subject to interpretation, and vary significantly from market to market.  ***These laws and regulations can have several impacts on our business, including***:
>
> - delays in ***or prohibitions of selling a product or ingredient in one or more markets***;
>
> - limitations on our ability to import products into a market;
>
> - delays and expenses associated with compliance, such as record keeping, documentation of the properties of certain products, labeling, and scientific substantiation;
>
> - limitations on the labeling and marketing claims we can make regarding our products; and
>
> - ***limitations on the substances that can be included in our product, resulting in product reformulations***, or the recall and

discontinuation of certain products that cannot be reformulated to comply with new regulations.

***These events could interrupt the marketing and sale of our products, cause us to be subject to product liability claims, severely damage our brand reputation and image in the marketplace, increase the cost of our products, cause us to fail to meet customer expectations*** or cause us to be unable to deliver products in sufficient quantities or sufficient quality, ***which could result in lost sales***.

Before we can market and sell our products in certain jurisdictions, the applicable local governmental authority may require evidence of the safety of our products, which may include testing of individual ingredients at relevant levels. In particular, because Bis-amino is our proprietary ingredient, it typically is not a pre-approved ingredient for use in products in specific jurisdictions and we have been required in the past, and may be required in the future, to perform testing and provide other data and information to governmental authorities prior to the sale of our products in the jurisdiction. For example, Australian authorities have required us to perform additional testing on Bis-amino to register Bis-amino under Australia's Industrial Chemical Introduction Scheme (AICIS), to be able to sell certain of our products in Australia. We are performing the final testing required, and have received provisional approval to sell our products. Although we are confident in our ability to obtain final approval, the Australian authorities could withdraw the provisional approval, resulting in impacts on our sales of certain products in Australia. Furthermore, our international customers are primarily responsible for registering ingredients or otherwise obtaining any approvals necessary for them to sell our products in the applicable territory and any failure by them to do so could decrease sales of our products and harm our reputation. Delays in or prohibition of selling our products, ***or the need to reformulate the ingredients used in our products, could have an adverse effect on our existing business and future growth.***

***Additional laws, regulations and policies, and changes, new interpretation or enforcement thereof, that affect our business could adversely affect our financial results. These include*** accounting standards, laws and regulations relating to tax matters, trade, data privacy and data security, anti-corruption, advertising, marketing, manufacturing, distribution, customs matters, product registration, ***ingredients***, chemicals, packaging, selective distribution, environmental or climate change matters. ***Changes may require us to reformulate or discontinue certain of our products or revise our product packaging or labeling, any of which could result in, among other things, increased costs to us,*** delays in our product launches, ***product returns or recalls and lower net sales, and therefore could have an adverse effect on our business, prospects, results of operations, financial condition and/or cash flows.***

165. ~~169.~~ The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while noting only the ***potential*** negative impacts on Olaplex's business, financial condition, and results of

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

55

operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Olaplex *had already been* facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)    The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b)    As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)    Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)    The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)    As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)    As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors

(who would take advantage of the reputational damage to Olaplex's brand), and revenue.

166. 170. The Offering Documents also inaccurately described as *potential*, certain risks associated with the safety of its products, including that its products "could" be deemed "unsafe," and the possible impact of customer complaints, product liability claims, and Olaplex's failure to meet customer expectations, which *could* have an adverse effect on its business, financial condition, and results of operations. The Offering Documents thus did not accurately disclose the actual events and trends or uncertainties that had *already* manifested—*i.e.*, the E.U. ban on lilial because it was deemed unsafe, prompting the Company to reformulate its best-selling No. 3 product to remove this chemical before the IPO—or were significantly likely to do so—*i.e.*, the resulting negative social media buzz and media publicity, consumer complaints and product liability lawsuits, associated reputational damage, declining demand as consumers pivoted away from Olaplex to competitors' products, and ultimately lost sales. Specifically, the Offering Documents stated:

> *If our products are found to be defective or unsafe we may be subject to various product liability claims, which could harm our reputation and business.*
>
> *Our success depends, in part, on the quality and safety of our products. If our products are found to be defective, unsafe, or otherwise fail to meet our consumers' expectations or if our product claims are found to be unfair or deceptive, our relationships with customers or consumers could suffer, the appeal of one or more of our products could be diminished and we could lose sales, any of which could result in an adverse effect on our business.* For example, we have historically received complaints regarding our products, including complaints alleging that our products have caused dryness, skin irritation, hair loss, or hair damage, or have failed to improve the look and texture of hair. We conduct testing of our products and, based on these tests, do not believe that our products are the direct cause of such adverse effects. However, regardless of their merit, *these or future complaints could have a negative impact on the reputation of our products and our brand*, cause us to recall or stop selling our products, or lead to increased scrutiny or enforcement action from regulatory authorities, *any of which could adversely affect our business and financial results.*

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

57

167. ~~171.~~ The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while noting only the *potential* negative impacts on Olaplex's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Olaplex *had already been* facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)     The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b)     As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)     Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)     The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)    As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)    As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

168.    172. The Offering Documents also inaccurately described as *potential*, certain risks associated with Olaplex's ability to attract new customers and retain existing customers "*if*" the Company failed "to meet customer expectations" or "customers were not convinced that our products are superior" to competitors', which *could* have an adverse effect on Olaplex's business, financial condition, and results of operations.  The Offering Documents thus did not accurately disclose the actual events and trends or uncertainties that had *already* manifested—*i.e.*, the E.U. ban on lilial due to its significant safety risks, prompting the Company to reformulate its best-selling No. 3 product to remove this chemical before the IPO—or were significantly likely to do so—*i.e.*, the negative impact of the lilial issue and its associated reputational damage to the Olaplex brand, on customer demand, and thus, the Company's sales.  The Offering Documents stated:

> *If we fail to attract new customers and consumers, retain existing customers and consumers, or fail to maintain or increase sales to those customers and consumers, our business, prospects, results of operations, financial condition, cash flows and growth prospects will be harmed.*
>
> Our success depends in large part upon widespread adoption of our products by consumers.  In order to attract new consumers and continue to expand our customer and consumer base, we must appeal to and attract hairstylists and consumers who identify with our products.  *If we fail to deliver a high-quality consumer experience or if our current or potential future customers are not convinced that our products are superior to alternatives, then our ability to retain existing customers, acquire new customers and grow our business may be harmed.*  We have made significant investments in enhancing our brand, attracting new customers and interacting with our hairstylist and consumer

communities, and we expect to continue to make significant investments to promote our products. Such campaigns can be expensive and may not result in new customers or consumers or increased sales of our products. Further, as our brand becomes more widely known, we may not attract new consumers or increase our net sales at the same rates as we have in the past. ***If we are unable to acquire new customers who purchase products in numbers sufficient to grow our business, we may not be able to generate the scale necessary to drive beneficial network effects with our suppliers, our net revenues may decrease, and our business, financial condition and operating results may be materially adversely affected.***

In addition, our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net sales are generated from sales to existing customers, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. We may be affected by changes in the policies and demands of our professional and specialty retail customers relating to inventory management, changes in pricing, marketing, advertising and/or promotional strategies by such customers, space reconfigurations by our customers or any significant decrease in our display space or online prominence or the ongoing COVID-19 pandemic as retailers faced store closures or reduced traffic. ***If existing customers no longer find our products appealing,*** are not satisfied with our customer service, including shipping times, or if we are unable to timely update our products to meet current trends and customer demands, ***our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.***

***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations and growth prospects will be harmed.***

169. ~~173.~~ The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while noting only the ***potential*** negative impacts on Olaplex's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Olaplex ***had already been*** facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)  The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

60

(b)     As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)     Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)     The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)     As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)     As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

**2.     The Offering Documents Contained Misstatements and Omissions About the Strength of Olaplex's Brand Reputation and Social Media Community Engagement**

170.   174.  The Offering Documents included numerous risk factors regarding Olaplex's brand reputation, consumer preferences, and social media community engagement that were false and misleading because they warned about *potential* future risks—including that Olaplex "*may*" not be able to maintain its brand

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

61

reputation if it experienced negative publicity and that the increased use of social media "*could*" or "*may*" negatively affect consumer preferences and demand for Olaplex's products.  These statements were false and misleading because they did not disclose the E.U. lilial ban and its likely impact on Olaplex, which were specific known risks that had *already* materialized or were significantly likely to do so—*i.e.*, the resulting inevitable reputational damage to Olaplex's brand image, waning consumer demand for its products, and declining sales.  In fact, the Offering Documents repeatedly, misleadingly touted Olaplex's purportedly strong brand reputation, social media presence, and customer loyalty as key drivers of the Company's financial success without disclosing the lilial issue, which posed a significant threat to all of these growth drivers.  As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

171. 175.  For example, the Offering Documents touted Olaplex's purportedly loyal and engaged community of professional hairstylists and consumers as a critical component of its "competitive advantage" in the cosmetics industry and source of growth, without disclosing the significantly likely risks to Olaplex's competitive advantage and growth posed by Olaplex's use and removal of lilial in one of its key products without informing its "strong and loyal following." Specifically, the Offering Documents stated:

Science-Backed Brand that Attracts a Loyal and Engaged Community

We offer science-backed solutions that improve hair health and are trusted by stylists and consumers.  We identify our consumers' most relevant haircare concerns in collaboration with our passionate and highly engaged community of professional hairstylists and consumers, and strive to address them through our proprietary technology and innovation capabilities.  Our deep roots in the professional haircare community and strong ties with our global network of hairstylists creates a continuous feedback loop, providing unique insight into the hair health goals and concerns of our consumers.  Our hairstylists are our strongest advocates; they have grown with our business since our

founding in 2014, and through mutual support we have empowered them to connect with their clients and to champion our brand through an engaged and active social community.  This community also provides insight into consumer needs and positions OLAPLEX to leverage our research and development platform to respond to consumers' demands for improved hair health by creating high-quality products that result in healthy, beautiful hair.  Results have validated our approach.  We believe that over 90% of our consumers think OLAPLEX products make their hair healthier, which we believe is among the highest ratings compared to competitors in this category.  Moreover, we believe OLAPLEX's professional net promoter score of 71% as of April 2021 is the highest in our brand category and well above the average score in our category.  ***The quality of our products, combined with our community-driven approach to engaging with both professional hairstylists and our consumers, have created a strong and loyal following for OLAPLEX that we believe provides a unique competitive advantage and foundation for growth.***

172. ~~176.~~ The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while touting Olaplex's strong and loyal following and unique competitive advantage, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Olaplex ***had already been*** facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)    The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b)    As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)    Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

63

(d)     The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)     As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)     As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

173.   177. The Offering Documents also inaccurately described as *potential*, certain risks associated with "negative publicity" and "the use of social media and internet based-communication" in marketing Olaplex's products, including the damage that adverse consumer perception of Olaplex's products *could* have on its "brand image and [] reputation," which *could* have an adverse effect on its business, financial condition, and results of operations.  The Offering Documents thus did not accurately disclose the actual events and trends or uncertainties that had *already* manifested—*i.e.*, the E.U. ban on lilial due to its significant safety risks, prompting the Company to reformulate its best-selling No. 3 product to remove this chemical before the IPO—or were significantly likely to do so—*i.e.*, the resulting negative publicity that the lilial issue would generate on social media and in the press, and the inevitable reputational damage to Olaplex's brand image, declining demand, and lost sales.  Specifically, the Offering Documents stated:

> *Our business depends on our ability to maintain a strong community of engaged customers, consumers and ambassadors, including by*

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

64

*social media.  We may not be able to maintain and enhance our brand if we experience negative publicity* related to our marketing efforts or use of social media, fail to maintain and grow our network of ambassadors *or otherwise fail to meet our customers' or consumers' expectations.*

We currently partner with eight brand ambassadors who promote and market our products, participate in product launches, engage with our professional hairstylist and consumer community and educate them about Olaplex products.  Our ability to maintain relationships with our existing ambassadors and to identify new ambassadors is critical to expanding and maintaining our customer and consumer base.  As our market becomes increasingly competitive or as we expand internationally, recruiting and maintaining new ambassadors may become increasingly difficult.  If we are not able to develop and maintain strong relationships with our ambassador network, our ability to promote and maintain awareness of our brand may be adversely affected.  Further, if we incur excessive expenses in this effort, our business, financial condition and results of operations may be adversely affected.

*We and our ambassadors often use third-party social media platforms to raise awareness of our brand and engage with our hairstylist and consumer community.  In recent years, there has been a marked increase in the use of social media platforms, including blogs, chat platforms, social media websites, and other forms of internet-based communications that allow individuals to interact with our products, which acts as a means to enhance brand awareness.  As existing social media platforms evolve and new platforms develop, we and our ambassadors must continue to maintain a presence on these platforms and establish presences on emerging popular social media platforms.*  If we are unable to cost-effectively develop and continuously improve our consumer-facing technologies, such as social media platforms, our ability to acquire new customers and consumers may suffer and we may not be able to provide a convenient and consistent experience to our consumers regardless of the sales channel.  *This could negatively affect our ability to compete with other companies and result in diminished loyalty to our brand.*

*The use of social media by our brand ambassadors, our consumers and us has increased the risk that our image and reputation could be negatively impacted.*  In particular, the reputation of our brand ambassadors could impact how consumers view our products or brand. *The rising popularity of social media and other consumer-oriented technologies has increased the speed and accessibility of information dissemination and given users the ability to organize collective actions such as boycotts and other brand-damaging behaviors more effectively.  The dissemination of information via social media could harm our brand or our business, regardless of the information's accuracy.  This could include negative publicity related to our products or negative publicity related to actions taken (or not taken) by us or our executives,* team members, employees, brand ambassadors, contractors, collaborators, vendors, consultants, advisors or other individuals or entities that may be perceived as being associated with us.  Such negative publicity may relate to actions taken (or not taken)

with respect to social, environmental, and community outreach issues and initiatives.  The harm may be immediate, without affording us an opportunity for redress or correction and could have an adverse effect on our business, financial condition and results of operations.  In addition, an increase in the use of social media for product promotion and marketing may increase the burden on us to monitor compliance of such materials, and increase the risk that such materials could contain problematic product or marketing claims in violation of applicable regulations.  For example, in some cases, the U.S. Federal Trade Commission ("FTC") has sought enforcement action where an endorsement has failed to clearly and conspicuously disclose a financial relationship or material connection between an influencer and an advertiser.

