**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (SBN 270796)
rprongay@glancylaw.com
CHARLES H. LINEHAN (SBN 307439)
clinehan@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495

*Liaison Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement*
*System and the Proposed Class*

**LABATON SUCHAROW LLP**
CAROL C. VILLEGAS (*pro hac vice*)
cvillegas@labaton.com
IRINA VASILCHENKO (*pro hac vice*)
ivasilchenko@labaton.com
LISA M. STREJLAU (*pro hac vice*)
lstrejlau@labaton.com
DANIELLE IZZO (*pro hac vice*)
dizzo@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement System*
*and Lead Counsel for the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE LILIEN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OLAPLEX HOLDINGS, INC., JUE WONG, ERIC TIZIANI, TIFFANY WALDEN, CHRISTINE DAGOUSSET, TRICIA GLYNN, DEIRDRE FINDLAY, JANET GURWITCH, MARTHA MORFITT, DAVID MUSSAFER, EMILY | No. 2:22-cv-08395-SVW(SKx) <br><br> <u>CLASS ACTION</u> <br><br> **LEAD PLAINTIFF'S OPPOSITION TO THE OLAPLEX DEFENDANTS' MOTION TO DISMISS THE REVISED CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

WHITE, MICHAEL WHITE, PAULA ZUSI, ADVENT INTERNATIONAL GPE IX LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-B LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-C LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-F LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-G LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-H LIMITED PARTNERSHIP ADVENT INTERNATIONAL GPE IX-I LIMITED PARTNERSHIP ADVENT INTERNATIONAL GPE IX-A SCSP, ADVENT INTERNATIONAL GPE IX-D SCSP, ADVENT INTERNATIONAL GPE IX-E SCSP, ADVENT INTERNATIONAL GPE IX STRATEGIC INVESTORS SCSP, ADVENT PARTNERS GPE IX LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-A LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX CAYMAN LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-A CAYMAN LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-B CAYMAN LIMITED PARTNERSHIP, MOUSSERENA, L.P., GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., BOFA SECURITIES, INC., EVERCORE GROUP L.L.C., JEFFERIES LLC, RAYMOND JAMES & ASSOCIATES, INC., COWEN AND COMPANY, LLC, PIPER SANDLER & CO., TRUIST SECURITIES, INC., TELSEY ADVISORY GROUP LLC, DREXEL HAMILTON, LLC, and LOOP CAPITAL MARKETS LLC,

Defendants.

Hearing Date: September 11, 2023
Hearing Time: 1:30 p.m.
Courtroom: 10A
Judge: Hon. Stephen V. Wilson

LEAD PLAINTIFF'S OPPOSITION TO THE OLAPLEX DEFENDANTS' MOTION TO DISMISS
No. 2:22-CV-08395-SVW(SKX)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

GLOSSARY OF DEFINED TERMS........................................................................ viii

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.   FACTUAL BACKGROUND .......................................................................... 3

      A.    Company Overview and Importance of Olaplex's Brand
            Reputation ............................................................................................. 3

      B.    Shortly Before the IPO, Olaplex Quietly Reformulated Its No. 3
            Product to Remove an Ingredient Banned as Unsafe by the E.U. ........... 3

      C.    Post-IPO, Consumers and Investors Gradually Learned of the
            Lilial Issue and Its Adverse Impact on Olaplex's Reputation and
            Sales ...................................................................................................... 5

III.  APPLICABLE LEGAL STANDARDS ........................................................... 6

IV.   ARGUMENT.................................................................................................. 7

      A.    The AC Plausibly Alleges Material Misstatements and Omissions ........ 7

            1.    Misstatements About the Impact of Laws and Regulations .......... 8

            2.    Misstatements About Reputation and Social Media
                  Following.................................................................................12

            3.    Misstatements Concerning Competition Risks............................15

            4.    Statements Concerning Olaplex's "Clean" Products ...................16

            5.    Olaplex's Other Materiality Arguments Are Unavailing.............17

                  a.    The Bespeaks Caution Doctrine Does Not Shield
                        Olaplex ..........................................................................17

                  b.    The Misstatements Are Not Inactionable Opinions...........18

                  c.    The Misstatements Are Not Inactionable Puffery.............19

                  d.    Olaplex's Truth-on-the-Market Defense Fails..................21

B.    Independent Duty to Disclose Under Items 303 and 105.......................23

C.    The Olaplex Defendants Are Section 12(a)(2) Statutory Sellers............24

D.    The Individual Defendants Are Liable as Control Persons ...................25

V.    CONCLUSION ..............................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
　1 F.4th 687 (9th Cir. 2021)...............................................................10

*In re Am. Apparel, Inc. S'holder Litig.*,
　855 F. Supp. 2d 1043 (C.D. Cal. 2012) .............................................12

*In re Amgen Inc. Sec. Litig.*,
　544 F. Supp. 2d 1009 (C.D. Cal. 2008) .......................................21, 22

*In re Amgen, Inc. Sec. Litig.*,
　2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)...................................22

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)..........................................................................6

*In re Atossa Genetics Inc. Sec. Litig.*,
　868 F.3d 784 (9th Cir. 2017).............................................................18

*Baker v. Seaworld Ent., Inc.*,
　2016 WL 2993481 (S.D. Cal. Mar. 31, 2016) ...................................9

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
　851 F. Supp. 2d 746 (S.D.N.Y. 2012) ...............................................18

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)..........................................................................6

*Berson v. Applied Signal Tech., Inc.*,
　527 F.3d 982 (9th Cir. 2008)............................................................10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
　856 F.3d 605 (9th Cir. 2017).............................................................6

*In re Countrywide Fin. Corp. Sec. Litig.*,
　588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................22

*In re Enzymotec Sec. Litig.*,
　2015 WL 8784065 (D.N.J. Dec. 15, 2015)................................. 21-22

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023)............................................................................*passim*

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)................................................................................................7

*Hildes v. Arthur Andersen LLP*,
   734 F.3d 854 (9th Cir. 2013)..................................................................................7

*Homyk v. ChemoCentryx, Inc.*,
   2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ....................................................10

*In re Honest Co. Sec. Litig.*,
   615 F. Supp. 3d 1149 (C.D. Cal. 2022) ......................................................*passim*

*In re Infonet Servs. Corp. Sec. Litig.*,
   310 F. Supp. 2d 1080 (C.D. Cal. 2003) ...............................................................25

*Johnson v. Riverside Healthcare Sys., LP*,
   534 F.3d 1116 (9th Cir. 2008)................................................................................6

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018)..................................................................... 8, 12, 13

*Lako v. Loandepot, Inc.*,
   2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ................................................. 23-24

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)..................................................................................21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005).................................................................................17

*In re Lyft Inc. Sec. Litig.*,
   484 F. Supp. 3d 758 (N.D. Cal. 2020).........................................9-10, 12-13, 22

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..............................................................................................7, 11

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010) ..................................................................22

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008)............................................................................7, 13

*Mingbo Cai v. Switch, Inc.*,
  2019 WL 3065591 (D. Nev. July 12, 2019) .......................................................23

*Mirmehdi v. United States*,
  689 F.3d 975 (9th Cir. 2012) ............................................................................25

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ......................................................... 19-20

*In re Musicmaker.com Sec. Litig.*,
  2001 WL 34062431 (C.D. Cal. June 4, 2001) ...................................................13

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*,
  2013 WL 12320069 (C.D. Cal. Dec. 19, 2013) ................................................24

*In re Nat'l Golf Props. Inc. Sec. Litig.*,
  2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ................................................25

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .............................................................................10

*Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...................................................................................6-7, 19

*Pino v. Cardone Cap., LLC*,
  55 F.4th 1253 (9th Cir. 2022)...........................................................................25

*Pinter v. Dahl*,
  486 U.S. 622 (1988)..........................................................................................24

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir.
  2021), *vacated on other grounds and remanded*, 598 U.S. 759 (2023)............25

*In re Progenity, Inc. Sec. Litig.*,
  2023 WL 219345 (S.D. Cal. Jan. 13, 2023)......................................................14

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996)...........................................................................21

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)...................................................... 16, 17, 19, 20

*In re Quarterdeck Off. Sys., Inc. Sec. Litig.*,
   1992 WL 515347 (C.D. Cal. Nov. 4, 1992)......................................................14

