**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (SBN 270796)
rprongay@glancylaw.com
CHARLES H. LINEHAN (SBN 307439)
clinehan@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495

*Liaison Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement*
*System and the Proposed Class*

**LABATON SUCHAROW LLP**
CAROL C. VILLEGAS (*pro hac vice*)
cvillegas@labaton.com
IRINA VASILCHENKO (*pro hac vice*)
ivasilchenko@labaton.com
LISA M. STREJLAU (*pro hac vice*)
lstrejlau@labaton.com
DANIELLE IZZO (*pro hac vice*)
dizzo@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement System*
*and Lead Counsel for the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LESLIE LILIEN, Individually and on Behalf of All Others Similarly Situated,<br><br>   Plaintiff,<br><br>  v.<br><br>OLAPLEX HOLDINGS, INC., JUE WONG, ERIC TIZIANI, TIFFANY WALDEN, CHRISTINE DAGOUSSET, TRICIA GLYNN, DEIRDRE FINDLAY, JANET GURWITCH, MARTHA MORFITT, DAVID MUSSAFER, EMILY | No. 2:22-cv-08395-SVW(SKx)<br><br><u>CLASS ACTION</u><br><br>**LEAD PLAINTIFF'S OPPOSITION TO THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

WHITE, MICHAEL WHITE, PAULA ZUSI, ADVENT INTERNATIONAL GPE IX LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-B LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-C LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-F LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-G LIMITED PARTNERSHIP, ADVENT INTERNATIONAL GPE IX-H LIMITED PARTNERSHIP ADVENT INTERNATIONAL GPE IX-I LIMITED PARTNERSHIP ADVENT INTERNATIONAL GPE IX-A SCSP, ADVENT INTERNATIONAL GPE IX-D SCSP, ADVENT INTERNATIONAL GPE IX-E SCSP, ADVENT INTERNATIONAL GPE IX STRATEGIC INVESTORS SCSP, ADVENT PARTNERS GPE IX LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-A LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX CAYMAN LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-A CAYMAN LIMITED PARTNERSHIP, ADVENT PARTNERS GPE IX-B CAYMAN LIMITED PARTNERSHIP, MOUSSERENA, L.P., GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., BOFA SECURITIES, INC., EVERCORE GROUP L.L.C., JEFFERIES LLC, RAYMOND JAMES & ASSOCIATES, INC., COWEN AND COMPANY, LLC, PIPER SANDLER & CO., TRUIST SECURITIES, INC., TELSEY ADVISORY GROUP LLC, DREXEL HAMILTON, LLC, and LOOP CAPITAL MARKETS LLC,

Defendants.

Hearing Date: September 11, 2023
Time: 1:30 p.m.
Courtroom: 10A
Judge: Hon. Stephen V. Wilson

LEAD PLAINTIFF'S OPPOSITION TO THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS
NO. 2:22-CV-08395-SVW(SKX)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... ii

I. PRELIMINARY STATEMENT ................................................................ 1

II. FACTUAL BACKGROUND ..................................................................... 4

III. APPLICABLE LEGAL STANDARDS ...................................................... 5

IV. ARGUMENT............................................................................................ 6

    A.    Plaintiff's Section 11 and 12 Claims Are Not Time-Barred ................... 6

        1.    The Underwriter Defendants Ignore the Governing Legal
                Standards for the Statute of Limitations Affirmative
                Defense................................................................................... 7

        2.    The Underwriters Have Not Conclusively Shown That the
                Limitations Period Began to Run by March 8, 2022, or by
                April 28, 2022, the Critical Date ............................................ 9

        3.    The Underwriter Defendants Ignore Numerous Key
                Disclosures After the April 28, 2022 Critical Date.......................16

        4.    Plaintiff Need Not Invoke the Relation Back Doctrine................20

    B.    The AC Adequately Pleads Actionable Misstatements and
        Omissions ........................................................................................20

    C.    Each of the Underwriters Is a Section 12(a)(2) Statutory Seller ............20

V. CONCLUSION ........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2U, Inc. Sec. Class Action*,
  2021 WL 3418841 (D. Md. Aug. 5, 2021) .................................................14, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................5

*Baker v. Seaworld Ent., Inc.*,
  2016 WL 2993481 (S.D. Cal. Mar. 31, 2016) ...................................................24

*In re Bare Escentuals, Inc. Sec. Litig.*,
  745 F. Supp. 2d 1052 (N.D. Cal. 2010)........................................................15, 16

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) .......................................................... 7-8, 9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................5

*Booth v. Strategic Realty Tr., Inc*,
  2014 WL 3749759 (N.D. Cal. July 29, 2014)......................................................7

*In re Charles Schwab Corp Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ................................................................6, 21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)..............................................................................6

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011).................................................................................7

*In re DDi Corp. Sec. Litig.*,
  2005 WL 3090882 (C.D. Cal. July 21, 2005)............................................23, 24

*In re Dynegy, Inc. Sec. Litig.*,
  339 F. Supp. 2d 804 (S.D. Tex. 2004)..........................................9, 10, 13, 15

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) .................................................10, 11

*FHFA v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)..................................................................7, 8, 9

*Flynn v. Sientra, Inc*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016) ......................................................25

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..................................................................................5

*Hildes v. Arthur Andersen LLP*,
    734 F.3d 854 (9th Cir. 2013)..........................................................................5

*In re Infonet Servs. Corp. Sec. Litig.*,
    310 F. Supp. 2d 1106 (C.D. Cal. 2003) ......................................................8, 10

*Johnson v. Riverside Healthcare Sys., LP,*
    534 F.3d 1116 (9th Cir. 2008)........................................................................6

*Katz v. China Century Dragon Media, Inc.*,
    2011 WL 6047093 (C.D. Cal. Nov. 30, 2011)..................................................24

*Lapin v. Goldman Sachs Grp., Inc.,*
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ..............................................................15

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    616 F. App'x 442 (2d Cir. 2015)..................................................................14

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011) ..................................................24

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010) ..............................................................*passim*

*Mirmehdi v. United States*,
    689 F.3d 975 (9th Cir. 2012)........................................................................25

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*,
    876 F. Supp. 2d 616 (D. Md. 2012), *aff'd sub nom.*
    *Yates v. Mun. Mortg. & Equity*, LLC,
    744 F.3d 874 (4th Cir. 2014) ................................................................14, 15

*Pino v. Cardone Cap., LLC*,
    55 F.4th 1253 (9th Cir. 2022)..................................................................21, 24

*Pinter v. Dahl*,
    486 U.S. 622 (1988)............................................................................20, 21, 24

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020)............................................................. 5-6

*Pirani v. Slack Techs., Inc.*,
    13 F.4th 940 (9th Cir. 2021), *vacated on other grounds and
    remanded*, 598 U.S. 759 (2023) .........................................................................6

*In re Portal Software, Inc. Sec. Litig.*,
    2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ...................................................25

*Primo v. Pac. Biosciences of Cal., Inc.*,
    940 F. Supp. 2d 1105 (N.D. Cal. 2013)..............................................................21

*Rafton v. Rydex Series Funds*,
    2011 WL 31114 (N.D. Cal. Jan. 5, 2011).........................................................8, 9

*Rieckborn v. Jefferies LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015)................................................. 8, 21, 22, 24

*Rubke v. Capitol Bancorp Ltd*,
    551 F.3d 1156 (9th Cir. 2009)..............................................................................5

*In re Scot. Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................23

*In re Stratosphere Corp. Sec. Litig.*,
    1 F. Supp. 2d 1096 (D. Nev. 1998) ............................................................. 21-22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..............................................................................................5

*In re Violin Memory, Inc. Sec. Litig.*,
    2015 WL 1968766 (N.D. Cal. Apr. 30, 2015) ......................................22, 23, 24

