UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE STEPHEN V. WILSON, U.S. DISTRICT JUDGE

LESLIE LILIEN, et al.,                          )
                                                )
                    Plaintiffs,                 )
                                                )
     v.                                         )          Case No.
                                                )   CV 22-8395 SVW (SKx)
OLAPLEX HOLDINGS, INC., et al.,                 )
                                                )
                    Defendants.                 )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
MOTION TO DISMISS
MONDAY, OCTOBER 16, 2023
2:19 P.M.
LOS ANGELES, CALIFORNIA

_____

**MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA  90012
(213) 894-2305

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF ARKANSAS TEACHER RETIREMENT SYSTEM:**

    LABATON SUCHAROW, LLP
    BY:  IRINA VASILCHENKO
    BY:  LISA M. STREJLAU
         Attorneys at Law
    140 Broadway
    New York, New York  10005
    (212) 907-0700

    GLANCY, PRONGAY & MURRAY, LLP
    BY:  CHARLES H. LINEHAN
         Attorney at Law
    1925 Century Park East, Suite 2100
    Los Angeles, California  90067
    (310) 201-9150


**FOR THE DEFENDANTS OLAPLEX HOLDINGS, INC., INDIVIDUAL DEFENDANTS, and ADVENT FUNDS:**

    ROPES & GRAY, LLP
    BY:  ANNE JOHNSON PALMER
         Attorney at Law
    Three Embarcadero Center
    San Francisco, California  94111
    (415) 315-6337

    ROPES & GRAY, LLP
    BY:  DANIEL A. YANOFSKY
         Attorney at Law
    800 Boylston Street
    Boston, Massachusetts  02199
    (617) 951-7571


///

///

///

///


**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL, CONTINUED:**


**FOR THE DEFENDANT MOUSSERENA, L.P.:**

     WILLKIE, FARR & GALLAGHER, LLP
     BY:  MATTHEW M. GURVITZ
          Attorney at Law
     2029 Century Park East, Suite 3400
     Los Angeles, California  90067
     (310) 855-3000

     WILLKIE, FARR & GALLAGHER, LLP
     BY:  JAMES C. DUGAN
          Attorney at Law
     787 Seventh Avenue
     New York, New York  10019
     (212) 728-8654


**FOR THE UNDERWRITER DEFENDANTS:**

     MORGAN, LEWIS & BOCKIUS, LLP
     BY:  JOHN WARREN RISSIER
          Attorney at Law
     300 South Grand Avenue, 22nd Floor
     Los Angeles, California  90071
     (213) 612-2500

     MORGAN, LEWIS & BOCKIUS, LLP
     BY:  ROBERT O'LEARY
          Attorney at Law
     One Market, 28th Floor
     San Francisco, California  94105
     (415) 442-1452


**UNITED STATES DISTRICT COURT**

MONDAY, OCTOBER 16, 2023; 2:19 P.M.

LOS ANGELES, CALIFORNIA

-oOo-

THE COURTROOM DEPUTY:  Calling Item 5, CV 22-8395-SVW, Leslie Lilien versus Olaplex Holdings, Incorporated, et al.

Counsel, please state your appearances.

MS. VASILCHENKO:  Good afternoon, Your Honor. Irina Vasilchenko from Labaton Sucharow on behalf of lead plaintiff, Arkansas Teacher Retirement System.

THE COURT:  I didn't hear anything you just said. Say it again.

MS. VASILCHENKO:  I'm sorry.

Good morning -- good afternoon, Your Honor. Irina Vasilchenko from Labaton Sucharow on behalf of lead plaintiff, Arkansas Teacher Retirement System.

MS. STREJLAU:  Good afternoon, Your Honor. Lisa Strejlau also from Labaton Sucharow on behalf of lead plaintiff, Arkansas Teacher Retirement System.

MR. LINEHAN:  Good afternoon, Your Honor. Charles Linehan from Glancy, Prongay & Murray, liaison counsel for lead plaintiff.

MS. JOHNSON PALMER:  Good afternoon, Your Honor. Anne Johnson Palmer of Ropes & Gray on behalf of Olaplex, the individual defendants, and the Advent Funds.  And I'm here

today with my colleague, Daniel Yanofsky.

MR. YANOFSKY:  Good afternoon, Your Honor. Dan Yanofsky from Ropes & Gray, as Ms. Johnson Palmer said, on behalf of the Olaplex defendants and Advent Funds.

MR. RISSIER:  Good afternoon, Your Honor. Warren Rissier with Morgan Lewis on behalf of the underwriter defendants.

MR. O'LEARY:  Good afternoon, Your Honor. Robert O'Leary also on behalf of the underwriter defendants.

MR. DUGAN:  Good afternoon, Your Honor.  James Dugan on behalf of defendant Mousserena, L.P.

MR. GURVITZ:  And good afternoon, Your Honor. Matthew Gurvitz also on behalf of Mousserena.

THE COURT:  I'm going to focus initially on the motion to dismiss brought by the issuer because the other defendants' motions, to some extent, depend on -- on that motion even though there are other defenses.  I know that.

But let me hear first from the moving party, Olaplex.  I mean, I know the -- the broad history.  My -- I'll just encapsulate it to get to a point of reference.

Olaplex makes this shampoo or hair product, whatever it is.  And the European Union investigated some ingredient, what they call little lilial, and determined that lilial was an ingredient that posed a health risk of some kind.  So it banned that ingredient in its products.

**UNITED STATES DISTRICT COURT**

The Olaplex product sold in the European Union and in the States contained that lilial. But the ban was, I believe, for products that had a certain amount of lilial and that the Olaplex product did not have that amount of lilial in it. But the ban was announced in August of 2020 on lilial products, and it was effective 2022.

So my understanding at this point is that the ban, if Olaplex kept lilial in its product, would have affected lilial in March of 2022 pursuant to the European Union.

In June of 2021, following this E.U. investigation, reformulated the product but continued to sell the old stock that contained the lilial ingredient.

