UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE STEPHEN V. WILSON

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

Leslie Lilien,                          )
                    PLAINTIFF,          )
                                        )
VS.                                     )   NO. CV 2022-08395 SVW
                                        )
Olaplex Holdings, Inc., et al.,         )
                    DEFENDANT,          )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, JULY 1, 2024

_____

KATIE E. THIBODEAUX, CSR 9858
U.S. Official Court Reporter
312 North Spring Street, #436
Los Angeles, California 90012

APPEARANCES OF COUNSEL:

FOR PLAINTIFF:

LABATON KELLER SUCHAROW LLP
BY:  IRINA VASILCHENKO
-and- LISA STREJLAU
140 Broadway
New York, NY  10005

FOR DEFENDANT MOUSSERENA:

WILKIE FARR & GALLAGHER
BY:  JAMES DUGAN
787 7th Avenue
New York, NY 10019

FOR DEFENDANTS OLAPLEX & ADVENT:

ROPES & GRAY LLP
BY:  ANNE J. PALMER
3 Embarcadero Center
Suite 300
San Francisco, CA  94111

FOR UNDERWRITER DEFENDANTS:

MORGAN, LEWIS & BOCKIUS
BY:   J. WARREN RISSIER
300 South Grand Avenue
22nd Floor
Los Angeles, CA  90071

LOS ANGELES, CALIFORNIA; MONDAY, JULY 1, 2024

1:46 P.M.

- - - - -

THE CLERK:  Calling item 2, CV22-8395-SVW, Leslie Lilien versus Olaplex Holdings, Incorporated, et al. Counsel please state your appearances.

MS. VASILCHENKO:  Good morning, Your Honor.  Irina Vasilchenko from Labaton Keller Sucharow on behalf of lead plaintiff.

MS. STREJLAU:  Lisa Strejlau from Labaton Keller Sucharow also on behalf of lead plaintiff.

THE COURT:  I am signaling you without criticizing you.  Hasn't anyone told you that when you are in federal court and you address the Court you are supposed to stand up?

MS. VASILCHENKO:  Our apologies, Your Honor.

THE COURT:  I was signaling you so I didn't have to say that.

MS. VASILCHENKO:  I'm sorry, Your Honor.  I thought you meant to speak up.

THE COURT:  No.  It may be that was a poor signal. Next time I will give you a different signal.  All right.

Are there more appearances on the other side?

MS. PALMER:  Yes, Your Honor.  Anne Johnson Palmer of Ropes & Gray on behalf of Olaplex and Advent Fund defendants.

MR. RISSIER:  Good afternoon, your Honor.  Warren Rissier with Morgan Lewis & Bockius on behalf of the underwriter defendants.

MR. DUGAN:  Good afternoon, your Honor.  James Dugan from Willkie Farr & Gallagher on behalf of defendant Mousserena LP.

THE COURT:  Okay.  You may be seated.  First, let me tell you that I haven't put this case aside since our last hearing, and the reason that I haven't acted with my usual promptness is because there are certain aspects of the case that I find to be more difficult than initially thought.

I thought it would be helpful to me to run some of my thoughts by you and have you not reargue everything but reargue some of the things that I am thinking about.

And maybe your responses will assist me in resolving this, which should be resolved.  It should have been resolved before today, but like I said, sometimes cases get stuck.

Maybe the best way to start is my giving sort of an overview and then you can argue your responses.

The case that is confronting the Court and I am sure the parties in the most direct way -- the cases are the Alphabet and the Facebook case.

So I want some argument there about why those cases are controlling or how they are distinguishable.

My review is that the Olaplex disclosures were on their face very complete. They were truthful and described the risks. And so if we stopped at that point, I think the case could be resolved.

The argument from the plaintiffs is that the disclosures were couched in a way that would make a reasonable investor think that these things could happen, when in fact one of the things -- the event in question did happen, principally the EU investigation regarding the component lilial.

The EU investigation described the potential cancerous effect of having that ingredient in a product in -- I'm trying to choose the right word -- somewhat of a hypothetical way. It said that percentage of lilial in a product would have to be a certain percentage of the total product to have the effect.

And even then the warning was that the usage of one product with that level wouldn't be cancerous but it would depend upon how many other products a hypothetical consumer used that did have that percentage

of lilial.

In fact, undisputed, the amount of lilial in the Olaplex product was about, in my recollection, one-tenth of that minimum amount.  But the EU requirement was that any product with any amount of lilial couldn't be sold within two years of this EU edict.

The EU edict was not followed by the FDA.  It didn't affect the product in the United States.  The defendant Olaplex did respond, did comply and never sold the Olaplex shampoo beyond the date that the EU said it was forbidden and in fact reformulated the product so that it did not contain this lilial, even the trace amounts.

The prospectus said by way of disclosure:
"Our business is subject to numerous laws, regulations and policies around the world.  Many of these laws and regulations have a high level of subjectivity, are subject to interpretation and vary significantly from market to market.  These laws and regulations can have several impacts on our business, including prohibitions of selling a product or ingredient in one or more markets, limitations in our ability to import, et cetera."

Then it goes on to say:
"Limitations on the substances that can be included

in our product, resulting in limitations on our products that can be included in our product, resulting in product reformulations or the recall and discontinuation of certain products that cannot be reformulated to comply with the new regulations."

So I am understanding some of the argument from the plaintiffs that a reasonable investor would want to know that what the company said could happen did happen.

And that appears to me to be the heart of the argument.  And that ties into at least the broad language of Facebook and Alphabet.  However there are some important distinctions.  And there is no sufficient allegation that this reformulation caused any economic loss, and it is just that.

So let me begin with the moving party, Olaplex.  And I have tried to lay it out in terms of where the tension may be.  And the tension appears to me, if there is tension -- this case, to me, is a very different case than Facebook and Alphabet, certainly in terms of the gravity of what happened.

I mean, in Alphabet or Facebook, they said, you know, a hacking could happen, and they knew it did happen.  I mean the argument here to transpose it as best

styled for the plaintiff would be you said, you know, you could be subject to regulations that require reformulation and you said it could happen, but it did happen and you didn't disclose it.

That is where I am having the analytical problem.  So let me hear your response.

MS. PALMER:  Thank you, Your Honor.  Anne Palmer on behalf of Olaplex.

So Facebook indicates that there isn't some general duty to disclose any and all material information that may be of interest to shareholders.

Really, the focus in this case, as you have articulated, is whether there is a material omission, and in particular here whether there was a risk that either had already --

THE COURT:  Let me stop you right there.  Is materiality something that can be addressed at this point?

MS. PALMER:  Your Honor, the arguments that we, the company defendants, have made in the context of the motion are not focused on materiality.  They are focused on whether a risk had actually materialized or whether it was significantly likely to do so.

THE COURT:  Use that word carefully because I don't think I can address materiality at this point.

MS. PALMER:  Correct.  Correct.  No.  And to be clear, maybe to put it differently, the focus is on whether the risk had already come to fruition or if there was a significant likelihood that it would do so at the time of the company's statements in the IPO.

THE COURT:  What risk?

MS. PALMER:  That is the key here.  The risk here as we understand the allegations in the complaint and what the plaintiffs have argued is not just the mere risk that you would have to reformulate the product.  The thrust of the complaint and what the plaintiffs have alleged has do with, okay, what happens next.

THE COURT:  What do you mean what happens next. What does that mean?

MS. PALMER:  So the risk factor disclosure in particular, the one that you were quoting from -- it's at paragraph 164 of the complaint -- this is about compliance with laws and regulations.

It is not just describing the fact that the company might have to reformulate a product.  What that disclosure is saying is there could be adverse impacts to our business if that happens.  And what our argument is, Your Honor --

THE COURT:  Hold on one second.  Just slow down.

So is your argument that the disclosure is not

stating that these risks are a hypothetical or could happen.  The language doesn't say that.  It says these are risks, real risks.

And you are arguing that -- I am just trying to collate it -- the case, was it Facebook you mentioned -- the risk that happened was still existent, and here what was the risk was lawfully complied with by the time of the offering.

MS. PALMER:  Correct.

THE COURT:  Is that your argument?

MS. PALMER:  That is the argument.  And just to expand on it a bit, if I may.  So the risk factor disclosure talks about adverse effects to the business. So interruption of marketing or sales of the product.

THE COURT:  None was alleged here.

MS. PALMER:  None was alleged here.  And unlike Facebook or Alphabet, where you have this significant data exposure that has happened and it necessarily puts the company at risk of an adverse impact because there is going to be regulatory scrutiny -- at Alphabet you have an internal memo saying if the public and Congress finds out about this we are going to be under the microscope. Here what you have is the company complying with the law.

It has no reason to think that there is going to be some sort of associated adverse impact, much less,

how the plaintiffs put it, inevitable brand reputation risk that results from this lilial regulatory change.

And what our argument is really focusing on is what was known or knowable to the company at the time of the IPO in September of 2021.

THE COURT:  They knew that this had happened, but what you are saying is that it happened, it was dealt with and it had no adverse effect on the company.  And let me just raise another topic while you are at it.  You can continue but I want to just make sure I introduce this topic.

Another argument is that the disclosure when it was made by -- I still have thought about how that ever happened, I have no idea.  It just seems very strange.  That is not before the Court.  But eight, nine months later, was it, or something -- I forget how long after the offering it was -- or maybe more, some, what do they call it, blogger came upon the fact that there was this investigation and that lilial was in the Olaplex product.

And even as I remember the blogger's own words, it was sort of -- it was said that there was some qualification about how much the blogger knew about it and so forth.

We can speculate how the blogger knew about

it, but that is not going to get us anywhere.

And the question -- if the adverse affect in addition to what I've discussed I think the plaintiffs are contending -- that even if the regulatory matter was accurately complied with and even if -- well, not even if.  Notwithstanding the regulatory compliance, if the consuming public found out that at one time a very minor ingredient of the product had this lilial, that that would totally upset the apple cart in terms of the profile that Olaplex admittedly sought to achieve with its market and that it promoted itself as a shampoo that used healthy, pure products and so forth, and if it were known that the product at one point was thought of by a European agency, not the FDA, to contain an ingredient of very minor proportion, that that would taint the image of Olaplex irreparably, and that once its image was affected -- and I think even in the disclosures Olaplex other places talks about how it is dependent on its image.

And if the matter was disclosed it was likely that what did happen would happen.  In other words, that the rumor mill started and the price tanked.  So include that in your responses too.

MS. PALMER:  So, Your Honor, two points there.  One, we contend that the plaintiffs do not sufficiently

allege that the company had some ability again at the time of the IPO to foresee what would unfold in terms of the rumor mill, as you put it, around lilial.  Again what you have is the EU, as you summarized --

THE COURT:  Wait just a second.  You are looking at it -- I have to stop you because you have to focus.

MS. PALMER:  Yes.

THE COURT:  And you are saying -- you are talking about what the company's thinking was.  As I understand, the analysis is not so much what the company was thinking but what a reasonable consumer, a reasonable investor would believe.

So in other words, it is true that in Facebook, I am thinking about it now, or Alphabet, there were these internal memos that show that there was a fright about this hacking and how it could be.  There is nothing like that in this case.

But the question is not what the company thought.  The issue is what a reasonable investor would think.

MS. PALMER:  And Your Honor, to be more precise about it, I think the issue in fact is what was reasonably knowable to the company at the time.  Was the company at the time of the IPO in a position --

THE COURT:  Is that relevant, knowable?  In other

words, I thought that it is a strange bird, this Rule 11 thing.  I mean, most all the cases that deal with offerings deal with 10b5 and the other 33 act violations. But this section 11 is different.  So we have to keep that in mind.  That is what makes this difficult.

In other words, on a 10b5 basis, maybe I would have had less difficulty.  But let me ask you something. 10b5 does come into play, does it not, in some of the elements?  Aren't there some elements of -- I'm sort of losing myself here.  Just one minute.

Just one second.