We also do not prescribe what our ambassadors post, and our ambassadors could engage in behavior or use their platforms in a manner that reflects poorly on our brand or is in violation of applicable regulations or platform terms of service, and all these actions may be attributed to us.  ***In addition, customer complaints or negative publicity related to our*** website, mobile app, ***products***, product delivery times, customer data handling, marketing efforts, security practices or customer support, ***especially on blogs and social media websites, could diminish customer loyalty and community engagement***. ***Our inability or failure to recognize, respond to, and effectively manage the accelerated impact of social media could adversely impact our business.***

Further, laws and regulations, including associated enforcement priorities, rapidly evolve to govern social media platforms and other internet-based communications, and any failure by us, our ambassadors or other third parties acting at our direction or on our behalf to abide by applicable laws and regulations in the use of these platforms could subject us to regulatory investigations, class action lawsuits, liability, fines or other penalties.  ***Other risks associated with the use of social media and internet based-communication include*** improper disclosure of proprietary information, ***negative comments about our brand or products***, exposure of personally identifiable information, fraud, hoaxes, or malicious dissemination of false information.  ***Damage to the brand image and our reputation could have an adverse effect on our business, results of operations and financial condition.***

174.   178.  The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while noting only the ***potential*** negative impacts on Olaplex's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Olaplex ***had already been*** facing at the time of the IPO and/or was significantly likely to do so as a result:

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

66

(a)    The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b)    As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)    Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)    The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)    As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)    As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

175.    179. Further, the Offering Documents also inaccurately described as *potential*, certain risks associated with "consumer preferences" and the impact of

social media on those preferences, including changing consumer sentiment and harm to Olaplex's brand recognition due to hypothetical "sudden challenges" that the Company "*may* face" in the marketplace," which *could* have an adverse effect on its business, financial condition, and results of operations.  The Offering Documents thus did not adequately disclose the actual events and trends or uncertainties that had *already* manifested—*i.e.*, the E.U. ban on lilial due to its significant safety risks which was a specific, known "challenge" facing Olaplex by this time, prompting the Company to reformulate its best-selling No. 3 product to remove this chemical before the IPO—or were significantly likely to do so—*i.e.*, the resulting negative social media buzz and press publicity that would adversely impact Olaplex's brand recognition and "consumer preferences" to pivot away from its products, leading to declining demand and lost sales.  The Offering Documents stated that:

> Our inability to anticipate and respond to market trends and *changes in consumer preferences could adversely affect our financial results.*
>
> *Our continued success depends on our ability to anticipate, gauge and react in a timely and cost-effective manner to changes in consumer tastes for haircare* and other beauty products, attitudes toward our industry and brand, as well as to where and how consumers shop.  *We must continually work to maintain and enhance the recognition of our brand,* develop, manufacture and market new products, maintain and adapt to existing and emerging distribution channels, successfully manage our inventories and modernize and refine our approach as to how and where we market and sell our products.  *Consumer tastes and preferences cannot be predicted with certainty and can change rapidly.  The issue is compounded by the increasing use of digital and social media by consumers and the speed by which information and opinions are shared.  If we are unable to anticipate and respond to sudden challenges that we may face in the marketplace, trends in the market for our products and changing consumer demands and sentiment, our business, financial condition and results of operations will suffer.*  In addition, from time to time, sales growth or profitability may be concentrated in a relatively small number of our products or countries.  *If such a situation persists or a number of products or countries fail to perform as expected, there could be an adverse effect on our business, financial condition and results of operations.*

176. 180. The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while noting only the *potential* negative impacts on Olaplex's business, financial condition, and results of

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

68

operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Olaplex *had already been* facing at the time of the IPO and/or was significantly likely to do so as a result:

(a) The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b) As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c) Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d) The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e) As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f) As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

69

(who would take advantage of the reputational damage to Olaplex's brand), and revenue.

### 3.    The Offering Documents Contained Misstatements and Omissions About Competition and Related Risks

177.    181.    The Offering Documents also included numerous risk factors regarding competition that were false and misleading because they warned about *potential* future risks—including that the Company's ability to compete depended on its strong brand reputation and that the Company's success in engaging existing customers and attracting new customers "*could*" or "*may*" impact the Company's results and business—without adequately disclosing specific, known risks that had *already* materialized or were significantly likely to do so—*i.e.*, the E.U. ban on lilial that prompted Olaplex to reformulate its No. 3 product shortly before the IPO and its likely adverse impact on the Company's brand reputation, competitive position, and thus, sales.    In fact, the Offering Documents repeatedly, misleadingly touted Olaplex's competitive position and advantages—including its strong brand reputation, social media presence, and customer loyalty—as key drivers of the Company's financial success without disclosing the lilial issue, which imperiled all of these, and thus, represented a known, substantial risk and uncertainty to the Company's business.    As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

178.    182.    For example, the Offering Documents misleadingly touted the strength of Olaplex's reputation and "favorable brand recognition" as key components of the Company's competitive advantage that enabled it to "compete effectively," without disclosing the lilial issue, which posed a significant threat to Olaplex's brand reputation and competitive position.    Specifically, the Offering Documents stated:

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

70

Competition in the haircare industry is based on a variety of factors, including innovation, effectiveness of beneficial attributes, accessible pricing, service to the consumer, promotional activities, advertising, special events, new product introductions, e-commerce initiatives and other activities. Our competitors include Henkel AG & Co. KgaA, Kao Corporation, L'Oreal S.A. and Unilever. We also face competition from a number of independent brands. Certain of our competitors also have ownership interests in retailers that are customers of ours.

***The continued strength of our brand and products is based on our ability to compete with other companies in our industry. We compete primarily by***:

- developing quality products with innovative performance features;

- educating consumers, retail customers and salon professionals about the benefits of our products;

- anticipating and responding to changing consumer, retail customer and salon professional demands in a timely manner, including the timing of new product introductions and line extensions;

- offering products at compelling and accessible price points across channels and geographies;

- ***maintaining favorable brand recognition;***

- developing and sustaining our relationships with our key customers;

- ensuring product availability through effective planning and replenishment collaboration with our customers;

- ***leveraging e-commerce, social media and the influence of our brand ambassadors and developing an effective omni-channel strategy to optimize the opportunity for consumers to interact with and purchase our products both on-line and in brick and mortar outlets***;

- attracting and retaining key personnel;

- maintaining and protecting our intellectual property;

- maintaining an effective manufacturing and distributor network; and

- obtaining and retaining sufficient retail display and floor space, optimal in-store positioning and effective presentation of our products on retailer's shelves.

***We believe we have a well-recognized and strong reputation in our core markets and that the quality and performance of our products,***

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

71

our emphasis on innovation, and engagement with our professional and consumer community *position us to compete effectively*.

179. ~~183.~~ The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while touting Olaplex's brand strength, strong reputation, and competitive position, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Olaplex *had already been* facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)    The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the Company's IPO;

(b)    As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)    Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)    The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

72

(e)     As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)     As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

180.   184. The Offering Documents also contained the following statements touting Olaplex's "strong reputation" and digital community engagement that purportedly "position[ed] [the Company] to compete effectively," which were false and misleading because they did not disclose the lilial issue that posed a significant threat to these key growth drivers, as described above.  These statements further inaccurately described as *potential*, certain risks associated with Olaplex's competition, including the adverse impact of any damage to the Company's reputation or its competitive position and ability to attract and retain customers, which *could* have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had *already* manifested (*i.e.*, the lilial issue) or were significantly like to do so (*i.e.*, the resulting reputational and financial impact of the lilial issue on the Company), as explained above.  Specifically, the Offering Documents stated:

*We operate in highly competitive categories.*

*We face competition from companies throughout the world, including multinational consumer product companies.  Most of our competitors have greater resources than we do, some others are newer companies and some are competing in distribution channels or territories where we are less represented.*  Our competitors also may be able to respond to changing business and economic conditions more quickly than us due to larger research and development operations, manufacturing capabilities and sales force. Competition in the beauty industry is based on a variety of factors, including innovation, effectiveness of beneficial attributes, accessible pricing, service to the consumer, promotional activities, advertising, special events, new product introductions,

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

73

e-commerce initiatives and other activities. It is difficult for us to predict the timing and scale of our competitors' actions in these areas.

*Our ability to compete also depends on the continued strength of our brand and products,* our ability to attract and retain key talent and other personnel, the influence of our brand ambassadors, the efficiency of our third-party manufacturing facilities and distribution network, our relationships with our key customers and our ability to maintain and protect our intellectual property and those other rights used in our business. *We believe we have a well-recognized and strong reputation in our core markets and that the quality and performance of our products,* our emphasis on innovation, *and engagement with our professional and consumer community position us to compete effectively. However, if our reputation is adversely affected, our ability to attract and retain customers and consumers would be impacted.* In addition, certain of our distributors in the United States and key retailers are owned or otherwise affiliated with companies that market and sell competing brands and, as a result, they may have an interest in promoting theses competing brands over our products. *Our inability to continue to compete effectively in key countries around the world could have an adverse effect on our business, financial condition and results of operations*.

181. ~~185.~~ The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while noting only the *potential* negative impacts on Olaplex's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Olaplex *had already been* facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)    The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b)    As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

74

(c)    Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)    The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)    As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)    As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

182.    186. The Offering Documents also inaccurately described as ***potential***, certain risks associated with Olaplex's ability to manage "challenges" to the Company's future growth—including *if* there were a "slowdown" in demand or "increased competition," which ***could*** have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had ***already*** manifested or were significantly likely to do so, (*i.e.*, the lilial issue) or were significantly like to do so (*i.e.*, the resulting reputational and financial impact of the lilial issue on the Company), as explained above.  Specifically, the Offering Documents stated:

> Our recent rapid growth may not be sustainable or indicative of future growth, and we expect our growth rate to ultimately slow over time.

We have experienced significant and rapid growth.  Net sales increased from $148.2 million in 2019 to $282.3 million in 2020.  For the six months ended June 30, 2020 and 2021, we had net sales of $99.6 million and $270.2 million, respectively.  Our historical rate of growth may not be sustainable or indicative of our future rate of growth, and in future periods, our net sales could grow more slowly than we expect or decline.  ***We believe that continued growth in net sales, as well as our ability to improve or maintain margins and profitability, will depend upon, among other factors, our ability to address the challenges, risks and difficulties described elsewhere in this "Risk Factors" section.  We cannot provide assurance that we will be able to successfully manage any such challenges or risks to our future growth.  Any of these factors could cause our net sales growth to slow or decline and may adversely affect our margins and profitability.  Even if our net sales continue to increase, we expect that our growth rate may slow for a number of other reasons, including if there is a slowdown in the growth of demand for our products, increased competition***, a decrease in the growth or reduction in the size of our overall market or if we cannot capitalize on growth opportunities.  Failure to continue to grow our net sales or improve or maintain margins would adversely affect our business, financial condition and results of operations.  You should not rely on our historical rate of growth as an indication of our future performance.

183.    187. The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while noting only the ***potential*** negative impacts on Olaplex's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Olaplex ***had already been*** facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)    The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the Company's IPO;

(b)    As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

76

Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)    Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)    The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)    As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)    As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

184.    188. Finally, the Offering Documents also inaccurately described as *potential*, certain risks associated with fluctuations in Olaplex's quarterly financial results and resulting declines in the Company's stock price due to the above risk factors and other reasons, including "the impact of competitive developments" and Olaplex's ability to attract new customers and engage existing customers, which "*may*" or *could* have an adverse effect on its business, financial condition, results of operations, and stock price, rather than disclosing the actual events and trends or uncertainties that had *already* manifested (*i.e.*, the lilial issue) or were significantly like to do so (*i.e.*, the resulting reputational and financial impact of the lilial issue on

the Company, and its stock price), as explained above.  Specifically, the Offering Documents stated:

> ***Our quarterly results of operations may fluctuate***, *and if our operating and financial performance in any given period does not meet the guidance that we have provided to the public or the expectations of our investors and securities analysts, the trading price of our common stock may decline.*
>
> ***Our quarterly results of operations may fluctuate for a variety of reasons,*** *many of which are beyond our control.  **These reasons include those described in these risk factors as well as the following:***
>
> - fluctuations in product mix;
>
> - our ability to effectively launch and manage new products;
>
> - fluctuations in the levels or quality of inventory;
>
> - fluctuations in capacity as we expand our operations;
>
> - ***our success in engaging existing customers and consumers and attracting new customers and consumers;***
>
> - the amount and timing of our operating expenses;
>
> - the timing and success of new product launches and expansion into new geographic markets;
>
> - ***the impact of competitive developments and our response to those developments;***
>
> - the impact of the COVID-19 pandemic;
>
> - our ability to manage our existing business and future growth; and
>
> - economic and market conditions, particularly those affecting our industry.
>
> ***Fluctuations in our quarterly results of operations may cause those results to fall below the guidance that we have provided to the public or the expectations of our investors and securities analysts, which could cause the trading price of our common stock to decline***. Fluctuations in our results could also cause a number of other problems. For example, analysts or investors might change their models for valuing our common stock, we could experience short-term liquidity issues, our ability to retain or attract key personnel may diminish and other unanticipated issues may arise.
>
> In addition, we believe that our quarterly results of operations may vary in the future and that period-to-period comparisons of our results of

operations may not be meaningful.  You should not rely on the results of one quarter as an indication of future performance.

185.  189. The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while noting only the *potential* negative impacts on Olaplex's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Olaplex *had already been* facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)  The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b)  As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)  Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)  The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

79

(e)      As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)      As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue, and that its stock price would decline accordingly.