*In re Read-Rite Corp. Sec. Litig.*,
   2004 WL 2125883 (N.D. Cal. Sept. 22, 2004) .................................................14

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011)............................................................................7

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014)..........................................................................11

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) .......................................................13, 20

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016)............................................................................7

*In re Snap Inc. Sec. Litig.*,
   2018 WL 2972528 (C.D. Cal. June 7, 2018) ............................................*passim*

*In re STEC Inc. Sec. Litig.*,
   2011 WL 2669217 (C.D. Cal. June 17, 2011) ............................................... 7-8

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998)........................................................................23

*Tellabs, Inc. v. Makor Issues & Rts.*,
   551 U.S. 308 (2007).........................................................................................6

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   683 F. Supp. 2d 1236 (D.N.M. 2010).............................................................21

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)..............................................11, 20

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
   2017 WL 2378369 (C.D. Cal. May 31, 2017) .................................................20

*In re Violin Memory Sec. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)..................................................23

*Westley v. Oclaro, Inc.*,
   897 F. Supp. 2d 902 (N.D. Cal. 2012)............................................................11

*Weston v. DocuSign, Inc.*,
    2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ....................................................19

*In re Winstar Commc'ns*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)........................................................22

**Statutes & Rules**

17 C.F.R. § 229.105(a).................................................................................................23

17 C.F.R. § 229.303(b)(2)(ii) .....................................................................................23

17 C.F.R. § 230.159A .................................................................................................24

Securities Act of 1933 Section 11, 15 U.S.C. §77k ........................................*passim*

Securities Act of 1933 Section 12, 15 U.S.C. §77l..............................................24, 25

Securities Act of 1933 Section 15, 15 U.S.C. §77o ...................................................25

Fed. R. Civ. P. Rule 8 .............................................................................................6, 25

Fed. R. Civ. P. Rule 9(b)...............................................................................................9

Fed. R. Civ. P. Rule 12(b)(6) .......................................................................................6

# GLOSSARY OF DEFINED TERMS

| | |
|---|---|
| AC | The Revised Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 123, filed on June 22, 2023. Citations to "¶__" refer to paragraphs in the AC. |
| Advent Defendants or Advent Funds | Advent International GPE IX Limited Partnership, Advent International GPE IX-B Limited Partnership, Advent International GPE IX-C Limited Partnership, Advent International GPE IX-F Limited Partnership, Advent International GPE IX-G Limited Partnership, Advent International GPE IX-H Limited Partnership, Advent International GPE IX-I Limited Partnership, Advent International GPE IX-A SCSp, Advent International GPE IX-D SCSp, Advent International GPE IX-E SCSp, Advent International GPE IX Strategic Investors SCSp, Advent Partners GPE IX Limited Partnership, Advent Partners GPE IX-A Limited Partnership, Advent Partners GPE IX Cayman Limited Partnership, Advent Partners GPE IX-A Cayman Limited Partnership, and Advent Partners GPE IX-B Cayman Limited Partnership |
| Advent MTD | Motion to Dismiss the Revised Consolidated Class Action Complaint and Memorandum of Points and Authorities (ECF No. 129, 129-1) filed by the Advent Defendants |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| COO | Chief Operating Officer |
| Class | All persons and entities who purchased or otherwise acquired Olaplex's publicly traded common stock pursuant and/or traceable to the Offering Documents for Olaplex's IPO, and who were damaged thereby. |
| CW or CWs | Confidential Witness—former employees of Olaplex who agreed to speak with Lead Plaintiff's counsel on the condition of anonymity. CWs are referred to in the masculine to preserve their anonymity. |

| | |
|---|---|
| Defendants | Collectively, the Olaplex Defendants, the Underwriter Defendants, the Advent Defendants, and Defendant Mousse |
| E.U. | European Union |
| Exchange Act | The Securities Exchange Act of 1934, Pub. L. 73–291, 48 Stat. 881, 15 U.S.C. § 78a et seq. |
| FY | Olaplex's fiscal year, which begins on January 1 and ends on December 31. The Company identifies each fiscal year based on the year in which it ends. For instance, FY 2022 refers to the period January 1, 2022 through December 31, 2022. |
| Individual Defendants | Collectively, Defendants JuE Wong (CEO), Eric Tiziani (CFO), Tiffany Walden (COO), Christine Dagousset, Tricia Glynn, Deirdre Findlay, Janet Gurwitch, Martha Morfitt, David Mussafer, Emily White, Michael White, and Paula Zusi |
| IPO | Olaplex's Initial Public Offering on or about September 29, 2021 |
| Lilial | The colloquial name for the chemical butylphenyl methylpropional typically used for fragrance in cosmetics products which was deemed reprotoxic by the E.U. |
| Mousse or Defendant Mousse | Defendant Mousserena, L.P. |
| Mousse MTD | Motion to Dismiss the Revised Consolidated Class Action Complaint and Memorandum of Points and Authorities (ECF No. 128, 128-1) filed by Defendant Mousserena, L.P. |
| MTD | Motion to Dismiss the Revised Consolidated Class Action Complaint and Memorandum of Points and Authorities (ECF No. 103, 130-1) filed by Defendants Olaplex and the Individual Defendants, ECF Nos. 130, 130-1. |
| OLPX | Olaplex Holdings, Inc.'s stock symbol on the NASDAQ stock exchange |
| Olaplex or the Company | Olaplex Holdings, Inc. |

| | |
|---|---|
| Olaplex Defendants or Olaplex | Collectively, Olaplex Holdings, Inc. and the Individual Defendants |
| Offering Documents | Collectively, Olaplex's Prospectus and the Registration Statement |
| Plaintiff | Court-appointed Lead Plaintiff Arkansas Teacher Retirement System |
| Prospectus | Olaplex's October 1, 2021 prospectus, which forms part of the Registration Statement, filed with the SEC on Form 424(b)(4) |
| Registration Statement | Olaplex's August 27, 2021 registration statement on Form S-1, which, following amendment, was declared effective by the SEC on September 29, 2021 |
| RJN | Request for Judicial Notice filed by the Olaplex Defendants (ECF No. 131) |
| Rule 8 | Rule 8 of the Federal Rules of Civil Procedure |
| Rule 12(b)(6) | Rule 12(b)(6) of the Federal Rules of Civil Procedure |
| SCCS | The Commission for the Scientific Committee on Consumer Safety |
| SEC | United States Securities and Exchange Commission |
| Section 10(b) | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j |
| Section 11 | Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k |
| Section 12(a)(2) | Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l |
| Section 15 | Section 15 of the Securities Act, 15 U.S.C. § 77o |
| Securities Act | The Securities Act of 1933, 15 U.S.C. § 77 *et seq.* |

| U.K. | United Kingdom |
|---|---|
| U.S. | United States |
| Underwriter Defendants or Underwriters | Collectively, Defendants Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Barclays Capital Inc. ("Barclays"), BofA Securities, Inc. ("BofA"), Evercore Group L.L.C. ("Evercore"), Jefferies LLC ("Jefferies"), Raymond James & Associates, Inc. ("Raymond James"), Cowen and Company, LLC ("Cowen"), Piper Sandler & Co. ("Piper Sandler"), Truist Securities, Inc. ("Truist"), Telsey Advisory Group LLC ("Telsey"), Drexel Hamilton, LLC ("Drexel Hamilton"), and Loop Capital Markets LLC ("Loop") |
| UW MTD | Motion to Dismiss the Revised Consolidated Class Action Complaint and Memorandum of Points and Authorities (ECF No. 132, 132-1) filed by the Underwriter Defendants |
| 3Q 2022 | Third quarter of fiscal year 2022 |

## I.     PRELIMINARY STATEMENT

This strict liability securities class action, brought solely under Sections 11, 12(a)(2), and 15 of the Securities Act, arises from the September 2021 IPO by Olaplex.[1] Olaplex's IPO Offering Documents contained many statements that were materially misleading because they failed to disclose that Olaplex's best-selling No. 3 product contained lilial—an ingredient that the E.U. banned in late 2020 as unsafe due to its infertility and reproductive system risks. Three months before the IPO, Olaplex reformulated its No. 3 product to remove lilial globally from newly manufactured stock due to the ban; yet, Olaplex continued to sell old stock with lilial at the time of the IPO and for months afterwards, as it later admitted. None of this was disclosed to investors. Instead, the Offering Documents touted Olaplex's "strong" brand reputation, social media following, and "clean" products—*i.e.*, that they do not contain any potentially harmful ingredients—as key assets and competitive advantages crucial to Olaplex's growth. The Offering Documents also contained general risk disclosures about, *e.g.*, the ***potential*** "impact" of some "laws and regulations" that "***may***" require Olaplex to "reformulate" its products and "remove" ingredients that ***might*** be deemed "unsafe."