*In re Vocera Commc'ns, Inc. Sec. Litig.*,
    2015 WL 603208 (N.D. Cal. Feb. 11, 2015) ...................................................24

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
    65 F.4th 459 (9th Cir. 2023)................................................................ 7, 8, 9, 16

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
259 F.R.D. 490 (W.D. Wash. 2009)......................................................................23

*Welgus v. TriNet Grp., Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)..................................... 13, 14, 24

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003) ...............................................................22

*In re ZZZZ Best Sec. Litig.*,
1994 WL 746649 (C.D. Cal. Oct. 26, 1994)......................................................25

**Statutes & Rules**

Securities Act of 1933 Section 11, 15 U.S.C. § 77k ....................................*passim*

Securities Act of 1933 Section 12, 15 U.S.C. § 77l.....................................*passim*

Securities Act of 1933 Section 13, 15 U.S.C. § 77m ..............................................7

Securities Act of 1933 Section 15, 15 U.S.C. § 77o ...............................................1

Fed. R. Civ. P. Rule 8 ................................................................................*passim*

Fed. R. Civ. P. Rule 12(b)(6) ..........................................................................5, 14

Lead Plaintiff Arkansas Teacher Retirement System ("Plaintiff") respectfully submits this memorandum in opposition to the Underwriter Defendants' Motion to Dismiss the Revised Consolidated Class Action Complaint for Violations of the Federal Securities Laws and Memorandum of Points and Authorities (ECF Nos. 132, 132-1, the "UW MTD") filed by Defendants Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., BofA Securities, Inc., Evercore Group L.L.C., Jefferies LLC, Raymond James & Associates, Inc., Cowen and Company, LLC, Piper Sandler & Co., Truist Securities, Inc., Telsey Advisory Group LLC, Drexel Hamilton, LLC, and Loop Capital Markets LLC (collectively, the "Underwriters" or "Underwriter Defendants").[1]

## I.   PRELIMINARY STATEMENT

This strict liability securities class action, brought solely under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, arises from the September 2021 Initial Public Offering ("IPO") by Olaplex, a luxury hair care brand. Olaplex's IPO registration statement and prospectus (the "Offering Documents") contained many statements that were materially false and misleading because they failed to disclose the "lilial issue," *i.e.*, that: Olaplex's best-selling No. 3 product contained lilial—an ingredient that the E.U. banned in August 2020, effective on March 1, 2022, as unsafe due to its infertility and reproductive system risks; as a result of the ban, Olaplex quietly reformulated the product in June 2021, as it *later* admitted, to remove lilial from newly manufactured stock; Olaplex continued selling old stock of the No. 3 product containing lilial at the time of the IPO and for months afterwards, as it also *later*

---

[1] Citations to paragraphs ("¶") are to paragraphs in the Revised Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed on June 22, 2023 (ECF No. 123, the "AC"). Unless otherwise noted, emphasis is added, and internal citations and quotation marks are omitted throughout. This memorandum is also submitted in opposition to the Motions to Dismiss filed by Olaplex Holdings, Inc. ("Olaplex" or the "Company") and the Individual Defendants (ECF Nos. 130 and 130-1, the "Olaplex MTD"), Mousserena, L.P. (ECF Nos. 127 and 127-1, the "Mousse MTD"), and the Advent Fund Defendants (ECF Nos. 129 and 129-1, the "Advent MTD"), to the extent that those motions and briefs incorporate by reference certain portions of the UW MTD.

admitted; and the significant related risks that these undisclosed facts represented to Olaplex's brand reputation and thus, business. Instead, the Offering Documents contained numerous statements misleadingly touting Olaplex's strong brand reputation, social media following, "clean" products (*i.e.*, ones not containing any potentially harmful ingredients), and general risk warnings about *potential* risks that "*may*" materialize, without disclosing the lilial issue that had *already* materialized by the time of the IPO and posed a significant threat to the Company's reputation, consumer demand, competitive position, and sales.

The Underwriters make two primary challenges in their brief. First, they argue that Plaintiff's claims against them are time-barred because the original Amended Complaint (ECF No. 72, "Original AC"), which added them as Defendants for the first time, was filed on April 28, 2023—supposedly more than a year after the applicable one-year statute of limitations period began to run. UW MTD 2, 4, 9. Second, the Underwriters contend that virtually all of them (except for Goldman Sachs) are not adequately pled to be "statutory sellers" under Section 12(a)(2).[2] UW MTD 12-14.

Both challenges are meritless. First, Plaintiff's claims are not time-barred. Ignoring recent controlling Ninth Circuit precedent, which made clear that the standard they rely on ("inquiry notice") is no longer good law, the Underwriters argue that the statute of limitations began to run on or before March 8, 2022—when the lilial issue was first publicly disclosed on social media, prompting negative publicity and Olaplex to issue various public statements in response. UW MTD 4-9. But under the governing Ninth Circuit standard, the relevant inquiry is whether investors had sufficient information ***to adequately plead*** a securities law violation—***not simply to begin***

---

[2] The Underwriters also assert a third basis for dismissal—that the AC fails to adequately plead any material misstatements or omissions in the Offering Documents, as required under both Section 11 and Section 12(a)(2) claims. But they do not make any substantive arguments of their own and instead incorporate by reference the related sections of the Olaplex MTD. This argument fails for the reasons discussed in Plaintiff's opposition to the Olaplex MTD filed concurrently herewith ("LP Olaplex Opposition"), Section IV.A.

*investigating*—by the critical date for the statute of limitations analysis (one year before the Original AC was filed), *i.e.*, April 28, 2022. The Underwriters do not meet their heavy burden on this fact-intensive affirmative defense at this early stage.

Specifically, the Underwriters have not ***conclusively*** shown that by April 28, 2022 investors knew enough information to plead material misstatements and omissions concerning the lilial issue. While investors had first began to learn of the lilial issue by March 8, 2022, they did not have sufficient information (in part because Olaplex significantly downplayed the issues) indicating that such undisclosed facts constituted ***material*** omissions in the Offering Documents—*i.e.*, that it was likely to have a significant adverse impact on Olaplex's business. Indeed, the initial disclosures of the lilial issue were accompanied by Olaplex's public reassurances minimizing the concerns about lilial's safety as mere "misinformation" and indicating that this issue was unlikely to have ***any adverse impact*** on the Company's sales. Analyst reports confirm that investors were lulled into inaction by such reassurances from Olaplex. Investors did not fully learn of the lilial issue's adverse impact on Olaplex's business until much later in 2022, when the Company, in fact, reported a substantial sales slowdown and slashed its guidance, prompting a ***57%*** stock price drop and shocked reactions from analysts. Indeed, the ***earliest*** public sign of any potential adverse impact from the lilial issue on Olaplex's sales (and thus the earliest possible time that the statute of limitations began to run) was in May 2022—***after*** the April 28, 2022 critical date—rendering the Original AC timely. The Underwriters, however, simply ignore the AC's extensive allegations about the numerous post-April 28, 2022 key facts necessary for the AC to adequately plead securities claims related to the lilial issue.