And then September of 2021 is the IPO in question. And then there are a lot of facts after that. And as I'm thinking about those other facts, I'm thinking about the TikTok video, the July social media '22 campaign about hair loss, the analyst downgrade in October '22, '22 the plunge in the stock price.

But the case is brought under Section 11. And Section 11, you know, is a different -- different securities analysis than the -- than 10(b) and '34 Act and all that stuff. And even under fraud sections under the '33 Act -- I mean, Section 11 is part of the '33 Act but -- isn't it?

But it strikes me as being sort of a strict liability type of statute in the sense that, if you make a

misrepresentation or omission, whether knowingly or not -- in other words, it doesn't seem to have any scienter requirement -- you could be on the hook.

And the question I have as a first matter -- we'll get to other things -- is:  Why would all the facts after September 20th, 2021, in light of scienter -- no scienter requirement, be relevant?

In other words, they could be relevant, assuming that the case gets to the class certification stage and other dynamics.  But why would any of those things be relevant?  I mean, isn't there sort of a picture taken at the time of the IPO?

MS. JOHNSON PALMER:  Your Honor, there is.

And, first of all, thank you for teeing up the Court's focus in that manner.  I think that you have a command of the chronology --

THE COURT:  I don't really have much command.  I basically told you everything I know.

MS. JOHNSON PALMER:  Yeah.  So let me try to connect the dots.

THE COURT:  I don't know very much.  I want to use this session as something of an exploratory session.

MS. JOHNSON PALMER:  So let me connect the dots and try to, you know, sew together the chronology that you just mentioned and with the focus on really a key issue.  And,

**UNITED STATES DISTRICT COURT**

Your Honor, I think what you're zeroing in on is really the cornerstone of the company and the co-defendants' motion to dismiss where -- Your Honor's correct, we're talking about the '33 Act.  It's a question of whether the offering documents contain, you know, a materially misleading statement or failed to and --

THE COURT:  It has an omission in it also. Section 11 says misrepresentation or omission.

MS. JOHNSON PALMER:  Or omission, right.  No, and the -- you know, the manner in which I read the plaintiff's briefing and the Complaint in this case is that it's much more omissions focused.  There isn't a suggestion that some of these statements in the offering documents were literally false.

What the plaintiffs claim, in essence, is that there was this lilial issue.

THE COURT:  I tend to see it that way too.  But, I mean, omission is still actionable.

MS. JOHNSON PALMER:  An omission is still actionable.

And what I'd like to focus on is, Your Honor, what you described as the snapshot because what the focus is here is what was known to the company at the time of the IPO.  We're talking about either a misstatement or an omission in the offering documents toward the IPO in September of 2021.

And the core ground on which we're alleging that

there isn't a misstatement or some sort of material omission in the offering materials is that -- you know, what the Complaint just sort of broadly characterizes as the lilial issue, when you, you know, really dig beyond that characterization and dive into the actual allegations in the Complaint, there isn't a risk that's alleged that actually had materialized as of the time of the IPO or any facts pled that indicate that there was a risk that was significantly likely to materialize in the future after the offering.

And what I mean by that --

THE COURT:  Let me just ask you this.

MS. JOHNSON PALMER:  Yeah.

THE COURT:  The materiality, whether it be misrepresentation or omission, generally speaking, is:  Would it be important to the decision-making of an investor?  Right? I mean, that's generally what it is.

MS. JOHNSON PALMER:  Correct.

THE COURT:  And under Section 11, an investor doesn't have to prove that they were misled if the -- if Section 11 is actionable, like I said, if there was something that could have reasonably caused an investor to review it as material or important.

So go ahead with the lilial thing.  It does focus on lilial.

MS. JOHNSON PALMER:  On the lilial issue and,

specifically, you know, what is it that the plaintiff is claiming should have been disclosed in the offering documents.

So as you alluded to, what we have here -- and I'm just going to walk through -- bear with me, but I'll do it quickly -- the chronology because it is important to understand what happened before the IPO because, as you have observed, the vast majority of the allegations really center on these TikTok videos and what happened after.

THE COURT:  Let me -- let me just interrupt to ask you this.  Whatever you're telling me, either side, I want you to tell me whether it's in the pleading or something attached to the pleading.  Because, if it's an argument beyond the pleading, how can I consider it?  This is just a pleading.

MS. JOHNSON PALMER:  Understood.  And I'm focused on the pleading, the Complaint and its allegations, and one particular document, which is this E.U. report that we've put before the Court on the basis that it's incorporated by reference in the plaintiff's pleading.

THE COURT:  Okay.

MS. JOHNSON PALMER:  So, Your Honor, what the Complaint alleges is that this E.U. body, the regulator that you referred to, issued its findings about this one ingredient, lilial, in May of 2019.  And those findings, Your Honor, were incorporated in this report that was issued in August of 2020 and, specifically, in this ban that was announced that was

going to become effective in March of 2022.

As you mentioned, the company's IPO happened in September of 2021.  So what we have at the time of the IPO is this ban that's prospective and the company taking action to comply with it.

And, Your Honor, the E.U.'s findings and really what precipitated this ban -- and this is the Scientific Committee on Consumer Safety of the E.U.  As you were alluding to, what that committee concluded after investigating lilial -- and to be clear -- and this is based on the Complaint's allegations, not something outside of that record.

But what the E.U. focused on was lilial across household consumer products.  This was not an investigation that was specific to Olaplex.

And what the E.U.'s report, Your Honor, concluded was that lilial, this one particular ingredient, which is fragrance related, that it was not an ingredient that posed a risk to consumers on an individual product basis in something like a shampoo or the product at issue here, which is a hair mask, but that there was a risk to consumers based on what the report called "aggregate exposure," meaning consumers are exposed to multiple different consumer household products that include this ingredient.

So you have the findings -- findings announced May of 2019, you have the E.U. announcing that there would be this

future ban in August of 2020, and then you have the company's offering in September of 2021.