This may be something I should have said at the outset, but let me get back to it.  Keep your thoughts in mind where we are, okay.

MS. PALMER:  Okay.

THE COURT:  I am reading from some notes that I have here.

"To state a claim under Section 11, plaintiff must plead that the registration statement either, one, contained an untrue statement of material fact; two, omitted to state a material fact necessary to make the statements that are not misleading; three, omitted to state a material fact required to be stated therein."

I mean that last part seems to subsume the

first two.  I don't know, it is a strange statute.  Then it says, "To state a claim under Section 12" -- is this 11 and 12?

MS. PALMER:  It is, Your Honor.

THE COURT:  Under 12:

"Plaintiff must prove that the prospectus either, one, contained an untrue statement of material fact; two, omitted to state a material fact necessary to make the statements therein not misleading."

And then there is a Ninth Circuit case that says:

"The materiality of information is different from the issue of whether the statement is false or misleading.  Thus not all material information must be disclosed to investors.  The only actionable omissions under Section 11 and 12 are those necessary to make the statements in the offering document not misleading or required to be stated in the offering document."

And then there is a Ninth Circuit case which says that in dealing with Section -- although they cited a case called Rico Wholesale, which dealt with a Section 10(b)(5) claim and its operative regulation Rule 10(b)(5).  The standard for analyzing whether a statement

is materially misleading is the same for both 10(b) and Section 11 claims. So you do look to 10(b)(4), that part of it.

So maybe I cut you off too quick on the materiality thing, but the Section 11 claim is different than the Section 12 claim I guess in that respect.

Section 11 says must make -- well, that also says material fact, material fact necessary to make the statements therein not misleading and omitted to state a material fact required to be stated therein.

So I mean your argument is that the statements in the prospectus were not untrue. They were true.

MS. PALMER: They were true, and moreover they are not misleading. They didn't omit some additional information.

THE COURT: So the question is whether in order to make them not misleading the prospectus had to include this information about the EU.

MS. PALMER: Correct.

THE COURT: That is the argument.

MS. PALMER: That is the argument, Your Honor, that the statements are not misleading, that the company did not fail to disclose some additional information that was required to make the statements complete because at the time the IPO happened, the state of affairs at that

point in time was that this regulation change had been announced.

As you summarized, it is a focus around aggregate exposure.  The EU report that is incorporated into the complaint and alleged extensively says that lilial can be safe in individual products at a certain concentration.  The Olaplex product was significantly below that.

THE COURT:  It also talked about the -- let's say there is lilial in the shampoo and lilial in some other product.  If you were a consumer, it was unspecified how many of these our products you would have to use and how often.  I mean, it is very vague "to have a potentially cancerous effect."

But you are making the argument that the statement was not untrue, which I agree.  Would you have to talk about the EU investigation to make the statements not misleading?  In other words, you would have to argue that, yes, you did disclose all the potential regulations and reformulation, but if you didn't talk about the EU investigation those statements would be misleading.

I have my doubts about that but I am just stating it to you.

And then omitted to state a material fact required to be stated therein.  Well, that is where we

are now.  And the material fact in part seems to be that Olaplex, you knew that even though you complied with the EU and even though it was a minute ingredient, much less than whatever, all those things we have talked about, that this company was so dependent on image that even this would cause the upset that it did.  And that is -- I am making the argument for the plaintiff -- and that is evidenced by what did happen even with this kind of blogger's release.

I forget exactly what the blogger said, but I remember there was even some uncertainty in what the blogger was saying, wasn't there?

MS. PALMER:  Correct, Your Honor.  And I would say just to try to package or tie some of that together, there isn't an omitted fact because the adverse effects that are talked about in the disclosure, none of those had come to pass or were significantly likely at the time of the IPO.  You can speculate today --

THE COURT:  The image.

MS. PALMER:  Correct.

THE COURT:  In other words, I mean, you could argue that -- you could take it to a further extreme, and let's say, I don't know, somebody higher up -- I am trying to formulate something.

Someone of significance in the company was

accused of an environmental issue unrelated to Olaplex and, you know, they view themselves imagewise as being a very pure product and that person's image could affect the image of Olaplex.

I mean, anything hypothetically could affect the image of the product. You are saying that if this was disclosed, there was no reason -- well, looking at it from the public's standpoint, I keep getting back to the investor.

In other words, I want to stay away from what Olaplex was thinking. In other words, Olaplex could be pure, you know, without fault in what they did, but if what they did or didn't do caused a reasonable investor to not buy the stock, that is it, isn't it?

MS. PALMER: But it is clear in Facebook the standard isn't does a reasonable investor have an interest in knowing all facts and circumstances that might relate to the company having a focus on marketing itself as a clean product.

The standard is specific to the actual statements the company has made and do they omit information that would be required not to make that misleading.

And here, you have a situation where it is not about mind state. It is really about what would an

issue, what would the company have been in a position to disclose as of the time of the IPO.

THE COURT:  One second, but saying it that way, why weren't they in a position to disclose it?

MS. PALMER:  Because what you have is a regulatory change that the company is already in fact complying with.  And it is not -- you mentioned the environmental analogy.  This is not specific to Olaplex.  It is industry-wide.  There is no case that the company's product is unsafe.

They are complying with this regulatory change and there hasn't been any sort of complaint.  There is no social media chatter.  There is a two-year period before the IPO where literally the only thing that is happening --

THE COURT:  I thought of a way to maybe get the best response in both parties.

Would it be analytically proper to think about what if Olaplex had put this in its IPO?  In other words, what if Olaplex had included this.  Your argument then would be it wouldn't affect things because they could explain it as you have explained it.

MS. PALMER:  Correct.  But that is not the standard.  The standard is whether given the statements the company chose to make in the offering documents did

they need to say more to make them materially accurate and complete.

THE COURT: You are correct.

MS. PALMER: And the argument that I made is that the statement especially that the plaintiffs focus on the most, it is not just about reformulation. It is reformulation and that could cause an adverse impact.

And there is no adverse impact at the time of the IPO. This isn't the Facebook or the Alphabet situation where you are sitting there already having in existence the risk having materialized in fact.

THE COURT: Stay with that thought. Say that again. I want to hear that again. You are saying that unlike Facebook and Alphabet, these things --

MS. PALMER: You have an event, Your Honor, that has already happened. So you have this exposure of user data that has happened before the statements were made.

It necessarily is a type of incident that poses risk to the corporation, and the company still says, oh, we could be at risk if data is exposed.

Here you have a situation where you have a disclosure that talks about changes in the law that might require reformulation. And those could result in adverse impacts like loss of sales or customer complaints.

THE COURT: But there were no --

MS. PALMER:  There were no adverse impacts.

THE COURT:  The only adverse impact was eight months later when this blogger went forward.  The stock dropped.

MS. PALMER:  Precisely.  And Your Honor, I know we have discussed some in the last argument what is the import or relevance of that TikTok post.

That blogger went on TikTok and and falsely accused the company of having its product banned because it was retrotoxic.  That is flatly incorrect.

THE COURT:  Say that again.  You may be right. There are so many moving parts here.  I want to make sure I have them all.  So you are saying when the blogger went forward, the blogger -- do you have the blog handy? Could you read it to me?

MS. PALMER:  Yes.  Give may moment, Your Honor, just to locate it.

THE COURT:  Yes.  Take your time.

MS. PALMER:  So there are two videos on TikTok that were posted on February 27th of 2022.  What I am referencing now is paragraph 197 and 198 of the complaint.

THE COURT:  When was the IPO?

MS. PALMER:  The IPO was in September of '21.

THE COURT:  About seven months later.

MS. PALMER:  Correct.  So the first video, the blogger says, "When you find out Olaplex is going to be banned in the EU and the UK next month."

And then the second video again that same day says, "There are reports that Olaplex is being banned in the EU and the UK and that this is because of this ingredient."  And the blogger posts to a Google search that is searching for lilial, which has been linked to infertility.

And your Honor, the statements that are made in those videos about there being some ban against Olaplex and it having something to do with fertility, that is just completely a misconstruction.

THE COURT:  I agree with you, but how is that analyzed under Section 11 or 12?  In other words, I am just translating in my own words what you just said, and that would be essentially that no company can anticipate someone going public with a blatantly false statement and that affecting its stock price.

So you are saying that the blogger's statement was so false and so different than what happened, but I am trying to put that into an analytical framework.

MS. PALMER:  But that is not something the company could have been expected to disclose seven months later.

THE COURT:  How does that argument -- the company,

would it be expected to disclose, how does that fit into Section 11?

MS. PALMER:  It fits into Section 11, Your Honor, because the TikTok videos are what plaintiffs --

THE COURT:  I am talking analytically.  I understand the facts.

MS. PALMER:  And I am trying to get there.

THE COURT:  Go ahead.

MS. PALMER:  So it is relevant to the analysis under Section 11 because that is the event or circumstance that the plaintiffs point to that they say revealed the omission, what was not stated beforehand and needed to be disclosed in order to make the prior statements the company made at the IPO, not misleading.

So essentially the plaintiffs claim these TikTok videos reveal the truth that was missing from the offering documents, and that is the material omission that is supposedly actionable under Section 11.

And part of what we are arguing is that really puts an impossible burden on this company to anticipate that there is going to be one person out there of millions of users on TikTok that comes forward with an inaccurate claim about the company.

And just critically here, Your Honor, the company did do its best in the offering documents to

provide a warning about this topic. And the law under Section 11 and 12 is also clear. You don't have to break out and sort of specify every granular permutation of the risk. You provide a meaningful risk disclosure.

And what the company did disclose when it warned investors we're usually dependent on social media, this is how we have built our brand awareness and reputation -- this is in paragraph 173 of the complaint. "The company disclosed the dissemination of information via social media could harm or ground our business regardless of the information's accuracy."

So this phenomenon, what the plaintiffs point to in the complaint and what the company explains as misinformation about this product, that is a risk that this company warned investors in the market about in its disclosures in connection with the IPO.

That is another independent reason why we say that there is some sort of omission, some absence of material information required to make the disclosures not misleading. That is another reason why we say that fails.

THE COURT: All right. Let me give the plaintiffs a chance to respond and then since you are the moving party I will give you a chance to speak further.

MS. PALMER: Thank you.

THE COURT:  I have sort of set the table so you know what I am interested in.

MS. VASILCHENKO:  Yes.  Thank you, Your Honor.

Just to respond to a few issues that Your Honor asked about.  How is Section 11 different from 10b, for example.  And you pointed to the three different clauses.

That is actually one of the key ways that Section 11 is different from 10b, is the pure omission, the third prong that you read, where a company is liable for pure omission under Section 11 if they fail to disclose a material fact that is required to be disclosed under some other statutory regulation.  For example, item 303 or item 105.

THE COURT:  I am glad you brought that up because I want to hear your analysis of how item 105 and Rule 303 fit into the analytical framework of Section 11.  Can you deal with that without getting into the facts, and then you can get into the facts if you wish.

MS. VASILCHENKO:  Sure, Your Honor.  And I want to point you to a recent supreme court decision that just came out earlier -- a few months ago.

THE COURT:  What is the name of it?

MS. VASILCHENKO:  Macquarie versus Moab Partners. And we can submit this as supplemental --

THE COURT:  Just tell me.

MS. VASILCHENKO:  Sure.

THE COURT:  What does it say?  What is the cite of it.  The citation.

MS. VASILCHENKO:  The citation is -- let me just pull it up.  Macquarie Infrastructure Corp versus Moab Partners, 601 U.S. 257 (2024).

THE COURT:  Okay.  Go ahead.  What does that case say?

MS. VASILCHENKO:  So in that case the supreme court said that --

THE COURT:  Can you speak a little more slowly?

MS. VASILCHENKO:  Sure.  In that case the supreme court said that Section 10b under the Exchange Act does not allow liability for pure omissions.  In other words, there has to be either an outright lie or a misleading half truth that was rendered.  Misleading by omission is not a fact.