### 4.      The Offering Documents Contained Misstatements and Omissions About the "Clean" Nature of Olaplex's Products

186. ~~190.~~ The Offering Documents failed to disclose that Olaplex's best-selling, "hero," No. 3 Hair Perfector contained an ingredient that had recently been classified as a *reprotoxic* substance and banned by the E.U. due to its infertility risks.  Instead, the Offering Documents misleadingly touted Olaplex's products as "*clean*"—*i.e.*, that they do not contain any "harmful ingredients," such as parabens, sulfates SLS (sodium lauryl sulfate) and SLES (sodium laureth sulfate), phthalates, mineral oils, formaldehyde, and other potential toxins and allergens.  As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

187. ~~191.~~ For example, the Offering Documents misleadingly touted Olaplex's focus on *"produc[ing] clean products"* without *"harmful ingredients,"* without disclosing that Olaplex's best-selling No. 3 product was formulated with lilial, which had been classified as a reprotoxic chemical and banned in the E.U. due to its infertility risks.  Specifically, the Offering Documents stated:

Commitment to Social and Environmental Consciousness

\*\*\*

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

80

*Environmental Sustainability.* We continue to explore ways to reduce our carbon footprint and to contribute to a more sustainable future for our planet. One of our key initiatives is to limit the use of secondary packaging in which our products are sold. We believe that between 2015 to 2021 we avoided the use of approximately 2.9 million pounds of paper packaging, which we believe prevented approximately 23 million pounds of greenhouse gas from being emitted into the environment, conserved approximately 37 million gallons of water and saved approximately 29,000 trees from deforestation, as compared to manufacturing, packaging and distribution alternatives. In addition, ***we strive to produce clean products that exclude certain harmful ingredients.*** These efforts are well recognized in the industry, with OLAPLEX being one of only 21 haircare brands accredited with the "Clean at Sephora" designation, as of July 31, 2021.

188. ~~192.~~ The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while touting the Company's production of clean products that exclude harmful ingredients, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Olaplex ***had already been*** facing at the time of the IPO and/or was significantly likely to do so as a result:

(a) The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b) As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c) Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)    The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)    As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)    As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

189.    193. Similarly, the Offering Documents misleadingly touted Olaplex's ability to meet the "high demand for clean" products by consumers who were focused on "health and wellness" through its product offerings, without disclosing that Olaplex's best-selling No. 3 product contained the reprotoxic lilial ingredient, which would negatively impact demand for Olaplex's products, particularly by such health-conscious consumers.  Specifically, the Offering Documents stated:

Consumers are Increasingly Focused on Health and Wellness

***

Several significant tailwinds support the long-term growth prospects of the haircare market. The way our consumers feel about their hair has a strong impact on how they perceive themselves; we believe that continued focus on personal appearance and wellness will drive increased spend in the category. We believe consumers are also becoming increasingly health-conscious, *generating a high demand for clean*, technology-backed *beauty products* that achieve results, and that the importance of hair health has driven increased willingness among our consumers to invest in premium-quality products. *Our offerings,* which are able to deliver results after the first use, *position us well to meet this rising consumer demand*.

190. ~~194.~~ The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while touting Olaplex's product offerings as positioning the Company well to meet the "high demand for clean" products by health-conscious consumers, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Olaplex ***had already been*** facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)     The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

(b)     As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)     Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)     The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)    As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)    As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

191. 195. Further, the Offering Documents misleadingly touted Olaplex's focus on developing "clean" products, which "has driven strong organic growth," without disclosing that Olaplex's best-selling No. 3 product contained a reprotoxic chemical that had been banned in the E.U. due to its fertility risks—a material fact that would negatively impact consumer demand and, as a result, Olaplex's growth. Specifically, the Offering Documents stated:

Synergistic Channel Strategy Underpinned by Our Omni-Channel Approach

***

*Since our first product launch, we have focused on developing clean,* technology-based *beauty products* and created powerful engagement between professional hairstylists and our consumers*, which has driven strong organic growth*.

192. 196. The statements in the preceding paragraph were each inaccurate statements of material fact when made because, while touting the Company's focus on developing clean products as having driven "strong organic growth," the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Olaplex *had already been* facing at the time of the IPO and/or was significantly likely to do so as a result:

(a)    The E.U.'s ban on lilial, which occurred in August 2020 and was set to take effect on March 1, 2022, due to the chemical's significant safety risks, particularly infertility links, which would apply to Olaplex's "hero," best-selling No. 3 product that contained this ingredient until shortly before the IPO;

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

84

(b)    As a result of the E.U. ban, Olaplex reformulated its No. 3 product in June 2021 to remove lilial world-wide, shortly before the Company's IPO, as confirmed by the lists of ingredients on the Company's labels and Safety Data Sheets posted on the Olaplex website, CW statements, and Defendants' own subsequent admissions;

(c)    Olaplex continued to sell old stock of the No. 3 product, which still contained the reprotoxic lilial ingredient, at the time of the IPO and for months afterwards, at least until January 2022, according to its own later public admissions;

(d)    The significant risk that Olaplex's brand reputation, consumer sentiment towards and demand for its products, and its competitive position would be adversely impacted by the implementation of the E.U.'s ban on lilial, particularly given the Company's heavy reliance on social media for sales and marketing efforts as its highly active digital community would amplify the resulting negative publicity and reputational damage to the Olaplex brand;

(e)    As Defendant Tiziani would later admit, Olaplex made a pre-IPO decision to hold more months of inventory on hand, which would saddle the Company and its distributors with excess inventory as sales slowed; and

(f)    As a result of the above, the significant risks that Olaplex likely would—and, in fact, later did—lose sales, customers, market share to competitors (who would take advantage of the reputational damage to Olaplex's brand), and revenue.

**H.    Post-IPO Events Demonstrate That the Offering Documents Were Materially False and Misleading at the Time of the Offering**

193.    ~~197.~~ Unbeknownst to investors, before the IPO, one of Olaplex's best-selling, flagship products, the No. 3 Hair Perfector, contained an ingredient, lilial, that the E.U. had banned as unsafe due to its links to fertility risks—a ban that was set to take effect less than six months after the IPO. As a result, Defendants quietly removed lilial as an ingredient from its key No. 3 product in June 2021

world-wide, shortly before the Company's IPO, as Defendants would later admit. Defendants did so without disclosing this issue and the material risks it represented to the Company's financial success in the Offering Documents.

         **1.**    **November 10, 2021 – Olaplex Reports First Post-IPO 3Q 2021 Quarterly Results**

194. ~~198.~~ In its first press release after the IPO, on November 10, 2021, Olaplex reported the Company's third quarter 2021 ("3Q 2021") financial results. Olaplex reported, among other things, an 81% increase in net sales, which the Company stated "reflect[s] strong growth across all channels of distribution driven by increased velocity of existing products, the launch of new products, and the addition of new customers, both in the U.S. and Internationally."

195. ~~199.~~ On the same day, during the earnings call to discuss the quarterly results, in response to an analyst question on Olaplex's distribution into salons and Ulta Beauty, Defendant Wong stated that "brand building" was one of Olaplex's "key growth considerations," thus reiterating how crucial its brand reputation was to Olaplex's financial success. Specifically, she stated, in relevant part:

> As to what else are we going to go, in terms of expansion of distribution in Specialty Retail. As I've mentioned, we just have so much with our core accounts that we really want to be the #1 hair care brand of the top 5 beauty brands in their offering so that we become an anchor brand for them. ***And when we are anchored brands for any of our partners, we then are able to really partner up on marketing, brand building as well as growth. So those are key growth considerations for us, in our partnership with our existing players.***

196. ~~200.~~ Further, in response to an analyst question about the Company's methods for building brand recognition and Olaplex's consumer base, Defendant Wong reiterated the importance of community and social media engagement to Olaplex's growth prospects, stating:

> I think, what is important to note is, we are very focused on what really builds long-term growth, and [what] studies have shown us that the three sources of truth, when it comes to brand building and marketing awareness, first and foremost, is the -- is -- especially for hair, is where they want to take recommendations from their professional hair stylist. ***So building that community will continue to be our focus. So with***

*that said, the #2 area, the #2 source of truth, is product reviews and word of mouth, which is the third one, which means that we are already in that space through our social media engagement connection and conversion, with our performance marketing, whether it's via digital media or search engine optimization.* We will continue all of this interactive tools to connect, engage and convert our customers. And if we continue to do that, the marketing, branding and the awareness build would just be a lot more organic as well as strategic because this is in partnerships, not only with what we are doing, but driving traffic to both online and offline retailers that we partner with.

**2. In Early 2022, Olaplex's Social Media Community and the Market Focuses on the Lilial Issue**

197. 201. Just two days before the E.U.'s ban on lilial was set to take effect, on February 27, 2022, a beauty influencer on TikTok with over 227,000 followers at the time, Hasini Kay ("Kay"), posted a video on the social media platform expressing her apparent dismay that Olaplex products may be banned in the E.U., with an in-video caption that stated: "When you find out Olaplex is going to be banned in the EU + UK next month."[26] The video thus for the first time revealed to consumers and investors that Olaplex's products had contained lilial, which was banned in the E.U. due to safety concerns. The video has since been viewed over 1.1 million times, generated over 1,370 comments, and has been shared over 3,500 times.

198. 202. The same day, Kay posted a second video on TikTok explaining to viewers that "[t]here are reports that Olaplex is being banned in the E.U. and the U.K., and that is because of this ingredient [pointing to a google search of lilial], which has been linked to infertility." Kay also noted that "[s]ome sources say it has already been reformulated" to remove lilial. This video has since been viewed over 223,800 times, shared over 2,000 times, and garnered over 9,019 likes and 380 comments.[27]

---

[26] This video can be found on TikTok at: https://www.tiktok.com/@hasinikay/video/7069331721623194885?refer=embed&referer_url=https%3A%2F%2Fgraziadaily.co.uk%2F&referer_video_id=7069331721623194885.

[27] This video can be found on TikTok at: https://www.tiktok.com/@hasinikay/video/7069451034434882822?is_from_webapp=1&sender_device=pc&web_id=7189819984725362222.

199.   ~~203.~~ Kay's videos immediately went viral on TikTok and other social media platforms, as countless users shared and reposted them, or made their own posts on the topic.  The traditional news media also widely reported on the controversy in numerous subsequent articles published online.  In particular, these videos sparked immediate public outcry and backlash against Olaplex for its undisclosed use of such potentially toxic ingredients in its supposedly "clean" products.  Indeed, numerous TikTok users quickly commented on the Kay videos, expressing their shock and concern about Olaplex's use of such ingredients, and the users' changed perception about Olaplex being a "clean" brand, marking the beginning of a stream of negative publicity for the Company.  For instance, as the following TikTok users commented on Kay's post:

**juniebear3**
Serious question isn't olaplex listed as a clean product?
2022-2-27      ♡ 11      Reply



**SJ**
I use this weekly and have been trying to get pregnant for 4 years! 😱
2022-3-1      ♡ 0      Reply



✨
Okay but why are they even putting dangerous chemicals in things we use everyday 😳😳😳😳
2022-2-27      ♡ 0      Reply



**Sarah**
@bemoreflamingo:  A company that thinks it's ok to put in a fertility killing ingredients should be permanently boycotted 😳
2022-2-28      ♡ 0      Reply

**MB**
So I've been weeping over negative tests for years because of my hair!!!!?
2022-2-28      ♡ 0      Reply

200. 204. The numerous TikTok comments even prompted the official Olaplex account on TikTok to respond on the video, in an attempt to reassure worried consumers: "OLAPLEX No.3 Hair Perfector is not banned in the UK. Olaplex takes the health of our consumers and regulatory compliance seriously."

201. 205. The next day, on February 28, 2022, Olaplex also posted a video on its official social media accounts, including on Facebook and Instagram, "in response to the recent social [media] posts" about lilial, "which Olaplex no longer uses in any of its products."  The video featured Olaplex's Chief Scientist and Vice President ("VP"), Research and Development ("R&D") and Regulatory, Lavinia Popescu, who addressed the E.U. regulatory ban and explained that Olaplex had removed lilial from its No. 3 Hair Perfector globally, acknowledging that her intention was to "address this lilial subject that recently ***the entire industry is talking about***."  In so doing, Popescu explained that "until last year, this ingredient [lilial] was classified as an allergen" and, although she insisted that Olaplex products contained lilial in small quantities for this reason, she admitted that "an allergen is a substance that could cause an allergic reaction and ***we were very aware about this problematic, to say, function of the lilial***" ingredient.  She also noted that, "in the past, when we [found] out that eventually this ingredient can have other side effects [*i.e.*, impacts on fertility], we decided to take it out."  Popescu reiterated that "I want to be clear and I want to explain that we decided to take lilial out from our products, not only in the E.U. where in this moment [it] is banished, we decided to take it out globally."  Popescu later again confirmed that "in this moment, Olaplex is lilial-free."  Accordingly, these statements by a senior Olaplex executive confirmed the potentially "problematic" side-effects of lilial, including infertility risks and allergic reactions, existed prior to the IPO, despite Defendants' failure to disclose these facts in the Offering Documents as described above.  Popescu's statements also show the significance of the lilial concerns to consumers and investors given

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

89

Popescu's acknowledgment that the "entire industry" was "talking about" this issue and the damage control efforts that Olaplex was engaging in at this time to make clear to the public that it had removed this ingredient from its products.

202. 206. Over the next few days, numerous news articles and social media posts continued to report on Olaplex's lilial issue. For example, a March 1, 2022 article by *The Independent*, titled, "Olaplex removes lilial from No.3 Hair Perfector following EU ban," discussed the E.U. ban on lilial due to the fertility safety concerns and the recent alarm sparked on social media regarding Olaplex's use of the ingredient in its No. 3 product. The article noted, for instance, that the above TikTok video by Kay regarding Olaplex and the E.U. ban had "received ***almost one million views***." The article also quoted the Company as follows: "In a statement to the *Independent*, Olaplex said it had now removed the ingredient from its No.3 Hair Perfector across the world, adding that Olaplex products containing lilial had not been sold in the UK since January." Specifically, the article quoted a "spokesperson" from Olaplex as further explaining: "'While this phase out is limited to the EU, out of an abundance of caution, Olaplex proactively removed lilial from our No.3 Hair Perfector globally. ***Since January 2022***, Olaplex no longer sold products using lilial in the UK or EU.'" Thus, these statements indicate that Olaplex still sold old stock containing lilial up until January 2022—*i.e.*, at the time of and for several months after the IPO.