Olaplex consumers and investors only learned of this lilial issue five months after the IPO, in late February 2022, when a TikTok influencer exposed it on social media. The posts went viral, prompting widespread backlash against Olaplex online. Though Olaplex publicly minimized the issue as mere "misinformation" and denied any impact on its sales—internally, the Company treated it as a "***fire drill***," recognizing the substantial reputational and financial risk it posed. Indeed, despite Olaplex's damage control efforts, its reputation deteriorated in the ensuing months, causing the Company's prior record sales growth to slow dramatically, as consumers turned away from its products and competitors took advantage. Notably, two CWs confirmed that

---

[1] Unless otherwise noted, emphasis is added, and internal citations and quotation marks are omitted throughout. This memorandum is also submitted in opposition to the motions to dismiss filed by Mousse, the Underwriters, and the Advent Defendants, to the extent those motions incorporate by reference certain portions of the MTD.

this lilial issue was a substantial factor in Olaplex's sales slowdown. On October 18, 2022, when Olaplex reported that sales growth had dropped so much that Olaplex was forced to slash its guidance, investors finally understood the full magnitude of the lilial issue—the resultant reputational fallout and its negative impact on Olaplex's sales.

Olaplex's falsity arguments ignore and mischaracterize the AC's allegations as "hindsight" pleading and a failure to "predict" the future. MTD 2. But, contrary to Olaplex's gaslighting, the E.U. lilial ban and its application to Olaplex's best-selling No. 3 product was a specific issue *already in existence and known* to Olaplex before the IPO. The E.U. regulators had *already* found lilial to be unsafe for use in consumer products, prompting Olaplex to *already* reformulate its top product to remove this ingredient pre-IPO. Thus, such risks had *already* materialized by the IPO or were significantly likely to do so—*i.e.*, the resulting reputational damage and adverse impact on Olaplex's demand, competitive position, and sales—rendering Defendants' *hypothetical* risk warnings actionable under well-settled Ninth Circuit law. By definition, such misleading risk warnings also do not qualify as adequate cautionary language sufficient to invoke the protections of the bespeaks caution doctrine. Olaplex's other falsity arguments—*e.g.*, that some statements were technically true— fail because it is also well-settled that literal truth is not the standard for falsity.

Such undisclosed facts were also undeniably material, as evidenced by the major sales slowdown that began after the public learned of Olaplex's lilial issue (illustrated in chart at ¶17) and the market's related negative reactions. Olaplex's related arguments that their statements were inactionable puffery or opinions fail for the same reasons. Further, as to Olaplex's other materiality arguments, the No. 3 reformulation before the IPO did not completely cure the lilial issue. Unbeknownst to the public, Olaplex continued to sell old No. 3 stock that still contained lilial *at the time of the IPO*— another material fact not disclosed in the Offering Documents. Finally, Olaplex's argument that investors knew or should have figured out the lilial issue because the E.U. ban and Olaplex's No. 3 label listing the ingredients were public is an affirmative

truth-on-the-market defense. Olaplex cannot meet its heavy burden on this fact-intensive defense at this stage, particularly given the public's shocked reaction to the lilial news. Indeed, Olaplex has not cited a *single* news article showing that the market even suspected this issue before the TikTok posts. Thus, the MTD should be denied.

## II.   FACTUAL BACKGROUND

### A.   Company Overview and Importance of Olaplex's Brand Reputation

Founded in 2014, Olaplex sells luxury hair care products that purportedly repair damaged hair through the Company's patented bis-amino ingredient. Of Olaplex's eleven products, including shampoos and conditioners, its No. 3 Hair Perfector—a pre-shampoo leave-in treatment—is its most popular and important, described by the Olaplex Defendants as Olaplex's "*hero*" product and "*best-seller*." ¶¶88-89. The Company grew rapidly since its founding. ¶85. According to Olaplex, its growth was due, in large part, to its strong brand reputation, particularly online and on social media, which the Company heavily relied on for marketing. ¶¶87; ¶¶95-110. Olaplex also marketed itself as a "clean" cosmetics company—*i.e.*, one that sold products "free of all beauty industry toxins" and prioritized consumer safety and transparency about its ingredients. ¶¶90-91. Analysts recognized the importance of Olaplex's strong online reputation to its financial success, for example, noting that "growing brand awareness" was one Olaplex's "biggest drivers of growth" and pointing to its "superior social media presence vs. competitors" as a key factor. ¶102; *see also* ¶¶101-05. But this disproportionate reliance on social media to build and maintain its brand reputation also rendered Olaplex more vulnerable to any reputational damage and backlash on social media, where its active digital community could quickly turn on Olaplex. ¶¶109-10. Given this context, "*any damage to the equity of the brand . . . could have a disproportionately larger impact on [Olaplex's] sales compared to beauty peers*." ¶89.

### B.   Shortly Before the IPO, Olaplex Quietly Reformulated Its No. 3 Product to Remove an Ingredient Banned as Unsafe by the E.U.

Although Olaplex is based in the U.S. (its biggest market), it has a large

international presence concentrated in Western Europe, and is thus subject to various E.U. and U.K. regulations. ¶86; ¶¶112-22. In August 2020, the E.U. amended a cosmetics regulation to ban lilial, effective March 1, 2022, due to safety concerns. ¶¶130-31. The E.U. imposed this ban based on scientific research by the SCCS, the E.U. agency responsible for assessing safety risks in consumer products, which revealed a concerning link between lilial and fertility risks and prompted the SCCS to conclude that "aggregate exposure" to lilial "*cannot be considered as safe*." ¶¶123-30. Thus, the E.U. classified lilial as "*reprotoxic*," *i.e.*, that it can be harmful to fertility and fetal development. ¶130. The U.K. later followed suit. ¶131.

Unbeknownst to consumers and investors, Olaplex's flagship No. 3 product contained lilial. ¶¶132-34. Per CW-1, Olaplex first decided to remove lilial from the No. 3 product in March 2021—six months before the IPO—due to the impending E.U. ban. ¶141. As Olaplex later admitted, it implemented this decision in June 2021—three months before the IPO—quietly reformulating the No. 3 product to remove lilial from newly manufactured stock. ¶¶133-38. At the same time, however, Olaplex continued to sell old stock that still contained lilial *at the time of the IPO and for months afterwards*, through at least January 2022—as the Company also *later* admitted. ¶¶139, 202. Olaplex did not disclose any of these developments when they occurred.

The Offering Documents also made no mention of: Olaplex's use of lilial in its purportedly "*clean* products that exclude certain harmful ingredients" (¶187; *see also* ¶¶189, 191); the E.U.'s already enacted lilial ban; the Company's related decision to remove lilial from its No. 3 product due to the E.U. ban; nor the resulting likely potential adverse impact of these issues on Olaplex's supposedly "strong reputation" and social media following that "position[ed] [it] to compete effectively" (¶¶178, 171, 180)—and thus its sales, which heavily depended on this brand reputation. Instead, the Offering Documents included many statements vaguely warning of general *future* risks regarding, *e.g.*, the *potential* impact of some unspecified global laws and regulations, including that regulators "*may*" deem Olaplex's products "*unsafe*" and Olaplex "*may*"

need to "reformulate" or "remove" ingredients. ¶¶164, 166, 168; *see also* ¶¶171-76.

**C.    Post-IPO, Consumers and Investors Gradually Learned of the Lilial Issue and Its Adverse Impact on Olaplex's Reputation and Sales**

On February 27, 2022—about five months after the IPO and just days before the E.U. ban was to take effect—a TikTok beauty influencer posted videos for the first time revealing that Olaplex's No. 3 product contained lilial and that it was subject to the ban. ¶¶197-98. Subsequent news reports confirmed that the public did not previously know of Olaplex's lilial issue—noting, *e.g.*, that the news "***came as a shock to***" Olaplex's followers (¶203) and "***came as a surprise***" (¶204). The news "went viral," sparking backlash on social media and other negative publicity. ¶¶199-209.