Second, the AC adequately pleads that the Underwriters are liable as statutory sellers under Section 12(a)(2). Supreme Court precedent provides for two categories of statutory seller liability under Section 12(a)(2): (1) direct sellers who pass title to the buyer; ***or*** (2) any persons who solicit sale of shares in the IPO for financial gain. The Underwriters first argue that 13 of the 14 Underwriters—*i.e.*, all but Goldman Sachs,

from whom Plaintiff purchased its Olaplex shares in the IPO—cannot be liable as direct sellers under Section 12 because Plaintiff does not allege that it purchased from them. Not so. The Underwriters, by the definition of what an underwriter is, sold stock to investors in the firm commitment underwriting that took place here, necessarily transferring title to everyone who purchased shares pursuant and traceable to the IPO—*i.e.*, other class members. The AC need not plead that Plaintiff (or all other class members) purchased shares in the IPO from *every* Underwriter for the Underwriters to qualify as direct sellers under Section 12. Regardless, even if the other 13 Underwriters are not direct sellers under the first prong (they are), they are also liable as statutory sellers under the second (solicitation) prong. The AC adequately alleges solicitation as, *inter alia*, the Underwriters promoted the IPO and sold millions of shares of Olaplex stock for their own financial benefit—allegations that have been deemed sufficient under the lenient Rule 8 standard. The Underwriters cannot evade Section 12 liability on this fact-intensive question at the pleading stage.

## II.    FACTUAL BACKGROUND

To avoid duplicate briefing, Plaintiff incorporates by reference the factual background set forth in Section II of the LP Olaplex Opposition.[3] In addition, the following facts are relevant to the specific arguments raised by the Underwriter Defendants in their motion.

On or about September 29, 2021, Olaplex, on behalf of the Selling Stockholders, registered for sale and issued 84,755,000 shares of its common stock for $21.00 per share, including an underwriter overallotment of 11,055,000 shares (the "IPO"). ¶154. As underwriters for the IPO, the Underwriter Defendants received *$93 million* in fees and commissions. ¶75. The Underwriters determined that in return for their share of the IPO's proceeds, they were willing to—and did—merchandise Olaplex's common stock in the IPO in exchange for that commission. ¶76. The Underwriters assisted the

---

[3] All terms referenced in this brief have the same meaning as defined in the LP Olaplex Opposition.

Olaplex Defendants, the Advent Funds, and Mousse in planning the IPO, and purportedly conducted a "due diligence" investigation, which is supposed to involve an adequate and reasonable investigation into the Company's business. ¶78. The Underwriters also met with Olaplex, the Advent Funds, and Mousse and engaged in drafting sessions regarding the Offering Documents in advance of their filing. ¶¶78-79.

## III. APPLICABLE LEGAL STANDARDS

In assessing a Rule 12(b)(6) motion, the Court must consider the complaint in its entirety, "accept all factual allegations . . . as true[,]" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 322 (2007). A complaint "does not need detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007), but rather must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Asking for plausible grounds does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556.

Section 11 imposes a "stringent standard of liability on the parties who play a direct role in a registered offering[,]" *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983), *e.g.*, the issuer, ***the underwriters***, and any person signing the registration statement, where the registration statement (1) contains an untrue statement of a material fact, (2) omits to state a material fact required to be stated therein, or (3) omits to state a material fact necessary to make the statements therein not misleading. *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009); *see also* 15 U.S.C. § 77k(a). Thus, a Section 11 claim "need only [allege] a material misstatement or omission" in the registration statement—not scienter, loss causation, or reliance. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 856, 859-61 (9th Cir. 2013).

Similarly, Section 12(a)(2) of the Securities Act imposes civil liability on "any person who . . . offers or sells a security . . . by the use of any means or instruments . . . in interstate commerce . . . ***by means of a prospectus or oral communication***, which includes" a material misstatement or omission. 15 U.S.C. § 77l(a); *Pirani v. Slack*

*Techs., Inc.*, 445 F. Supp. 3d 367, 383 (N.D. Cal. 2020). In other words, "Section 12 liability (resulting from a false prospectus) is consistent with Section 11 liability (resulting from a false registration statement)." *Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 949 (9th Cir. 2021), *vacated on other grounds and remanded*, 598 U.S. 759 (2023). Section 12 liability applies not only to traditional sellers—those who directly pass title to another—but also those who engage in the solicitation of sales for financial gain. *In re Charles Schwab Corp.*, 257 F.R.D. 534, 548 (N.D. Cal. 2009).

Securities Act claims under both Sections 11 and 12 are subject to the permissive notice pleading standards of Rule 8(a). *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 624 (9th Cir. 2017); *see also Charles Schwab*, 257 F.R.D. at 548 ("Section 12 claims, like the Section 11 claims, do not sound in fraud and Rule 8 rather than Rule 9(b) applies."). Rule 8(a) does not impose "an onerous burden" as "[s]pecific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008).

## IV.   ARGUMENT

### A.   Plaintiff's Section 11 and 12 Claims Are Not Time-Barred

The Underwriter Defendants argue that the AC's Section 11 and 12 claims are time-barred because the statute of limitations began to run by March 8, 2022—when the lilial issue began to be publicly disclosed to investors—rendering untimely the claims against the Underwriter Defendants asserted in the Original AC, which was filed on April 28, 2023 (more than a year later). As discussed below, this argument fails because the adverse ***impact*** of the lilial issue on Olaplex's business—*i.e.*, facts supporting the ***materiality*** of the alleged misrepresentations and omissions, a key element necessary to establish violations under Section 11 and Section 12—did not become publicly apparent until later in 2022 when Olaplex disclosed a significant sales slowdown due to the reputational fallout resulting from the lilial controversy.

**1.      The Underwriter Defendants Ignore the Governing Legal Standards for the Statute of Limitations Affirmative Defense**

Securities Act claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]" 15 U.S.C. § 77m. "[T]he limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation[.]" *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010). The Ninth Circuit has recently addressed, as a matter of first impression by the Court of Appeals, how much information a reasonable investor must have about the facts constituting a securities violation before it is deemed "discovered" for purposes of commencing the limitations period. *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 465 (9th Cir. 2023). In answering this question, the Ninth Circuit adopted the Second Circuit's analysis in *City of Pontiac General Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011), interpreting *Merck* to hold that a "reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can ***plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss***." *HP*, 65 F.4th at 465 (citing *MBIA, Inc.*, 637 F.3d at 174).[4] Notably, the Underwriters fail to cite this recent, controlling Ninth Circuit precedent and thus ignore the standards it has articulated.

In particular, although the Underwriters focus on Plaintiff's supposed "inquiry notice" of the lilial issue in March 2022 (UW MTD 4), that is not the applicable legal standard under *Merck* and *HP*. Specifically, the Supreme Court made clear that "the

---

[4] Although these cases were decided under Section 10(b) of the Exchange Act, numerous decisions have made clear that their reasoning and standards apply equally to Section 11 and 12 claims brought under the Securities Act, such as this one. *See, e.g.*, *Booth v. Strategic Realty Tr., Inc.*, 2014 WL 3749759, at *4 (N.D. Cal. July 29, 2014) (rejecting attempt to "limit[]" *Merck's* standards "to Exchange Act cases" and applying them in a Section 11 case); *FHFA v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (applying *Merck* and *MBIA* standards to Securities Act claims); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 762-63 (S.D.N.Y. 2012) (declining to "cabin[] *Merck's* holding" to Section 10(b) cases because "[t]he limitations provisions for '33 Act and '34 Act claims are functionally identical"). Indeed, the Underwriters also rely on *Merck* (UW MTD 4), admitting that its standards apply to Section 11 and 12 cases, such as this one.

discovery of facts that put a plaintiff on ***inquiry notice does not automatically begin the running of the limitations period***." *Merck*, 559 U.S. at 652-53. As the Ninth Circuit further explained in *HP*, *Merck* "***rejected this [inquiry notice] approach***, finding the inquiry notice rule incompatible with the statutory language that accrual of a claim begins ***after*** discovery." *HP*, 65 F.4th at 464. Importantly, "the point at which a plaintiff knows enough ***to investigate*** is not necessarily the point at which the plaintiff would already have discovered the facts" constituting the alleged violation. *Id*. Thus, "[t]he statute does not begin to run when the plaintiff merely 'should have begun investigating.'" *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 914 (N.D. Cal. 2015).[5]

Instead, "[a]fter *Merck* . . . the limitations period begins to run ***only*** when, in the course of that investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately." *Nomura*, 873 F.3d at 119. In *HP*, the Ninth Circuit provided further guidance on this analysis post-*Merck*, instructing that courts "first identif[y] what it called 'the critical date,'"—*i.e.*, the date one year before the complaint was filed—and then assess whether defendants have proven: "either (1) the plaintiff could have pleaded an adequate complaint based on facts discovered prior to the critical date and failed to do so, or (2) the complaint does not include ***any*** facts necessary to plead an adequate complaint that were discovered following the critical date." *HP*, 65 F.4th at 465-66.