And during that, you know -- whether it's one year from the ban or two years from the finding, during that entire time period that spans at the outside two years before the company's IPO, what our motion focuses on is what does the Complaint allege as to that period of time before September of 2021 when the company went public?

And there's no allegation that Olaplex faced any sort of criticism, any public commentary, any customer complaint, any litigation, anything.  There's no, you know, warning sign or any sort of smoke signal where lilial's concerned.

And that's the basis for our motion, Your Honor, that there wasn't a lilial issue in terms of some material facts that needed to be disclosed in the offering documents.

This is a company that, you know, being aware of this E.U. forthcoming ban, sought to comply with the law. Your Honor, we cited case law in our opening brief and in our reply that an issuer isn't required to itemize the steps that it's taken to comply with the law.

What really the plaintiffs are focusing on here is the fact that, because the product previously included the ingredient that had been banned, that that might subject the company to a future risk of reputational harm or --

THE COURT:  Let me just -- let me just interrupt you --

MS. JOHNSON PALMER:  Yep.

THE COURT:  -- because I'll give you a chance to respond, of course.

But I think the allegation is along the lines of you didn't talk about the ban in the -- in the offering material. In other words, had you said something like the E.U. has investigated an ingredient called lilial in 2019, our product had a trace of this.  The investigation showed that this lilial is not at all harmful unless it's used in other products.

But I'm just making the argument for them because I want you to respond.  The argument would then be, well, how does the consumer know what other products?  Is the consumer supposed to get an encyclopedia of every product that has lilial in it?  And maybe it's in a household cleaner, maybe it's in a deodorant, whatever.  It's an ingredient that some recognized body found to be potentially troublesome.

At the time of the offering, lilial -- I mean, Olaplex maybe internally thought, well, we're just going to have to rid ourselves of this product and -- and then we won't have a problem with the E.U. or anyone.  But that wasn't communicated.  It wasn't in the offering material.

And so the question is posed -- or I'm posing it this way.  If I'm an investor and I know that -- maybe I'm

assuming too much here, but I think that's part of the record -- that these type of products are kind of queen-for-a-day-type product, you know, faddish.  I mean, my own personal view is that most of the drugstore products that cost more or less are all legitimate hype of one kind or another.  I mean, you know, it's probably all some kind of soap, you know, but anyway.

So the argument would be that Olaplex, even in the offering material, somewhere, I think, did say, you know, we're -- you know, social media likes us and, you know, they were sort of intimating that they have a good following, you know, and so forth.

And the question is:  Knowing -- or espousing that, wouldn't it be important to somebody to know, investing in the company, that, even if this risk is, you know, kind of minimal or has to be in multiple products and who knows what other products it contains, it's something that should have been disclosed.  Because it seems to me what Rule 11 is designed to do is to encourage disclosure at the risk of getting stung without the scienter requirement if you don't.

And is that thinking plausible?  Because that's what we're looking at now.  It may be looked at differently at a different stage of the litigation.  But why isn't it plausible?

MS. JOHNSON PALMER:  So, Your Honor, it's not a question of, um -- our arguments are not directed to

materiality.  And it's not a question of, you know, would an investor with benefit of 20/20 hindsight, knowing what we know today, wanted to know this information in September of '21 when the IPO occurred.  There's not a duty of completeness when it comes to offering documents under the '33 Act to plead a material omission --

THE COURT:  But it has to be material.  Why isn't it material?

MS. JOHNSON PALMER:  So, Your Honor, to plead a material omission -- and I'm not just focusing on the materiality piece.  I'm focusing on:  Is there an omission to begin with?  They need to specify and to adequately allege plausibly, to be clear -- this isn't the '34 Act.  It's not a 9(b) case.

But they need to sufficiently allege that the offering documents created some impression of a state of affairs that differed from what actually existed.  And, again, this is a company that, you know, sought to comply with the law in response to this ban that was industry-wide in scope --

THE COURT:  Who -- I mean, there's -- you're getting into mind, you know, their mind.

As I understand it -- and I haven't had a lot of such 11 cases because most of them are not brought under Section 11.  But the -- it's not what the company was thinking. It's what was in that offering material.  And the company on a

fraud claim may -- there may be a whole lot -- may be a lot more to your argument than may be here because the investor -- the point of materiality is -- I mean, like anything, I mean, every day -- I mean, I can't use, you know, information that I think is well-known, although I think it is well-known.

You know, almost every day, every week some -- there's some article about something that you have been using for a hundred years that's a carcinogen, you know.  Dial soap has a carcinogen, Ajax, you know, has a carcinogen.  This underarm spray is going to give you cancer or whatever.

And a lot of these things are pure bogus, I mean, they're just, you know, some junk science.  And even assuming they're junk science, the question is -- yes, completeness is not required.  But if the Oshkosh Journal of Science and Technology says this could be and it's not in Section 11, yeah, that's one thing.  But the European Union said it's so.  Is that something that is stand up and consider?

In other words, somebody might say, well, you know, so what?  Everything has something in it.  We don't know a lot and whatever.  But, I mean, why -- why wouldn't an investor want to know that and make their own decision?

MS. JOHNSON PALMER:  So, Your Honor, the argument that we're making, it's not directed to what the company, you know, believed or its mental state at the time of these statements.

What the argument is that there isn't a rule of completeness, that an issuer isn't, you know, required to itemize every step that it's taking to comply with the law. And what the plaintiffs are focused on here is not the mere fact of the reformulation or the mere fact that the E.U. had announced this ban but what actually transpired in 2022 that eventually precipitated the decline in the stock price that led to this case being filed.

THE COURT:  Is that so?  I mean, in other words, you're moving in a different direction.  I want to hear that. I'm not discounting it.  But I want to follow the argument.

So now you're moving away, which is okay, from, you know, whether it should have been disclosed or not.  And if I hear you correctly, let's assume that it should have been disclosed.  Okay?