THE COURT:  Now, I remember this case.  It dealt with 10b, not with Section 11.

MS. VASILCHENKO:  Exactly.

THE COURT:  But you are arguing that it has some impact on Section 11.

MS. VASILCHENKO:  Absolutely because in that case the supreme court specifically distinguished 10b

liability versus Section 11 liability.  And in contract to Section 10b, and I'm quoting here, Your Honor --

THE COURT:  Slower, okay.

MS. VASILCHENKO:  (Reading:)

"Congress imposed liability for pure omissions in Section 11A of the Securities Act of 1933.  By its terms, in addition to proscribing lies and half truths, this section also creates liability for failure to speak on a subject at all."

And that is very different from Section 10b, where you do need some kind of statement that is rendered misleading by omission.

Under Section 11, you don't, which is why under Section 11 there can be some other source of a duty to disclose material information.

THE COURT:  Tell me what it is.  Now, bring it home to our case.

MS. VASILCHENKO:  Sure.  So here we do have this external source, which is this regulation by the SEC called item 303, which requires all issuers to disclose any notes, trends or uncertainties that may reasonably impact unfavorably on the company's revenues or sales.

THE COURT:  What is the -- I don't know if a trend -- what is the uncertainty?

MS. VASILCHENKO:  Uncertainty here is precisely

what we have, is this lilial issue.  The fact that the EU has banned this ingredient in one of Olaplex's key products, the No. 3 product.

And this uncertainty can reasonably be expected to impact unfavorably on the company's sales and revenues.

THE COURT:  That is the issue, whether the uncertainty, if there is one here, could reasonably be found to affect the IPO.  That is section?

MS. VASILCHENKO:  Item 303.

THE COURT:  What is 105?

MS. VASILCHENKO:  Item 105 is another SEC regulation that requires disclosure, a discussion of the most significant factors that make the offering speculative or risky.  So that doesn't have the reasonably likely to cause unfavorable material effects on revenues or sales.

THE COURT:  I guess it is just habit.  I am guilty of these habits too.  You can speak more slowly.

MS. VASILCHENKO:  I will try, Your Honor.  I'm sorry.

THE COURT:  First of all, it is hard for the court reporter.  She is polite and not interrupting you but it is difficult for her and it is difficult for me.  I am trying to absorb, not just here, here.  And so the idea

is to help me better understanding your arguments, and I can do that if you speak more slowly.

MS. VASILCHENKO:  Sure, Your Honor.  I will slow down.

THE COURT:  Take a note.  Write down slowly.

MS. VASILCHENKO:  Writing it down.

Yes, Your Honor.

So item 105 requires a discussion of the most significant factors that make that offering speculative or risky.

THE COURT:  Well, I think we are getting back to the same nucleus effects.

MS. VASILCHENKO:  Yes, Your Honor.  But my point is that there doesn't have to be an actual statement in the offering documents that is rendered misleading, although we have that, such as the risk warning statements that we've been talking about.

THE COURT:  Why are they misleading?

MS. VASILCHENKO:  Why are they misleading?

THE COURT:  Yes.  They seem very accurate and complete.  What is misleading about them?

MS. VASILCHENKO:  So what is misleading about them, to point you to the risk warnings that were warning about the hypothetical prospect that a government regulation might require Olaplex to reformulate the

product.

THE COURT:  They didn't say hypothetically, did they?

MS. VASILCHENKO:  They did.  They said may.  There are government regulations that may require us to reformulate a product such that we might have to remove a problematic ingredient that may be deemed unsafe.

THE COURT:  But isn't that something that any reasonable investor would contemplate with a consumer product like this?  I mean, it has been the subject of litigation for years and years that these products are subject to examination.  Scientists or pseudoscientists are always coming up with some new carcinogen.  I mean, it is endless.

And why wouldn't a reasonable investor read that and think, well, it is not hypothetical.  It's not may happen.  These kinds of thing do happen.  They are commonplace.

MS. VASILCHENKO:  Well, Your Honor, there is absolutely no indication in the record that anyone suspected that Olaplex's supposedly clean products contained an ingredient that had been banned as unsafe by the EU because of its fertility health risks.

THE COURT:  But even the ban really didn't literally include the amount of lilial in the Olaplex

product.  It said that a certain percentage in a product combined with a consumer buying an unknown number of other products could get to the point where it could be harmful.

The amount of lilial in the product itself was not at the limits of the EU ban, but the ban did say any amount has to be taken out.  So that is why Olaplex took out the lilial and so forth.

Go ahead.  And weave into this business of the disclosure.

MS. VASILCHENKO:  Sure, Your Honor.  So, again, to bring it back to the Facebook decision and the Alphabet decision, which we agree with you that you are completely spot on that those are controlling here with respect to the risk factors.

THE COURT:  I didn't say they were controlling.  I said that they have language -- I was careful about it -- which relates to some view of this case.  Whether or not they are controlling may be the ultimate issue, but that is why I wanted to have this argument, because it is something I have to pay attention to.

Go ahead.

MS. VASILCHENKO:  Sure, Your Honor.

So we do submit that the Facebook decision in particular is very on point to Olaplex's arguments here

because in Facebook as well --

THE COURT:  Slow.

MS. VASILCHENKO:  -- they argued that there was no risk that had already materialized.  They pointed to the fact that even though the Cambridge Analytica data breach had already happened that there was no reputational or other business harm at the time of the statements.  That is the exact same argument that defendants make here.

THE COURT:  Well, now, getting back to the disclosure.

MS. VASILCHENKO:  Yes.

THE COURT:  In the -- was it the Facebook case you just mentioned?

MS. VASILCHENKO:  Facebook, yes.

THE COURT:  How did Facebook describe their disclosure as related to this data breach?

MS. VASILCHENKO:  So same thing as here, Your Honor.

THE COURT:  What was the exact language?

MS. VASILCHENKO:  I will quote from the Ninth Circuit's decision.

"The Ninth Circuit explained that our case law does not require harm to have materialized for a statement to be materially misleading.  And because Facebook presented the prospect of a

breach as purely hypothetical when it had already occurred, such a statement could be misleading even if the magnitude of the ensuing harm was still unknown."

THE COURT:  But what language did Facebook use in their offering material that the Ninth Circuit was talking about?  Is there a direct quote from that?

MS. VASILCHENKO:  I don't have it off the top of my head but it was similar language that they warned about general risks, that there may be a data breach. There could be a party who acts --

THE COURT:  You don't have the exact language?

MS. VASILCHENKO:  But it is the may or could that rendered the statements misleading.

THE COURT:  I see.

MS. VASILCHENKO:  Because that breach had already occurred and the same exact same thing here.  Defendants presented the prospect of regulatory impacts as purely hypothetical.  There might be a regulation that might force us to regulate the product.

THE COURT:  You are using words that were not used in the actual -- let me just get to it here.

The actual wordage was -- actually the hypothetical or word "can" only applies to -- as I am reading it now, it says -- reading from the IPO of

Olaplex: "These laws and regulations can have severe impacts on our business." But the laws and regulations didn't have any severe impact on their business.

It was the lie of the blogger.

MS. VASILCHENKO: Your Honor, can I point you to another statement in that section?

THE COURT: Yes.

MS. VASILCHENKO: It says, and I quote, "Changes in laws may require us to reformulate certain of our products."

THE COURT: Well, and they did. They did reformulate the product.

MS. VASILCHENKO: Yes, by the time of the IPO they already did. So that is misleading to say that they may have to do it in a future, a hypothetical future prospect, when they already have had do it because of this EU ban.

THE COURT: Then why does saying in the IPO it may cause us to reformulate our product when they had already reformulated the product, how does that make what was said misleading?

MS. VASILCHENKO: Because they are presenting this as a purely future hypothetical thing that they might have to do in the future, when they in fact have already had to do it because a government regulation has already

deemed one of its products unsafe, lilial.

THE COURT:  One second.

(Pause in proceedings.)

THE COURT:  But the reformulation of the product didn't result in any recall or discontinuation and the reformulation didn't have any adverse business effect.

MS. VASILCHENKO:  But, Your Honor, as Facebook says, that harm, the consequences of the risk warned of here doesn't have to materialize yet at the time of the statement.

THE COURT:  But the harm that happened and the reason, the causation of the stock drop was the blogger, and the blogger made a false statement.  I mean, the blogger is telling the investing public, hey, this Olaplex which advertises itself as a pure shampoo, they are lying about it because they contain ingredients that are so bad that they are going to be banned by the EU, a blatantly false statement.

MS. VASILCHENKO:  So Your Honor --

THE COURT:  How could any company react?  Should a company say in their material, you know, some blogger may misstate our record, and if the blogger does it in a convincing way with a following, that could affect our stock?

MS. VASILCHENKO:  No, Your Honor.  We are not

saying that it has to say that.

THE COURT:  The causation was what the blogger said.  If the blogger had said truthfully -- the truthful statement from the blogger would have been -- let's say the blogger found out about all we are talking about and said that two years ago there was a minute amount of lilial in our product, less than one-tenth of what the minimum was for concern, and the EU said within two years companies have to take that ingredient out, and we did.

So that would have been -- and not we, Olaplex did.  That would have been a true statement.  Are you saying that that statement would have caused the stock drop?

MS. VASILCHENKO:  I don't know what would have happened, Your Honor, because we are now speculating about other possible --

THE COURT:  Well, aren't we in the world of entrepreneur speculation here?  Some of the way you are arguing it is Section 11 has no fabric at all.  It is just, you know, could it happen and you forget causation everything else.  How do you argue that point.

MS. VASILCHENKO:  Sure, Your Honor.  So I submit that Olaplex immediately did damage control and corrected the blogger's misinformation.  And they immediately told investors and consumers that all the things that defense

counsel just talked about, how this is just trace amounts, it was only dangerous in aggregate when used with other products that contain lilial.

We already removed it, all of that stuff.  And the consumers still did not trust Olaplex's brand reputation because they used an ingredient that had been deemed unsafe by EU regulators while they marketed themselves as a clean products company.

THE COURT:  I have your argument.  Let me hear from the defense and then I will get back to you if you want.

MS. VASILCHENKO:  Sure.  Thank you, Your Honor.

THE COURT:  When I am making these comments back and forth, obviously if I had decided the issue I wouldn't have the hearing.  So it isn't an effort to affirm my view one way or the other.

I am trying to make sure that I have all the information and the analysis correct, or as correct as I can get it.

Go ahead.

MS. PALMER:  So I want to start first with items approximation 303 and 505 because we didn't touch on those.

THE COURT:  105?

MS. PALMER:  505.

THE COURT:  It is not 105, it's 505?

MS. PALMER:  It's 505.

MS. VASILCHENKO:  105.

MS. PALMER:  105?  I'm having a senior moment here.

So 303 applies to a known trend or uncertainty that is reasonably likely to have impact and 105 applies to material factors that make the investment speculative or risky.

And your Honor, just the bottom line here is we submit that the same arguments apply here in terms of the lack of some adverse impact that could have been detected at the time of the IPO, and in fact, what the company did disclose in terms of a risk that might make the investment speculative or particularly risky, the risk of the misinformation phenomenon, what actually happened with the TikTok blogger, that in fact was disclosed in terms of a potential risk.  Again that is paragraph 173 of the complaint.

THE COURT:  What was potentially disclosed regarding the blogger?

MS. PALMER:  The risk of misinformation.

THE COURT:  Where was that?  Read that part slowly to me.

MS. PALMER:  So this appears in Paragraph 173 of

the complaint.

THE COURT:  Yes.

MS. PALMER:  And the relevant sentence from the disclosure, Your Honor, it says, "The dissemination of information via social media could harm our brand or our business regardless of the information's accuracy."

So what the company is saying is that we are usually dependent on social media to grow our brand, and if there is negative commentary online, including if it is inaccurate, that can pose a risk of harm to our business.

So all that counsel has pointed to in terms of what unfolded once the blogger on TikTok surfaced, that risk, there was a warning about it that was concrete in the offering documents.