203. 207. Similarly, a March 2, 2022 *New York Post* article, titled, "Banned Olaplex ingredient linked to infertility sparks TikTok backlash," reported that "Olaplex is a staple at trendy upscale salons, but hair-raising rumors that a now-banned ingredient causes infertility have ***racked up 30 million views on TikTok***." The article explained that the Olaplex brand "has gone viral" after reports on social media in the preceding days that its No. 3 product, which "***is arguably their most popular in the line*** — evidenced by the more than 30 million views tied

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

90

to the social media hashtag #olaplexno3 on TikTok alone," was subject to the E.U. ban on lilial due to safety concerns with fertility.  The article also confirmed that the public did not previously know of this lilial issue with Olaplex products, noting that "*it came as a shock* to the hair-obsessed that Olaplex would be revealed as an infertility risk" due to this ingredient.

204. 208. Likewise, a March 1, 2022 article by Refinery 29, titled, "The Truth About Olaplex & Infertility," reported on the lilial controversy: "The Olaplex website even touts the product as a bestseller.  *That's why it came as a surprise* to hear rumors bubbling over the weekend that the product would be banned."

205. 209. Moreover, on March 3, 2022, a group of Olaplex consumers filed a class action lawsuit in the Superior Court of Quebec against Sephora Canada and Olaplex in connection with the Company's use of lilial in its No. 3 product.  The lawsuit, which is still pending, alleged that Olaplex failed to inform its customers of the "serious health risks" associated with the lilial ingredient, which included potential infertility and allergic reactions, based on the EU's SCCS's opinion described above, including its finding that lilial is linked to "reproductive toxicity." The Canadian consumers' complaint also noted that it appeared that Olaplex had "*apparently very discre[e]t[]ly*" removed lilial from its No. 3 Hair Perfector "at some point in June 2021," citing Olaplex's current Safety Data Sheet posted on its website, which was updated on June 27, 2021.  The Canadian consumers' complaint further alleged, regarding Olaplex's removal of lilial before the IPO, as follows: "Olaplex tried to very subtly remove this dangerous chemical from Olaplex No. 3 Hair Repair Perfector in June of 2021 and hoped that its customers would never realize.  *It only acknowledged and spoke publicly about the safety issues after its use of lilial in Olaplex No. 3 Hair Perfector went viral on social media in February 2022*."

206. 210. Negative news coverage on this issue mounted in the following days and weeks. For example, a March 4, 2022 article from *Insider*, titled, "Olaplex Removes Lilial After the Fragrance Was Linked to Infertility," stated that "[c]onsumers who use Olaplex, a popular haircare line, expressed concern on social media after an ingredient in the brand's No. 3 Hair Perfector mask was linked to a risk of fertility problems." The article explained that "a review by the European Union's consumer safety regulators concluded that adding up small exposures over time could pose a health risk, particularly for individuals trying to conceive." Further, an April 13, 2022 *MTL Blog* article discussed the Canadian lawsuit that "calls attention to one specific product, the Olaplex No. 3 Hair Repair Perfector, as it contains a 'dangerous chemical' called butylphenyl methylpropional (lilial)."

207. 211. At the same time, the Company's stock price fell $0.90 per share, or 5.41% to close at $15.75 on March 3, 2022, and following an intervening weekend, the Company's stock price fell an additional $1.86 per share, or 11.68% to close at $14.06 on March 7, 2022.

208. 212. Securities analysts following Olaplex also were concerned by this lilial issue and its impact on the Company's business. For example, in a March 7, 2022 analyst report, Piper Sandler noted that, "[f]ollowing the *No. 3 controversies that have been taking over headlines* this past week," analysts were remaining "*watchful of the future competitive environment*." The report also commented that "[w]e plan to gain further insight on all these topics on the company's Q4 call tomorrow," further showing the significance of this issue to investors.

209. 213. Multiple other analysts also noted the lilial issue and its impact on Olaplex's brand equity and sales were a key area of concern for investors to be addressed at the upcoming fourth quarter 2021 earnings call, and that such concerns were a substantial factor in the recent Olaplex stock price declines. For example, a March 7, 2022 J.P. Morgan analyst report highlighted that "*OLPX shares have been*

*under meaningful pressure* YTD (OLPX -51.7% vs. XLP -3.4% and SPX -11.8%), *which we attribute to some combination of investor concerns regarding* an Omicron related slowdown in underlying consumption, *unfavorable headlines around past product formulations* and the broader market rotation away from growth names." The report further pointed out that "[d]uring the earnings call at 9am ET (details below), *we believe main topics will be: removal of non-active fragrance ingredient Lilial from formulation* (link to No. 3 Q&A section) despite its relatively safe concentration, *but how management is insulating from the potential impact in its brand equity.*"

### 3.    March 8, 2022 – Olaplex Reports 4Q and FY 2021 Quarterly Results

210.    ~~214.~~ On March 8, 2022, Olaplex issued a press release reporting the Company's financial results for the fourth quarter of 2021 ("4Q 2021") and full year 2021 ("FY 2021"), both of which ended on December 31, 2021, before the lilial issue was publicly disclosed. Olaplex reported, among other things, net sales growth of 78.7% in the fourth quarter and 112% for the fiscal year, exceeding Company guidance.

211.    ~~215.~~ On the related earnings call the same day to discuss these results, at the outset of the "Q&A" portion of the call, Defendant Wong made a lengthy statement acknowledging the consumer and investor concerns regarding what she characterized as "misinformation" concerning Olaplex and lilial. Defendant Wong admitted the significance of the lilial issue to investors but minimized its severity and impact on Olaplex's sales, stating No. 3 included "very small amounts of lilial" and was "never an active or functional ingredient." Specifically, Defendant Wong explained, in relevant part:

> I also want to address the misinformation surrounding OLAPLEX and lilial upfront in view of taking questions on it during the Q&A. In the last 10 days, misinformation on OLAPLEX has surfaced with regards to lilial in our products. *We have been actively communicating across all our channels to ensure that our customers have access to the facts*

*and to alleviate any anxiety that has been caused by this misinformation.*

Lilial is a fragrance ingredient commonly found in beauty and household products. In September of 2020, the EU regulatory authority announced their intent to phase out the use of butylphenyl methylpropional, which is lilial, by March of 2022, out of concern that lilial when used at certain quantities could have negative impact on women's fertility and reproductive system if ingested. *In response to the EU's phaseout of lilial, we no longer produce products with lilial.*

Prior to the EU's phaseout, our No. 3 Hair Perfector product contained very small amounts of lilial to enhance the product's fragrance. Lilial was never an active or functional ingredient in our products. And independent medical and chemist experts have confirmed that the very small amount of lilial, 0.0119%, previously used by OLAPLEX in its [rinse-off] No. 3 Hair Perfector product, had no impact on fertility and the reproductive system.

We have provided updated and detailed information on our website under the FAQs. There is also a link to an article citing experts from the medical and science community as well as the original study that led to the phaseout of lilial.

We take pride in our investment in R&D and our commitment to ensuring that our products are designed and produced with the safety and health of the consumer at heart. And we will continue to abide by health and safety standards as they evolve. And as we have always been, we will continue to proactively and transparently communicate with our customers and the market to ensure they are well informed about our products.

212. ~~216.~~ During the Q&A portion, a Goldman Sachs analyst followed up on the lilial issue, noting that it could damage Olaplex's brand reputation and asked if Olaplex was seeing any impact on sales: "*But even if there's not a substance behind the concerns, perception matters*. Have you seen any negative impact in retail sales related to this?" In response, Defendant Wong did not directly answer the question, claiming that it was too soon to tell if the lilial issue had any impact on sales but that this was a key concern that Defendants were closely monitoring "from all angles" and "on all fronts":

> *I think what I want to point you back is to the fact that we are addressing it on all fronts. It did only happen, as in my sort of early-on statement, in the last 10 days. So we are monitoring and looking at everything from all angles.* But the primary concern now is to really address all of this misinformation because you can appreciate how some of the anxiety that it has created for women when they read about infertility, and we are very happy to be able to cite experts not

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

94

affiliated with OLAPLEX, not paid by us, citing that there is no impact to fertility.

213. 217. Numerous analysts reported on the lilial issue after this earnings call and its possible impact on Olaplex's business. Indeed, several analysts specifically noted that the lilial issue's impact on Olaplex's brand reputation and sales was a "key" area of concern for investors that they would continue to monitor, particularly given Defendant Wong's statements on the call not denying any adverse sales impact.

214. 218. For example, in a March 8, 2022 Jefferies analyst report issued after this earnings call, the analysts stated: "*Key* sticking points from call, based on inbound investor requests: *1) ingredient concern*, which [management] addressed, but *didn't* definitively confirm no sales impact . . . ." In discussing the call in greater depth, Jefferies then described the lilial issue as its first concern, stating: "Concern 1: EU Bans Lilial, Non-Active Fragrance Ingredient Used in Trace Amounts in Olaplex No.3. *In a very recent flurry of media activity*, Olaplex has been drawn into a cycle of information & misinformation re: the EU's Oct-21 announced phase out of lilial, a fragrance additive used in trace amounts in Olaplex's No.3 product." The Jefferies analysts further noted that "*[w]hen pressed in Q&A whether the headline effects have burdened short-term sales, management didn't directly say 'no' which left the possibility open.*" The Jefferies report then explained that the market was concerned about a potential impact of the lilial issue on Olaplex's DTC sales, though the analysts believed this conclusion was too soon to draw at this early point, but that it was a "key risk" they would closely monitor: "Paired with Q1 sales guidance that is due to be higher than FY guide (+36%) but with DTC below, *the market appears to be interpreting an impact to dot com sales*. This seems like a rapid jump to conclusions, but *it's a key risk* we now must digest in real time."

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

95

215. 219. In a second report the same day that was issued after Jefferies held a call with Olaplex management to follow up on the topics addressed on the earnings call, Jefferies noted, under the heading "***Key Takeaway***," that Olaplex "***[s]hares were volatile post the earnings call, down -4.6% at the close, reflecting lingering questions re: [lilial] ingredient safety*** & EBITDA margin sustainability." Jefferies then explained: "We used our follow-up with management to get clarity on these topics which underpins our confidence in the beatability of sales expectations." Specifically, Jefferies claimed to be reassured by Defendants' clarification on this management call that apparently the lilial issue had not yet adversely affected Olaplex's sales: "***Points of Clarification Following Our Call with Management: 1) Lilial Ingredient Impact: In our follow-up, we confirmed that order flow and DTC sales have remained on-track through ingredient concern headlines (which peaked in late Feb)***." Nevertheless, Jefferies indicated that this issue remained a key area to watch given its potential ramifications on Olaplex's future sales: "***We continue to monitor: 1) sentiment re: ingredient concerns.***"

216. 220. Other analysts similarly acknowledged the impact of unfavorable news and media coverage regarding lilial, though most believed any fallout on sales would be minimal given Defendants' statements on the call minimizing the issue. For example, in a March 9, 2022 analyst report, J.P. Morgan confirmed that, as expected, the lilial issue was a key topic of the earnings call: "As we had anticipated, ***management spent some time during the conference call addressing the recent press around the company's prior use of the lilial ingredient in the No.3 Hair Perfector***." In particular, they were "encouraged" by Defendants' statements during and after the earnings call downplaying the impact of this negative publicity on the Company's "brand equity" and sales: "To that end, Ms. Wong reiterated [on the earnings call] that the product previously contained de minimis amounts of the ingredient (0.0119%) which has since been removed from the formulation (globally)

prior to the EU regulatory authority's phase out by March 2022.  ***Encouragingly, we note that management sounded confident during both the conference call and our follow-up conservation that the unfavorable headlines*** (which have receded relatively quickly) ***should not have a material impact on the brand's equity nor underlying consumption in 2022.***"

217.  ~~221.~~  Likewise, in a March 9, 2022 analyst report, Raymond James described the lilial controversy as their "***Key Takeaway[]***" from the earnings call, writing: "[Management] addresses recent ingredient questions.  During its call, [management] addressed recent questions around the use of the fragrance enhancer lilial in Olaplex #3 following an EU ban on the ingredient that went into effect on 3/1.  [Management] noted that lilial is harmful if ingested and makes up a miniscule fraction of the #3 product.  It has since been removed from the product."  Similarly, in a March 8, 2022 analyst report, Piper Sandler covered the lilial issue as a "***Key Point***[] from the Call," writing: "There were a number of topics covered on today's call, including management addressing the misinformation around the previous lilial ingredient in No. 3."  In addition, a March 9, 2022 Telsey analyst report detailed "Management comments on lilial" at the earnings call, including: "Following recent social media confusion and misinformation, ***management reiterated on the call that its products no longer contain lilial***, a fragrant ingredient commonly found in beauty and household products."  Further, in a March 8, 2022 analyst report, Evercore discussed, under "Takeaways from the call," "Olaplex's communication strategy to meet concerns over lilial, a fragrance used in one item of the range."

       **4.**      **May 11, 2022 – Olaplex Reports 1Q 2022 Quarterly Results**

218.  ~~222.~~ Before Olaplex issued its financial results for the following quarter, *i.e.*, the first quarter of 2022, which ended on March 31, 2022 ("1Q 2022")—a few weeks after the lilial news came out—analysts remained watchful of the lilial issue's potential impact on the Company's sales.  For example, on May 5,

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

97

2022, a few days before Olaplex announced its financial results for 1Q 2022, Evercore issued an analyst report discussing the following risks to Olaplex's business: "*1) concerns over health risk of lilial, an inactive ingredient removed from the formulation; 2) K-18*" and "*Controversy: Competitiveness of marketing strategy that only uses social media* and focuses on salons v. heavy spenders like L'Oreal."  In another section of the report titled "Competition," the Evercore analysts further noted "*investor worry about . . . competing technologies* --- Redken by L'Oreal and *more recently K18, which is generating buzz in social media, a precursor of [market] share gains.  These are all legitimate worries*, and this is a sobering market."  Thus, investors and analysts were growing increasingly concerned about the potential impact of Olaplex's lilial controversy to its brand reputation, and ultimately sales, particularly amidst rising social media-savvy competition, such as K-18, given these early warning signs that they were potentially beginning to erode Olaplex's leading market position.