Analysts also noted that the lilial issue had raised significant "investor concerns" and put "meaningful pressure" on Olaplex's share price, as the market worried about "how management is insulating from the potential impact on its brand equity." ¶209; *see also* ¶¶214-15. Internally, per CW-1, the lilial controversy was treated as a "***fire drill***." ¶¶143-44. Publicly, however, Olaplex engaged in "damage control," repeatedly minimizing the lilial issue's severity and impact on its sales, including on a March 8, 2022 earnings call. ¶¶202, 211-12. While some analysts noted that Olaplex "shares were volatile post the earnings call[], down -4.6% at the close, reflecting lingering questions re: [lilial] ingredient safety," (¶215) most analysts were "encouraged" by these reassurances from "management [who] sounded confident . . . that the unfavorable headlines . . . should not have a material impact on the brand's equity nor underlying consumption [i.e., sales] in 2022." ¶216; *see also* ¶217.

Over the next year, however, the lilial issue resulted in a significant sales slowdown as demand for its products diminished and competitors took advantage. ¶¶218-81. Indeed, two CWs confirmed that the reputational fallout from the lilial issue, as compounded by increasing competition, was a key factor in Olaplex's sales troubles that began in spring 2022. ¶¶144-49. Further, the negative publicity from the lilial issue continued to plague Olaplex. For example, a June 22, 2022 *Vogue Business* article

described the Olaplex lilial news as an "***overnight disaster***[,]" explaining: "Building a viral marketing machine on social media by leveraging key beauticians and hair stylist influencers was core to the brand, ***and now they were threatening it***." ¶225. Indeed, the article quoted Defendant Wong (the CEO) as admitting as much: "'***The thing with social media is that it's a double-edged sword,' . . . 'It can elevate you,' she says, but 'it can also be disruptive***.'" *Id.*; *see also* ¶¶228-29; 238-40 (news and analyst reports).

On October 18, 2022, Olaplex issued 3Q 2022 preliminary financial results, which revealed quarterly net sales growth of only 9.2% (vs. 81% growth before the lilial news, ¶17) and a 4% decline in U.S. sales. ¶243. Olaplex also slashed its 2022 sales guidance by ***over $100 million***, attributing this downturn in part to "increased competitive activity and a moderation in new customer acquisition." *Id.*; *see also* ¶¶244-49. On this news, Olaplex's stock price plummeted ***57%***. ¶250. On November 17, 2022, the day this action was filed, Olaplex's stock price closed at a low of $5.75 per share—a nearly ***73%*** drop from the IPO price of $21 per share. ¶258.

## III. APPLICABLE LEGAL STANDARDS

On a Rule 12(b)(6) motion, courts must consider the complaint in its entirety, "accept all factual allegations . . . as true[,]" and construe them in the light most favorable to plaintiffs. *Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 322 (2007). A complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), but rather must simply "contain sufficient factual matter, [] to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Securities Act claims are subject to these permissive notice pleading standards of Rule 8(a). *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 624 (9th Cir. 2017). Rule 8(a) does not impose "an onerous burden" as "[s]pecific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008).

The Securities Act "protects investors by ensuring that companies issuing

securities . . . make a full and fair disclosure of information relevant to a public offering." *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015). Section 11 imposes a "stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). A Section 11 claim "need only [allege] a material misstatement or omission" in the registration statement—not scienter, loss causation, or reliance. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 856, 859-61 (9th Cir. 2013). Thus, under Section 11, if a material misstatement or omission is adequately alleged, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

## IV.    ARGUMENT

### A.    The AC Plausibly Alleges Material Misstatements and Omissions

"A statement or omission is misleading . . . if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). Further, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). "[O]nce defendants cho[o]se to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

An omitted fact is material where "a reasonable investor would have viewed [it] as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28 (2011). Because of the fact-intensive nature of the inquiry, "generally, questions of materiality are inappropriate for resolution on a motion to dismiss." *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1157 (C.D. Cal. 2022). "[W]hether a public statement is misleading . . . is a mixed question to be decided by the trier of fact[,]" *In re STEC Inc. Sec. Litig.*, 2011 WL

2669217, at *9 (C.D. Cal. June 17, 2011), and may not be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018).

The AC alleges that the Offering Documents contained four categories of misstatements about risks related to: (1) the impact of laws and regulations on Olaplex's business (¶¶162-69); (2) the strength of Olaplex's brand reputation and social media presence (¶¶170-76); (3) its competitive position (¶¶177-85); and (4) the "clean" nature of its products. ¶¶186-92. The AC plausibly alleges that these statements were materially false or misleading based on the failure to disclose the lilial issue— *i.e.*, the already-enacted E.U. lilial ban that, unbeknownst to investors, applied to Olaplex's flagship product—and its foreseeable adverse impact on Olaplex's business.

### 1. Misstatements About the Impact of Laws and Regulations[2]

The Offering Documents' risk disclosures about the impact of laws and regulations on Olaplex's business were false and misleading because they omitted *then-existing* material facts about Olaplex's lilial issue. Instead, such statements only vaguely warned about *potential* future risks that "could" or "may" occur, when in fact such risks had either already occurred or were significantly likely to do so. For example, the Offering Documents included generic warnings that some unspecified laws and regulations, and "changes" thereto, "*can* have several impacts on our business," including "prohibitions of selling a product *or ingredient in one or more markets*" and "*the need to reformulate the ingredients used in our products*, [which] *could* have an adverse effect on our existing business." ¶164; *see also id.* ("Changes [in laws] *may* require us to reformulate . . . certain of our products."). The Offering Documents also mischaracterized as merely hypothetical the risk that regulators *may* deem Olaplex's products "*unsafe*," when in fact E.U. regulators had *already* banned

---

[2] Even though the AC leads with this category of misstatements, Olaplex addresses them third, switching up the order in an apparent effort to deemphasize Plaintiff's strongest allegations of risks that had already materialized by the time of the IPO.

an ingredient in Olaplex's "hero" No. 3 product as unsafe due to its reproductive risks. ¶166 ("*if* our products are found to be . . . *unsafe* we *may* be subject to various product liability claims . . . "); *see also* ¶¶166, 168. Olaplex ignores this "unsafe" statement.[3] Further, Olaplex's arguments disputing lilial safety (MTD 9) are belied by the E.U. ban, and regardless, at most raise a factual issue that cannot be resolved at this stage.

These statements were misleading because Olaplex omitted critical, *then-existing* information that its flagship No. 3 product contained an ingredient already deemed "unsafe" by E.U. regulators in the August 2020 lilial ban, which had *already* impacted Olaplex by prompting it to reformulate the product globally to remove lilial, only a few months before the September 2021 IPO.[4] ¶¶130, 132-41. For example, CW-1 confirmed that Olaplex was aware of this E.U. ban and had internally decided to reformulate the No. 3 product in response in March 2021. ¶141. Indeed, Olaplex admitted post-IPO (on May 11, 2022) that "the Company reformulated [the No. 3 product] *in June 2021* as a result of regulation changes in the E.U." ¶220. *See In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018) (falsity adequately alleged based on defendants' "subsequent admissions"). Thus, at the time of the IPO, the potential risks that a government regulation *might* cause Olaplex to reformulate a product to remove an "unsafe" ingredient had in fact *already materialized*, which was not disclosed to investors.[5] *See In re Lyft Inc. Sec. Litig.*, 484

---

[3] Thus, Olaplex's assertion that Plaintiff "does not advance some claim that the No. 3 Product was unsafe" (MTD 16) disregards the AC's allegations.

[4] That the U.S. has not banned lilial (MTD 15) is of no avail. Olaplex failed to disclose that other key markets had already banned it. ¶¶86, 130-31. Olaplex also realized the reputational risk posed by such E.U. and U.K. bans on its U.S. sales, as evidenced by its decision to reformulate No. 3 globally. And the U.S. is known for its lax regulatory oversight of cosmetics' safety. ¶¶116-21 (*e.g.*, banning *only eleven* ingredients).

[5] For this reason, Defendants' cited authority (MTD 15), where plaintiffs failed to adequately allege—under a heightened Rule 9(b) pleading standard that is inapplicable here—that the warned-of risks "were having *any* impact" at the time of the IPO, is inapposite. *Baker v. Seaworld Ent., Inc.*, 2016 WL 2993481, at *12 (S.D. Cal. Mar. 31, 2016). The allegations there "amount[ed]" to mere "*speculation*" that the issue was having an "impact on attendance at SeaWorld . . . before or during the IPO." *Id.* Further, the statements in that case specifically *disclosed the relevant issue*—in stark contrast to this case, where the Offering Documents made *no mention of the lilial issue*. *Id.*

F. Supp. 3d 758, 769-70 & n.5 (N.D. Cal. 2020) (rejecting similar argument that "warned-of risks had [not] actually materialized at the time of the IPO").