Further, as the statute of limitations is an "affirmative defense," the Underwriters bear the burden of "***conclusively*** show[ing]" that investors had sufficient information before the critical date to adequately plead Securities Act claims. *Id.* This "determination . . . is fact intensive and is usually not appropriate at the pleading stage." *Rafton v. Rydex Series Funds*, 2011 WL 31114, at *9 (N.D. Cal. Jan. 5, 2011); *see also*

---

[5] The Underwriters' reliance on pre-*Merck* cases for this inquiry notice rule is misplaced for this and other reasons discussed below. UW MTD 4-5 (citing *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1113-14 (C.D. Cal. 2003) for the point that Securities Act claims against underwriters were dismissed as time-barred "where plaintiffs filed suit more than a year after being put ***on inquiry notice***").

*Bear Stearns*, 851 F. Supp. 2d at 763 (same). Thus, "the Supreme Court [in *Merck*] has set a **high bar** for establishing [the statute of limitations defense] as a matter of law in securities cases." *Rafton*, 2011 WL 31114, at *9; *see also Bear Stearns*, 851 F. Supp. 2d at 763 ("[A] motion to dismiss [on statute of limitations grounds] will only be granted where **uncontroverted evidence irrefutably demonstrates** [that the] plaintiff discovered or should have discovered facts sufficient to adequately plead a claim."). The disclosures must be "specific enough to provide . . . indications of the **probability (not just the possibility)** of a violation." *Nomura*, 873 F.3d at 120.

**2.**     **The Underwriters Have Not Conclusively Shown That the Limitations Period Began to Run by March 8, 2022, or by April 28, 2022, the Critical Date**

Here, the Underwriters have not met their heavy burden under the governing *HP* legal standard. Specifically, "the critical date" for the statute of limitations analysis here is April 28, 2022—one year before the Original AC was filed (April 28, 2023). *HP*, 65 F.4th at 465-66. The Underwriters have not "***conclusively***" shown that: (1) Plaintiff "could have pleaded an adequate complaint based on facts discovered prior to" April 28, 2022; nor (2) that the AC "does not include ***any*** facts necessary to plead an adequate complaint that were discovered following" April 28, 2022. *Id.*

As to the first prong, the February 27–March 8, 2022 disclosures regarding the lilial issue that Underwriters highlight (UW MTD 5-6) were not sufficient for Plaintiff to have adequately pleaded Securities Act claims—which require it to plausibly allege ***material*** misrepresentations and omissions in the Offering Documents. At that time, Olaplex sought to minimize the severity and significance of the lilial issue as mere "misinformation" immaterial to the Company's business, including that it was unlikely to have ***any adverse impact on the Company's sales***. ¶¶211-13, 215-17. *See In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 851 (S.D. Tex. 2004) ("[s]ince the disclosures concerned a single transaction that ***investors could reasonably have believed was not likely to have a significant impact on the company's overall financial performance***, the court is not persuaded to conclude as a matter of law that

these disclosures triggered the limitations period for the 1933 Act claims"). Such information did not publicly emerge until *after* April 28, 2022, beginning—at the *earliest*—in May 2022, when the market for the first time began to see glimmers that Olaplex's prior record sales growth was *starting* to slow down as a result of the lilial reputational fallout. ¶¶218-24.

Specifically, under the first prong of the *HP* test, Defendants have not conclusively shown that the initial disclosures of Olaplex's lilial issue on social media, resulting press coverage, and Olaplex's public statements about the issue in March 2022 provided sufficient information for Plaintiff to adequately plead Securities Act claims given they were accompanied by management's reassurances intended to allay investors' concerns. "Courts often decline to find that plaintiffs were on inquiry notice in the face of [] *reliable words of comfort [from management]* designed to counter information that might otherwise give rise to inquiry notice." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 284–85 (S.D.N.Y. 2006); *see also, e.g., Dynegy*, 339 F. Supp. 2d at 850 (same).[6] "[W]hether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated . . . depend[s] in large part *on how significant the company's disclosed problems are*." *Id.*

Here, the lilial news in early 2022 was immediately counteracted by Olaplex management's reliable words of comfort, which trivialized the lilial disclosures as mere "misinformation" that was *insignificant* to the Company's financial performance. These public reassurances included numerous denials about the potential danger posed by the prior use of lilial in Olaplex products and reassurances that the issue had been fully addressed by Olaplex's prior reformulation to remove the ingredient before the E.U. ban went into effect, and that the Company did not expect any adverse financial

---

[6] The Underwriters' own authorities acknowledge that disclosures that are accompanied by "positive" statements regarding the financial impact of the issue are insufficient to trigger the limitations period. *See Infonet*, 310 F. Supp. 2d at 1116 ("Plaintiffs contend, and the court agrees, that these statements alone do not constitute adequate warnings of the upcoming storm, as [they] *were accompanied by positive statements* regarding the potential revenue the [] transaction would create.").

impact from this controversy. ¶¶200-01, 211-17. For example, immediately after the TikTok influencer first posted about Olaplex's lilial issue on February 27, 2022, Olaplex responded on its various official social media accounts—including a video featuring Olaplex's Chief Scientist and Vice President, Research and Development and Regulatory (¶201)—attempting to reassure worried consumers and investors. In this video, Olaplex's Chief Scientist insisted, *e.g.*, that Olaplex "no longer uses [lilial] in any of its products" given that it had already removed the ingredient globally, that Olaplex products had contained it only in small amounts, and that "Olaplex takes the health of our consumers and regulatory compliance seriously." ¶¶200-01. *See, e.g.*, *eSpeed*, 457 F. Supp. 2d at 284 (denying statute of limitation defense where "investors also heard contemporaneous statements from [] management, asserting that the criticisms aired in the articles" about the product were not valid as these "statements went beyond mere expressions of hope but instead were ***designed to specifically address the concerns raised in the . . . articles cited by defendants***").

As media coverage of the lilial issue nevertheless continued in the following days, investors ***reasonably*** waited for further information from Olaplex on the impact of this issue on the Company's business, including its brand reputation and sales. Indeed, for example, on March 7, 2022, J.P. Morgan analysts noted some "investor concerns" about "unfavorable headlines around past product formulations," but echoed Olaplex's reassuring statements in the preceding days that lilial was "a non-active fragrance ingredient" that had already been removed "from formulation . . . despite its relative safe concentration." ¶209. The analysts also expressed their belief that this lilial issue would be one of the "main topics" on an upcoming Olaplex earnings call, as investors sought to understand "***how management is insulating from the potential impact [of the lilial issue] in its brand equity***." *Id.*; *see also* ¶208 (March 7, 2022 Piper Sandler report similarly noting that the analysts remained "watchful of the future competitive environment" for Olaplex "following the No. 3 controversies that have

been taking over headlines this past week" and that they "***plan to gain further insight on all these topics*** on the company's Q4 call tomorrow").