So is there -- what does Section 11 say on causation and damage?  In other words, the stock price plunged in a fraud case, you know, that there's cause and effect between the plunge and so forth.

Here, there seems to be a strange time gap between the plunge and when this all surfaced.  But does Section 11 allow an investor -- how would damages play out here?  Assuming there was a misstatement or an omission that's actionable in some way, how would the damage part of it proceed?  Explain that to me.

MS. JOHNSON PALMER:  So, Your Honor, I will --

THE COURT:  There's a causation, isn't there?

MS. JOHNSON PALMER:  So I'll address that.  I want to be clear at the outset, obviously.  And I want to get back to this with sort of the, you know, kind of shift in the path that you were referring to a moment ago because we don't concede that there is something that could or should have been disclosed --

THE COURT:  I know you don't.

MS. JOHNSON PALMER:  -- with respect to the lilial issue.

THE COURT:  Just assume that.

MS. JOHNSON PALMER:  Yeah.  So assuming that, for the sake of argument, what you're talking about in terms of damages traditionally in a case like this is the difference between the offering price and the price of the shares when the suit was filed.

The issuer has an affirmative defense on causation.  And if we get beyond this motion, you know, it's beyond the Complaint, it's beyond what's before the Court properly today.  But certainly, as you're observing, there is a significant lag between this TikTok video and various developments that happen to the company afterwards that are not related to the loan issue, even if you assume that that's the basis for a claim in this action.  But that's beyond what's before the Court today.

UNITED STATES DISTRICT COURT

THE COURT:  I'm interrupting, not because you're not making good points, but I just want to educate myself.

MS. JOHNSON PALMER:  Yeah.

THE COURT:  So I was just checking myself because the issue in an IPO is different than a fraud case.  In the IPO, it's the difference between the offering price and what would have been had this been disclosed.  Correct?

MS. JOHNSON PALMER:  That -- that is a way in which plaintiffs allege damages in this case, Your Honor.

THE COURT:  Yeah.  And so -- then the question is for pleading.  Because causation is an element, isn't it?

MS. JOHNSON PALMER:  Your Honor, causation is not an element --

THE COURT:  Well --

MS. JOHNSON PALMER:  -- for a claim.  It's a defense that the issuer has.

THE COURT:  I see.

MS. JOHNSON PALMER:  Yeah.

THE COURT:  So that changes the analysis.  I see.

MS. JOHNSON PALMER:  So, Your Honor --

THE COURT:  Is Olaplex still on the market?

MS. JOHNSON PALMER:  It is, Your Honor.  Meaning that the company is still publicly traded and this product --

THE COURT:  And they sell this shampoo.

MS. JOHNSON PALMER:  Yes.  And multiple -- there's

an entire suite of products, of which one is this No. 3 Hair Perfector that's at issue with the motion today.

THE COURT:  Oh, I see.

Well, you've been helpful, I mean, to me.  Is there -- I think I understand more about the issues.

Is there something else you want to say?

MS. JOHNSON PALMER:  Your Honor, there is, because what I was getting to and sort of the pivot that I think you spotted a few moments ago, you know, what we see, you know, the plaintiff staking out sort of in terms of their theory of what the lilial issue is is not just a suggestion -- and this really isn't sort of the nature of the Complaint -- that the company should have, you know, merely disclosed the fact that the product was reformulated or merely disclosed the fact that the E.U. had instituted this ban.

What the case is really about and, Your Honor, frankly, why we're here today is the TikTok videos -- right? -- that came out at the end of February --

THE COURT:  Why are they relevant?

MS. JOHNSON PALMER:  And why they're relevant, Your Honor, is that the plaintiffs allege that those videos are effectively a manifestation of some risk that supposedly existed at the time of the IPO and should have been disclosed. Because the claims in the case are really focused not on the reformulation or the E.U. regulatory change but the suggestion

**UNITED STATES DISTRICT COURT**

that those developments somehow put the company at risk of brand tar or reputation in the future.

So just two key points briefly here, Your Honor.

One, again, as I've mentioned, there aren't facts that are alleged at the time of the offering that the company was subject to some sort of risk with respect to its brand reputation.  You know --

THE COURT:  There are not facts.

MS. JOHNSON PALMER:  There are not facts.

THE COURT:  I know.  But there were some statements that the company was favored in social media, something like that.

MS. JOHNSON PALMER:  Correct.  And, Your Honor, the plaintiffs, as I read their Complaint, they don't allege that those statements, for example -- and I'm just paraphrasing briefly here -- but there's a statement that they -- they latch onto that indicates that Olaplex had built up a strong community of salons and influencers and the social media presence you're referencing over the course of years and that that represented a strong foundation for the company's growth going forward.

There isn't some, you know, allegation that the company didn't have a social media presence that was strong.  There isn't an allegation that the company subjectively didn't believe it was positioned to grow.  Their claim is more that

those statements were misleading because they fail to reference this lilial issue, meaning the product reformulation, the E.U. ban, and somehow that that put the company at risk looking ahead.

THE COURT:  You know something?  I got it.

MS. JOHNSON PALMER:  Yeah.  So just to briefly round this out, Your Honor, the TikTok videos, they did not --

THE COURT:  I don't view the TikTok videos, at least at this point, as being so important.  I -- I really don't. I'm looking at it, like you said, from a stopped camera, that -- what happened on the IPO, I mean, and the analyst downgrade, all that stuff, and -- you know, I'm -- that may have a place, but I am -- I'm not focused on that.

Let me -- thank you.  Let me hear the -- the -- I mean, I think -- you know, one thing about lawyers is if it -- if you think that the Court has -- understands things, you know, you don't have to get into things in detail.

But if you want to, go ahead.  What have I missed? I'm asking you.

MS. VASILCHENKO:  Oh.  Me?

THE COURT:  Yeah.  Through the questions, have I made the points that you think are relevant?

MS. VASILCHENKO:  Thank you, Your Honor.  I do want to --

THE COURT:  Did I miss something?