The company here did the best it could in terms of anticipating the nature of that potential threat to its business.

What the plaintiffs are suggesting is the company needed to go a step farther, and I think the term speculation fits here, that the company somehow was required to speculate at the time of the IPO that even though these EU findings had been announced two years earlier, even though the ban had been announced --

THE COURT:  Announced, let me say this about the

announcement.  As I read the Ninth Circuit case law, this announcement does not qualify as public information.

MS. PALMER:  Correct.  And we are not arguing, and it should be clear from the briefing we are not arguing in the context of this motion some sort of truth on the market, investors knew it defense.

What we are arguing is in terms of assessing what the company was in a position to disclose, you have this two-year period before the IPO where these EU findings are out there and there isn't some sort of sign of an emerging adverse impact to the company.

You don't have complaints.  You don't have chatter online.  You don't have a lawsuit filed.  There isn't any sort of development that puts the company on notice that there could be a risk of this situation where someone could crop up and say, oh, you promote yourself as being a clean brand.  You may have a trace amount of this product, but does that somehow call into question your reputation.

THE COURT:  I guess further, even though the EU announcement wouldn't qualify as public information because it was in Europe, it was public.  I mean, that is how the blogger found out about it.

In other words, the blogger -- at least as to what the blogger says, I have my doubts -- said that he

was researching infertility something or lilial.  What was he researching, lilial or infertility?

MS. PALMER:  The blogger was Googling the term lilial and had the impression that somehow --

THE COURT:  Why would the blogger -- why would somebody out of thin air Google lilial, which is a trace part of all these products?  I mean, it is not for me to say, but something happened behind the scenes here that we don't know.  This blogger didn't just wake up one morning and say I am going to Google lilial.

Somebody somehow planted that seed in the blogger.  But that is not for me to speculate or say to a conclusion.

But the point is the blogger even in his blog said he verified it by looking on the Google and Google through this sort of circular way got into the EU; right?  The announcement.

MS. PALMER:  Correct.

THE COURT:  And he just misrepresented the announcement.

MS. PALMER:  Yes.  The blogger misrepresented the announcement and the fact that the announcement had occurred.  That had been out there since August 2020, over a year before the IPO itself, and certainly even farther from the point in time where the blogger made

those posts in February 2022.

And standing here today, I can't explain how the blogger came about doing that.  What I can say is that the company was not under some legal obligation to speculate that that set of events might potentially transpire.

And what the company warned the market about was the potential risks that could be associated with misinformation being perpetrated online which captures the very nature and essence of this issue.

THE COURT:  But the argument by plaintiff was that the stock price was affected not just by the misinformation from the blogger, but also even with the company's correcting statement where the company explained that the blogger was not truthful or didn't know what the blogger was talking about.

So tell me how you analyze that.

MS. PALMER:  Your Honor, the short answer is I am not sure how you analyze that as relevant to the question of what was the company in a position to disclose as of the time of the IPO.

We have heard a lot of arguments in this case about what happened when the blogger surfaced and the set of events that unfolded from there, but that doesn't address the critical question of what was knowable to the

company at the time of the offering and needed to be put in that disclosure.

THE COURT: I am going to take a short recess to make sure I have covered the questions I want. Both sides have been helpful. Just take a short recess.

MS. PALMER: Thank you.

(Recess from 3:04 p.m. to 3:30 p.m.)

THE COURT: We are here with the parties in the Olaplex case. You may be seated.

You fulfilled what I wanted to accomplish today. I have to give your thoughts more examination, and I promise you that within a few weeks I will figure this out best way I can. But you have helped me.

Nothing that was said was something I hasn't thought about before, but at least it is good to hear the parties argue their point.

Okay. Thank you.

(Proceedings concluded.)

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28,

United States Code, the foregoing is a true and correct

transcript of the stenographically reported proceedings held

in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the

Judicial Conference of the United States.

Date:  July 9, 2024


 /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

MR. DUGAN: [1]   4/7
MR. RISSIER: [1]   4/4
MS. PALMER: [48]
MS. STREJLAU: [1]   3/12
MS. VASILCHENKO: [46]
THE CLERK: [1]   3/6
THE COURT: [93]

'21 [1]   22/24

-and [1]   2/5

/s [1]   45/12

08395 [1]   1/8

10 [4]   15/24  15/25  16/1  16/2
10005 [1]   2/6
10019 [1]   2/10
105 [10]   26/14  26/16  29/11
 29/12  30/8  38/24  39/1  39/3
 39/4  39/7
10b [7]   26/5  26/9  27/14  27/20
 27/25  28/2  28/10
10b5 [3]   14/3  14/6  14/8
11 [24]
11A [1]   28/6
12 [7]   15/2  15/3  15/5  15/17
 16/6  23/15  25/2
140 [1]   2/5
164 [1]   9/17
173 [3]   25/8  39/19  39/25
1933 [1]   28/6
197 [1]   22/21
198 [1]   22/21
1:46 [1]   3/2

2020 [1]   42/23
2021 [1]   11/5
2022 [2]   22/20  43/1
2022-08395 [1]   1/8
2024 [4]   1/15  3/1  27/7  45/10
22nd [1]   2/19
257 [1]   27/7
27th [1]   22/20
28 [1]   45/4

300 [2]   2/14  2/19
303 [6]   26/14  26/16  28/20  29/10
 38/22  39/6
312 [1]   1/20
33 [1]   14/3
3:04 [1]   44/7
3:30 [1]   44/7

436 [1]   1/20

505 [4]   38/22  38/25  39/1  39/2

601 [1]   27/7

753 [1]   45/4
787 [1]   2/10
7th [1]   2/10

90012 [1]   1/20
90071 [1]   2/20
94111 [1]   2/15
9858 [2]   1/19  45/12

ability [2]   6/23  13/1
about [54]
above [1]   45/7
above-entitled [1]   45/7
absence [1]   25/18
absolutely [2]   27/24  31/20
absorb [1]   29/25
accomplish [1]   44/10
accuracy [2]   25/11  40/6
accurate [2]   21/1  30/20
accurately [1]   12/5
accused [2]   19/1  22/9
achieve [1]   12/10
act [3]   14/3  27/14  28/6
acted [1]   4/12
actionable [2]   15/17  24/18
acts [1]   34/11
actual [4]   19/20  30/14  34/22
 34/23
actually [4]   8/22  26/8  34/23
 39/16
addition [2]   12/3  28/7
additional [2]   16/14  16/23
address [3]   3/16  8/25  43/25
addressed [1]   8/17
admittedly [1]   12/10
ADVENT [2]   2/12  4/2
adverse [15]   9/21  10/13  10/19
 10/25  11/8  12/2  18/15  21/7
 21/8  21/23  22/1  22/2  36/6
 39/12  41/11
advertises [1]   36/15
affairs [1]   16/25
affect [7]   6/8  12/2  19/3  19/5
 20/21  29/9  36/23
affected [2]   12/17  43/12
affecting [1]   23/19
affirm [1]   38/16
after [1]   11/17
afternoon [2]   4/4  4/7
again [8]   13/1  13/3  21/13  21/13
 22/11  23/4  32/11  39/18
against [1]   23/11
agency [1]   12/14
aggregate [2]   17/4  38/2
ago [2]   26/22  37/6
agree [3]   17/16  23/14  32/13
ahead [5]   24/8  27/8  32/9  32/22
 38/20
air [1]   42/6
al [2]   1/9  3/7
all [19]   3/24  8/10  14/2  15/15
 17/19  18/4  19/17  22/13  25/22
 28/9  28/20  29/22  37/5  37/19
 37/25  38/4  38/17  40/12  42/7
allegation [1]   7/15
allegations [1]   9/8
allege [1]   13/1
alleged [4]   9/12  10/15  10/16  17/5
allow [1]   27/15
Alphabet [10]   5/3  7/13  7/21  7/23
 10/17  10/20  13/14  21/9  21/14
 32/12
already [15]   8/15  9/3  20/6  21/10
 21/16  33/4  33/6  34/1  34/16
 35/14  35/16  35/19  35/24
 35/25  38/4
also [6]   3/13  16/7  17/9  25/2
 28/8  43/13
although [2]   15/22  30/16
always [1]   31/13

am [26]
amount [6]   6/2  6/4  6/5  6/11/25
 32/5  32/7  37/6  41/17
amounts [2]   6/13  38/2
analogy [1]   20/8
analysis [4]   13/10  24/9  26/16
 38/18
Analytica [1]   33/5
analytical [3]   8/5  23/22  26/17
analytically [2]   20/18  24/5
analyze [2]   43/17  43/19
analyzed [1]   23/15
analyzing [1]   15/25
ANGELES [4]   1/14  1/20  2/20
 3/1
ANNE [3]   2/13  4/1  8/7
announced [4]   17/2  40/23  40/24
 40/25
announcement [7]   41/1  41/2  41/21
 42/17  42/20  42/22  42/22
another [6]   11/9  11/12  25/17
 25/20  29/12  35/6
answer [1]   43/18
anticipate [2]   23/17  24/20
anticipating [1]   40/17
any [13]   6/5  6/5  7/15  8/10
 20/12  28/21  31/8  32/6  35/3
 36/5  36/6  36/20  41/14
anyone [2]   3/15  31/20
anything [1]   19/5
anywhere [1]   12/1
apologies [1]   3/18
appearances [3]   1/21  3/8  3/25
appears [3]   7/11  7/19  39/25
apple [1]   12/9
applies [3]   34/24  39/6  39/7
apply [1]   39/11
approximation [1]   38/22
are [71]
aren't [2]   14/9  37/17
argue [5]   4/25  17/18  18/22  37/21
 44/16
argued [2]   9/9  33/3
arguing [7]   10/4  24/19  27/22
 37/19  41/3  41/4  41/7
argument [24]
arguments [5]   8/19  30/1  32/25
 39/11  43/22
around [3]   6/16  13/3  17/3
articulated [1]   8/13
as [36]
aside [1]   4/11
ask [1]   14/7
asked [1]   26/5
aspects [1]   4/13
assessing [1]   41/7
assist [1]   4/20
associated [2]   10/25  43/8
attention [1]   32/21
August [1]   42/23
August 2020 [1]   42/23
Avenue [2]   2/10  2/19
awareness [1]   25/7
away [1]   19/10

back [7]   14/13  19/8  30/11  32/12
 33/9  38/10  38/13
bad [1]   36/17
ban [6]   23/11  31/24  32/6  32/6
 35/17  40/24
banned [6]   22/9  23/3  23/5  29/2
 31/22  36/17
basis [1]   14/6
be [66]
because [27]
been [18]   4/22  17/1  20/1  20/12
 23/8  23/24  30/17  31/10  31/22
 37/4  37/10  37/11  38/6  39/12

been... [4]  40/23 40/24 42/23 44/5
before [7]  4/22 11/15 20/13 21/17 41/9 42/24 44/15
beforehand [1]  24/12
begin [1]  7/17
behalf [6]  3/10 3/13 4/2 4/5 4/8 8/8
behind [1]  42/8
being [5]  19/2 23/5 23/11 41/17 43/9
believe [1]  13/12
below [1]  17/8
best [6]  4/24 7/25 20/17 24/25 40/16 44/13
better [1]  30/1
beyond [1]  6/10
bird [1]  14/1
bit [1]  10/12
blatantly [2]  23/18 36/18
blog [2]  22/14 42/14
blogger [39]
blogger's [4]  11/21 18/9 23/20 37/24
BOCKIUS [2]  2/18 4/5
both [3]  16/1 20/17 44/4
bottom [1]  39/10
brand [6]  11/1 25/7 38/5 40/5 40/8 41/17
breach [5]  33/5 33/16 34/1 34/10 34/16
break [1]  25/2
briefing [1]  41/4
bring [2]  28/16 32/12
broad [1]  7/12
Broadway [1]  2/5
brought [1]  26/15
built [1]  25/7
burden [1]  24/20
business [13]  6/15 6/21 9/22 10/13 25/10 32/9 33/7 35/2 35/3 36/6 40/6 40/11 40/18
buy [1]  19/14
buying [1]  32/2