219. ~~223.~~ Shortly thereafter, on May 11, 2022, Olaplex reported its financial results for 1Q 2022, including *slowing growth* in net sales, which declined from the prior quarter's 79% to 58% year-over-year.  This slowing sales growth signaled to investors that the prior lilial issue was in fact beginning to have an adverse impact on Olaplex's sales.

220. ~~224.~~ On the same day, Defendants filed Olaplex's Form 10-Q for 1Q 2022, providing further information on its 1Q 2022 financial results.  Notably, in the 1Q 2022 10-Q, Defendants specifically *admitted* that the reformulation of its No. 3 product to remove lilial occurred in *June 2021*—three months before the Company's IPO:

> Our cost of sales increased $20.5 million or 83.5% to $45.0 million in the three months ended March 31, 2022 from $24.5 million in the three months ended March 31, 2021, due to a $16.9 million increase driven by a growth in sales volume, *a $4.3 million increase due to the inventory write-off and disposal costs related to unused stock of a product that the Company reformulated in June 2021 as a result of*

*regulation changes in the E.U.  In the interest of having a single formulation for sale worldwide, the Company reformulated on a global basis and is now disposing of unused stock.*  In addition, cost of sales was partially offset by a $0.7 million decrease in the amortization of our acquired patented formulations.

221. ~~225.~~ At this time, the Company's stock price fell $0.78 per share, or 6.03% to close at $12.16 on May 10, 2022.

222. ~~226.~~ Analysts noted Olaplex's slowing sales growth and expressed continued concerns about the impact of the lilial issue.  For example, in a May 11, 2022 analyst report, BofA noted the "*disruptions*" generated "*by the EU ban of lilial*" and the "$4.3mil of inventory writedown from lilial-related global reformulation of OLPX's No. 3 line" that the Company had disclosed, commenting "that reiterated sales, EBITDA, and profit guide implies *some moderation in expectations for the remaining quarters*," although it was still "reassure[d]" by the "continued momentum" in Olaplex's sales.

223. ~~227.~~ Indeed, as discussed further above, the accounts of CW-~~2~~1 and CW-~~3~~2 confirm that negative social media and news reports on the lilial issue, after it was disclosed in March 2022, began to negatively impact the Company's sales shortly thereafter.  Specifically, CW-~~3~~2 explained that when he began working at Olaplex in April 2022, the Company was dealing with concerns reported in the media that an ingredient in its hair products, lilial, may be harmful.  CW-~~3~~2 indicated that *those concerns were causing problems with the Company's sales*, and members of the Sales team asked the Marketing department to help them boost their performance.  CW-~~3~~2 recalled that the controversy over lilial began in late February or early March 2022, shortly before CW-~~3~~2 started with Olaplex, and that CW-~~3~~2 believed that the controversy was *a large factor in the Company's struggling sales*.

224. ~~228.~~ Similarly, CW-~~2~~1 recalled that he started seeing *softer demand for Olaplex's products, and a drop-off in sales, in approximately Q2 of 2022.*  CW-~~2~~1 stated Olaplex's weakening sales and inventory oversupply were caused by two

factors: (1) Olaplex's failure to anticipate the existence of competition for its products; and **(2) Olaplex's failure to respond effectively to negative reports and social media about its products**.  CW-~~21~~1 noted that now, "everyone" had a bond builder product like Olaplex, and so the Company is losing market share.

### 5.    Negative Publicity Surrounding Olaplex and Lilial Continues Later in 2022

225.  ~~229.~~ Negative press surrounding Olaplex's lilial issue persisted in the summer of 2022.  For example, on June 22, 2022, an article in *Vogue Business* entitled "After viral infertility memes, can Olaplex bounce back?" that included an interview with Defendant Wong, described the brand's struggle with the lilial news as an "**overnight disaster**."  The article noted that Olaplex "found itself at the centre of a controversy earlier this year when a TikTok video [by Kay, as described above] highlighting its use of an ingredient that was set to be banned in Europe over links to infertility **went viral**."  The article further explained that the No. 3 product was a crucial product for the Company's financial success: "Olaplex's success has been driven by focusing on less than 10 very effective products **with No. 3 among its best sellers**."  The *Vogue Business* article also pointed out that Olaplex was particularly vulnerable to such reputational controversies on social media because of its reliance on social media marketing to build and maintain its brand reputation: "***Building a viral marketing machine on social media by leveraging key beauticians and hair stylist influencers was core to the brand, and now they were threatening it.***  Indeed, the article quoted Defendant Wong as admitting as much, stating: "'***The thing with social media is that it's a double-edged sword,'*** Wong tells Vogue Business over a cup of tea at new London hotspot the Nomad Hotel. . . ***'It can elevate you,' she says, but 'it can also be disruptive.'***"

226.  ~~230.~~ In addition, the *Vogue Business* article commented that during a recent earnings call, "Olaplex told investors it had already begun phasing out lilial in Europe following the EU's ruling, and would now remove the product globally.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

100

Olaplex shares fell 6 per cent after the earnings call."[28]  Moreover, the article described the reputational fallout of the lilial issue for Olaplex on social media as follows: "Still, *shock and disappointment had rippled throughout the brand's online community*.  Some joked in memes about preferring good hair over fertility, while several others requested a refund."  The article also noted other financial costs of the lilial issue, stating that "[t]he company made the decision to spend $4.3 million to dispose of existing stock" of the No. 3 product that had still contained lilial as an ingredient.

227.  ~~231.~~ Further, in the article, Defendant Wong admitted that consumers and the market were very concerned about the lilial issue but continued to minimize its long-term impact: "'*The impact [on sales] was very minimal*, because of the mitigating factors that we implemented,' says Wong.  '*When the thing first came out, we did see a lot of concerns.  But, at this point in time, everything has been addressed* given that we have disposed of the inventory.  We were very quick in responding.'"

228.  ~~232.~~ The article, however, explained that such adverse social media publicity in fact *continued* to pose "*a real risk to Olaplex*" given the Company's reliance on social media and the persistent nature of such TikTok posts, citing in support a Jefferies analyst who focuses on consumer research:

> Still, *the incident spells a cautionary tale for brands that rely on social media.*  While Olaplex has addressed the concerns, *some posts on TikTok remain online.  The posts about Olaplex's No. 3 range gained traction because of the viral nature of TikTok's algorithm*.  Even with zero followers, users on the platform can get millions of views on a video and continue to do so a year later (posts on other social media platforms, such as Instagram and YouTube, haven't historically been easily discoverable and tend to have a lifespan of no more than 24 to 48 hours).  "The TikTok algorithm keeps spinning whatever is hottest and

---

[28] The article appears to suggest in error that Olaplex's discussion of lilial occurred during the Company's May 11, 2022 1Q22 earnings call.  As explained above, however, this discussion actually occurred on the Company's March 8, 2022 4Q22 earnings call.

driving the most clicks," says Stephanie Wissink, managing director of consumer research at investment banking firm Jefferies.

***To date, Kay's video has over a million views and thousands of likes.*** Kay did not respond to requests for comment. ***Still, it's continued life online poses a real risk to Olaplex as "it's a company that positions and commercialises itself as being backed by science, so in the moments where efficacy, performance and safety are called into question, it's going to require the company to do everything they can to remediate that,***" says Wissink.

229. ~~233.~~ This negative media attention, and thus, related consumer concerns about the credibility of the Olaplex brand, continued into July 2022, as evidenced, for example, by a July 4, 2022 *Woman and Home* article, titled "Olaplex—what are the infertility links and is it safe?" This article reported that "Olaplex is involved in an ingredient controversy as some chemicals found in certain products have been linked to infertility," referring to the lilial issue in the No. 3 product. The article stated that the "recent controversy has concerned shoppers who are worried that their hair care products may be linked to infertility and other pregnancy issues." Additionally, the article explained that "lilial has been linked to infertility because the European Commission concluded that in large concentrations it 'cannot be considered safe.'" Further, it elaborated that its use "on an individual product basis" also "would quickly become unsafe if an individual used various products within a day that contained the chemical compound." As a result, the article recommended similar alternative products by competitors like K18 for any consumers who remained concerned about the Olaplex brand given the lilial issue: "It's also worth saying that ***there are alternative treatments on the market that you may wish to try instead, see our K18 review for our beauty editor's top hair repair mask***." Thus, these and similar articles demonstrate the continuing reputational harm to the Company and consumer sentiment against its products, which competitors could, and did, exploit at the time to take business away from Olaplex.

### 6. August 9, 2022 – Olaplex Reports 2Q 2022 Quarterly Results

230. 234. The following quarter, on August 9, 2022, Olaplex reported its financial results for the second quarter of 2022 ("2Q 2022"), including further slowing growth in net sales to **38.6%** year-over-year (down from 57.6% in the prior quarter). On the earnings call the same day to discuss these results, Defendant Wong downplayed the Company's competitive pressure and the impact of the E.U.'s ban on lilial on Olaplex's brand reputation and resulting demand, describing Olaplex's level of competition as "normal," stating:

> *We also continue to see a normal level of competitive intensity, which is healthy for a high-growth category.* As the creator of the bond-building category, and as the only brand using patent-protected Bisamino technology to truly repair hair bond from the inside out, we stand to gain the most from growing awareness of the category. *While we do not expect the category to be immune for potential pressure related to an economic slowdown, we also believe that current sentiment for the category and OLAPLEX remains strong.*

231. 235. Regarding the Company's inventory, Defendant Tiziani acknowledged Olaplex's "higher" level of inventory on hand as follows:

> Inventory at the end of Q2 2022 was $140.3 million compared to $98.4 million at year-end 2021 and $117.5 million at the end of Q1 2022. *We have strategically maintained a higher level of inventory months on hand* to support the growth in our business, compensate for longer transit times overseas and to help mitigate macro supply chain risks. We remain comfortable with our inventory position and our ability to meet future demand.

232. 236. In response to a follow-up analyst question regarding inventory, Defendant Tiziani admitted that the Company had decided in **mid-2021**—the same time Olaplex was reformulating its No. 3 product and before the IPO—to hold more inventory on hand than usual:

> We're happy with the level and quality of the inventory we have on hand. It's been a big part of our strategy to maintain excellent customer service, which we've been able to do over the past several years. *And that means we made a strategic decision to hold more months on hand of inventory. We made that decision way back in the middle of last year.* It served us very well. That's exactly what we're continuing to do here. And that month on hand level of inventory remains pretty stable.

Thus, these statements indicated that before the IPO, and at the same time Olaplex was removing a chemical linked to fertility issues from one of its top products—and in the face of the significant likelihood that the ban on lilial would negatively impact Olaplex's brand reputation, demand for its products, and sales—Olaplex had decided to hold *more* inventory on hand than it had before.  The Company had not previously disclosed this pre-IPO inventory decision, which would compound the adverse impact to Olaplex's business from its waning demand problem that began after the lilial issue surfaced, thereby saddling the Company with more unwanted stock that it struggled to sell.

233.  ~~237.~~ At this time, the Company's stock price fell $1.63 per share, or 9.99% to close at $14.68 on August 9, 2022.

234.  ~~238.~~ Analysts took note of Olaplex's sales slowdown.  For example, in an August 10, 2022 analyst report, Barclays stated that, "*[o]ur concerns around a slowdown in the U.S. proved valid*," and with "anticipating decelerating growth, we believe the path ahead, at least from a share price standpoint, could prove challenging."

235.  ~~239.~~ Similarly, an August 10, 2022 BofA analyst report highlighted the following concerns: "1) *Sequentially flat Specialty Retail* ahead of moderate elasticity from 5.5pts of pricing starting 3Q; 2) *Direct-to-Consumer (DTC) slowdown continuing with 8% sequential decline vs 1Q*; and 3) Gross margin contraction of -550bps YoY was 300bps worse than BofAe from mix and higher logistics costs."

**7.    In Fall 2022, Olaplex's Brand Reputation Continues to Erode and Negative Press Escalates as Concerns Grow That Lilial and Other Ingredients in Its Products May Cause Hair Loss**

236.  ~~240.~~ The negative publicity generated by the lilial issue and related safety and efficacy concerns continued to plague Olaplex at this time.  In particular, additional reputational fallout from the Company's use of lilial in its supposedly "clean" products surfaced—*i.e.*, growing consumer concerns that rather than repair

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

104

and prevent hair damage as they were supposed to do, Olaplex products could actually *cause* it, including potential **hair loss**.  Specifically, posts and reports swirled on social media and in the press that consumers were questioning the brand's credibility in the wake of the lilial issue, which besides the infertility concerns had also highlighted the chemical's classification as a skin allergen that could cause scalp irritation and thus ultimately hair loss.  In other words, such reports revealed that consumers no longer trusted the Olaplex brand name after the lilial news, which had showed them that the Company had in fact used such potential toxins and allergens in its products contrary to its prior claims of including only "clean" ingredients.

237. 241. Indeed, in the summer and fall of 2022, consumers began to increasingly complain about Olaplex products online, including in Sephora reviews and a Facebook Group created July 12, 2022 dedicated to this topic called: "Olaplex Hair Loss/Hair Damage?".  The Sephora reviews and Facebook Group highlighted consumers' concerns about hair damage and hair loss from using Olaplex products, including the No. 3 Hair Perfector that was at issue in the lilial controversy.  For example, the following negative customer reviews about hair damage and loss posted on the Sephora website in August 2022, which again mention the lilial safety concerns and encapsulate the mounting consumer shift against Olaplex in the wake of the lilial news and its reputational fallout:[29]

---

[29] These screenshots are available at: https://community.sephora.com/t5/Best-Hair-Ever/Olaplex-and-Major-hair-loss/m-p/6249615.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

105



REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

106



caldang (ROUGE) (NEWCOMER III)

Olaplex and Major hair loss!!