For this reason, the Olaplex Defendants' refrain that the AC faults them for failing to "predict" the future (MTD 16) mischaracterizes Plaintiff's allegations. While "corporate officials need not be clairvoyant," they are "***responsible for revealing those material facts reasonably available to them***" at the time of the statements. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Further, Defendants' decision to discuss such regulatory risks in the Offering Documents triggered a duty to disclose the lilial issue. *See Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *11 (N.D. Cal. Feb. 23, 2023) (statements suggesting that regulators "had not highlighted particular concerns" with product misleading based on omissions of regulators' prior concerns).

Indeed, courts in this Circuit have found such hypothetical risk warnings to be actionable because "[r]isk disclosures that speak entirely of as-yet-unrealized risks . . ., and do not alert the reader that ***some of these risks may already have come to fruition***, can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008) ("learning that stop-work orders ***might*** be issued is quite different from knowing they were ***in fact*** issued."). For this reason, Olaplex's related argument that the Offering Documents adequately disclosed these risks (MTD 14-15) fails. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 779 (9th Cir. 2023) ("[d]efendants cannot rely on boilerplate language describing ***hypothetical*** risks to avoid liability for the failure to disclose that the company ***already*** had information suggesting the [the risk] might" occur) (emphasis in original); *Snap*, 2018 WL 2972528, at *6 ("the Ninth Circuit has rejected similar efforts to rely on abstract and hypothetical risk warnings that fail to alert the reader that ***some of the risks may already have come to fruition***").

Contrary to Olaplex's suggestion, the Ninth Circuit has also recognized that the relevant risk need not be an "absolute certainty" for liability. *Forescout*, 63 F.4th at

781. Defendants may be held liable where they were "aware of a ***significant likelihood*** that the risk ***would materialize*** and did not sufficiently apprise its investors of this development." *Id.* Here, Olaplex was aware of, or ***negligently*** failed to realize (as this is a Section 11 claim), the significant likelihood that the related risks would materialize once consumers learned of Olaplex's use of this unsafe ingredient—*i.e.*, reputational damage, product liability lawsuits, and declining demand and sales. Indeed, Defendant Wong has admitted that such risks were "foreseeable" to her and Olaplex (MTD 15) given Olaplex's dependence on social media marketing: "'***The thing with social media is that it's a double-edged sword,' . . . 'It can elevate you,' she says, but 'it can also be disruptive.***'" ¶110; *see also* ¶¶95-99 (Offering Documents touting reputation and social media following as key); ¶¶101-09, 228-29, 238-40 (analyst and media reports).[6]

Further, such omissions were material because the fact that Olaplex was using an ingredient, banned due to infertility risks, in one of its best-selling products, jeopardized Olaplex's brand reputation, which was critical to the Company's continued growth—information that would "significantly alter[] the total mix of information" available to investors. *Matrixx*, 563 U.S. at 38. In fact, the resulting public outcry, including analyst coverage, and related stock price drops once the lilial issue, and its adverse impact on sales, were ultimately disclosed after the IPO, confirm the materiality of such information. *E.g.*, ¶¶209, 212-18, 232, 234-35, 240-41, 248-49, 257; *see also* ¶¶221, 233, 242, 250, 270 (stock price drops); *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 (C.D. Cal. Aug. 4, 2017) (analyst interest "evidence[s]" materiality); *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) ("Facts demonstrating public interest in the withheld information support its materiality."); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 914 (N.D. Cal. 2012) (stock price drop supports materiality). Such allegations do not turn the AC into improper "hindsight"

---

[6] Defendants' claim that the "reformulation was a non-event" given CW-1's statements that the "only real cost" of removing lilial was the "scrapping and reprinting the labels" (MTD 15) misses the point and ignores the ***reputational*** costs of the lilial issue.

pleading (*see* MTD 10). *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1068 (C.D. Cal. 2012) (rejecting "fraud by hindsight" argument and considering later developments in upholding material falsity).

Additionally, Olaplex's suggestion that the No. 3 reformulation before the IPO effectively resolved the lilial issue, rendering it unnecessary to disclose (MTD 15), at best raises a factual dispute on materiality that cannot be resolved now. *See Khoja*, 899 F.3d at 1013 ("a jury should assess materiality as a question of fact"). This argument also ignores the reality that consumers would undoubtedly still care that Olaplex had used such unsafe ingredients in its purportedly "clean" products, thereby jeopardizing consumer trust and demand for Olaplex products, as in fact later occurred. It also ignores allegations that these statements were also misleading because Olaplex failed to disclose that, even after the reformulation, the Company continued to sell old No. 3 stock that still contained lilial ***at the time of the IPO and for months afterwards***, through January 2022—as Olaplex also later admitted. ¶¶139, 202. Olaplex does not dispute this allegation, which shows that its lilial problem was far from fully addressed at the time of the IPO. This fact and the foreseeable, material risk that it represented to Olaplex's reputation with consumers—mostly women, who were unlikely to buy products containing ingredients linked to infertility risks—should have been disclosed.

### 2. Misstatements About Reputation and Social Media Following

The Offering Documents repeatedly touted Olaplex's strong brand reputation and social media community as key assets for growth while wholly failing to mention the lilial issue, which was significantly likely to damage Olaplex's brand reputation and consumer trust, and in turn diminish demand for and sales of Olaplex's products. ¶¶170-76. For example, the Offering Documents touted Olaplex's "strong and loyal following" on social media as providing a "unique competitive advantage and foundation for growth." ¶171; s*ee also* ¶178 ("We believe we have a well-recognized and ***strong reputation***"); ¶180 (similar). This was misleading. *See Lyft*, 484 F. Supp. 3d at 767, 769 (statements touting ***brand reputation***, *e.g.,* "[w]e believe that building

a strong reputation and brand as a safe . . . platform are critical," and related risk warnings were misleading based on omission of sexual assault incidents that had occurred before the IPO and jeopardized that reputation); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 277, 279 (S.D.N.Y. 2012) (statements touting company's "reputation" were "materially misleading" based on failure to disclose certain misconduct). Thus, contrary to Olaplex's misdirection, the alleged "omitted information" here **already "existed at the time"** of the IPO, distinguishing their cited authorities (MTD 9, 11) and undermining their repeated complaint that Plaintiff seeks to hold them liable for a "failure to predict the future" (MTD 11).

Likewise, Olaplex's contention that the AC does not allege that such statements were "actually false" (MTD 9) ignores that falsity "is measured **not by literal truth**, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller*, 519 F.3d at 886. Here, these statements were actionable half-truths because they omitted the lilial issue and its foreseeable impact on Olaplex, thus creating the misleading impression that its purportedly "strong" reputation and "loyal" social media following were not in any danger. *See In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, *11 (C.D. Cal. June 4, 2001) ("[a] registration statement can contain none but factually true statements and be misleading nevertheless").

Further, contrary to Olaplex's arguments, such omitted information was material because Olaplex's use of an ingredient banned by the E.U. due to its safety risks to **fertility**, would likely have a negative impact on sales for Olaplex's products, which focused on female consumers—the primary constituents of Olaplex's "active" and "powerful" social media community. ¶¶95-103. Materiality is also supported by the importance of Olaplex's brand reputation and social media marketing to its financial success, as discussed above. ¶¶95-110. *See Khoja*, 899 F.3d at 1012-13 (where an undisclosed fact "**might—and allegedly did**—impact the financial health of [the company], that information was likely material to reasonable investors"). Thus, the E.U. lilial ban, its application to Olaplex's best-selling product, and the foreseeable

adverse impact on the Company's brand reputation and sales were **not mere "details"** that need not be disclosed, rendering Olaplex's authorities (MTD 10-11) inapposite.[7]

The Offering Documents also described as merely ***potential*** risks, some vague "negative publicity" and the damage that "adverse consumer perception" of Olaplex's products "***could***" have on its "brand image and [] reputation," which "***could***" have an adverse effect on its business. *E.g.,* ¶173; *see also* ¶¶175, 180. As discussed above, such "***hypothetical*** risk disclosures" are actionable because Olaplex did not disclose (i) the E.U. lilial ban, which had ***already*** occurred, and (ii) the specific risk it represented to the company's business, which was foreseeable. *Snap*, 2018 WL 2972528, at *6. Again, that the ***likely consequences*** of the lilial issue—*i.e.*, negative publicity, reputational damage, and sales decline—had not yet materialized at the time of the IPO (MTD 11-12) does not absolve Defendants. *Forescout*, 63 F.4th at 781. Further, the AC need not allege that they ***knew*** such social media backlash would occur. Under Section 11, it is sufficient that they were ***negligent*** in not realizing that a company so dependent on its reputation and social media presence, and known for its supposed transparency and "clean" products (¶¶90-91, 186-92), would suffer from decreased demand when consumers learned that it sold products containing an unsafe ingredient.