On March 8, 2022, Olaplex released the Company's financial results for the fourth quarter of 2021 ("4Q 2021") and full year 2021 ("FY 2021"), reporting, among other things, strong net sales growth of 78.7% in fourth quarter 2021 and 112% for fiscal year 2021, exceeding Company guidance. ¶210. On the related March 8 earnings call, Defendant JuE Wong, Olaplex's CEO, further allayed consumer and investor concerns regarding what she characterized as "misinformation" about Olaplex's lilial issue. ¶211. In her statement, Defendant Wong repeatedly minimized the severity of the lilial issue, downplaying concerns about its safety concerns and its expected impact on Olaplex's sales. *Id.* For example, she assured investors that "we no longer produce products with lilial," that before the E.U. ban, the No. 3 product "contained very small amounts of lilial," which "was never an active or functional ingredient in our products," and that studies by purportedly "independent medical and chemist experts have confirmed" that such "very small amount of lilial . . . had no impact on fertility and the reproductive system." *Id.* Notably, when a Goldman Sachs analyst asked Defendant Wong, "Have you seen ***any negative impact in retail sales related to this***?", she evaded the question, claiming that it was too soon to tell. ¶212. But Defendant Wong then immediately implied that any such impact should be minimal given the lilial safety concerns were simply "misinformation" that was refuted by the purported "expert" studies indicating "there is no impact on fertility." *Id.*

Moreover, later that same day, Olaplex then explicitly confirmed in follow-up calls with analysts that this lilial issue should not have any "material impact" on the Company's brand reputation or sales. For example, in a March 9, 2022 analyst report, J.P. Morgan wrote: "***Encouragingly***, we note that ***management sounded confident*** during both the conference call and our follow-up conversation that the unfavorable headlines [regarding lilial] . . . ***should not have a material impact on the brand's equity nor underlying consumption [i.e., demand and sales] in 2022***." ¶216; *see also* ¶215

(March 8, 2022 Jefferies analyst report describing its "follow-up [call] with management to get clarity on these topics [*e.g.*, the lilial issue] which underpins ***our confidence in the beatability of sales expectations*,*" including the following: "Points of Clarification Following Our Call with Management: *Lilial Ingredient Impact*: In our follow-up, *we confirmed that order flow and DTC [direct-to-consumer] sales have remained on-track through ingredient concern headlines*"); ¶217 (multiple other analyst reports on March 8–9, 2022 repeating Olaplex's statements on the call minimizing lilial safety concerns as misinformation—*e.g.*, Telsey: "Following recent social media confusion and *misinformation*, management reiterated on the call that its products no longer contain lilial"). Thus, the Underwriters' argument that analyst coverage of the lilial issue on or around March 8, 2022 triggered the statute of limitations (UW MTD 8-9) disregards the actual contents of those analyst reports.[7]

Accordingly, because the market was reassured by Olaplex's accompanying "reliable words of comfort" that downplayed the severity and impact of the lilial issue on Olaplex's sales, such public statements in March 2022 could not have provided sufficient information to investors to trigger the statute of limitations, as the Underwriters claim (UW MTD 7-8). *See Dynegy*, 339 F. Supp. 2d at 850 (disclosures did not trigger the limitation period for Securities Act claims given defendants' accompanying "reliable words of comfort" and the disclosures also "contained statements that may *reasonably have lulled investors to inaction*," including that the relevant problem "*has little impact* on the company's net income").[8] In other words,

---

[7] Other cited analyst reports at most expressed uncertainty about the impact of the lilial issue on Olaplex's sales before management confirmed the lack of sales impact in their follow-up calls with the analysts. ¶214 (first Jefferies report on March 8, 2022, issued after the earnings call but before its follow-up discussion with Olaplex management: "ingredient concern which [management] addressed but didn't definitively confirm no sales impact," which "left the possibility open" for burden on short-term sales).

[8] Olaplex's reassurances are a far cry from the disclosures by management found to put investors on sufficient notice in the Underwriters' cited cases (UW MTD 7-8). *See Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *3, *30 (N.D. Cal. Dec. 18, 2017) (company disclosed not only the "precise[]" issue that allegedly rendered its prior statements false, but also the issue's adverse, material financial *impact*—*i.e.*, that, due

Footnote continued on next page

"as presented, the information disclosed on [March 8, 2022] revealed only that [Olaplex] had encountered a few unexpected, short-term problems [regarding one of its products] *which did not impact [the Company's] long-term growth plans* and thus was insufficient to put [p]laintiffs on notice" of the probability of *material* misrepresentations and omissions in the Offering Documents regarding the lilial issue sufficient to survive a Rule 12(b)(6) motion. *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *24 (D. Md. Aug. 5, 2021); *see also In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 654 (D. Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) (same because "[i]t is *at least plausible* that" after the purported storm warnings, which included a restatement and admission of an internal controls weakness, "a reasonably diligent plaintiff did not have sufficient information adequately to plead the Securities Act violations" given that "[t]he *scope* of the consolidation and restatement effort, the enormous cost it would entail, and *its impact on [financial metrics] were not disclosed until much later*").[9]

Likewise unavailing is the Underwriters' related argument that the relatively small stock price declines on March 3 and 7, 2022 (approximately 5% and 11%, respectively) "erase any doubt" that investors had notice of the relevant facts sufficient to trigger the statute of limitations. UW MTD 7; *see also* Olaplex MTD 5 (asserting that the Olaplex stock price declined *only "1.09%* the first business day after the TikTok videos were posted"). Indeed, as further discussed below, these stock price declines pale by comparison to the collapse of the Olaplex stock price in late 2022 (*e.g.*, by almost *57%* after the October 18, 2022 disclosure, ultimately dropping nearly *73%*

___

to this issue, the company's "*financial results fell short of its projections*"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 446, 447 (2d Cir. 2015) (company "repeatedly disclosed ongoing [internal] control weaknesses [including a financial restatement] *while continuing to warn of possible additional problems*," rather than minimizing the issue and its financial impact, as here).

[9] For these reasons, the Underwriters' other cited authorities, which did not involve such accompanying reassurances by management denying any adverse impact from the relevant product issues, are readily distinguishable. *See* UW MTD 5 (citing *In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *12 (S.D. Cal. Sept 25, 2019)).

from the IPO price to the date this action was filed) when the truth about the adverse impact of the lilial issue on Olaplex's sales finally emerged. ¶¶250, 258. Importantly, the post-March 8, 2022 analyst reports discussed above confirm that analysts generally remained confident that the lilial issue "should not have a material impact on the brand's equity" and sales. ¶216; *see also* ¶¶215, 217; *2U*, 2021 WL 3418841, at *24 ("though the [company's] stock price declined by $15.16 to $44.47 the next day [after the disclosure], ***investment analysts remained confident*** in [company's] growth trajectory beyond 2019"). Further, all of the stock price declines that the Underwriters highlight occurred ***before*** the March 8, 2022 statements by Olaplex that they focus on as the key disclosure date triggering the statute of limitations. Tellingly, none of the Defendants argues that there were any stock price drops ***after*** the March 8, 2022 disclosure, which confirms that investors were "reasonably lulled [into] inaction" by Olaplex's "reliable words of comfort" on that date. *Dynegy*, 339 F. Supp. 2d at 850.