MS. VASILCHENKO:  I don't believe you missed anything, Your Honor.  You're absolutely right, that Section 11 does not have a scienter requirement.  And all we need to plead -- and we believe we've done that -- is that there was material misstatement or omission in the offering documents at the time of the IPO.

THE COURT:  Well, why are you -- why did you make a to-do about the TikTok -- why was that -- is that necessary?

MS. VASILCHENKO:  Well, that was the first time that the market actually learned of Olaplex's lilial issue.

THE COURT:  But the issue is not whether the stock plunged or not.  It's -- I mean, like counsel herself said, it could be circumstantial evidence that the media was important.

But, on the other hand, I mean, this could also be negative for you because the social media stuff started in July of 2022 and the stock crashed in October and that was after the analyst.  So the argument could be the causation, if there is causation.  There isn't.  But if it were a fraud case, it would be the analysts and -- anyway, why get into that?

The issue, to me, is:  Should there have been a disclosure of this E.U. ilium -- lilium -- lilia -- ilia thing.

MS. VASILCHENKO:  Lilial.

THE COURT:  *Liliom* is the great play by the Danish playwright that became *Carousel*.  Right?  Anybody know that?

MS. VASILCHENKO:  I don't know that, Your Honor.

THE COURT:  Who wrote *Liliom*?  Google that, *Liliom*.  Make yourself useful.  Who wrote *Liliom*?  It became *Carousel*, the great musical.  It was based on *Liliom*.

THE LAW CLERK:  Molnar.

THE COURT:  Moldar.

THE LAW CLERK:  Molnar with an "n."

THE COURT:  Molnar, yes.

THE LAW CLERK:  With an "n."

THE COURT:  Molnar.  Yes.  That's right.  That's right.  Yes.  Now it comes back to me.  Yes.  Yes.

Okay.  Look, I think I -- look, you can sit down.

Now, with regard to the others, the issuer -- I mean, the underwriter, the other people, I mean, is your -- tell me about the pleading part of it.  You want to talk about that, somebody?

MR. RISSIER:  Yes, Your Honor.

THE COURT:  Are you the underwriter?

MR. RISSIER:  Yes, Your Honor.

THE COURT:  Who is the underwriter?  What was his name?

MR. RISSIER:  There was a group of 14 underwriters.

THE COURT:  14?  Okay.

I mean, is there -- what I'm focused here on is your liability, is it just strictly derivative of the issue is liability or does -- or do you have -- are there certain

additional requirements under Rule 11 regarding underwriters?

MR. RISSIER:  Your Honor, there are additional defenses that the --

THE COURT:  No, not defenses, just pleading.  In other words, if -- if -- if the plaintiff pleads adequately a Rule -- Section 11 violation against the issuer, does that satisfy the pleading requirements for the underwriter, understanding that there are at least three specific defenses available to an underwriter?

MR. RISSIER:  Your Honor, it does not entirely, but it gets them part of the way there.

THE COURT:  What's missing?

MR. RISSIER:  One of the things that's missing is that the underwriter must be a statutory seller.  And under that element, the plaintiff must establish under *Pinter* -- this is different than Section 11 where -- so long as it's traceable to the registration statement.  But under Section 12, they have to be a statutory seller and that means direct interaction with the plaintiff.

I was going to cover that third, but I can address it now.

THE COURT:  Do it in any order -- what I want to know is where, from your standpoint, the pleading is deficient as against your clients.

MR. RISSIER:  Okay.  Thank you, Your Honor.

The claims against the underwriters should be dismissed for three reasons.  The first is already covered, that's the lack of falsity.  The second is statute of limitations.

And as Your Honor pointed out, the Section 11 claim --

THE COURT:  One year.

MR. RISSIER:  Exactly.  One year, that's true -- the one year is true for both Section 11 and Section 12.

THE COURT:  And does the one year begin from the date of issuance, the issuance of the IPO?

MR. RISSIER:  What we do is we count back one year from the date of filing of the Complaint against the underwriters.  And it's different because they filed earlier against the issuer.  So the underwriters were first added to the Complaint on April 28th, 2023.

So all facts that were known prior to April 28th, 2022, that's the critical date, put plaintiff on notice of their claims.  And --

THE COURT:  And so -- and I take it because this is a strict liability type of statute, there is no tolling?

MR. RISSIER:  Um, I don't know the answer to that, Your Honor, but it's not pled so it's not at issue here.

THE COURT:  I see.

MR. RISSIER:  But what is clear is that the same

UNITED STATES DISTRICT COURT

thing that makes Section 11 easier to plead than a Section 10(b) claim, for example, also makes it more difficult for plaintiffs to clear the statute of limitations hurdle because we just have to show that the allegedly undisclosed facts were actually disclosed before the critical date.

And so if I could direct --

THE COURT:  "The critical date," meaning one year before the statute -- before the Complaint was filed?

MR. RISSIER:  Exactly, Your Honor.

And so if we look at what plaintiffs allege in the Complaint was what they say the offering documents failed to disclose.  And this is in paragraph 162 of the Complaint.  They say there were three things that the offering documents failed to disclose.

Number 1, that this No. 3 Hair Perfector product contained an ingredient that had been banned by the E.U. as unsafe due to infertility risks.  That's the lilial product.  Number 2, that the product had been reformulated.  And, No. 3, that there were significant risks that Olaplex's use and removal of lilial in its products posed to the company's brand reputation and competitive positioning.

And then in the very next paragraph, plaintiffs go on to say that the offering documents were deficient because they talk about potential future risks but this was an existing risk and that existing risk should have been disclosed,

according to plaintiffs.

And then when we get to what plaintiffs say was actually disclosed prior to the critical date, it -- starting in paragraph 197, this is page 81 of the Complaint, there's a heading.  The heading is in early 2022, before the critical date, Olaplex's social media community and the market focuses on the lilial issue.  That's plaintiff's heading.  And then they go through the facts.