CA [2]  2/15 2/20
CALIFORNIA [4]  1/2 1/14 1/20 3/1
call [2]  11/18 41/18
called [2]  15/23 28/20
Calling [1]  3/6
Cambridge [1]  33/5
came [3]  11/18 26/22 43/3
can [26]
can't [1]  43/2
cancerous [3]  5/17 5/23 17/14
cannot [1]  7/5
captures [1]  43/9
carcinogen [1]  31/13
careful [1]  32/17
carefully [1]  8/24
cart [1]  12/9
case [26]
cases [4]  4/23 5/2 5/5 14/2
causation [3]  36/12 37/2 37/20
cause [4]  18/6 21/7 29/16 35/19
caused [3]  7/15 19/13 37/12
Center [1]  2/14
CENTRAL [1]  1/2
certain [6]  4/13 5/20 7/4 17/6 32/1 35/9
certainly [2]  7/21 42/24
CERTIFICATE [1]  44/20
certify [1]  45/4
cetera [1]  6/23
chance [2]  25/23 25/24

change [4]  11/2 17/1 20/6 20/11 21/1 21/22 35/9
changes [2]  21/22 35/9
chatter [2]  41/11 41/13
choose [1]  5/18
chose [1]  20/25
Circuit [5]  15/11 15/21 33/22 34/6 41/1
Circuit's [1]  33/21
circular [1]  42/16
circumstance [1]  24/11
circumstances [1]  19/17
citation [2]  27/4 27/5
cite [1]  27/3
cited [1]  15/22
claim [7]  14/18 15/2 15/24 16/5 16/6 24/15 24/23
claims [1]  16/2
clauses [1]  26/7
clean [4]  19/19 31/21 38/8 41/17
clear [4]  9/2 19/15 25/2 41/4
Code [1]  45/5
collate [1]  10/5
combined [1]  32/2
come [3]  9/3 14/8 18/17
comes [1]  24/22
coming [1]  31/13
commentary [1]  40/9
comments [1]  38/13
commonplace [1]  31/18
companies [1]  37/9
company [50]
company's [6]  9/5 13/9 20/9 28/22 29/5 43/14
complaint [10]  9/8 9/11 9/17 17/5 20/12 22/22 25/8 25/13 39/19 40/1
complaints [2]  21/24 41/12
complete [4]  5/7 16/24 21/2 30/21
completely [2]  23/13 32/13
compliance [2]  9/18 12/6
complied [3]  10/7 12/5 18/2
comply [2]  6/9 7/5
complying [3]  10/23 20/6 20/11
component [1]  5/15
concentration [1]  17/7
concern [1]  37/8
concluded [1]  44/18
conclusion [1]  42/13
concrete [1]  40/14
Conference [1]  45/9
conformance [1]  45/8
confronting [1]  5/1
Congress [2]  10/21 28/5
connection [1]  25/16
consequences [1]  36/8
consumer [5]  5/25 13/11 17/11 31/9 32/2
consumers [2]  37/25 38/5
consuming [1]  12/7
contain [4]  6/12 12/14 36/16 38/3
contained [3]  14/20 15/7 31/22
contemplate [1]  31/9
contend [1]  12/25
contending [1]  12/4
context [2]  8/20 41/5
continue [1]  11/10
contract [1]  28/1
control [1]  37/23
controlling [4]  5/5 32/14 32/16 32/19
convincing [1]  36/23
Corp [1]  27/6
corporation [1]  21/19
correct [14]  9/1 9/1 10/9 16/19 18/13 18/20 20/23 21/3 23/1 38/18 38/18 41/3 42/18 45/5
corrected [1]  37/23
correcting [1]  43/14

couched [1]  5/11
could [38]
couldn't [1]  6/5
counsel [4]  2/1 3/8 38/1 40/12
court [11]  1/1 1/19 3/16 3/16 5/1 11/15 26/21 27/11 27/14 27/25 29/22
covered [1]  44/4
creates [1]  28/8
critical [1]  43/25
critically [1]  24/24
criticizing [1]  3/14
crop [1]  41/16
CRR [1]  45/12
CSR [2]  1/19 45/12
customer [1]  21/24
cut [1]  16/4
CV [1]  1/8
CV22 [1]  3/6
CV22-8395-SVW [1]  3/6

damage [1]  37/23
dangerous [1]  38/2
data [6]  10/18 21/17 21/20 33/5 33/16 34/10
date [2]  6/10 45/10
day [1]  23/4
deal [3]  14/2 14/3 26/18
dealing [1]  15/22
dealt [3]  11/7 15/23 27/19
decided [1]  38/14
decision [5]  26/21 32/12 32/13 32/24 33/21
deemed [3]  31/7 36/1 38/7
defendant [4]  1/9 2/8 4/9 6/9
defendants [7]  2/12 2/17 4/3 4/6 8/20 33/8 34/17
defense [3]  37/25 38/10 41/6
depend [1]  5/24
dependent [4]  12/18 18/5 25/6 40/8
describe [1]  33/15
described [2]  5/8 5/16
describing [1]  9/19
detected [1]  39/13
development [1]  41/14
did [32]
didn't [15]  3/19 6/8 8/4 16/14 17/20 19/13 31/2 31/24 32/16 35/3 36/5 36/6 38/22 42/9 43/15
different [10]  3/24 7/21 14/4 15/13 16/5 23/21 26/5 26/6 26/9 28/10
differently [1]  9/2
difficult [4]  4/14 14/5 29/24 29/24
difficulty [1]  14/7
direct [2]  5/2 34/7
disclose [15]  8/4 8/10 16/23 17/19 20/2 20/4 23/24 24/1 25/5 26/12 28/15 28/20 39/14 41/8 43/20
disclosed [8]  12/20 15/16 19/7 24/13 25/9 26/12 39/18 39/20
disclosure [15]  6/14 9/15 9/21 9/25 10/13 11/12 18/16 21/22 25/4 29/13 32/10 33/10 33/16 40/4 44/2
disclosures [5]  5/6 5/11 12/17 25/16 25/19
discontinuation [2]  7/4 36/5
discussed [2]  12/3 22/6
discussion [2]  29/13 30/8
dissemination [2]  25/9 40/4
distinctions [1]  7/14
distinguishable [1]  5/5
distinguished [1]  27/25
DISTRICT [3]  1/1 1/2 1/4

DIVISION [1]  1/2
do [22]  8/23 9/4 9/12 9/13 11/17 12/25 16/2 19/13 19/21 22/14 23/12 24/25 28/11 28/18 30/2 31/17 32/24 35/15 35/16 35/24 35/25 37/21
document [2]  15/19 15/20
documents [5]  20/25 24/17 24/25 30/15 40/15
does [15]  9/14 14/8 14/8 19/16 23/25 24/1 27/3 27/8 27/14 33/22 35/18 35/20 36/22 41/2 41/18
doesn't [5]  10/2 29/15 30/14 36/9 43/24
doing [1]  43/3
don't [13]  8/25 15/1 18/23 25/2 28/13 28/23 34/8 34/12 37/14 41/12 41/12 41/13 42/9
doubts [2]  17/22 41/25
down [4]  9/24 30/4 30/5 30/6
drop [2]  36/12 37/13
dropped [1]  22/4
DUGAN [2]  2/9 4/8
duty [2]  8/10 28/14

earlier [2]  26/22 40/24
economic [1]  7/15
edict [2]  6/6 6/7
effect [5]  5/17 5/21 11/8 17/14 36/6
effects [4]  10/13 18/15 29/16 30/12
effort [1]  38/15
eight [2]  11/15 22/2
either [4]  8/14 14/19 15/6 27/16
elements [2]  14/9 14/9
else [1]  37/21
Embarcadero [1]  2/14
emerging [1]  41/11
endless [1]  31/14
ensuing [1]  34/3
entitled [1]  45/7
entrepreneur [1]  37/18
environmental [2]  19/1 20/7
especially [1]  21/5
essence [1]  43/10
essentially [2]  23/17 24/15
et [3]  1/9 3/7 6/23
EU [25]
Europe [1]  41/22
European [1]  12/14
even [21]  5/22 6/12 11/21 12/4 12/5 12/5 12/17 18/2 18/3 18/5 18/8 18/11 31/24 33/5 34/3 40/22 40/24 41/20 42/14 42/24 43/13
event [3]  5/13 21/15 24/10
events [2]  43/5 43/24
ever [1]  11/14
every [1]  25/3
everything [2]  4/18 37/21
evidenced [1]  18/8
exact [4]  33/8 33/19 34/12 34/17
exactly [2]  18/10 27/21
examination [2]  31/12 44/11
example [2]  26/6 26/13
Exchange [1]  27/14
existence [1]  21/11
existent [1]  10/6
expand [1]  10/12
expected [3]  23/24 24/1 29/5
explain [2]  20/22 43/2
explained [3]  20/22 33/22 43/15
explains [1]  25/13
exposed [1]  21/20

exposure [3]  10/18 17/4 21/16
extensively [1]  17/5
external [1]  12/14
extreme [1]  18/22

fabric [1]  37/19
face [1]  5/7
Facebook [20]  5/3 7/13 7/21 7/23 8/9 10/5 10/17 13/14 19/15 21/9 21/14 32/12 32/24 33/1 33/12 33/14 33/15 33/25 34/5 36/7
fact [27]
factor [2]  9/15 10/12
factors [4]  29/14 30/9 32/15 39/8
facts [4]  19/17 24/6 26/18 26/19
fail [2]  16/23 26/11
fails [1]  25/21
failure [1]  28/9
false [5]  15/14 23/18 23/21 36/13 36/18
falsely [1]  22/8
FARR [2]  2/9 4/8
farther [2]  40/20 42/25
fault [1]  19/12
FDA [2]  6/7 12/14
February [2]  22/20 43/1
February 2022 [1]  43/1
February 27th [1]  22/20
federal [1]  3/15
fertility [2]  23/12 31/23
few [3]  26/4 26/22 44/12
figure [1]  44/12
filed [1]  41/13
find [2]  4/14 23/2
findings [2]  40/23 41/10
finds [1]  10/21
first [5]  4/10 15/1 23/1 29/22 38/21
fit [2]  24/1 26/17
fits [2]  24/3 40/21
flatly [1]  22/10
Floor [1]  2/19
focus [6]  8/12 9/2 13/6 17/3 19/18 21/5
focused [2]  8/21 8/21
focusing [1]  11/3
followed [1]  6/7
following [1]  36/23
forbidden [1]  6/11
force [1]  34/20
foregoing [1]  45/5
foresee [1]  13/2
forget [3]  11/16 18/10 37/20
format [1]  45/8
formulate [1]  18/24
forth [4]  11/24 12/12 32/8 38/14
forward [3]  22/3 22/14 24/22
found [4]  12/7 29/9 37/5 41/23
framework [2]  23/22 26/17
Francisco [1]  2/15
fright [1]  13/16
fruition [1]  9/3
fulfilled [1]  44/10
Fund [1]  4/2
further [3]  18/22 25/24 41/20
future [4]  35/15 35/15 35/23 35/24

GALLAGHER [2]  2/9 4/8
general [2]  8/10 34/10
get [10]  4/23 12/1 14/13 20/16 24/7 26/19 32/3 34/22 38/10 38/19
getting [4]  19/8 26/18 30/11 33/9
give [5]  3/24 22/16 25/22 25/24