Has anyone out there been experience sudden hair loss (or just noticed) from using any olaplex products? Specifically, Olaplex #3? My hair was gorgeous 6-8 months ago, but after using olaplex shampoo & conditioner and olaplex #3 for a few months, my hair began falling about in groves! I stopped using it many months ago, but my hair is still falling out. I contacted the company, and of course they say their product is not linked to hair loss -- of course they sl say that. Not one other product has ever caused my hair to fall out like olaplex and no other health conditions nor products can be attributed to my major hair loss. What in the world is in these products?? Can somebody please help or share their experience. Have Mercy! Make it stop! Olaplex, I am so mad at you! I wish somebody could get to the bottom of this! I urge you to be careful with these products. I know they've been hyped, but I know this is not just me and I hope to get to the bottom of this or at least find something to grow my hair back. It has been a nightmare!!

OLAPLEX
Olaplex No. 3 Hair

OLAPLEX
Olaplex No. 4 Bond

OLAPLEX
Olapl

View products (3)

Labels:

Damaged Hair    Hair Advice & Recommendations    Hair Challenges

♡ 24    ↩ Reply  |  101 Replies                                    •••

Shahalie (INSIDER) (NEWCOMER III)                          06-28-2022 12:26 AM

Okay seriously what's up with this… I bought a bottle February of 2022 my first ever olaplex product and it took me MONTHS to figure of what was causing it because so many people rave about olaplex but it was in fact the bottle of olaplex conditioner. What the heck is going on? I am so upset because I don't normally care to spend extra money but this like suppose to be soo healthy and I did bleach for the first time in YEARS. I hadn't even died my hair in over a year and it caused me to lose so much hair but not just that it literally broke off so many pieces from my hair like the breakage is really really bad and caused my hairline to literally move back. It's not letting me tag the conditioner so I had to tag another olaplex product. #olaplex

OLAPLEX
Olaplex No. 6 Bond

View products (1)

♡ 3    ↩ Reply                                              •••

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

107



238. 242. Further, a September 8, 2022 *New York Times* article, titled "What's Going on With the Magical Mystery Shampoo?," reported on this persisting reputational damage to the brand from the lilial news, which had prompted "***TikTok [to] turn[] on them***." "Earlier this year, the same platforms that helped turn Olaplex into a household name hosted far less friendly content: A TikTok video that went viral said that the European Union and Britain would ban Olaplex No. 3 for containing lilial, an ingredient used in trace amounts as a fragrance — and linked to infertility." The article also described the No. 3 Hair Perfector as "the company's top-selling product," and noted that Olaplex was forced to "destroy[] $4.3 million worth of inventory" of this product after "announcing a reformulation."

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

108

239. 243. Notably, the article also discussed the growing consumer complaints and doubts about Olaplex products' safety and efficacy after the lilial issue surfaced, including concerns that they may contain allergens that cause hair damage: "But for all the customers who think the products are capable of necromancing their hair, there is also dissent: *unhappy customers, skeptical chemists, disillusioned colorists. Sephora.com has dozens of one-star reviews for Olaplex, some blaming the oils and creams for damage*, many just saying the products don't live up to the hype." Finally, the article highlighted the increased competition that Olaplex now faced, which posed a much greater threat given Olaplex's reputational problems in the wake of the lilial issue: "*Some stylists note that there are several Olaplex competitors*, like Wella BlondorPlex, which was introduced in 2020 and includes a bond builder already mixed in with the color. Many also favor K18, another bond-building treatment that takes just minutes and doesn't need to be rinsed out or repeated as often." The article then quoted, as but one example, a previously-loyal Olaplex customer who had recently switched to K18 after being "tempted by Instagram ads" to try it. In sum, the article, after noting that Olaplex has previously "hinted at an expansion into skin care" as "other options," concluded that "*[t]he company may need them*" given these mounting problems with its haircare line.

240. 244. A few weeks later, on September 29, 2022, Piper Sandler published an analyst report downgrading Olaplex shares "as a result of further work . . . [that] revealed that *competition and misinformation pose growing risks to the company*." Specifically, the report detailed the results of its survey of 150 hair salons in the top fifty (50) U.S. metropolitan areas, finding that Olaplex was losing market share in salons due to competing products as "[c]ompetition has and continues to be on the rise in the hair repair category, particularly K18, which has risen to the #2 alternative hair repair product in our survey." Importantly, the report

directly linked this decline in sales and market share loss to competitors to the lilial issue and related negative reviews complaining of hair damage, which the report referred to as "misinformation" that began in early 2022: "*But, why are people switching from Olaplex? Mainly misinformation*," including that customers were "listening to what's most buzz-worthy on social media." Thus, the report confirmed that Olaplex's growing sales losses to competition at this time were attributable to the damage to its brand reputation and credibility from the lilial news, including intensifying consumer concerns that its products could cause hair damage and loss. In particular, the report further explained as follows:

> *A key factor we see driving this competitive growth and shift away from Olaplex is a notable amount of misinformation out there.* As we show below from our September Olaplex Salon Survey, there were a number of *negative reviews* mentioned by the hair stylists surveyed, however a number of these reviews are a result of error or misinformation. . . . Additionally, we believe that [product] misuse could be leading to some other *negative reviews we're seeing regarding damage, such as dryness, breakage, and hair loss.*

***

> *The quick spread of misinformed infertility concerns arising from the lilial ingredient in No. 3 (back in late-February/early March) is a clear example of how quickly negative press can spread*, and while we applaud management's quick actions to put out the fire, this does show the power of the press. *Recall, OLPX stock dropped ~6% the day the issue was brought to the public eye via social media.*

> **Lowering Forward Estimates**

> So, where do we go from here? While we understand our survey work is not representative of the entire population, we do view it as a good indicator of general trends. *Some salons are stopping use and sales of Olaplex products, competition is certainly growing, and there are clear concerns out there arising from misinformation.* We believe heavier investments in marketing and education are needed from Olaplex to offset these headwinds. As such, we are lowering our forward estimates today on both the top and bottom lines, and we are now sitting below the Street across all metrics.

241. 245. Moreover, the Piper Sandler report noted that its analysts were "more cautious on OLPX given some of the risk factors that have come up, particularly *negative reviews*" regarding hair damage and loss. The Piper Sandler

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

110

analysts also stated that "marketing and education spend will need to increase notably to correct these misconceptions and slow share loss to competitors."

242. 246. At this time, the Company's stock price fell $1.33 per share, or 12.15% to close at $9.62 on September 29, 2022.

**8.      October 18, 2022 – Olaplex Provides Disappointing "Business Update" and Preliminary 3Q 2022 Quarterly Results**

243. 247. On October 18, 2022, Olaplex issued a press release announcing its preliminary financial results for the third quarter of 2022 ended on September 30, 2022 ("3Q 2022").   This announcement revealed that the Company's sales slowdown had continued and in fact worsened this quarter, as Olaplex preliminarily reported net sales growth of *only 9.2%* in 3Q 2022, with sales *decreasing 4%* in the U.S.  The Company further announced revised guidance for the 2022 fiscal year, stating that Olaplex now expected fiscal year 2022 sales between $704-$711 million, significantly down—*by more than $100 million*—from its prior guidance range of $796-$826 million.  The press release attributed this slowdown in part to "increased competitive activity including discounting, *and a moderation in new customer acquisition*."  The press release also quoted Defendant Wong as acknowledging that "[w]e are disappointed to lower our fiscal 2022 guidance" and that Olaplex had "identified and put actions in place to *accelerate demand*."

244. 248. On the same day, Olaplex filed with the SEC a current report on Form 8-K that also announced the departure and resignation of Defendant Walden, the COO, effective immediately.

245. 249. Later that day, the Company also held a business update earnings call (the "Business Update") to discuss this revised guidance, which revealed significantly reduced consumer demand, and other preliminary financial results. During this call, Defendants also discussed the Company's reduced guidance for the full year 2022, which it had lowered by *more than $100 million or 11.5-13.9%* (depending on the high or low end used).  In particular, on the call, Defendant Wong

attributed this sales "slowdown" in part to "pressure on [Olaplex's] ability to attract new consumers," including due to "increased competitive activity" and "inventory rebalancing across partners[,]" stating:

> We believe there are two key reasons for the change in growth trajectory. ***First, we have seen a slowdown in sell-through momentum.*** We believe this has been driven by a combination of factors, including macroeconomic pressures have impacted both PRO stylist and consumers with the most pronounced impact being on our U.S. PRO stylist. ***U.S. Pros are buying less*** and buying closer to need as they report clients lengthening the time between salon visits and spending less for services and take-home products.
>
> ***In addition, we have seen increased competitive activity in our highly attractive core bond building space. Both new comers and large hair care incumbents have extended into our category and have intensified promotional behavior.*** Olaplex has made a strategic decision to avoid over promotion. Instead, prioritizing spending behind long-term sustainable brand health.
>
> In this context, it is important to note that we do not believe that any of our competitors represents a lasting threat to our competitive position. Moreover, while we believe our customer retention is best in class, the macroeconomic impact and ***competitive activity has put pressure on our ability to attract new consumers to the brand. The second driver of our change in performance is inventory rebalancing across partners.*** Our retail, DTC and PRO B2B customers are experiencing the same macroeconomic pressures and being impacted by the same sell-through trends. While at the same time, increasing their confidence in the supply chain.

246. 250. On the same call, Defendant Tiziani further explained that the sales miss was driven primarily by a deceleration in Olaplex's DTC channel amongst U.S. customers and "pressure" the Company saw in the U.S., including due to increased competition, stating:

> In Q3, the miss to our expectations and shipments was disproportionately driven by 2 customer groups: U.S. professional and a U.S. pure-play e-commerce customer within DTC. These linked to the ***year-over-year sales declines in the professional and DTC channels as well as the pressure we saw specifically in the U.S. We saw a reduction in U.S. professional orders*** as we believe macroeconomic concerns are impacting the stylist community and ***our key distributors chose to pull back on inventory levels in response to the lower sell-through trends.*** Despite this, for third-party data, which we receive on a 1-quarter lag, I want to stress that through the second quarter, we are still gaining market share year-over-year in the U.S. professional channel.

*We've also seen a deceleration of sell-through trends in the U.S. retail and DTC channels related to slower market growth and increased competitive activity, including from discounting.  In the third quarter, this was most acutely felt at a key U.S. DTC customer, which reduced orders to lower inventory levels, in part due to slower sell-through and in part to meet lower targeted levels of inventory on hand.* I will also note that Q3 net sales in retail, DTC and our International Professional business, benefited from a higher selling of holiday kits in 2022 versus 2021, which is part of what's driving retail, DTC and international net sales growth to be stronger in Q3 than our projection for Q4.

247. ~~251.~~ Defendant Tiziani further explained the Company would "alter[]" its 2021 strategy of holding onto more inventory and instead "lower our own inventory to target levels."

248. ~~252.~~ These disclosures shocked analysts.  For example, in an October 19, 2022 analyst report, Barclays downgraded Olaplex from equal-weight to underweight due to "lack of near-term visibility" and stated that they were "*taken aback by the absence of any commentary around how the company severely misread the changing realities of its operating environment*[,]" noting that analysts were previously "*concerned about decelerating growth in the US*" but "did not expect to see such a *sudden and dramatic change in trend just two months later*." The Barclays report further stated that the "resignation of COO Tiffany Walden is concerning," having questioned the "viability and risk profile of having one person called on as Head of Sales, Chief Legal Officer & Chief Operating Officer."  The Barclays analysts also stated that it was "reasonable to assume headwinds to new customer acquisition persist at least into 1Q23 . . . and *sales decline through 1H23*."

249. ~~253.~~ Similarly, Morgan Stanley, in an October 19, 2022 analyst report, downgraded Olaplex to equal-weight from overweight, noting that inventory adjustments made by retailers had created "low visibility."  The report further stated the "magnitude of pressure is much greater than [] expected," citing "*weaker consumer demand* due both to macro weakness and *competitive impacts*, as well as inventory reductions."

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

113

250. ~~254.~~ On this news, the Company's stock price fell $5.55 per share, or *56.69%* to close at $4.24 on October 19, 2022.

### 9.   November 9, 2022 – Olaplex Reports 3Q 2022 Financial Results and Affirms Disappointing Sales Slowdown

251. ~~255.~~ On November 9, 2022, Olaplex reported its full 3Q 2022 financial results and affirmed the disappointing preliminary results disclosed in the October 18, 2022 Business Update.  The earnings announcement thus confirmed that the Company's sales had greatly deteriorated in 3Q 2022, as Olaplex reported a further slowdown in net sales growth of *only 9.2%* in the quarter, with sales *decreasing 4.3%* in the U.S.

252. ~~256.~~ On the related earnings call to discuss these results, which occurred on the same day, Defendant Wong explained the steps Olaplex was taking to address the sales problems it was experiencing, which included rebalancing its inventory to "provide a more stable foundation" going forward, stating:

> We continue to have the #1 selling [SKUs] sold through salons in the U.S. in each subcategory.  Shampoo, conditioner and styling has decline[d] through the second quarter of 2022.  We have increased investment for the fourth quarter in building awareness across the stylist community in the key markets of the U.S., U.K., Australia and France. We have also partnered with new chains and key opinion leader salons in the U.S. and Canada to further drive awareness, PR and sales.  *We have proactively taken steps to rebalance inventory at one of our key U.S. distributors to improve overall inventory mix and provide a more stable foundation for 2023.*

253. ~~257.~~ On the same call, Defendant Tiziani expanded on the "softer demand" in the U.S. that Olaplex was experiencing in the Professional and DTC channels, which he again attributed in part to increased competition:

> Professional channel sales *declined 16%* to $63 million *versus a 58% increase last year*, as our U.S. distributor partners reduced purchases to adjust inventory levels given *softer demand from stylists*, which we believe is partially driven by macroeconomic concerns.  *And our direct-to-consumer channel sales were down 2.6% to $39.3 million, following an 87% increase last year, due to slower sell-through related to weakening market growth and increased competitive activity, including discounting.*

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

114

*In the third quarter, we also saw a key U.S. DTC customer reduce orders to meet lower targeted levels of inventory on hand.* By geography, international led our growth with a 27.8% increase driven by strong contributions from the U.K., Italy, France, Germany, Canada and our emerging cross-border e-commerce business in China. *The U.S. declined 4.3%, driven by the aforementioned pressures in the professional and DTC channels.*

254. 258. In addition, Defendant Tiziani reiterated that Olaplex's inventory levels were higher than expected and the Company would be rebalancing its inventory to lower inventory levels given this reduced demand for Olaplex products—in stark contrast to its pre-IPO inventory strategy, in which the Company held multiple months of inventory on hand. Specifically, Defendant Tiziani stated:

Now turning to the balance sheet. Inventory at the end of the third quarter was $151.3 million compared to $140.3 million at the end of the second quarter and $98.4 million at the end of 2021. *As mentioned on our October call, this is higher than originally planned due to our lower sales delivery in the quarter.* We have already altered our sourcing plans and slowed procurement to match the new sales forecast. Over time, this will lower our own inventory to target levels, and the timing of this will depend on sell-through trends.