Finally, Olaplex's assertion that the AC's allegations about its continued sales of old No. 3 stock with lilial after the June 2021 reformulation do not bear "any connection" to these misstatements (MTD 11) is wrong. As discussed above, that Olaplex continued to sell No. 3 products containing lilial at the time of the IPO (and afterwards) shows that the reformulation did not cure the lilial issue before the IPO.

---

[7] Further, in *In re Progenity, Inc. Sec. Litig.*, 2023 WL 219345, at *10 n.8 (S.D. Cal. Jan. 13, 2023), the "[r]egistration [s]tatement ***clearly warned*** of "significant drop in test volume due to the COVID-19 pandemic"—unlike here, where the Offering Documents made ***no mention*** of the lilial issue. Likewise, *In re Quarterdeck Off. Sys., Inc. Sec. Litig.*, 1992 WL 515347, at *5 (C.D. Cal. Nov. 4, 1992) involved the failure to disclose a director's resignation where the company "***clearly warn[ed]***" investors that "key personnel" might leave the company. *In re Read-Rite Corp.*, which involved Section 10(b) claims, applied a ***heightened*** pleading standard, in finding that the complaint lacked necessary "specificity" in alleging the at-issue problems to hold that plaintiffs did not plead ***scienter***. 2004 WL 2125883, at *4 (N.D. Cal. Sept. 22, 2004).

This was another undisclosed material fact that increased the associated reputational risk to Olaplex. Indeed, consumers likely would be upset to learn that Olaplex was still trying to offload old stock containing this unsafe ingredient onto them, even after the Company recognized that it was best to remove the ingredient from new stock.[8]

### 3.    Misstatements Concerning Competition Risks

In the Offering Documents, Olaplex also made similar hypothetical risk disclosures regarding competition, which are materially misleading for the same reasons as discussed above. For example, the Offering Documents repeatedly touted the "***continued strength of our brand***" as a key factor in maintaining the Company's competitive position, including, *e.g.*, that Olaplex's supposedly "***strong reputation . . . position[ed] [the Company] to compete effectively***." ¶178. These risk disclosures portrayed increasing competition as a merely potential risk that "***could***" or "***may***" impact Olaplex's financial results. *Id*. This statement and others (¶¶180, 182, 184) were materially misleading because they omitted critical, ***then-existing*** information, *i.e.*, the lilial issue and the significant threat—rather than some purely hypothetical risk—that it posed to Olaplex's brand reputation. Because Olaplex's brand reputation was the cornerstone of its competitive advantage, any adverse impact to brand reputation would in turn jeopardize Olaplex's leading competitive position. Thus, these hypothetical risk disclosures are actionable because they omitted the lilial issue, which had already materialized, and the ***significant likelihood*** that it would adversely affect Olaplex's competitive position. *See supra* at 10 (citing *Forescout*).

Olaplex's argument that these disclosures were not alleged to be "not true" (MTD 16) again fails, as it ignores well-settled law that "literal truth" is not the standard for falsity. *See supra* at 13. These statements created the misleading impression that

---

[8] Likewise, another undisclosed material fact existing at the time of the IPO was Olaplex's pre-IPO strategic decision to hold more months of inventory on hand. ¶¶153, 231. This undisclosed decision exacerbated the risk to the Company's business from any slowdown in demand due to the lilial issue by saddling Olaplex with excess inventory (and associated costs) that it was unable to sell. *Id. See* MTD 11.

Olaplex's competitive position was not threatened by any specific issue.

### 4.      Statements Concerning Olaplex's "Clean" Products

The Offering Documents also included statements that Olaplex's products were "clean"—*i.e.*, free of any potentially harmful toxins and allergens. ¶¶90, 186-92. Specifically, Olaplex stated: (1) "we strive to produce clean products that exclude certain harmful ingredients," (¶187); (2) "[o]ur offerings . . . position us well to meet this rising [health-conscious] consumer demand" for "clean [] beauty products" (¶189); and (3) "[s]ince our first product launch, ***we have focused on developing clean*** [] ***beauty products.***" ¶191. Such statements were false and misleading because they were "inconsistent" with (*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017)) Olaplex's selling a product that used a chemical banned in the E.U., and deemed ***unsafe*** and "***reprotoxic***." ¶¶123-31. Indeed, despite the pre-IPO reformulation for new stock, Olaplex was still selling old stock containing this reprotoxic ingredient ***at the time of the IPO***. ¶138. None of this was disclosed in the Offering Documents.

In response, Olaplex primarily argues that these statements were literally true in that "Plaintiff does not dispute that Olaplex, did in fact, ***seek*** to produce 'clean' products." MTD 18. Again, this quibbling (based on the word "strive" in the first statement) ignores well-settled law that falsity is not measured by "literal truth." Here, these statements created the misleading impression that Olaplex's products were ***in fact*** "clean"—particularly, as they assured investors that the Olaplex Defendants "***have focused on developing*** clean [] beauty products" (¶191) and were well-positioned to meet this "high demand for clean . . . beauty products" given its "offerings[.]" ¶189.

Similarly, Olaplex also wrongly focuses on whether the statements were literally true in that Olaplex's products were "clean" pursuant to Sephora's definition, which they say is limited to the specific 50 ingredients listed therein.[9] MTD 18-19. In other

---

[9] The AC does not challenge this statement (that Olaplex's products are designated "Clean at Sephora") as an actionable misstatement, contrary to what Olaplex suggests. MTD 18. Further, Olaplex mischaracterizes the AC's allegations as to the Sephora definition in claiming that such allegations are "false." MTD 18-19 n.10 (incorrectly

*Footnote continued on next page*

words, because the Sephora designation did not specifically include lilial, the "clean" statements were literally true. But, again, that is not the applicable falsity standard. Further, given the ordinary usage of the term "clean" to refer to beauty products that do not contain potentially unsafe ingredients, reasonable investors would understand the "clean" statements to mean that Olaplex's products do not contain any ingredients that have already been banned as potentially harmful by regulators—including lilial. Such statements also must be viewed in the broader context—including Olaplex's own other public statements, *e.g.*, on its website, marketing itself as a "clean" company that is "***proud to be non-toxic . . . and free of <u>all</u> beauty industry toxins***." ¶¶90-91. In sum, by choosing to tout the "clean" nature of its products as a key business strength, Olaplex brought upon itself a duty to disclose that its flagship product contained a "***reprotoxic***" ingredient banned by the E.U.

### 5.    Olaplex's Other Materiality Arguments Are Unavailing

#### a.    The Bespeaks Caution Doctrine Does Not Shield Olaplex

Olaplex argues that some misstatements about its reputation, social media following, and competition are forward-looking statements protected by the bespeaks caution doctrine. MTD 12-13, 17 (listing only some examples and thus failing to specify all statements challenged on this ground). This argument, however, ignores that many misstatements in these categories are non-forward-looking representations about "current or past facts," or at the least "mixed" statements, which are "not protected" under the bespeaks caution doctrine or the PSLRA safe harbor (the doctrine's statutory codification). *Quality Sys.*, 865 F.3d at 1142; *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) ("extension of the bespeaks caution doctrine to statements of historical fact is inappropriate"); *e.g.*, ¶171 ("[t]he quality of our products, combined with our community-driven approach . . . ***ha[s] created*** a strong

---

citing ¶91). The AC was simply paraphrasing Sephora's "clean" definition to refer to products that are "formulated without parabens, sulfates . . . and other such toxins or allergens that have been linked to various safety concerns." ¶90. This paraphrasing is consistent with the Sephora language that Olaplex quotes. *See* MTD 18-19 n.10.

and loyal following for OLAPLEX that we believe **provides** a unique competitive advantage"); ¶178 ("We believe we **have** a well-recognized and strong reputation . . . .") ("We **compete** primarily by[] . . . **maintaining** favorable brand recognition[.]"). Olaplex's risk disclosures are also alleged to be misleading by **omission of historical fact**—*i.e.*, the E.U. lilial ban and its application to Olaplex—and are thus unprotected by this doctrine. *Honest*, 615 F. Supp. 3d at 1155–56 (this "doctrine does not apply to . . . **failure to disclose past**" issues); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768-69 (S.D.N.Y. 2012) (this "doctrine . . . does not apply . . . where a plaintiff alleges **omissions** . . . of historical fact").