The same reasoning applies to the Underwriters' contention that the filing of the Canada ***consumer*** action was enough to put Plaintiff on notice of Olaplex's violations of the ***Securities*** Act claims sufficient to withstand a motion to dismiss. UW MTD 7. *See Lapin v. Goldman Sachs Grp., Inc.,* 506 F. Supp. 2d 221, 235–36 (S.D.N.Y. 2006) (rejecting statute of limitation defense where "even assuming that the press articles and [related] ***complaint*** [against the company alleging similar misconduct] constituted storm warnings, ***investors were also being fed reassuring statements by [the company]***"); *Mun. Mortg.,* 876 F. Supp. 2d at 654 (rejecting statute of limitations defense in Securities Act case where purported storm warnings included the filing of a related "shareholder derivative suit"). At most, this argument raises a factual dispute that is inappropriate for resolution at this motion to dismiss stage. *See In re Bare Escentuals, Inc. Sec. Litig.,* 745 F. Supp. 2d 1052, 1083 (N.D. Cal. 2010) (rejecting the statute of limitations defense on a motion to dismiss because the issue "is fact-intensive" and plaintiffs' allegations are not "***completely lacking in plausibility*** with

respect to the running of the statute of limitations" such that "plaintiffs are entitled to develop a factual record prior to resolution of the issue").

### 3. The Underwriter Defendants Ignore Numerous Key Disclosures After the April 28, 2022 Critical Date

The Underwriter Defendants also have not met their heavy burden under the second prong of the *HP* test. Specifically, the Underwriters have not "conclusively" shown that the AC "does not include *any* facts necessary to plead an adequate complaint that were discovered following" April 28, 2022. *HP*, 65 F.4th at 459, 466. Notably, the Underwriters *entirely* ignore over *sixty-three* paragraphs in the AC alleging numerous facts discovered only after April 28, 2022. ¶¶218-81. These facts were necessary for Plaintiff to adequately plead material misstatements and omissions regarding the lilial issue, including its severe, adverse impact on the Company's brand reputation, consumer demand, competitive position, and sales.

Indeed, the Underwriters' myopic focus on only the lilial news in March 2022 is contrary to well-settled law that courts should consider "all disclosures *collectively* . . .—*i.e.*, that it was no single disclosure that was dispositive, but rather all the disclosures collectively." *Bare Escentuals*, 745 F. Supp. 2d at 1081 ("In light of the various purported disclosures and relevant dates that plaintiffs allege, stemming *throughout* the class period—the last of which allegedly occurred in the October 30, 2008 earnings release statement—the court finds that resolution of the limitations issue is not appropriate at the pleading stage."). Here, the initial March 2022 lilial disclosures must be viewed collectively with the key Olaplex disclosures in late 2022 that showed investors the significance and impact of the lilial issue—*i.e.*, its materiality—on the Company's business, *i.e.*, a substantial sales slowdown that gradually emerged over the course of several quarterly earnings results as the adverse effects of the lilial issue on the Company's sales publicly manifested themselves.

Specifically, the AC alleges numerous facts discovered or discoverable only after April 28, 2022. Notably, the first *potential* warning sign to investors that the lilial

issue *might* be negatively affecting sales occurred on May 11, 2022—*after* the critical April 28, 2022 date—when Olaplex reported financial results for the first quarter of 2022, which ended on March 31, 2022 ("1Q 2022"), a month after the lilial news emerged.[10] Therefore, this was the earliest opportunity for investors to see whether the lilial issue had in fact impacted sales in any way. This earnings announcement in fact included slightly slowing net sales growth, which had declined from the prior quarter's 79% to 58%, thereby showing the first potential indication to investors of this adverse impact from the lilial news. ¶¶218-19. Moreover, on the same date, Olaplex admitted *for the first time* that the Company had reformulated its No. 3 product "*in June 2021* as a result of regulation changes in the E.U."—thus, credibly disclosing to investors for the first time that Olaplex knew of the lilial issue *before the IPO* but omitted any mention of it in the Offering Documents.[11] ¶220 (also disclosing a $4.3 million inventory write-off and unused product disposal costs due to this reformulation). Analyst reactions to this news confirm that the market noted the "disruptions" generated "by the EU ban of lilial," including the possible adverse impact on Olaplex's sales, although they were still generally "reassure[ed]" by the "continued momentum" in Olaplex's sales. ¶222 (May 11, 2022 BofA report stating "that reiterated sales, EBITDA, and profit guide implies *some moderation in expectations* for the remaining quarters"). Thus, at this time, investors were still mostly in the dark regarding the impact of the lilial issue on Olaplex's business.

Indeed, to plead the link between the lilial news in March 2022 and the subsequent sales slowdown, the AC also relies on the accounts of two former Olaplex employees, who relayed *internal* Company facts that Plaintiff only discovered in the *course of its subsequent investigation* and were *not publicly available* before April

---

[10] Thus, even if the Court were to find the statute of limitations began to run as of this date, Plaintiff's claims against the Underwriters—filed on April 28, 2023—are timely.

[11] To the extent such information was alluded to earlier in the Canadian consumer complaint (UW MTD 7 (citing ¶205)), that complaint itself was not disseminated in the U.S. media coverage and was not readily publicly available in the U.S.

28, 2022. Specifically, CW-1 and CW-2 stated that the lilial concerns were a substantial factor in Olaplex's demand and sales slowdown that began in Spring 2022, after the lilial news. ¶¶223-24. Thus, these were additional facts discovered only after April 28, 2022 that were necessary for Plaintiff to adequately plead its claims arising from the lilial issue in the AC.

In fact, investors were not provided sufficient public facts regarding the severe impact from the lilial issue on Olaplex sales until Fall 2022. Up to that point, Olaplex publicly continued to downplay the lilial issue and its effects on the Company's business. For example, in a June 22, 2022 *Vogue Business* article discussing the lilial issue, Defendant Wong still insisted: "'***The impact [on sales] was very minimal***, because of the mitigating factors that we implemented,' . . . 'When the thing first came out, we did see a lot of concerns. But, at this point in time, ***everything has been addressed***.'" ¶¶225-28. On August 9, 2022, Olaplex reported another quarter of further slowing sales growth (declining to 38.6%, but still in high double-digits). On the related earnings call, Defendant Wong at the same time reassured investors of Olaplex's continued strong competitive position and consumer demand—stating, for example, that Olaplex "continue[d] to see a normal level of competitive intensity," and that "current [consumer] sentiment" for Olaplex products "***remain[ed] strong***." ¶230.

Analysts only began to connect the dots between the lilial issue (including its reputational fallout) and Olaplex's ***emerging*** sales slowdown (including corresponding decline in competitive position) on September 29, 2022. On that date, Piper Sandler published an analyst report downgrading Olaplex shares due to the results of the analysts' survey of hair salons, which indicated that "competition" and what it referred to as "misinformation"—*i.e.*, consumer concerns about Olaplex products' safety and efficacy that began after "infertility concerns arising from the lilial ingredient in No. 3 (back in late-February/early March)"—"***pose growing risks to the company***." ¶¶240-41. The report explained that survey results indicated that Olaplex was losing market share to growing, social-media savvy competitors—with some salons "stopping use

and sales of Olaplex products" altogether due to safety concerns—because consumers were increasingly "switching from Olaplex" products to those of competitors due to what Piper Sandler called "[m]ainly misinformation" like the lilial issue. *Id.*

On October 18, 2022, investors finally learned of the severe adverse sales impact that the Company experienced as a result of the lilial issue. On that date, Olaplex announced preliminary financial results for the third quarter of 2022 ("3Q 2022"), including net sales growth of *only 9.2%* for the quarter and a U.S. sales *decline* of 4%. ¶243.[12] As a result, the Company also slashed its sales guidance for the 2022 fiscal year, by *more than $100 million*. *Id.* On the related earnings call, Defendant Wong explained that the sales "slowdown" was due, in part, to decreased consumer demand and increased competition—*i.e.*, "pressure on [Olaplex's] ability to attract new consumers" including due to "increased competitive activity." ¶245; *see also* ¶246 (Defendant Tiziani, the CFO, providing further information about the "sales declines").