And they say on February 27, 2022 -- this is in paragraph 197 -- a beauty influencer on TikTok with over 227,000 followers revealed the lilial issue in two videos that day.  And then plaintiffs connect the dots for us.  They say this is the thing that should have been disclosed that wasn't.

And they allege in paragraph 197 -- and I quote -- "The video, thus, for the first time revealed to consumers and investors that Olaplex's products had contained lilial which was banned in the E.U. due to safety concerns."  And this video has since been viewed over 1.1 million times.

So not only are plaintiffs saying the fact occurred prior to the critical date, but they're saying this is the fact that should have been disclosed.

THE COURT:  When was the Complaint filed again?

MR. RISSIER:  The Complaint, Your Honor, was filed on March -- on April 28th, 2023 --

THE COURT:  Is that --

MR. RISSIER:  -- against the underwriters.

THE COURT:  And when was it filed against the issuer?

MR. RISSIER:  It was filed earlier against the issuer, Your Honor -- I can get that date for you here.

Maybe one of the other defendants can bail me out and whisper.

MR. YANOFSKY:  November 2022.

MR. RISSIER:  Thank you.

November 2022, Your Honor.

THE COURT:  I understand what you're -- what you're saying.

Let me get a response, and then I'll get back to you.

MR. RISSIER:  Okay.  Thank you, Your Honor.

MS. VASILCHENKO:  So, Your Honor, just to clarify the standard and that was recently confirmed in the *HP* case by the Ninth Circuit that came out earlier this year that we cite in our opposition brief.  The standard of what notice is required to trigger the statute of limitations period is that there's enough information out in the market to trigger not just a duty to investigate but to actually have enough information to be able to successfully plead the violation at issue.

So here, was there information, enough information

in March of 2022 to allow investors to successfully bring a securities act claim at that time?

And, Your Honor, as explained in our briefing, we explained that there wasn't at the time because, even though the lilial issue is exposed through these TikTok posts, there is not information in the market to show investors that this is actually material to the company's business because at that time there is no evidence of any negative sales impact yet.

And when analysts asked Olaplex on the earnings call about it and in the follow-up calls with analysts, defendants repeatedly minimized the severity of the issue, they say this is just misinformation, no big deal, we don't expect any material adverse --

THE COURT:  Wait.  You're now saying things which seem to cut against your initial position.  You seem to be saying that just the -- as I was questioning counsel for the issuer, just the disclosure of the E.U. investigation and potential ban of lilial wasn't actionable.  There had to be something more.  And you're saying that something more had to be some interplay between the company and the market makers and the -- and the analysts?

MS. VASILCHENKO:  Just to be clear, no, Your Honor.

THE COURT:  That's what you said.

MS. VASILCHENKO:  Let me --

THE COURT:  If you heard it read back, you just said

UNITED STATES DISTRICT COURT

that.

MS. VASILCHENKO:  Well, let me just clarify --

THE COURT:  The way you said it was self-defeating because you were saying that the E.U. in and of itself is not enough.  There had to be some evidence before you could file a lawsuit that this had -- that this was actually affecting the market.

MS. VASILCHENKO:  No, Your Honor.  What I'm saying is that at the time when the lilial news comes out, the market is wondering, Is this a significant material issue or not?  And defendants at the same time trivialize it --

THE COURT:  Was Olaplex -- that was the initial public offering; right?  Was Olaplex --

MS. VASILCHENKO:  Yes.

THE COURT:  Was Olaplex a public company at that point?

MS. VASILCHENKO:  Yeah.  The IPO was in September of 2021, yeah.  So it's been seven months since the IPO.

THE COURT:  So that was the initial public offering.

So the way I was questioning Ms. Palmer was that why wouldn't just the fact that this E.U. investigation of this ingredient, which was in Olaplex, be material enough to put in the IPO.  You seem to be saying that that wouldn't be, there would have to be something more.

MS. VASILCHENKO:  No, Your Honor.  There is case law

and we cited in our briefing that words of comfort, reliable words of comfort from management upon a disclosure that reassures investors, that can credibly lull investors into inaction and that prevents the triggering of the statute of limitations.

THE COURT:  So what you're saying -- so you're saying this was before the IPO, these statements that they give?

MS. VASILCHENKO:  No, Your Honor.  No.  I'm talking about the time frame in March of 2022 when the -- after the TikTok --

THE COURT:  You're talking about the statute of limitations.

MS. VASILCHENKO:  Yes.

THE COURT:  So you're saying that -- that there were statements by the company --

MS. VASILCHENKO:  Minimizing the lilial news when it comes out.

THE COURT:  And so your -- it's still -- okay.  I understand.  Thank you.  I got it.

MS. VASILCHENKO:  Yes.  An analyst picked that up and issued analyst reports positively saying, oh, well, maybe we were initially worried, we're no longer that concerned because this appears to be just mere misinformation that management --

UNITED STATES DISTRICT COURT

THE COURT:  I mean, are you saying that the basis of a lawsuit is dependent upon how analysts view facts?

MS. VASILCHENKO:  It's not --

THE COURT:  I mean, analysts -- I mean, I don't think I'm speaking out of school.  Maybe I'm engaging in some hyperbole.  Analysts don't know anything.  I mean, the word "analyst" is a joke.  Economists are not economists.  They're historians.  They never predict anything.  They just tell you why it happened.  So same thing with analysts.

MS. VASILCHENKO:  Well, Your Honor, there is case law and we cited in our briefing that says that you do look at the market reaction upon the --

THE COURT:  Well, that -- I get it.

Look, I'm spending a lot of time with this.  Let me give you the last word here because it's your motion.  Go ahead.

MS. VASILCHENKO:  Thank you, Your Honor.

THE COURT:  Are you Mr. Yanofsky?

MR. RISSIER:  I'm Mr. Rissier.

THE COURT:  Rissier.  Okay.

MR. RISSIER:  Thank you, Your Honor.