44/11
given [1]  26/24
giving [1]  4/24
glad [1]  26/15
go [6]  24/8 27/8 32/9 32/22 38/20 40/20
goes [1]  6/24
going [10]  10/20 10/22 10/24 12/1 23/2 23/18 24/21 36/17 42/10 44/3
good [4]  3/9 4/4 4/7 44/15
Google [5]  23/7 42/6 42/10 42/15 42/15
Googling [1]  42/3
got [1]  42/16
government [3]  30/24 31/5 35/25
Grand [1]  2/19
granular [1]  25/3
gravity [1]  7/22
GRAY [2]  2/13 4/2
ground [1]  25/10
grow [1]  40/8
guess [3]  16/6 29/18 41/20
guilty [1]  29/18

habit [1]  29/18
habits [1]  29/19
hacking [2]  7/24 13/16
had [29]
half [2]  27/17 28/7
handy [1]  22/14
happen [15]  5/12 5/14 7/9 7/10 7/24 7/25 8/3 8/4 10/2 12/21 12/21 18/8 31/17 31/17 37/20
happened [16]  7/22 10/6 10/18 11/6 11/7 11/14 16/25 21/16 21/17 23/21 33/6 36/11 37/15 39/17 42/8 43/23
happening [1]  20/15
happens [3]  9/12 9/13 9/22
hard [1]  29/22
harm [8]  25/10 33/7 33/23 34/3 36/8 36/11 40/5 40/10
harmful [1]  32/4
has [16]  9/12 10/18 10/24 19/21 21/16 21/17 23/8 27/16 27/22 29/2 31/10 32/7 35/25 37/1 37/19 40/12
hasn't [3]  3/15 20/12 44/14
have [91]
haven't [2]  4/11 4/12
having [8]  5/17 8/5 19/18 21/10 21/11 22/9 23/12 39/4
he [4]  41/25 42/2 42/15 42/19
head [1]  34/9
health [1]  31/23
healthy [1]  12/12
hear [5]  8/6 21/13 26/16 38/9 44/15
heard [1]  43/22
hearing [2]  4/12 38/15
heart [1]  7/11
held [1]  45/6
help [1]  30/1
helped [1]  44/13
helpful [2]  4/16 44/5
her [1]  29/24
here [36]
hereby [1]  45/4
hey [1]  36/14
high [1]  6/17
higher [1]  18/23
his [1]  42/14
Hold [1]  9/24
Holdings [2]  1/9 3/7
home [1]  28/17
Honor [42]
HONORABLE [1]  1/3

how [26]
However [1]   7/13
hypothetical [10]   5/19 5/25 10/1
 30/24 31/16 34/1 34/19 34/24
 35/15 35/23
hypothetically [2]   19/5 31/2

I'm [6]   3/21 5/18 14/9 28/2
 29/20 39/4
I've [1]   12/3
idea [2]   11/14 29/25
image [8]   12/15 12/16 12/19
 18/5 18/19 19/3 19/4 19/6
imagewise [1]   19/2
immediately [2]   37/23 37/24
impact [12]   10/19 10/25 21/7
 21/8 22/2 27/23 28/22 29/5
 35/3 39/7 39/12 41/11
impacts [6]   6/20 9/21 21/24 22/1
 34/18 35/2
import [2]   6/23 22/7
important [1]   7/14
imposed [1]   28/5
impossible [1]   24/20
impression [1]   42/4
inaccurate [2]   24/23 40/10
Inc [1]   1/9
incident [1]   21/18
include [3]   12/22 16/17 31/25
included [3]   6/25 7/2 20/20
including [2]   6/21 40/9
incorporated [2]   3/7 17/4
incorrect [1]   22/10
independent [1]   25/17
indicates [1]   8/9
indication [1]   31/20
individual [1]   17/6
industry [1]   20/9
industry-wide [1]   20/9
inevitable [1]   11/1
infertility [3]   23/9 42/1 42/2
information [14]   8/10 15/13 15/15
 16/15 16/18 16/23 19/22 25/9
 25/19 28/15 38/18 40/5 41/2
 41/21
information's [2]   25/11 40/6
Infrastructure [1]   27/6
ingredient [11]   5/17 6/22 12/8
 12/14 18/3 23/7 29/2 31/7
 31/22 37/9 38/6
ingredients [1]   36/16
initially [1]   4/14
interest [2]   8/11 19/17
interested [1]   26/2
internal [2]   10/21 13/15
interpretation [1]   6/18
interrupting [1]   29/23
interruption [1]   10/14
introduce [1]   11/10
investigation [5]   5/14 5/16 11/19
 17/17 17/21
investing [1]   36/14
investment [2]   39/8 39/15
investor [9]   5/12 7/8 13/11 13/19
 19/9 19/13 19/16 31/9 31/15
investors [5]   15/16 25/6 25/15
 37/25 41/6
IPO [23]
IRINA [2]   2/4 3/9
irreparably [1]   12/16
is [183]
isn't [9]   8/9 18/15 19/14 19/16
 21/9 31/8 38/15 41/10 41/14
issue [10]   13/19 13/22 15/14
 19/1 20/1 29/1 29/7 32/19
 38/14 43/10

issuers [1]   28/20
issues [1]   26/4
it [148]
it's [4]   9/16 31/16 39/1 39/2
item [8]   3/6 26/13 26/14 26/16
 28/20 29/10 29/12 30/8
items [1]   38/21
its [13]   12/11 12/16 12/18 15/24
 20/19 22/9 23/19 24/25 25/15
 28/6 31/23 36/1 40/18
itself [5]   12/11 19/19 32/5 36/15
 42/24

JAMES [2]   2/9 4/7
Johnson [1]   4/1
JUDGE [1]   1/4
Judicial [1]   45/9
JULY [3]   1/15 3/1 45/10
just [36]

KATIE [2]   1/19 45/12
keep [3]   14/4 14/13 19/8
KELLER [3]   2/4 3/10 3/12
key [3]   9/7 26/8 29/2
kind [2]   18/8 28/11
kinds [1]   31/17
knew [6]   7/24 11/6 11/23 11/25
 18/2 41/6
know [15]   7/9 7/24 8/1 15/1
 18/23 19/2 19/12 22/5 26/2
 28/23 36/21 37/14 37/20 42/9
 43/16
knowable [4]   11/4 13/23 13/25
 43/25
knowing [1]   19/17
known [3]   11/4 12/13 39/6

LABATON [3]   2/4 3/10 3/12
lack [1]   39/12
language [7]   7/12 10/2 32/17
 33/19 34/5 34/9 34/12
last [3]   4/12 14/25 22/6
later [4]   11/16 22/3 22/25 23/24
law [5]   10/23 21/22 25/1 33/22
 41/1
lawfully [1]   10/7
laws [7]   6/15 6/17 6/20 9/18
 35/1 35/2 35/9
lawsuit [1]   41/13
lay [1]   7/18
lead [2]   3/11 3/13
least [3]   7/12 41/24 44/15
legal [1]   43/4
Leslie [2]   1/6 3/6
less [4]   10/25 14/7 18/3 37/7
let [12]   4/10 7/17 8/6 8/16 11/9
 14/7 14/13 25/22 27/5 34/22
 38/9 40/25
let's [3]   17/9 18/23 37/4
level [2]   5/23 6/17
LEWIS [2]   2/18 4/5
liability [5]   27/15 28/1 28/1 28/5
 28/8
liable [1]   26/10
lie [2]   27/16 35/4
lies [1]   28/7
like [4]   4/22 13/17 21/24 31/10
likelihood [1]   9/4
likely [5]   8/23 12/20 18/17 29/16
 39/7
lilial [26]
Lilien [2]   1/6 3/7
limitations [3]   6/23 6/25 7/1
limits [1]   32/6
line [1]   39/10

linked [1]   23/8
LISA [2]   2/5 9/12
literally [2]   20/14 31/25
litigation [1]   31/11
little [1]   27/12
LLP [2]   2/4 2/13
locate [1]   22/17
long [1]   11/16
look [1]   16/2
looking [3]   13/5 19/7 42/15
LOS [4]   1/14 1/20 2/20 2/22
losing [1]   14/10
loss [2]   7/16 21/24
lot [1]   43/22
LP [1]   4/9
lying [1]   36/16

Macquarie [2]   26/24 27/6
made [9]   8/20 11/13 19/21 21/4
 21/17 23/10 24/14 36/13
 42/25
magnitude [1]   34/3
make [24]
makes [1]   14/5
making [3]   17/15 18/7 38/13
many [4]   5/24 6/16 17/12 22/12
market [6]   6/19 6/19 12/11 25/15
 41/6 43/7
marketed [1]   38/7
marketing [2]   10/14 19/18
markets [1]   6/22
material [21]   8/10 8/13 14/20
 14/21 14/23 15/7 15/8 15/15
 16/8 16/8 16/10 17/24 18/1
 24/17 25/19 26/12 28/15
 29/16 34/6 36/21 39/8
materiality [5]   8/17 8/21 8/25
 15/13 16/5
materialize [1]   36/9
materialized [4]   8/22 21/11 33/4
 33/23
materially [3]   16/1 21/1 33/24
matter [3]   12/4 12/20 45/7
may [22]   3/23 4/10 7/19 8/11
 10/12 14/12 22/11 22/16
 28/21 31/4 31/5 31/7 31/17
 32/19 34/10 34/13 35/9 35/14
 35/18 36/21 41/17 44/9
maybe [7]   4/20 4/24 9/2 11/17
 14/6 16/4 20/16
me [27]
mean [15]   7/23 7/25 9/13 9/14
 14/2 14/25 16/11 17/13 18/21
 19/5 31/10 31/13 36/13 41/22
 42/7
meaningful [1]   25/4
meant [1]   3/22
media [5]   20/13 25/6 25/10 40/5
 40/8
memo [1]   10/21
memos [1]   13/15
mentioned [3]   10/6 20/7 33/13
mere [1]   9/9
microscope [1]   10/22
might [10]   9/20 19/18 21/22
 30/25 31/18 34/19 34/19 35/23
 39/14 43/5
mill [2]   12/22 13/3
millions [1]   24/22
mind [3]   14/5 14/14 19/25
minimum [2]   6/4 37/8
minor [2]   12/7 12/15
minute [3]   14/10 18/3 37/6
misconstruction [1]   23/13
misinformation [6]   25/14 37/24
 39/16 39/22 43/9 43/13
misleading [27]
misrepresented [2]   42/19 42/21

missing [1]   24/16
misstate [1]   36/22
Moab [2]   26/24 27/6
moment [2]   22/16 39/4
MONDAY [2]   1/15 3/1
month [1]   23/3
months [5]   11/16 22/3 22/25
 23/24 26/22
more [10]   3/25 4/14 6/22 11/17
 13/21 21/1 27/12 29/19 30/2
 44/11
moreover [1]   16/13
MORGAN [2]   2/18 4/5
morning [2]   3/9 42/10
most [5]   5/2 14/2 21/6 29/14
 30/8
motion [2]   8/21 41/5
MOUSSERENA [2]   2/8 4/9
moving [3]   7/17 22/12 25/23
much [4]   10/25 11/23 13/10 18/3
must [4]   14/18 15/6 15/16 16/7
my [11]   4/12 4/17 4/24 5/6 6/3
 17/22 23/16 30/13 34/9 38/16
 41/25
myself [1]   14/10

name [1]   26/23
nature [2]   40/17 43/10
necessarily [2]   10/18 21/18
necessary [4]   14/21 15/9 15/18
 16/8
need [2]   21/1 28/11
needed [3]   24/13 40/20 44/1
negative [1]   40/9
never [1]   6/9
new [4]   2/6 2/10 7/5 31/13
next [4]   3/24 9/12 9/13 23/3
nine [1]   11/15
Ninth [6]   15/11 15/21 33/20
 33/22 34/6 41/1
no [21]   1/8 3/23 7/14 9/1 10/24
 11/8 11/14 19/7 20/9 20/12
 21/8 21/25 22/1 23/17 29/3
 31/20 33/3 33/6 36/25 37/19
 45/12
none [3]   10/15 10/16 18/16
North [1]   1/20
not [62]
note [1]   30/5
notes [2]   14/16 28/21
nothing [2]   13/17 44/14
notice [1]   41/15
Notwithstanding [1]   12/6
now [8]   13/14 18/1 22/21 27/19
 28/16 33/9 34/25 37/15
nucleus [1]   30/12
number [1]   32/2
numerous [1]   6/15
NY [2]   2/6 2/10

obligation [1]   43/4
obviously [1]   38/14
occurred [3]   34/2 34/17 42/23
off [2]   16/4 34/8
offering [13]   10/8 11/17 15/19
 15/20 20/25 24/17 24/25
 29/14 30/9 30/15 34/6 40/15
 44/1
offerings [1]   14/3
Official [1]   1/19
often [1]   17/13
oh [2]   21/20 41/16
okay [7]   4/10 9/12 14/14 14/15
 27/8 28/3 44/17
Olaplex [34]