\*\*\*

As it relates to the fourth quarter, while we have actions in place to accelerate growth, *we are still planning for an increasingly difficult macroeconomic operating environment and for further inventory rebalancing by several key customers related to our slower sales momentum.* Based on today's macro environment and our current forecast, we expect this inventory rebalancing to normalize by the end of the first quarter 2023 in our professional and specialty retail channels.

255. 259. With respect to the Company's forthcoming fourth quarter results, Defendant Tiziani signaled that this sales slowdown was likely to continue given declining consumer demand:

As a reminder, our guidance for Q4 also reflects that *we will not be able to lap the robust sales lift that we experienced during the fourth quarter holiday period last year when we grew 78%,* benefiting from significant replenishment orders across our specialty retail and DTC channels at a time when we believe *consumer demand was stronger* and some of our competitors struggled with consistent supply.

256. 260. In the Q&A portion of the call, multiple analysts commented on the Company's poor sales performance in the quarter. For example, an Evercore

analyst noted that "it sounds like September really slowed down a lot" and that it was "a pretty bad September," asking for more color on what happened. In response, Defendant Tiziani admitted that **"[c]learly, we did see a slowdown in September"** and mentioned "the marketing activations [that] we're putting in place," in the hopes of improving demand. Likewise, a Goldman Sachs analyst commented: "Clearly, we all got a little too enthusiastic and excited about the sales trajectory of the business," noting that there was "a cohort consumers who probably . . . *came in because there was hype behind [Olaplex's products],* right? Like it was a shiny new toy. *And now, there are other shiny toys that are out there.*" Thus, analysts recognized that Olaplex's disappointing sales results were driven by increased competition from competitors who were taking advantage of the fact that Olaplex's brand no longer had the positive "hype"—*i.e.,* social media buzz and brand reputation—that it once did before the lilial issue. In response, Defendant Wong nevertheless insisted that the Olaplex "brand fundamentals are strong," noting that consumers are "*looking for brands that they can trust,* not just on marketing hype or promises that they cannot deliver." However, Olaplex's dramatic sales slowdown that began after the lilial issue in early 2022, demonstrates that Olaplex was actually a brand that consumers deemed they could *no longer "trust"* given its use of potentially unsafe ingredients like lilial, which Olaplex had concealed from the public.

257. 261. After the earnings call, analysts further noted the Company's drastic sales slowdown. For example, in a November 10, 2022 analyst report, J.P. Morgan stated, "we believe the company will face challenging four quarters head with *deep deceleration in sales performance in Q322, followed by negative sales growth in Q422.* The *increased competition* and excess inventory at OLPX and retailers *will likely remain a significant headwind* over the next 12 months." Thus, the market now recognized that Olaplex's sales underperformance, driven by

increased competition that now took advantage of the Company's reputational damage and waning demand from the lilial issue, was not a mere temporary blip but a sign of deeper, long-term demand problems that would persist, and thus, continue to adversely impact the Company's sales long after the news of the lilial issue.

258. 262. On November 17, 2022, the day this action was filed, the Company's stock closed at a low of $5.75 per share, a nearly *73%* decrease from the IPO price of $21.

### 10. The Damage From the Lilial Issue to Olaplex's Brand Reputation and Related Legal and Financial Consequences Continue Into 2023

259. 263. The full impact of the lilial issue on the Company's brand reputation, consumer demand, competitive position, and sales has continued throughout early 2023. In particular, the negative news cycle and social media backlash against the Olaplex brand that began with the lilial issue persisted into 2023 as Olaplex faced new legal challenges centered around the safety and efficacy of its products related to hair damage and hair loss claims due to the Company's use of toxins and allergens like lilial. Notably, on February 9, 2023, a group of consumers filed a product liability lawsuit in the U.S. District Court for the Central District of California against Olaplex for negligence and false advertising, alleging that Olaplex's products contained allergens and irritants, including *lilial*, that caused hair loss and other damage to the hair and scalp. The lawsuit specifically included allegations that Olaplex's products were unsafe because they contained lilial, which the E.U. had banned due to concerns about its impact on fertility, and that Olaplex thus had removed lilial from the Olaplex No. 3 product ingredient list in June 2021 due to such concerns.

260. 264. This consumer lawsuit prompted another round of negative publicity in the press and on social media. For example, a February 10, 2023 *BestLife* article, titled "Popular Hair Care Brand Olaplex Under Fire for Allegedly

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

117

Causing Hair Loss," reported that "Olaplex is facing a lawsuit from a group of customers who allege that these products cause hair loss." The article, and numerous others, directly linked these consumer claims to the prior lilial safety revelations:

> [T]he plaintiffs claim that Olaplex knowingly uses ingredients that make products 'unreasonably dangerous.' *Lilial*, which can cause allergic reactions, was used in Olaplex products until last year, Insider reported. The chemical was banned from hair products in the European Union in 2020. ***Olaplex removed lilial (which can also cause infertility issues) in 2021,*** and put out a new formulation in 2022, per Today.

261. ~~265.~~ Similarly, in a February 15, 2023 article, *CBS News's MoneyWatch* reported on the lawsuit, stating, "a group of roughly 30 consumers sued the hair care brand alleging that its products damaged their hair and scalps and left them with bald spots." According to the suit, said the article, "Olaplex products contain ingredients called '*lilial*' and 'panthenol' that can lead to conditions causing hair loss and scalp injuries, including 'inflamed, blistered, flaking or scaling skin.' Lilial is banned from hair and beauty products in Europe."

262. ~~266.~~ Likewise, a February 16, 2023 *BBC* article, titled "Olaplex products cause hair loss, lawsuit says," stated that the lawsuit alleges that "***Olaplex products contain lilial*** and panthenol - chemical compounds that can lead to hair loss and conditions including 'inflamed, blistered, flaking or scaling skin.' Lilial was once used as a perfume in cosmetics, until the European Union banned it from March 2022 due to its impact on fertility." An NPR article published the same day, titled "Nearly 30 women are suing Olaplex, alleging products caused hair loss," stated, "[a]ccording to the complaint, multiple Olaplex products contained *lilial*, a chemical compound that is often used as a perfume in cosmetics until the European Union mandated the ingredient be gone from products by March 2022 due to concerns about its impact on fertility."

263. 267. On February 28, 2023, Olaplex reported its financial results for the fourth quarter ("4Q 2022") and full year 2022 ("FY 2022"), including a disappointing *decrease* in net sales by *21.5%* for the fourth quarter and a mere 17.7% increase in net sales for fiscal year 2022, as compared to net sales growth of *112%* for fiscal year 2021. Thus, Olaplex's prior sales *growth slowdown* had now turned into a full *decline*, further demonstrating the extent to which consumers had turned away from Olaplex in the wake of the lilial news and the damage this controversy caused to its brand reputation. The following chart illustrates this sales growth decline that began after the lilial issue emerged in early 2022:



264. 268. On the related earnings call to discuss these results, which occurred on the same day, Defendant Wong explained that Olaplex would need to "reset and stabilize [its] core business with a long-term view," including notably a

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAA SVW(SKx)

119

significant investment in sales and marketing to rehabilitate its damaged brand reputation.  Specifically, Defendant Wong stated:

> As disclosed in today's press release, following multiple years of strong growth, ***we expect 2023 net sales down 15% from last year and adjusted EBITDA down 32%,*** in each case, at the midpoint of our annual guidance range.  This expectation follows an analysis of recent business trends, the issues we face and the growth opportunities in front of us.  Based on this work, we realize that we need to invest more to keep pace with our rapid growth and current scale.  As we look at our plan for 2023 with macro uncertainties and quickly changing market dynamics, reducing visibility, ***we see the need to reset and stabilize our core business with a long-term view.  We are disappointed with this outlook*** and hold ourselves accountable for getting to this position and for improving the business*.  **This year, we have a clear focus on increasing investments in sales and marketing, education and our partner relationships,*** and we believe this initiative will optimize our potential and position Olaplex to resume growth in 2024 and beyond.

265. ~~269.~~ Defendant Wong also "acknowledge[d]" the "***lessons learned***" from Olaplex's disappointing performance in 2022, which included that the Company needed to do more "***to defend the brand from the natural competitive intensity*** that exists in an attractive category" and that "we need to act faster and be better equipped to deal with ***negative PR and misinformation about our brand, such as has surfaced over the past year***"—*i.e.*, the initial lilial controversy and the related consumer accusations of hair damage and hair loss that followed, eventually culminating in the U.S. consumer lawsuit filed shortly before this earnings call.  Thus, Defendants admitted that Olaplex's sales declines in 2022 were directly linked to what they referred to as the lilial "misinformation" issue.

266. ~~270.~~ To that end, Defendant Wong also discussed that "[a]nother ***key objective*** this year will be increasing our ***education and training efforts on the Olaplex brand***," particularly in "marketing our ***core products*** with an anchor around ***No. 3 as our hero SKU***," noting with respect to this product specifically that there were "opportunities to better educate on the product and how it is utilized."  Thus, Defendants tacitly acknowledged that Olaplex needed to invest tremendous resources in rehabilitating its brand reputation, particularly for its most important

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

120

product, the No. 3 Hair Perfector, which was the one at issue in the lilial controversy.

267. 271. Moreover, Defendant Wong addressed the substantial negative media coverage about Olaplex's products, including more recent claims that its products cause hair loss and breakage because they had contained unsafe allergens like lilial:

> To that end, I want to address *the recent negative media headlines that claims Olaplex products cause hair loss*. So anyone experiencing hair loss and hair breakage, we understand the emotional toll it has and are empathetic to the impact on your well-being. However, Olaplex products do not cause hair loss or hair breakage. Olaplex products are safe and effective as millions of our consumers can happily attest and as evidenced by our published HRIPT test results. *We also recognize the concern that this misinformation may cause our loyal customers, stylists and retail partners* when hearing baseless claims about a product they love and trust.

268. 272. On the call, Defendant Tiziani further explained that sales for the quarter were "*negatively impacted by approximately $29 million at several of our key customers* as these customers lowered their orders to rebalance inventory *in response to lower levels [of] demand* and to target overall lower levels of month on hand than previously carried." Defendant Tiziani further stated, as follows, admitting that the disappointing performance was driven by lower consumer "demand in an increasingly competitive environment":

> By Channel, professional sales declined 3.9% to $54.9 million versus a 9% increase last year, which was in line with our expectations. *This decline was driven by reduced purchases by our stylist community in the U.S. and the U.K., partially driven by the tougher macro environment impacting the professional channel.* This was evidenced by the latest available Klein data, which showed total market front of salon sales in the U.S. declined by 2% in the third quarter, while Olaplex front of sale sell-through in the third quarter was up 2% compared to last year. Specialty Retail sales decreased 45.3% to $32.6 million, following a robust 332% gain in the prior year period. *Performance was below the expectations we provided on our third quarter call, reflecting a softening in replenishment demand in an increasingly competitive environment, including heightened promotional activity during the holiday season.* In addition, as we previously communicated, we were lapping the $15 million initial wave of Ulta pipeline fill in Q4 2021.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

121

269. ~~273.~~ Defendant Tiziani also confirmed that Olaplex continued to rebalance its inventory, stating:

> Inventory at the end of the fourth quarter was $144.4 million, down from $151.3 million at the end of the third quarter. ***The reduction in inventory levels as a result of our decision to alter our sourcing plans and slow procurement to match the new sales forecast,*** which more than offset building inventory of new SKUs as we prepare for product launches this year.

270. ~~274.~~ On this news, the Company's stock price fell $0.49 per share, or 9.06% to close at $4.92 on February 28, 2023.

271. ~~275.~~ Despite Defendants' earlier attempts to downplay the significance of the lilial issue, Olaplex has been unable to escape the negative reputational harm precipitated by the E.U.'s ban of lilial and the Company's use of the problematic ingredient in Olaplex's No. 3 product.

272. ~~276.~~ Indeed, today when "Olaplex Lilial" is entered into Google, this top search engine generates the following list of questions, which all center around Olaplex's use of lilial, its connection to infertility, and consumer complaints and lawsuits about Olaplex.  For example:

People also ask  ⋮

Does Olaplex have lilial in it?                                          ⌄

Does Olaplex 4 have lilial?                                              ⌄

Did Olaplex remove lilial?                                              ⌄

Which Olaplex products use lilial?                                      ⌄

How do I know if my Olaplex has lilial?                                ⌄

Does Olaplex still have butylphenyl methylpropional?                    ⌄

Which Olaplex products have butylphenyl methylpropional?                ⌄

What are the complaints about Olaplex?                                  ⌄

Why not to use Olaplex?                                                 ⌄

What are the lawsuits against Olaplex?                                  ⌄

Which Olaplex got banned?                                              ⌄

What is the toxicity of Olaplex?                                        ⌄

Should I throw away my Olaplex?                                        ⌄

Feedback

273. 277. Thus, the negative narrative that began in early 2022 with the social media disclosures about Olaplex's lilial issue has permeated Olaplex's online reputation—persisting long after the initial posts surfaced.