Even if any misstatements are forward-looking, Olaplex must show that they were accompanied by meaningful cautionary language. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) ("The bespeaks caution doctrine [dismissal] . . . requires a **stringent showing**: [t]here must be sufficient cautionary language . . . such that reasonable minds could not disagree that the challenged statements were not misleading."). Here, Olaplex's disclosures of "general risks" fall far short under this stringent standard, as they did not disclose the specific lilial issue. *Honest*, 615 F. Supp. 3d at 1155 (rejecting defense under this "stringent" standard where "offering documents identified general risks associated with negative customer sentiment on social media" that were not "specific enough to the issues of concern with the [product]"). Further, as discussed above (Section IV.A.1), "[t]he Ninth Circuit has rejected similar efforts to rely on abstract and hypothetical risk warnings that fail to alert the reader that **some of the risks may already** have come to fruition[,]" as here. *Snap*, 2018 WL 2972528, at \*6; *see also Forescout*, 63 F.4th at 781 (same). For these reasons, Olaplex's cited cases (MTD 13) are distinguishable.

### b. The Misstatements Are Not Inactionable Opinions

Nor are Olaplex's statements inactionable opinions. MTD 12-14, 17, 19. Olaplex selectively quotes certain portions of the statements they challenge as opinions (¶¶171,

178, 180, 182, 189), omitting others that were not couched with any prefatory opinion language, but rather "expresse[d] certainty" and thus are representations of fact. *Omnicare*, 575 U.S. at 183; *e.g.*, ¶171 ("[t]he quality of our products . . . *ha[s] created* a strong and loyal following"); ¶189 ("Our offerings . . . *position us well* to meet this rising consumer demand [for clean products].").

Regardless, even if considered opinions, such statements are actionable. Contrary to Olaplex's assertion, under *Omnicare*, plaintiffs need not allege "both" objective and subjective falsity. MTD 14. Rather, an opinion is actionable, even if "sincerely held[,]" if it "omits material facts" that "conflict with what a reasonable investor would take from the statement itself[.]" *Omnicare*, 575 U.S. at 176, 189. Here, the statements omitted conflicting, material facts—*i.e.*, the lilial issue and the associated risk it posed to Olaplex's "strong reputation," "strong and loyal following," "ability to compete," and meet the "rising consumer demand" for "clean products"— rendering any opinions misleading. ¶¶171, 178, 180, 182, 189; *see Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *18 (N.D. Cal. Apr. 18, 2023) ("statements about customer demand" are actionable, "[e]ven if" deemed opinions, based on material "omissions").

### c.    The Misstatements Are Not Inactionable Puffery

Olaplex challenges a few statements as puffery. MTD 14 n.9 (¶171 – "strong and loyal following"); *id.* at 16-17 (¶¶178, 180, 182 – "strong reputation" and competition statements); *id.* at 19 (¶189 – "clean" products). Courts should dismiss statements as "'puffery' *only if* . . . the statement is *so obviously unimportant* to a reasonable investor that reasonable minds could not differ on . . . their unimportance." *Honest*, 615 F. Supp. 3d at 1154. Context also matters. "The [c]ourt may not assess the statements . . . in a vacuum, plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery[.]" *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). "[E]ven general statements of optimism, *when taken in context*," are actionable if they omit material, adverse facts

about "specific aspects of a company's operation." *Quality Sys.*, 865 F.3d at 1143.

These statements are not puffery because they were assurances about specific aspects of Olaplex's operations—its strong brand reputation and social media following—that Olaplex repeatedly touted as key assets that were crucial to its growth. ¶¶97-100. When viewed in this context, it cannot be said that these statements and omissions "would be *so obviously unimportant* to a reasonable investor." *Richman*, 868 F. Supp. 2d at 279-80 (statements touting "value[]" of company's "*reputation*" not mere puffery); *see also Quality Sys.*, 865 F.3d at 1137-38, 1144 (statements that "sales pipeline" was, *e.g.*, "*strong*" and "deep," held actionable). The damage to Olaplex's reputation and resultant adverse impact on its sales after the lilial news confirms the materiality of this information. ¶¶218-24, 230-35, 243-49, 251-57. Analyst coverage of these topics also supports their materiality. *See Turocy*, 2017 WL 3328543, at *14.

The same reasoning applies to statements about Olaplex's "clean" products. Indeed, the Offering Documents touted the "clean" nature of Olaplex's products as a crucial driver of its growth and competitive position given the "high demand" by "health-conscious" consumers for "clean" products. ¶189; *see also* ¶191. Further, Olaplex marketed itself on this reputation as a "clean" company that prioritized consumer "health" and transparency. ¶¶90-91. Given such context, it strains credulity that Olaplex's flagship product containing an unsafe reprotoxic ingredient would be so obviously unimportant to investors. *Honest*, 615 F. Supp. 3d at 1154-55 (statements touting "commitment" to "existing products' safety . . . and efficacy" not puffery where "tether[ed]" to allegations of "customers' efficacy and safety concerns" about key product); *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *12-13 (C.D. Cal. May 31, 2017) (statements touting "*clean* diesel" technology not puffery where it "was central to [company's] core business strategy").[10]

_____

[10] It is also objectively verifiable (MTD 19) that Olaplex's No. 3 product contained an ingredient deemed unsafe for consumers under E.U. regulations, rendering No. 3 not a "clean" product in the common usage of that term. *See supra* at Section IV.A.4.

### d.    Olaplex's Truth-on-the-Market Defense Fails

Olaplex's recurrent argument that investors knew or should have discovered the lilial issue pre-IPO (*e.g.*, MTD 10 n.6, 15) is a truth-on-the-market affirmative defense, "[t]hough not labeled as such[.]" *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). "Under this theory, a defendant's failure to disclose material information may be excused where [it] was made credibly available to the market by other sources." *Id.* To prevail, defendants bear a "heavy burden" in showing that the truth was "transmitted to the public with a degree of ***intensity and credibility sufficient to effectively counterbalance any misleading impression created by . . . [the] representations***." *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996); *Snap*, 2018 WL 2972528, at *7. "[T]he truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *Amgen*, 544 F. Supp. 2d at 1025.

The Olaplex's burden is especially high in the case of an IPO where, as here, "the only pertinent representations are those made within the four corners of the issuers' offering documents or in documents expressly incorporated therein." *In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1248 (D.N.M. 2010); *see* ¶156; *Snap*, 2018 WL 2972528, at *7 (denying defense where "any credibility these rumors had could have been counteracted by the [] S–1, which unequivocally directed investors not to consider any information beyond the four corners of the S–1").

Olaplex has not made the requisite showing here. Even if the E.U. lilial ban and the No. 3 ingredient list were publicly available, Olaplex nowhere publicly disclosed the ban, nor its ***impact*** on the Company's products, before the TikTok influencer exposed it in early 2022. *See Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 718-19 (2d Cir. 2011) (even if underlying facts were public, the "key information" that should have been disclosed, their "***impact*** [on company,] was certainly not public knowledge") (emphasis in original); *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *15-16 (D.N.J. Dec. 15, 2015) (though "new Chinese regulations were publicly known," defendants "would have to show that the market understood the regulations'

*implications* [on company], which is a fact question not properly addressed at this stage"). Notably, the MTD does not cite a *single* news report, nor other evidence, suggesting that the public even suspected this issue before the TikTok disclosure. *See Lyft*, 484 F. Supp. 3d at 769 ("[d]efendants do not establish as a matter of law that the complaints [] were in the public domain" *even* where they cited some "exemplary news reports"). Indeed, the market's reaction, as evidenced by many news and analyst reports after the TikTok disclosure, confirms that this information was not previously known. *E.g.*, ¶203 (the news "*came as a shock*"); ¶204 ("*it came as a surprise*"); ¶¶206, 208-09; *see In re Amgen, Inc. Sec. Litig.*, 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014) (analyst reports precluded truth-on-the-market defense at pleading stage).