The resultant *57% drop* in Olaplex's stock price after this news (¶250) and analysts' shocked reactions confirm that investors did not previously have sufficient facts regarding the extent to which the lilial issue and its reputational damage had negatively impacted the Company's sales, demand for its products, and competitive position. *See, e.g.*, ¶248 (Barclays analyst report downgrading Olaplex and explaining they were "taken aback by" the news and "did not expect to see such a *sudden and dramatic change in [growth] trend*"); ¶249 (Morgan Stanley analyst report downgrading Olaplex, in part, because the "magnitude of pressure is much greater than

---

[12] Olaplex confirmed its full 3Q 2022 financial results on November 9, 2022. ¶251. The disclosures elaborated on the Company's sales struggles due to waning demand and increased competition. ¶¶252-57. The AC alleges further revelation of this continued adverse financial impact when the Company reported its full year 2022 financial results on February 28, 2023, when Olaplex reported a *decline* in sales (as opposed to a slowdown in growth) for the first time since the IPO. ¶¶263-69. On the related earnings call, Defendant Wong acknowledged the "lessons learned" from the lilial issue, including the importance of "defend[ing] the brand" from increased competition and "negative PR and misinformation about our brand, such as has surfaced over the past year," referring to the lilial issue with its No. 3 product. ¶¶265-67. Thus, under every potential scenario addressed herein, Plaintiff's claims are timely.

[] expected," citing "*weaker consumer demand* due both to macro weakness and *competitive impacts*"). For all the foregoing reasons, the Underwriters have not met their burden of conclusively showing that investors had sufficient information before April 28, 2022 to adequately plead the AC's material misrepresentations and omissions related to the lilial issue in the Offering Documents.

### 4.    Plaintiff Need Not Invoke the Relation Back Doctrine

Plaintiff does not—and need not—invoke the relation back doctrine. The Underwriters spend several pages of their brief arguing that the relation back doctrine does not "save" the AC's purportedly "untimely" claims. UW MTD 9-12. But, for the reasons discussed above, under the governing statute of limitations standards, Plaintiff's claims are timely, and the relation back doctrine is not relevant here.

### B.    The AC Adequately Pleads Actionable Misstatements and Omissions

The Underwriters join in the Olaplex Defendants' motion to dismiss Plaintiff's Section 11 and 12 claims for failure to plead a material misstatement or omission, incorporating the related section of the Olaplex Defendants' brief by reference without additional argument. UW MTD 12. Thus, Plaintiff similarly incorporates by reference its arguments in opposition to the Olaplex Defendants' motion on falsity and materiality. *See* LP Olaplex Opposition, Section IV. Because the AC adequately pleads material misstatements and omissions in Olaplex's Offering Documents for the reasons detailed in the LP Olaplex Opposition, Plaintiff's Section 11 and 12 claims against the Underwriters necessarily survive.

### C.    Each of the Underwriters Is a Section 12(a)(2) Statutory Seller

The Underwriter Defendants are liable as statutory sellers under Section 12(a)(2). Under the Supreme Court's decision in *Pinter v. Dahl*, Section 12(a)(2) creates liability for "statutory seller[s]" who either (1) "passed title, or other interest in the security, to the buyer for value" *or* (2) "successfully solicit[ed] the purchase" of the securities at issue, motivated "at least in part by a desire to serve his own financial interests or those of the securities owner." 486 U.S. 622, 642, 646 (1988). As the Ninth

Circuit recently recognized in *Pino v. Cardone Capital, LLC*, "imposing liability beyond those who merely pass title to securities, *i.e.*, to brokers and others who solicit offers to purchase securities, 'furthers the purposes of the Securities Act—to promote full and fair disclosure of information to the public in the sales of securities.'" 55 F.4th 1253, 1259 (9th Cir. 2022) (citing *Pinter*, 486 U.S. at 646); *see also Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1125 (N.D. Cal. 2013) ("[L]iability under § 12 is not limited only to those who pass title to a purchaser."); *Rieckborn*, 81 F. Supp. 3d at 925 ("Section 12 encompasses both direct sellers who pass title of the subject securities and indirect sellers who successfully solicit the purchase, motivated at least in part by a desire to serve their own financial interests . . . ."). "Whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; ***at this stage plaintiffs[] need only satisfy Rule 8(a)'s lenient pleading standards***." *Charles Schwab*, 257 F.R.D. at 550.

In Olaplex's IPO, ***over 84 million*** shares were sold to the investing public for proceeds of ***over $1.6 billion.*** ¶154. Someone must be the seller. In their collective briefing (ECF Nos. 127, 129, 130, 132), all Defendants deny being statutory sellers. They cannot all be right, but they can each be wrong.

Here, the Underwriters concede that Plaintiff has adequately pled that Goldman Sachs, at a minimum, is a Section 12(a)(2) statutory seller under the first prong of *Pinter* because the AC alleges that Plaintiff purchased Olaplex stock in the IPO directly from Goldman Sachs. UW MTD 13. They, however, then argue that the AC fails to plead the other thirteen Underwriters are direct sellers under this prong because Plaintiff has not alleged it purchased shares from them. *Id*. But the AC need not plead that Plaintiff purchased shares in the IPO from ***every*** underwriter for them to qualify as Section 12 statutory sellers under the first *Pinter* prong. The Underwriters, by the definition of what an underwriter is, sold stock to investors in the firm commitment underwriting that took place here (*see* ¶¶75-76; Dugan Decl. Ex. A at 178 of 239), necessarily transferring title to everyone who purchased shares pursuant and traceable

to the IPO. *See In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1120 (D. Nev. 1998) ("In a firm commitment offering, the underwriters purchase the shares from the issuer and ***then resell them to the public***."); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 409 (S.D.N.Y. 2003) ("In a firm commitment underwriting, the underwriter agrees to purchase an agreed upon percentage of the offering. . . . The underwriter is thus the owner of any unsold shares ***and can be liable as a 'seller' for direct sales to the public for purposes of Section 12(a)(2)***.").[13]

Here, the AC—which alleges Securities Act claims on behalf of a ***Class*** of investors in the IPO—has sufficiently alleged that all fourteen Underwriters qualify as statutory sellers as direct sellers because they transferred title to Plaintiff ***and/or other members of the Class*** who purchased Olaplex shares pursuant or traceable to the Offering Documents for the IPO. *See, e.g.*, ¶23 (alleging Plaintiff's purchase directly from Goldman Sachs); ¶¶60-73 (alleging, *inter alia*, that each Underwriter was allocated a certain number of shares "***to sell to the investing public***"); ¶282 (class action allegations, including that Plaintiff "brings this action as a class action . . . on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Olaplex's publicly traded common stock pursuant and/or traceable to the Offering Documents for Olaplex IPO"). This is sufficient at this pleading stage under Rule 8. *See Rieckborn*, 81 F. Supp. 3d at 926 (allegations that underwriter defendants "transferred title to [plaintiff] ***and/or other members of the class*** who purchased in the IPO" is "enough at the pleading stage to establish that the [u]nderwriters are statutory sellers" and "declin[ing] to hold that plaintiffs must plead additional facts"); *In re Violin Memory, Inc. Sec. Litig.*, 2015 WL 1968766, at *4 (N.D. Cal. Apr. 30, 2015) (underwriters are statutory sellers under Section 12(a)(2) because "plaintiffs have satisfied the pleading standard under Rule 8" where, "construed in a light favorable to

---

[13] Indeed, the Underwriters' own cited authority (UW MTD 12) acknowledges that "in a firm commitment underwriting . . . the ***public purchases from the underwriters***." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003).

plaintiffs, the [complaint] alleges that the underwriter defendants *directly sold [company] stock to putative class members*" given that "the underwriters were to transfer title to purchasers, of whom the putative class is comprised").