So I'll address the points that plaintiffs raise, which is where they're reassuring statements.  And I'll go straight from the plaintiff's own Complaint, paragraph 199.  It says that the plaintiffs allege that, after this TikTok video

went viral, that it "sparked immediate public outcry and backlash against Olaplex."  That's a -- that's a quote.

And then plaintiffs allege in paragraph 201 that on the next day, February 28th, Olaplex management addressed this by posting its own video.  And Olaplex management acknowledged the lilial issue and discussed it.

And plaintiffs, in their Complaint, characterize what the Olaplex executive said.  And here's the quote from the Complaint.  "Accordingly, these statements by a senior Olaplex executive confirmed the potentially problematic side effects of lilial, including infertility risks and allergic reactions, existed prior to the IPO despite defendants' failure to disclose these facts in the offering documents as described above."

So in plaintiff's own words, they're saying the Olaplex executive confirmed what they said was not alleged --

THE COURT:  I can't take up the whole afternoon with this.  I'll have to go back and look at the pleadings.  But there's another lawyer here, Mr. Yanofsky.  Who do you represent?

MR. YANOFSKY:  I'm with Olaplex, defendants.

THE COURT:  Oh, you're with Olaplex.  So we've -- is there some other group here that's on the hook?

MR. DUGAN:  Your Honor, I represent Mousserena, L.P.

THE COURT:  Who?

MR. DUGAN:  Mousserena, L.P.  James Dugan. Mousserena, L.P. is an alleged selling shareholder.

THE COURT:  You want to address the pleading?

MR. DUGAN:  Would you mind if I just be heard very briefly?

THE COURT:  Yes.  I don't mind at all.  Take the lectern.

MR. RISSIER:  Thank you, Your Honor.  I'll pass the mic.  And if I could just give one last point before I go --

THE COURT:  Go ahead.

MR. RISSIER:  -- which is that -- on the issue of materiality that plaintiff raised, it's not required but the stock price, plaintiffs allege in paragraph 207, dropped 5 percent on March 3rd and 11 percent on March 7, both before the critical date.  And they say it's as a result of the lilial news being reported.

THE COURT:  2022; right?

MR. RISSIER:  Yes.  That's correct, Your Honor. Thank you.

THE COURT:  Okay.

MR. DUGAN:  Thank you, Your Honor.

So my client, Mousserena, is in the lawsuit because it's a selling shareholder.  And that's the only reason it's in the lawsuit.  Mousserena does have the positions that have already been argued as -- as bases for its motion to dismiss,

the failure to allege, falsity, and also the statute of limitations.

The reason why I'm before you, Your Honor, is I think there's an additional thing about Mousserena that should be considered, which is, um, there are no allegations in the Complaint at all, zero, specific to Mousserena. Mousserena's name is mentioned twice, specifically, in the 317-paragraph Complaint.

Mousserena was a minority shareholder. Mousserena transferred its shares in the IPO to the underwriter defendants, thus went to a firm commitment offering. Mousserena did not sell to any of the plaintiffs in this case. There could be no allegation that it did.

There are two claims against Mousserena, that it's a statutory seller under 12(a)(2) and it's a control person under Section 15. Your Honor, the facts alleged against Mousserena don't come close, within shouting distance, to establish the elements of either of those two claims. What we have, your Honor, are conclusory allegations directed to the selling shareholders as a group.

Your Honor, most of the selling shareholders were affiliated with another entity, also a defendant here, called Advent. There is no connection between Mousserena and Advent. Mousserena is not affiliated with Advent. Mousserena and Advent were not alleged to be working together to do anything.

THE COURT:  Let me -- structurally, I'm a little unclear.  I'm a little lacking of knowledge to be more precise about how this mechanically works.  In other words, when there's an IPO, there is an underwriter.  And an underwriter, as I understand it, basically, as the word says, underwrites the offering and then sells it.  And then the underwriter has the offering pegged at a certain amount.  And if the stock doesn't sell at the IPO to that level, does the underwriter have to eat it?

MR. DUGAN:  Your Honor, in a firm commitment underwriting, the answer is yes.

THE COURT:  But there are -- there are negotiations and that sort of thing.  In other words, an underwriter under certain circumstances could be like a bookie.  I mean, you know, you figure -- figure who's going to win the Super Bowl the wrong way, and, you know, you may want to leave town.  Right?

MR. DUGAN:  Yes, Your Honor.

THE COURT:  So -- so the -- so here, when the -- when the company goes public, the IPO, the -- how mechanically does the process work with, like, someone who owns private stock -- not the company stock, they own private stock in the company, like your client or some others.  How do they participate in the underwriting?  Do they participate by -- or can it be any number of ways?  I guess everything is

negotiable.  Can they sell their stock to the issuer, and then it's one package to the underwriter?  Or can they -- do they deal directly with the underwriter?

MR. DUGAN:  It's an excellent question, Your Honor. And I don't want to get too far out of my expertise.

THE COURT:  I don't want to get in the weeds too much, but I just want to understand it.

MR. DUGAN:  Your Honor, in this case -- and I could be mistaken, but I believe in this case the underwriter dealt with the shareholders.  There are two principal shareholders. One was Advent and its funds.  They had something like 90 percent of the outstanding shares.  My client had 6 percent or 6.8 percent.

THE COURT:  Who had the rest?  The company?

MR. DUGAN:  I'm sorry, Your Honor?

THE COURT:  When you say -- 90 percent of what?  Of what?

MR. DUGAN:  Of the shares that -- in the company, the ownership shares of the company, the equity shares.

THE COURT:  So Advent owned the company, in effect.

MR. DUGAN:  Practically speaking.  I don't want to speak for Advent, but --

THE COURT:  Advent was a bunch of individuals who calls themselves Advent who own this company.

MR. DUGAN:  They were funds, Your Honor, yes.  They

were funds, and they had most of the common stock.

THE COURT:  And so why is your client different than Advent?