Olaplex's [4]   29/2 31/21 32/25
 36/9
omission [8]   8/22 24/12 24/17
 25/18 26/9 26/11 27/17 28/12
omissions [3]   15/17 27/15 28/5
omit [2]   16/14 19/21
omitted [6]   14/21 14/23 15/8
 16/9 17/24 18/15
once [2]   12/16 40/13
one [23]
one-tenth [2]   6/4 37/7
online [3]   40/9 41/13 43/9
only [5]   15/16 20/14 22/2 34/24
 38/2
operative [1]   15/24
order [2]   16/16 24/13
other [24]
our [26]
out [16]   7/18 10/22 12/7 23/2
 24/21 25/3 26/22 32/7 32/8
 37/5 37/9 41/10 41/23 42/6
 42/23 44/13
outright [1]   27/16
outset [1]   14/13
over [1]   42/24
overview [1]   4/25
own [2]   11/21 23/16

p.m [3]   3/2 44/7 44/7
package [1]   18/14
page [1]   45/7
PALMER [3]   2/13 4/1 8/7
paragraph [5]   9/17 22/21 25/8
 39/19 39/25
paragraph 164 [1]   9/17
paragraph 173 [2]   25/8 39/25
part [6]   14/25 16/2 18/1 24/19
 39/23 42/7
particular [3]   8/14 9/16 32/25
particularly [1]   39/15
parties [4]   5/2 20/17 44/8 44/16
Partners [2]   26/24 27/7
parts [1]   22/12
party [3]   7/17 25/24 34/11
pass [1]   18/17
Pause [1]   36/3
pay [1]   32/21
percentage [4]   5/19 5/20 5/25
 32/1
period [2]   20/13 41/9
permutation [1]   25/3
perpetrated [1]   43/9
person [1]   24/21
person's [1]   19/3
phenomenon [2]   25/12 39/16
places [1]   12/18
plaintiff [9]   1/7 2/3 3/11 3/13 8/1
 14/18 15/6 18/7 43/11
plaintiffs [14]   5/10 7/8 9/9 9/11
 11/1 12/3 12/25 21/5 24/4
 24/11 24/15 25/12 25/22
 40/19
planted [1]   42/11
play [1]   14/8
plead [1]   14/19
please [1]   3/8
point [17]   5/8 8/18 8/25 12/13
 17/1 24/11 25/12 26/21 30/13
 30/23 32/3 32/25 35/5 37/21
 42/14 42/25 44/16
pointed [3]   26/6 33/4 40/12
points [1]   12/24
policies [1]   6/16
polite [1]   29/23
poor [1]   3/23
pose [1]   40/10
poses [1]   21/19
position [5]   13/24 20/1 20/4 41/8

43/20
possible [1]   37/16
post [1]   22/7
posted [1]   22/20
posts [2]   23/7 43/1
potential [5]   5/16 17/19 39/18
 40/17 43/8
potentially [3]   17/13 39/20 43/5
precise [1]   13/21
precisely [2]   22/5 28/25
presented [2]   33/25 34/18
presenting [1]   35/22
PRESIDING [1]   1/4
price [3]   12/22 23/19 43/12
principally [1]   5/14
prior [1]   24/13
problem [1]   8/6
problematic [1]   31/7
proceedings [4]   1/13 36/3 44/18
 45/6
product [40]
products [15]   5/24 7/2 7/4 12/12
 17/6 17/12 29/3 31/11 31/21
 32/3 35/10 36/1 38/3 38/8
 42/7
profile [1]   12/10
prohibitions [1]   6/21
promise [1]   44/12
promote [1]   41/16
promoted [1]   12/11
promptness [1]   4/13
prong [1]   26/10
proper [1]   20/18
proportion [1]   12/15
proscribing [1]   28/7
prospect [4]   30/24 33/25 34/18
 35/16
prospectus [4]   6/14 15/6 16/12
 16/17
prove [1]   15/6
provide [2]   25/1 25/4
pseudoscientists [1]   31/12
public [7]   10/21 12/7 23/18
 36/14 41/2 41/21 41/22
public's [1]   19/8
pull [1]   27/6
pure [8]   12/12 19/3 19/12 26/9
 26/11 27/15 28/5 36/15
purely [3]   34/1 34/18 35/23
pursuant [1]   45/4
put [7]   4/11 9/2 11/1 13/3
 20/19 23/22 44/1
puts [3]   10/18 24/20 41/14

qualification [1]   11/23
qualify [2]   41/2 41/21
question [7]   5/13 12/2 13/18
 16/16 41/18 43/19 43/25
questions [1]   44/4
quick [1]   16/4
quote [3]   33/20 34/7 35/8
quoting [2]   9/16 28/2

raise [1]   11/9
react [1]   36/20
read [5]   22/15 26/10 31/15
 39/23 41/1
reading [4]   14/16 28/4 34/25
 34/25
real [1]   10/3
really [5]   8/12 11/3 19/25 24/19
 31/24
reargue [2]   4/17 4/18
reason [6]   4/12 10/24 19/7 25/17
 25/20 36/12
reasonable [9]   5/12 7/8 13/11

reasonable... [6]  13/11 13/19 19/13 19/16 31/9 31/15
reasonably [6]  13/23 28/21 29/4 29/8 29/16 39/7
recall [2]  7/3 36/5
recent [1]  26/21
recess [3]  44/3 44/5 44/7
recollection [1]  6/3
record [2]  31/20 36/22
referencing [1]  22/21
reformulate [7]  9/10 9/20 30/25 31/6 35/9 35/12 35/19
reformulated [3]  6/11 7/5 35/20
reformulation [8]  7/15 8/3 17/20 21/6 21/7 21/23 36/4 36/6
reformulations [1]  7/3
regarding [2]  5/14 39/21
regardless [2]  25/11 40/6
registration [1]  14/19
regulate [1]  34/20
regulation [8]  15/24 17/1 26/13 28/19 29/13 30/25 34/19 35/25
regulations [11]  6/16 6/17 6/20 7/6 8/2 9/18 17/19 31/5 35/1 35/2 45/8
regulators [1]  38/7
regulatory [7]  10/20 11/2 12/4 12/6 20/5 20/11 34/18
relate [1]  19/18
related [1]  33/16
relates [1]  32/18
release [1]  18/9
relevance [1]  22/7
relevant [4]  13/25 24/9 40/3 43/19
remember [3]  11/21 18/11 27/19
remove [1]  31/6
removed [1]  38/4
rendered [4]  27/17 28/11 30/15 34/14
report [1]  17/4
reported [1]  45/6
reporter [2]  1/19 29/23
REPORTER'S [1]  1/13
reports [1]  23/5
reputation [4]  11/1 25/8 38/6 41/19
reputational [1]  33/6
require [6]  8/2 21/23 30/25 31/5 33/23 35/9
required [9]  14/23 15/19 16/10 16/24 17/25 19/22 25/19 26/12 40/22
requirement [1]  6/4
requires [3]  28/20 29/13 30/8
researching [2]  42/1 42/2
resolved [3]  4/21 4/22 5/9
resolving [1]  4/21
respect [2]  16/6 32/14
respond [3]  6/9 25/23 26/4
response [2]  8/6 20/17
responses [3]  4/20 4/25 12/23
result [2]  21/23 36/5
resulting [2]  7/1 7/3
results [1]  11/2
retrotoxic [1]  22/10
reveal [1]  24/16
revealed [1]  24/12
revenues [3]  28/22 29/6 29/17
review [1]  5/6
Rico [1]  15/23
right [6]  3/24 5/18 8/16 22/11 25/22 42/16
risk [30]
risks [7]  5/8 10/1 10/3 10/3 31/23 34/10 43/8

risky [4]  29/15 30/10 39/9 39/15
RISSIER [2]  2/18 4/15
ROPES [2]  2/1 2/2
RPR [1]  45/12
Rule [3]  14/1 15/24 26/16
rumor [2]  12/22 13/3
run [1]  4/16

---

safe [1]  17/6
said [25]
sales [5]  10/14 21/24 28/22 29/5 29/17
same [8]  16/1 23/4 30/12 33/8 33/17 34/17 34/17 39/11
San [1]  2/15
say [27]
saying [14]  9/21 10/21 11/7 13/8 18/12 19/6 20/3 21/13 22/13 23/20 35/18 37/1 37/12 40/7
says [15]  10/2 15/2 15/12 15/22 16/7 16/8 17/5 21/20 23/2 23/5 34/25 35/8 36/8 40/4 41/25
scenes [1]  42/8
Scientists [1]  31/12
scrutiny [1]  10/20
search [1]  23/7
searching [1]  23/8
seated [2]  4/10 44/9
SEC [2]  28/19 29/12
second [6]  9/24 13/5 14/11 20/3 23/4 36/2
section [34]
Securities [1]  28/6
see [1]  34/15
seed [1]  42/11
seem [1]  30/20
seems [3]  11/14 14/25 18/1
selling [1]  6/21
senior [1]  39/4
sentence [1]  40/3
September [2]  11/5 22/24
set [3]  26/1 43/5 43/23
seven [2]  22/25 23/24
several [1]  6/20
severe [2]  35/1 35/3
shampoo [4]  6/10 12/11 17/10 36/15
shareholders [1]  8/11
She [1]  29/23
short [3]  43/18 44/3 44/5
should [5]  4/21 4/21 14/12 36/20 41/4
show [1]  13/15
side [1]  3/25
sides [1]  44/5
sign [1]  41/10
signal [2]  3/23 3/24
signaling [2]  3/14 3/19
significance [1]  18/25
significant [4]  9/4 10/17 29/14 30/9
significantly [4]  6/19 8/23 17/7 18/17
similar [1]  34/9
since [3]  4/11 25/23 42/23
sitting [1]  21/10
situation [4]  19/24 21/10 21/21 41/15
slow [3]  9/24 30/3 33/2
Slower [1]  28/3
slowly [5]  27/12 29/19 30/2 30/5 39/23
so [61]
social [5]  20/13 25/6 25/10 40/5 40/8
sold [2]  6/6 6/9
some [34]

somebody [3]  18/23 42/6 42/11
somehow [4]  40/21 41/19 42/4 42/11
someone [3]  18/25 23/18 41/16
something [12]  8/17 11/16 14/7 14/12 18/24 23/12 23/23 31/8 32/21 42/1 42/8 44/14
sometimes [1]  4/22
somewhat [1]  5/18
sorry [2]  3/21 29/21
sort [12]  4/24 10/25 11/22 14/9 20/12 25/3 25/18 26/1 41/5 41/10 41/14 42/16
sought [1]  12/10
source [2]  28/14 28/19
South [1]  2/19
speak [6]  3/22 25/24 27/12 28/9 29/19 30/2
specific [2]  19/20 20/8
specifically [1]  27/25
specify [1]  25/3
speculate [5]  11/25 18/18 40/22 42/12 43/5
speculating [1]  37/15
speculation [2]  37/18 40/21
speculative [4]  29/15 30/9 39/8 39/15
spot [1]  32/14
Spring [1]  1/20
stand [1]  3/16
standard [5]  15/25 19/16 19/20 20/24 20/24
standing [1]  43/2
standpoint [1]  19/8
start [2]  4/24 38/21
started [1]  12/22
state [10]  3/8 14/18 14/21 14/23 15/2 15/8 16/9 16/25 17/24 19/25
stated [5]  14/24 15/20 16/10 17/25 24/12
statement [21]  14/19 14/20 15/7 15/14 15/25 17/16 21/5 23/18 23/20 28/11 30/14 33/24 34/2 35/6 36/10 36/13 36/18 37/4 37/11 37/12 43/14
statements [18]  9/5 14/22 15/9 15/18 16/9 16/11 16/22 16/24 17/17 17/21 19/21 20/24 21/17 23/10 24/14 30/17 33/7 34/14
STATES [5]  1/1 1/4 6/8 45/5 45/9
stating [2]  10/1 17/23
statute [1]  15/1
statutory [1]  26/13
stay [2]  19/10 21/12
stenographically [1]  45/6
step [1]  40/20
STEPHEN [1]  1/3
still [5]  10/6 11/13 21/19 34/4 38/5
stock [7]  19/14 22/3 23/19 36/12 36/24 37/12 43/12
stop [2]  8/16 13/6
stopped [1]  5/8
strange [3]  11/15 14/1 15/1
Street [1]  1/20
STREJLAU [2]  2/5 3/12
stuck [1]  4/23
stuff [1]  38/4
styled [1]  8/1
subject [6]  6/15 6/18 8/2 28/9 31/10 31/12
subjectivity [1]  6/18
submit [4]  26/25 32/24 37/22 39/11
substances [1]  6/25
subsume [1]  14/25