274. 278. Indeed, while Olaplex had previously touted its strong social media presence and brand reputation, as evidenced by the widespread positive use of Olaplex hashtags, the lilial issue also changed that.  In particular, numerous hashtags surrounding the topic have since trended on social media, including #olaplexlilial, #olaplexhairloss, #olaplexban, #olaplexlawsuit, and #olaplexinfertility.  The various reels and videos posted under such hashtags, which among other things have called to "ban" and "cancel" the brand altogether, due to its undisclosed use of unsafe ingredients like lilial.  As these hashtags gained momentum on social media, they created a ripple effect that compounded the negative image of the Olaplex brand with the unfavorable links to infertility and hair damage/loss, and consumers' sentiment evidenced in the comments/videos have overwhelmed Olaplex's once

positive social media presence. There are several examples of this negative online narrative about the Olaplex brand image, including posts about consumers switching to different products rather than risking their hair and fertility health.

275. 279. For example, one TikTok post depicts the user throwing its Olaplex No. 3 product in the garbage, stating "this is your sign to break ties with Olaplex."[30] Another TikTok video explains that Olaplex contributed to hair thinning issues and vowed to stop using Olaplex:[31]

> #olaplex took me from having thick hair with thick strands to balding in a matter of 2 years as a healthy 22 year old woman. And yes, I checked. I went to the clinic and got tested for everything possible only to come back in top knotch health. I stopped using olaplex and my hair is healthier. Coincidence? This is why I'm returning to the products that have never done me dirty ☐ #olaplexban #fableandmane #amika #briogeo.

276. 280. Further, Olaplex-related TikTok hashtag searches—which the Company had publicly touted as a key example of its strong social media presence that was crucial to its success—demonstrate the voluminous number of views related to Olaplex's lilial issues, and thus, the significant, detrimental impact of the lilial issue on Olaplex's online brand reputation. For example, the hashtag "#olaplexban" has a cumulative 7.4 million views on TikTok:

---

[30] *See, e.g.,* https://www.tiktok.com/@anarosamendoza_/video/7205702250713369902?is_from _webapp=1&sender_device=pc&web_id=7213381034674718213.

[31] *See, e.g.,* https://www.tiktok.com/@lafreakajones/video/7198766204666858795?is_from_we bapp=1&sender_device=pc&web_id=7213381034674718213.



277. ~~281.~~ Similarly, the TikTok search for "olaplex infertility lawsuit" has a cumulative **6.5 billion** views on TikTok:



278. ~~282.~~ The reputational damage to the Olaplex brand online from the lilial issue is also evident from other websites as well. For example, on Trustpilot, a highly regarded customer review platform that receives over one million new reviews each month, Olaplex's digital reputation is now defined by negative reviews, which have populated as a result of the lilial issue. For example, as of

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

125

April 16, 2023, there are 291 reviews of Olaplex on Trustpilot for a highly negative rating of *1.8* (out of 5), with many of the reviews focusing on safety and efficacy concerns with Olaplex products, including due to their use of lilial.  Of these reviews, approximately *72%* of them (211 in total) are 1-star (199 reviews, 68%) or 2 star (12 reviews, 4%) reviews.  Notably, 171 of the negative 1-star or 2-star reviews—*i.e.*, *81%*—occurred after the February 28, 2022 news about Olaplex's use and removal of lilial due to the E.U. ban.

279. 283. Moreover, recent financial market commentary also has noted Olaplex's continued issues stemming from the lilial issue and its corresponding product sales declines.  For example, a March 15, 2023 *Seeking Alpha* article titled "Olaplex: Ongoing Struggle Is No Surprise," stated:

> Interestingly, **Olaplex spent a significant amount of time on the fourth quarter earnings call discussing negative PR and misinformation**. This would suggest that claims of Olaplex causing hair loss have been **damaging consumer perception of the product**.  Whether there is any substance to the claims may not matter, **recovering from this type of damage could be difficult**.

The article also stated that "[a] number of data points suggest that Olaplex's brand awareness and customer acquisition has stalled, indicating a problem that goes beyond just softer end market demand."

280. 284. Similarly, an April 16, 2023 *Seeking Alpha* article titled, "Olaplex: Poor Momentum In A Complex Market," explained that Olaplex had committed "*too much reliance on social media,*" noting the Company's initial success with gaining popularity on social media, such as gaining two million followers on Instagram "at the drop of a hat," with "many influencers promot[ing] the brand on their accounts," including Kim Kardashian and Katy Perry.  However, the article stated: "*their brand prevalence has always depended on social media popularity, which has been a double-edged sword*.  Indeed, the most recent products didn't go down well, and the word was spread on social media.  Furthermore, contrary to some months ago, *Olaplex has lost some popularity on social media*.  As a result, *the last year was*

*worse than expected, and next year is expected to be dismal*." The article further reported on the consumer lawsuit against Olaplex due to the hair loss allegations, which has since been amended to, *inter alia*, add numerous additional plaintiffs: "the Company is facing a lawsuit, accused by one hundred people of inducing hair loss," "accusations [that] *always harm their reputation*." As to competition, the article additionally stated that patent-protected products, like Olaplex's bis-amino, are "usually insufficient" to fend off competitors. Contrary to the Company's prior statements in the IPO Offering Documents touting its purported competitive advantage, the article explained that "*Olaplex lacks competitive advantages*" based on its fieldwork on K18—one of Olaplex's key competitors—compared to Olaplex, stating:

> The results were surprising. *Almost every hairdresser knew K18 and thought it was better than Olaplex.* Finally, I asked my hairdresser about both products, and he said that K18 was way better than Olaplex because of the nature of the products. Effectively, they are both in charge of hair repair, but they act completely differently.

The article concluded that K18 is "much more effective than Olaplex," further demonstrating the extent to which Olaplex's image and position versus its competitors have declined in the wake of the lilial controversy.

281. ~~285.~~ In sum, the news regarding the lilial issue, and its immense negative impact on Olaplex's reputation and business, has led to substantial harm to Olaplex's investors who purchased its shares in connection with the IPO. Notably, since its IPO, the value of Olaplex's common stock has collapsed *81%* from its $21 per share offering price to as low as $3.63 per share on April 25, 2023.

## V.    CLASS ALLEGATIONS

282. ~~286.~~ Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Olaplex's publicly traded common stock pursuant and/or traceable to the Offering Documents

for Olaplex's IPO, and who were damaged thereby (the "Class").  Excluded from the Class are: (i) the Defendants' and the Individual Defendants' immediate family members; (ii) the officers, directors, control persons, and affiliates of Olaplex, the Selling Stockholder Defendants and the Underwriter Defendants, at all relevant times, including Olaplex's employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired Olaplex's common stock through any such plan(s); (iii) any entity in which any Defendant has or had a controlling interest; and (iv) the legal representatives, heirs, successors, or assigns of any such excluded person or entity, in their capacities as such.

283. 287. The members of the Class are so numerous that joinder of all members is impracticable.  The exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery.  Lead Plaintiff believes there are at least thousands of members in the proposed Class as the Company offered over 73 million shares of common stock in the IPO.  Record owners and other members of the Class may be identified from records maintained by Olaplex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

284. 288. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

285. 289. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

286. 290. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

128

(a)    whether Defendants violated the Securities Act;

(b)    whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

287. 291. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    CAUSES OF ACTION

### COUNT I
### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT
**Against Defendant Olaplex, the Individual Defendants, and the Underwriter Defendants**

288. 292. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

289. 293. This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and the Class, against Defendant Olaplex, each of the Individual Defendants, and the Underwriter Defendants.

290. 294. This cause of action does not sound in fraud.  Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This cause of action is based solely on strict liability as to Olaplex and negligence as to the remaining Defendants.  Lead Plaintiff expressly disclaims any allegations of scienter

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

129

or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

291. 295. The Registration Statement, which includes the Prospectus, issued in connection with the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein in accordance with the rules and regulations governing the Registration Statement's preparation.

292. 296. Defendant Olaplex is the registrant and issuer of the common stock sold pursuant to the Registration Statement.  As such, Defendant Olaplex is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate. By virtue of the Registration Statement containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Defendant Olaplex is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

293. 297. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

294. 298. The Individual Defendants each signed the Registration Statement and caused its issuance, and are therefore statutorily liable under Section 11 of the Securities Act.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Individual Defendants each had a duty to ensure that such statements were true and accurate and that there were no omissions of

material fact that would make the statements misleading.  By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.  As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

295.  ~~299.~~ Each of the Underwriter Defendants served as the underwriters for the IPO and, as alleged herein, qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, the Underwriter Defendants participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents.  Each of the Underwriter Defendants, as an underwriter of the securities offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Underwriter Defendants each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.  As such, the Underwriter Defendants are liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

296.  ~~300.~~ None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

297. ~~301.~~ Each of the Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misrepresented and failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

298. ~~302.~~ Lead Plaintiff and the Class have sustained damages. The value of Olaplex common stock has declined substantially subsequent to and due to violations by Defendants named in this Count.

299. ~~303.~~ At the time of their purchases of Olaplex common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein.

300. ~~304.~~ Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time that this action was commenced.

## COUNT II
## FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT
## <u>Against All Defendants</u>

301. ~~305.~~ Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

302. ~~306.~~ This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Lead Plaintiff and the Class, against Defendant Olaplex, each of the Individual Defendants, the Selling Stockholder Defendants, and the Underwriter Defendants.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

132

303. 307. This cause of action does not sound in fraud. Lead Plaintiff does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim. This cause of action is based solely on negligence and/or strict liability. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

304. 308. Each of the Defendants named in this Count were sellers, offerors, and/or solicitors of purchasers of the Company's common stock pursuant to the defective Prospectus. The actions of solicitation by the Defendants named in this Count included participating in the preparation of the false and misleading Prospectus, roadshows, and marketing of Olaplex's common stock to investors, such as Lead Plaintiff and other members of the Class.

305. 309. The Prospectus contained untrue statements of material facts, omitted to state other material facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

306. 310. Each of the Defendants named in this cause of action owed to the purchasers of Olaplex's common stock, including Lead Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements made therein not misleading and no omission of material fact required by the rules and regulations governing the Prospectus's preparation. By virtue of each of these Defendants' failure to exercise reasonable care, the Prospectus contained material misstatements of fact, omitted material facts necessary to make the statements therein not misleading, and omitted material facts required to be stated

therein.  As such, each of these Defendants is liable under Section 12(a)(2) of the Securities Act to Lead Plaintiff and the Class.

307. 311. Lead Plaintiff and other members of the Class did not know, nor in the exercise of reasonable diligence could Lead Plaintiff or other members of the Class have known, of the untruths and omissions contained in the Prospectus at the time Lead Plaintiff and other members of the Class acquired Olaplex common stock shares.

308. 312. By reason of the conduct alleged herein, the Defendants named in this cause of action violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who acquired Olaplex common stock shares pursuant to the Prospectus sustained substantial damages.  Accordingly, Lead Plaintiff and the other members of the Class who hold the shares issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members who have sold their Olaplex shares seek damages to the extent permitted by law.

**COUNT III**
**FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**Against the Selling Stockholder Defendants and the Individual Defendants**

309. 313. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

310. 314. This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and the Class, against each of the Selling Stockholder Defendants and each of the Individual Defendants.

311. 315. This cause of action does not sound in fraud.  Lead Plaintiff does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.  This cause of action is based solely on negligence

and/or strict liability.  Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

312. ~~316.~~ The Selling Stockholder Defendants and the Individual Defendants each were control persons of Olaplex by virtue of their positions as directors and/or senior officers and/or major shareholders of Olaplex.  The Selling Stockholder Defendants and the Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Olaplex.

313. ~~317.~~ Each of the Selling Stockholder Defendants and the Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct Olaplex's IPO.  Because of their positions of control and authority as senior officers,directors, and/or signers of the Registration Statement, each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

314. ~~318.~~ The Selling Stockholder Defendants, by virtue of their stock ownership and their control of the Company's Board of Directors, controlled Olaplex and each of the Individual Defendants.  The Selling Stockholder Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the IPO.  Because of their positions of control and authority, the Selling Stockholder Defendants were able to, and did, control the contents of the Offering Documents, which contained materially

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-~~CAS-MAA~~SVW(SKx)

135

untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

315. 319. Each of the Selling Stockholder Defendants and each of the Individual Defendants were culpable participants in the violations of Section 11 and 12(a)(2) of the Securities Act alleged above, based on having signed the Registration Statement and/or having otherwise participated in the process that allowed the IPO to be completed.

316. 320. As control persons of Olaplex, each of the Selling Stockholder Defendants and each of the Individual Defendants are liable jointly and severally with and to the same extent as Olaplex for its violations of Section 11 and 12(a)(2) of the Securities Act whom they controlled.

317. 321. As a result of the foregoing, Lead Plaintiff and other members of the Class have suffered damages.

## VII.    PRAYER FOR RELIEF

318. 322. WHEREFORE, Lead Plaintiff on behalf of itself and the other members of the Class, prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiff as a Class Representative, and appointing Labaton Sucharow LLP as Class Counsel, under Rule 23(a),(b)(3), and (g) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including pre-judgment and post-judgment interest, as allowed by law;

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

136

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, experts' fees, and other costs and disbursements; and

(d)     Awarding Lead Plaintiff and the Class such other relief as may be deemed just and proper by the Court.

## VIII. JURY TRIAL DEMANDED

319.   323. Lead Plaintiff demands a trial by jury.

Dated: April 28, 2023                    Respectfully Submitted,

By: */s/ Carol C. Villegas*
      CAROL C. VILLEGAS

**LABATON SUCHAROW LLP**
CAROL C. VILLEGAS (*pro hac vice*)
cvillegas@labaton.com
IRINA VASILCHENKO (*pro hac vice*)
ivasilchenko@labaton.com
LISA M. STREJLAU (*pro hac vice*)
lstrejlau@labaton.com
DANIELLE IZZO (*pro hac vice*)
dizzo@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement System*
*and Lead Counsel for the Proposed Class*

**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (SBN 270796)
rprongay@glancylaw.com
CHARLES H. LINEHAN (SBN 307439)
clinehan@glancylaw.com

1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495

*Liaison Counsel for Lead Plaintiff
Arkansas Teacher Retirement System and the
Proposed Class*

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS - NO. 2:22-CV-08395-CAS-MAASVW(SKx)

138