Olaplex speculates that investors could have figured out the lilial issue on their own by scouring the public E.U. regulations and reports regarding lilial, as well as the No. 3 public labels—which listed lilial's scientific name (butylphenyl methylpropional) among a laundry list of other ingredients—and thereby connected the dots. But the truth-on-the-market defense focuses on what the "reasonable" investor knows or can discover with "minimal diligence." *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 584-85 (S.D.N.Y. 2010); *see also In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) ("claimed ability . . . to arrive at [such] findings by an examination of the publicly reported financials does not mean that a reasonable investor could have drawn those same conclusions"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1160 (C.D. Cal. 2008) ("complexity" of public information precludes truth-on-the-market defense). For these reasons, such information was not reasonably "available" to consumers and investors, as Olaplex insists, rendering their cases (MTD 10 n.6) inapposite. At most, Olaplex has raised a factual dispute "inappropriate" for resolution at this stage. *Amgen*, 544 F. Supp. 2d at 1025 (denying defense even where the at-issue meeting and agenda were public).

## B. Independent Duty to Disclose Under Items 303 and 105

Olaplex also had an independent duty to disclose the lilial issue under Items 303 and 105 of Regulation S-K. Under Item 303, defendants must "[d]escribe any known trends *or uncertainties* that have had or that are *reasonably likely* to have a material favorable or unfavorable impact on net sales or revenues." 17 C.F.R. § 229.303(b)(2)(ii); *see Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) ("omission of facts required to be stated under Item 303 will produce liability" under the Securities Act). Item 105 is violated, and gives rise to actionable claims under Section 11, when the offering materials fail to provide "a discussion of the [most significant] factors that make . . . [the] offering speculative or risky." 17 C.F.R. § 229.105(a); *see Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) (Item 105 claim pled where company did not disclose risks "of its new sales strategy" as "boilerplate risk factors do not satisfy [Item 105] requirements").

Here, the Olaplex Defendants violated their duties to disclose under Items 303 and 105 by omitting any mention of the lilial issue, which was an uncertainty that existed *at the time of the IPO*. Defendants' claim to the contrary (MTD 20) ignores such allegations. *See In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *15 (N.D. Cal. Oct. 31, 2014) (defendants' "claim that the [r]egistration [s]tatement should have disclosed a *future* trend projection, as opposed to *a then-present* trend, is belied by the allegations"). Further, as discussed above (Section IV.A.1), the lilial issue was reasonably likely to have a material, unfavorable impact on Olaplex's sales given the importance of its brand reputation, active social media following, and purported focus on "clean" products. *See Switch*, 2019 WL 3065591, at *5 (Item 303 claim pled where company's undisclosed "strategy presented a serious risk of diminishing revenue"). At most, Olaplex's contrary materiality arguments involve an "intensely fact-intensive" issue that cannot be decided "at this stage." *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *11-12 (C.D. Cal. Jan. 24, 2023) (rejecting similar argument that the relevant projects did not have "a material impact on [company's] finances" in finding Item 303

violation where complaint alleged that the "imminent cessation [of the omitted projects] would cause a decrease in future revenues").

Further, Plaintiff need only allege facts to support a plausible inference that Olaplex knew of an issue requiring Item 303 or 105 disclosure. *See Honest*, 615 F. Supp. 3d at 1157-58 (upholding Item 303 and 105 claims where CW allegations "rais[ed] an inference that [] management knew of the [product] issues" at IPO time). Here, CW-1's testimony and Olaplex's own later admissions confirm that its management was well aware of the E.U. lilial ban and its application to No. 3 product months before the IPO. ¶¶132-41. Finally, Olaplex's argument that it adequately disclosed the exact risks that materialized is belied by the reality that the Offering Documents nowhere mentioned the lilial issue. MTD 20. And such hypothetical risk warnings were themselves misleading and thus inadequate. *See* Section IV.A.1, *supra*.

### C.    The Olaplex Defendants Are Section 12(a)(2) Statutory Sellers

Plaintiff has adequately pled that the Olaplex Defendants are statutory sellers under Section 12(a)(2), which imposes liability against anyone who "offers or sells a security . . . by means of a prospectus or oral communication" that includes a material misstatement or omission. 15 U.S.C. §77l(a)(2). The provision governs "statutory sellers" who either (1) "passed title . . . in the security, to the buyer for value" *or* (2) "successfully solicit[ed] the purchase" of the securities, motivated by financial gain. *Pinter v. Dahl*, 486 U.S. 622, 642, 647, 652 (1988).

As the issuer, Olaplex qualifies as a statutory seller. *See* 17 C.F.R. § 230.159A ("in a primary offering of securities of the issuer . . . seller shall include the issuer of the securities" for Section 12(a)(2)); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, 2013 WL 12320069, at *5 (C.D. Cal. Dec. 19, 2013) (relying on SEC Rule 159A in holding that the issuers were statutory sellers for purposes of § 12(a)(2)).

Further, as solicitation is independently sufficient, the Olaplex Defendants need not have "sold shares directly to Plaintiff" (MTD 21) to qualify as statutory sellers. *Id.* at 647-50. The AC's solicitation allegations—including that the Individual Defendants,

who were significant Olaplex stockholders, ***signed***, participated in the preparation of, and disseminated the Offering Documents and related materials, and solicited sales at IPO roadshows for their own financial gain (an allegation the Olaplex Defendants do not contest, *see* MTD 21)—are sufficient at this stage under Rule 8's lenient pleading standard. ¶¶38, 304-08. *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 384 (N.D. Cal. 2020) (similar allegations sufficient as "the corporation, its officers and directors . . . appear to be the true 'sellers'"); *In re Nat'l Golf Props. Inc. Sec. Litig.*, 2003 WL 23018761, at *3 (C.D. Cal. Mar. 19, 2003) ("allegations that an issuer signed a registration statement is sufficient to allege active solicitation").

Further, the AC's lack of allegations that the Olaplex Defendants "'personally or directly solicited'" Plaintiff is ***not*** "fatal." MTD 21 (citing *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1102 (C.D. Cal. 2003)). This argument ignores recent, controlling Ninth Circuit precedent that such allegations are not required: "Nor has the Supreme Court imposed a requirement that solicitation under § 12 requires that a seller '***actively and directly' solicit a plaintiff's investment***, as [d]efendants contend." *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1259 (9th Cir. 2022). Thus, *Infonet* and other cases relied upon by Olaplex for this point, which predate *Pino*, are no longer good law. Finally, dismissal on this basis is inappropriate at this stage because "the solicitation question is a ***factual question which should generally be left to the jury***." *Pirani,* 445 F. Supp. 3d at 384. Thus, the AC's Section 12 claims must survive.

### D. The Individual Defendants Are Liable as Control Persons

The Individual Defendants do not deny their control over Olaplex. MTD 22. Because Plaintiff has adequately alleged primary violations of the Securities Act, the Section 15 claims against the Individual Defendants must also be sustained.

## V. CONCLUSION

For the foregoing reasons, the Olaplex Defendants' motion should be denied in its entirety. If the Court grants any part of this motion, Plaintiff respectfully requests leave to amend. *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012).

Dated: August 14, 2023                    Respectfully Submitted,


By: */s/ Irina Vasilchenko*
IRINA VASILCHENKO

**LABATON SUCHAROW LLP**
CAROL C. VILLEGAS (*pro hac vice*)
cvillegas@labaton.com
IRINA VASILCHENKO (*pro hac vice*)
ivasilchenko@labaton.com
LISA M. STREJLAU (*pro hac vice*)
lstrejlau@labaton.com
DANIELLE IZZO (*pro hac vice*)
dizzo@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff
Arkansas Teacher Retirement System
and Lead Counsel for the Proposed Class*


**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (SBN 270796)
rprongay@glancylaw.com
CHARLES H. LINEHAN (SBN 307439)
clinehan@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495

*Liaison Counsel for Lead Plaintiff
Arkansas Teacher Retirement System and the
Proposed Class*