Indeed, contrary to the Underwriters' assertion, Plaintiff is not required to allege *which* Underwriters sold securities to *which* putative Class members. *See id.*; *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *19-20 (C.D. Cal. July 21, 2005) (rejecting underwriters' argument that "[p]laintiffs' § 12(a)(2) claim against them must be dismissed because [p]laintiffs have failed to allege *which particular underwriter sold them [the] common stock in the [o]ffering*"); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) (Section 12(a)(2) claims against underwriter defendants adequately pled where plaintiffs alleged that "the [u]nderwriter [d]efendants, through public offerings, solicited and sold [company] securities to members of the [c]lass" even where the "[c]omplaint does not explicitly state that plaintiffs purchased securities directly from any particular underwriter defendant"); *Violin Memory*, 2015 WL 1968766, at *4 (same because "plaintiffs need not allege 'which underwriter sold securities to each plaintiff' to state a Section 12(a)(2) claim under Rule 8"); *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007) (Section 12(a)(2) claims adequately pled against underwriters where complaint alleged that the "[u]nderwriter [d]efendants, sold the securities as part of the [o]fferings, and plaintiffs acquired securities in the [o]fferings. *A reasonable inference is that plaintiffs acquired their securities from the [u]nderwriter [d]efendants.*").

Further, the Underwriters' argument conflates the issue of standing and whether the Section 12(a)(2) claims against them have been plausibly alleged. The securities laws do not require plaintiffs to purchase stock from *every* underwriter in a particular offering to assert claims on behalf of a proposed class of investors—each of whom may have purchased from any of the Underwriters. A rule requiring such an evidentiary burden at the pleading stage would be unworkable and frustrate the purposes of the class action vehicle. At best, this is a question the other Underwriters can raise at class

certification (although this argument has been rejected even at that stage). *See DDi*, 2005 WL 3090882, at \*20 n.18 ("insofar as [d]efendants' argument is related to 'standing,' . . . this concern is better addressed during the class certification stage"); *Violin Memory*, 2015 WL 1968766, at \*4 (same).[14]

In any case, the Underwriter Defendants qualify as Section 12(a)(2) statutory sellers because Plaintiff has also adequately alleged solicitation under the second, alternative prong of *Pinter*. Importantly, their contention that to plead solicitation a plaintiff must include specific allegations of "direct communication" with the Section 12(a)(2) defendant (UW MTD 13), was recently rejected by the Ninth Circuit in *Pino*: "Nor has the Supreme Court imposed a requirement that solicitation under § 12 requires that a seller '***actively and directly' solicit*** a plaintiff's investment, as [d]efendants contend." 55 F.4th at 1259 (holding that "***§ 12 contains no requirement that a solicitation be directed or targeted to a particular plaintiff***").[15]

The AC includes numerous allegations about the Underwriters' active involvement in the IPO, showing their solicitation of sales in the IPO for financial gain, including: how many shares each Underwriter was allocated and sold in the IPO (¶¶60-73); that they collectively received over ***$93 million*** in fees and commissions for the IPO (¶75);[16] that they arranged for roadshows prior to the IPO during which they, along

---

[14] *Katz v. China Century Dragon Media, Inc.* (*see* UW MTD 13) is distinguishable because it found that plaintiffs lacked standing to sue the underwriters where there were no allegations that plaintiffs "bought their shares in a manner traceable to the IPO." 2011 WL 6047093, at \*5 (C.D. Cal. Nov. 30, 2011). In contrast, here Plaintiff has sufficiently alleged its standing because it alleged that it purchased its stock in the IPO (as opposed to in the aftermarket), at the IPO price, from an Underwriter Defendant. ¶23; *see Rieckborn*, 81 F. Supp. 3d at 926 (that plaintiffs "purchased [defendant's] common stock pursuant to and traceable to" the offering documents sufficient to allege Section 12(a)(2) standing as it shows purchases in the offering). To the extent *Katz* suggests otherwise, it and *In re Vocera Communications, Inc. Securities Litigation*, 2015 WL 603208, at \*2 (N.D. Cal. Feb. 11, 2015), which the Underwriters also rely on (UW MTD 13), are outliers.

[15] Thus, the cases they rely on for this proposition (UW MTD 13-14), which all predate *Pino*, have now been overruled. *See Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at \*10 (C.D. Cal. May 5, 2011); *Baker v. Seaworld Ent., Inc.*, 2016 WL 2993481, at \*18 (S.D. Cal. Mar. 31, 2016); *TriNet*, 2017 WL 6466264, at \*31.

[16] Notably, the Underwriters fail to address this allegation entirely.

with the Individual Defendants, met with investors and presented highly favorable information about Olaplex (¶76); that the Underwriters obtained an indemnification agreement from Olaplex and confirmed that Olaplex had purchased millions of dollars in Directors' and Officers' liability insurance (¶77); that the Underwriters helped determine the strategy to best accomplish the IPO, the language to be used in the Offering Documents, the disclosures that Olaplex would make in the Offering Documents, and what responses would be made to the SEC in connection with their review of the Offering Documents (¶79); and that the Underwriters were involved in creating the Offering Documents, promoting the IPO, and selling millions of shares of Olaplex common stock for their own financial benefit. ¶¶60-80, 301-08. Thus, the AC adequately pleads that the Underwriters solicited sales in the IPO under Section 12(a)(2). *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *18 (C.D. Cal. June 9, 2016) (allegations that underwriters "'offered, promoted, and sold [issuer] common stock in the [offering]'" held sufficient "to state a [S]ection 12 claim against" them under Rule 8); *In re ZZZZ Best Sec. Litig.*, 1994 WL 746649, at *4 (C.D. Cal. Oct. 26, 1994) (similar allegations against underwriters sufficient to create at least a question of fact as to Section 12 solicitation and thus denying summary judgment). At most, the Underwriters have raised a factual dispute with respect to their status as Section 12(a)(2) sellers, which is "not properly decided on a motion to dismiss." *In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *4 (N.D. Cal. Aug. 17, 2006).

## V.   CONCLUSION

For the foregoing reasons, the Underwriters' motion to dismiss should be denied in its entirety. If the Court grants any part of this motion, Plaintiff respectfully requests leave to amend. *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012) ("requests for leave [to amend] should be granted with 'extreme liberality[]' . . . .").

Dated: August 14, 2023                    Respectfully Submitted,


                                          By: */s/ Irina Vasilchenko*
                                              IRINA VASILCHENKO

                                          **LABATON SUCHAROW LLP**
                                          CAROL C. VILLEGAS (*pro hac vice*)
                                          cvillegas@labaton.com
                                          IRINA VASILCHENKO (*pro hac vice*)
                                          ivasilchenko@labaton.com
                                          LISA M. STREJLAU (*pro hac vice*)
                                          lstrejlau@labaton.com
                                          DANIELLE IZZO (*pro hac vice*)
                                          dizzo@labaton.com
                                          140 Broadway
                                          New York, NY 10005
                                          Telephone: (212) 907-0700
                                          Facsimile: (212) 818-0477

                                          *Counsel for Lead Plaintiff*
                                          *Arkansas Teacher Retirement System*
                                          *and Lead Counsel for the Proposed Class*

                                          **GLANCY PRONGAY & MURRAY LLP**
                                          ROBERT V. PRONGAY (SBN 270796)
                                          rprongay@glancylaw.com
                                          CHARLES H. LINEHAN (SBN 307439)
                                          clinehan@glancylaw.com
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, CA 90067
                                          Telephone: (310) 201-9150
                                          Facsimile: (310) 432-1495

                                          *Liaison Counsel for Lead Plaintiff*
                                          *Arkansas Teacher Retirement System and the*
                                          *Proposed Class*