MR. DUGAN:  Well, Your Honor, there's no --

THE COURT:  Aside from the obvious difference in magnitude?

MR. DUGAN:  Well, Your Honor, the difference of magnitude is important.  And, also, there's a difference in allegations.  There's no allegation that my client had any ability to control the company.  There's no allegation that my client had any board representatives on the company's board. There's no allegation that my client, because of its security position, had the ability, practically speaking, to affect the policies of the company.  There's no allegation that my client ever did affect the policies of the company.  My client, because of the size of its position, couldn't make a decision whether this company would go public or not.

THE COURT:  Under Rule 11, which seems to be a very strong statute for the securities enforcement, why -- by -- in other words, are you saying that your client who couldn't control what went into the IPO is not responsible?

MR. DUGAN:  Your Honor, my client -- there's no allegation, is what I'm saying, that my client was a control person, other than conclusory.

THE COURT:  A control person.

**UNITED STATES DISTRICT COURT**

MR. DUGAN:  Correct.

THE COURT:  So you're saying -- and having just a small interest is a strong factor.

MR. DUGAN:  Correct, Your Honor.  It's not sufficient to allege that my -- my client was a control person to say it held 6.8 percent of the stock.  That's not sufficient.  There has to be additional facts alleged, not conclusory facts, not facts that say you are a control person because you controlled the company.  That's conclusory.  That's a legal conclusion.  That's not a fact.

THE COURT:  Did you cite some cases we can look at or authority?

MR. DUGAN:  Yes.  Well, Your Honor, we cite a number of cases on that point.

THE COURT:  I'll look at them.

MR. DUGAN:  Okay.  And the only other thing I would say, Your Honor, is we've been talking about control person.  There's also -- to establish that my client was a statutory seller, the plaintiff would have to allege either that it sold directly to them, which they cannot allege, or that it participated in the solicitation of the IPO, that it was out there seeking to sell the IPO to people that engaged in, you know, activities to market and sell the IPO.

Again, no allegation that my client did that other than conclusory allegations that are not specific to my client.

There's nothing specifically alleged about my client doing those things.

THE COURT:  On the statute of limitations argument that Mr. Rissier made, are you a part of that argument too?

MR. DUGAN:  Yes, Your Honor.  We have the exact same position.  We were added in April of 2023.

THE COURT:  All right.  The matter will stand submitted.  Thank you.

MS. JOHNSON PALMER:  Your Honor, if I could briefly, we -- I'm not going to double up on it, but we haven't addressed the Advent Funds.  I just want to make clear the arguments they participate in as well.  I represent the Advent Funds in addition to Olaplex.

THE COURT:  What makes your argument different for Advent than -- it sounds like -- I mean, Advent was the moving force behind the IPO.

MS. JOHNSON PALMER:  So, Your Honor, again, that's alleged in, you know, conclusory terms.  And so same issues, just to be very brief --

THE COURT:  What do you mean "conclusory"?  How else a company -- Advent owns 90 percent of the shares, the IPO goes forward.  How can you say Advent wasn't the moving force of the IPO?

MS. JOHNSON PALMER:  So, Your Honor, there are three arguments as to Advent, just like Mousserena, the other selling

stockholder.  One shared in common with the underwriters is the statute of limitations issue.  The second specific to the Section 12 claim is that Advent, regardless of what you take from the Complaint's allegations about control or lack of control, for Section 12(a)(2) you need to be a statutory seller.  Again, it was the -- you know, one underwriter here that sold the shares to the plaintiffs.  And there are allegations that indicate that, regardless of what's alleged as to control, that Advent had some active solicitation presence in the offering.

There are just conclusory assertions about signing the registration statement, you know, presence at road shows and the like.

And then, finally, with respect to the control person claim, Your Honor, you know, the state of the case law -- and it's articulated in our briefs -- is not just, you know, pointing to the magnitude of Advent's control stake, as you're referring to it.  It's percentage ownership in the company.  But that you need to have allegations of control that, again, to Mr. Dugan's point, are factual and supported with respect to the registration statement and prospectus --

THE COURT:  Who, then, interplayed with the underwriter to create the IPO other than IPO -- other than Advent?

MS. JOHNSON PALMER:  And, Your Honor, it's our

position that the company did.  So you have the company and its directors and officers that, you know, are signatories to the registration statement.  But there aren't specific allegations about Advent and the Funds, which are separate entity defendants, having some sort of involvement in these disclosures.

THE COURT:  I see.  I see.

All right.  You can answer that.  You want to answer that?  Then we'll quit, at least for the time being.

MS. STREJLAU:  Thank you, Your Honor.  Um, Your Honor is correct in observing --

THE COURT:  Who are you?

MS. STREJLAU:  I'm sorry.  Lisa Strejlau from Labaton Sucharow on behalf of --

THE COURT:  What is your name?

MS. STREJLAU:  Lisa Strejlau.

THE COURT:  Okay.

MS. STREJLAU:  So counsel for defendant -- for the Advent Fund defendants and Mousserena make a point that there are not specific allegations in the Complaint as to them.  However, in the offering documents, the offering documents don't talk about those entities as separate entities.  They define those entities as the selling stockholders, and they are referred that way throughout the offering documents.

For example, the word "selling stockholders" appear

in the offering documents 30 times, where Mousserena's name only appears three times in one singular footnote.  So it's our position that the allegations in the Complaint meet Rule 8's pleading standard because they have alleged that those defendants as a collective group did control and sell their -- solicit the sale of shares in the offering from investors by offering their own stock in the IPO.

THE COURT:  Thank you.  Thank you.

MS. STREJLAU:  Thank you, Your Honor.

THE COURT:  All right.  The matter will stand submitted.

(Proceedings concluded at 3:26 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

        I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

                    DATED THIS 18TH DAY OF OCTOBER, 2023.


                    /S/ MYRA L. PONCE
          _____
          MYRA L. PONCE, CSR NO. 11544, CRR, RDR
             FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**