**such [3]**  30/16  31/6  34/2
**SUCHAROW [3]**  2/4  3/10  3/13
**sufficient [1]**  7/14
**sufficiently [1]**  12/25
**suggesting [1]**  40/19
**Suite [1]**  2/14
**summarized [2]**  13/4  17/3
**supplemental [1]**  26/25
**supposed [1]**  3/16
**supposedly [2]**  24/18  31/21
**supreme [4]**  26/21  27/10  27/13  27/25
**sure [15]**  5/1  11/10  22/12  26/20  27/2  27/13  28/18  30/3  32/11  32/23  37/22  38/12  38/17  43/19  44/4
**surfaced [2]**  40/13  43/23
**suspected [1]**  31/21
**SVW [2]**  1/8  3/6

**table [1]**  26/1
**taint [1]**  12/15
**take [6]**  18/22  22/18  30/5  37/9  44/3  44/5
**taken [1]**  32/7
**talk [2]**  17/17  17/20
**talked [4]**  17/9  18/4  18/16  38/1
**talking [6]**  13/8  24/5  30/17  34/7  37/5  43/16
**talks [3]**  10/13  12/18  21/22
**tanked [1]**  12/22
**tell [4]**  4/11  27/1  28/16  43/17
**telling [1]**  36/14
**tension [3]**  7/19  7/19  7/20
**tenth [2]**  6/4  37/7
**term [2]**  40/20  42/3
**terms [11]**  7/18  7/22  12/9  13/2  28/7  39/11  39/14  39/18  40/12  40/17  41/7
**than [6]**  4/14  7/21  16/6  18/4  23/21  37/7
**Thank [6]**  8/7  25/25  26/3  38/12  44/6  44/17
**that [322]**
**their [6]**  5/7  33/15  34/6  35/3  36/21  44/16
**them [5]**  16/17  21/1  22/13  30/21  30/23
**themselves [2]**  19/2  38/8
**then [13]**  4/25  5/22  6/24  15/1  15/11  15/21  17/24  20/20  23/4  25/23  26/18  35/18  38/10
**there [65]**
**therein [5]**  14/24  15/9  16/9  16/10  17/25
**these [17]**  5/12  6/17  6/19  10/1  10/2  13/15  17/12  21/14  24/15  29/19  31/11  31/17  35/1  38/13  40/23  41/9  42/7
**they [51]**
**THIBODEAUX [2]**  1/19  45/12
**thin [1]**  42/6
**thing [7]**  14/2  16/5  20/14  31/17  33/17  34/17  35/23
**things [7]**  4/18  5/12  5/13  18/4  20/21  21/14  37/25
**think [12]**  5/9  5/12  8/25  10/24  12/3  12/17  13/20  13/22  20/18  30/11  31/16  40/20
**thinking [5]**  4/19  13/9  13/10  13/14  19/11
**third [1]**  26/10
**this [75]**
**those [10]**  5/4  15/18  17/21  18/4  18/16  21/23  23/11  32/14  38/23  43/1

**though [6]**  18/2  18/3  33/5  40/23  40/24  41/20
**thought [10]**  2/22  4/15  4/16  11/13  12/13  13/19  14/1  20/16  21/12  44/15
**thoughts [3]**  4/17  14/14  44/11
**threat [1]**  40/17
**three [2]**  14/23  26/6
**through [1]**  42/16
**thrust [1]**  9/11
**Thus [1]**  15/15
**tie [1]**  18/14
**ties [1]**  7/12
**TikTok [8]**  22/7  22/8  22/19  24/4  24/16  24/22  39/17  40/13
**time [22]**  3/24  9/5  10/8  11/4  12/7  13/2  13/23  13/24  16/25  17/1  18/17  20/2  21/8  22/18  33/7  35/13  36/9  39/13  40/22  42/25  43/21  44/1
**Title [1]**  45/4
**today [4]**  4/22  18/18  43/2  44/11
**together [1]**  18/14
**told [2]**  3/15  37/24
**too [3]**  12/23  16/4  29/19
**took [1]**  32/7
**top [1]**  34/8
**topic [3]**  11/9  11/11  25/1
**total [1]**  5/21
**totally [1]**  12/9
**touch [1]**  38/22
**trace [4]**  6/12  38/1  41/17  42/6
**transcript [3]**  1/13  45/6  45/7
**translating [1]**  23/16
**transpire [1]**  43/6
**transpose [1]**  7/25
**trend [2]**  28/24  39/6
**trends [1]**  28/21
**tried [1]**  7/18
**true [5]**  13/13  16/12  16/13  37/11  45/5
**trust [1]**  38/5
**truth [3]**  24/16  27/17  41/5
**truthful [3]**  5/7  37/3  43/15
**truthfully [1]**  37/3
**truths [1]**  28/8
**try [2]**  18/14  29/20
**trying [7]**  5/18  10/4  18/24  23/22  24/7  29/25  38/17
**two [11]**  6/6  12/24  14/21  15/1  15/8  20/13  22/19  37/6  37/8  40/23  41/9
**two-year [2]**  20/13  41/9
**type [1]**  21/18

**U.S [2]**  1/19  27/7
**UK [2]**  23/3  23/6
**ultimate [1]**  32/19
**uncertainties [1]**  28/21
**uncertainty [6]**  18/11  28/24  28/25  29/4  29/8  39/6
**under [15]**  10/22  14/18  15/2  15/5  15/17  23/15  24/10  24/18  25/1  26/11  26/13  27/14  28/13  28/14  43/4
**understand [3]**  9/8  13/9  24/6
**understanding [2]**  7/7  30/1
**underwriter [2]**  2/17  4/6
**undisputed [1]**  6/2
**unfavorable [1]**  29/16
**unfavorably [2]**  28/22  29/5
**unfold [1]**  13/2
**unfolded [2]**  40/13  43/24
**UNITED [5]**  1/1  1/4  6/8  45/5  45/9
**unknown [2]**  32/2  34/4
**unlike [2]**  10/16  21/14
**unrelated [1]**  19/1

**unsafe [5]**  20/10  31/7  31/22  36/1
**unspecified [1]**  17/11
**untrue [4]**  14/20  15/7  16/12  17/16
**up [8]**  3/17  3/22  18/23  26/15  27/6  31/13  41/16  42/9
**upon [2]**  5/24  11/18
**upset [2]**  12/9  18/6
**us [5]**  12/1  31/5  34/20  35/9  35/19
**usage [1]**  5/22
**use [3]**  8/24  17/12  34/5
**used [5]**  5/25  12/12  34/21  38/2  38/6
**user [1]**  21/16
**users [1]**  24/22
**using [1]**  34/21
**usual [1]**  4/13
**usually [2]**  25/6  40/8

**vague [1]**  17/13
**vary [1]**  6/19
**VASILCHENKO [2]**  2/4  3/10
**verified [1]**  42/15
**versus [4]**  3/7  26/24  27/6  28/1
**very [11]**  5/7  7/20  11/14  12/7  12/15  17/13  19/3  28/10  30/20  32/25  43/10
**via [2]**  25/10  40/5
**video [2]**  23/1  23/4
**videos [4]**  22/19  23/11  24/4  24/16
**view [3]**  19/2  32/18  38/16
**violations [1]**  14/3
**VS [1]**  1/8

**Wait [1]**  13/5
**wake [1]**  42/9
**want [11]**  5/4  7/8  11/10  19/10  21/13  22/12  26/16  26/20  38/11  38/21  44/4
**wanted [2]**  32/20  44/10
**warned [5]**  25/6  25/15  34/9  36/8  43/7
**warning [5]**  5/22  25/1  30/16  30/23  40/14
**warnings [1]**  30/23
**WARREN [2]**  2/18  4/4
**was [96]**
**wasn't [1]**  18/12
**way [12]**  4/24  5/2  5/11  5/19  6/14  20/3  20/16  36/23  37/18  38/16  42/16  44/13
**ways [1]**  26/8
**we [40]**
**we're [1]**  25/6
**we've [1]**  30/17
**weave [1]**  32/9
**weeks [1]**  44/12
**well [11]**  12/5  16/7  17/25  19/7  30/11  31/16  31/19  33/1  33/9  35/11  37/17
**went [3]**  22/3  22/8  22/13
**were [18]**  5/6  5/7  5/11  9/16  12/12  13/15  16/12  16/12  16/13  17/11  18/17  21/17  21/25  22/1  22/20  30/23  32/16  34/21
**weren't [1]**  20/4
**WESTERN [1]**  1/2
**what [84]**
**whatever [1]**  18/4
**when [15]**  3/15  5/13  11/12  22/3  22/13  22/23  23/2  25/5  34/1  35/16  35/19  35/24  38/2  38/13

when... [1]  43/23
where [17]  7/19 8/5 10/17 14/14
  17/25 19/24 20/14 21/10
  21/21 26/10 28/11 32/3 39/23
  41/9 41/15 42/25 43/14
whether [11]  8/13 8/14 8/22 8/22
  9/3 15/14 15/25 16/16 20/24
  29/7 32/18
which [13]  4/21 15/21 15/23
  17/16 23/8 28/13 28/19 28/20
  32/13 32/18 36/15 42/6 43/9
while [2]  11/9 38/7
who [1]  34/11
Wholesale [1]  15/23
why [13]  5/4 20/4 25/17 25/20
  28/13 30/18 30/19 31/15 32/7
  32/20 35/18 42/5 42/5
wide [1]  20/9
WILKIE [1]  2/9
will [8]  3/24 4/20 25/24 29/20
  30/3 33/20 38/10 44/12
Willkie [1]  4/8
WILSON [1]  1/3
wish [1]  26/19
within [3]  6/6 37/8 44/12
without [3]  3/14 19/12 26/18
word [3]  5/18 8/24 34/24
wordage [1]  34/23
words [15]  11/22 12/21 13/13
  14/1 14/6 17/18 18/21 19/10
  19/11 20/19 23/15 23/16
  27/15 34/21 41/24
world [2]  6/16 37/17
would [36]
wouldn't [5]  5/23 20/21 31/15
  38/15 41/21
Write [1]  30/5
Writing [1]  30/6

year [3]  20/13 41/9 42/24
years [6]  6/6 31/11 31/11 37/6
  37/8 40/23
yes [15]  4/1 13/7 17/19 22/16
  22/18 26/3 30/7 30/13 30/20
  33/11 33/14 35/7 35/13 40/2
  42/21
yet [1]  36/9
York [2]  2/6 2/10
you [132]
your [58]
yourself [1]  41/16