# EXHIBIT 1

Exhibit 1
6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE LILIEN, Individually and on Behalf of all Others Similarly Situated,<br><br>      Plaintiff<br><br>  v.<br><br>OLAPLEX HOLDINGS, INC., et al.,<br><br>      Defendants | Case No. 2:22-cv-08395-SVW-SK |

## Expert Report of Jack R. Wiener

## June 20, 2025

Exhibit 1

7

**TABLE OF CONTENTS**

I.      Assignment..................................................................................................... 1

II.     Qualifications................................................................................................. 3

III.    Summary of Opinions.................................................................................... 6

IV.     DTC History and Background........................................................................ 7

V.      DTC's Intermediated System of Securities Holding..................................... 12

        A.      Overview of the DTC System.............................................................. 12

        B.      Way to Trace Shares ........................................................................... 25

VI.     Background on Olaplex's IPO and Common Stock Offerings...................... 26

VII.    Traceability of Olaplex Stock ...................................................................... 31

        A.      Data and Methodology........................................................................ 31

        B.      Analysis............................................................................................... 35

                1.      Olaplex Authorization Letters.................................................. 35

                2.      Olaplex's November 2021 Stock Awards................................. 37

                3.      AST Lists of Registered Owners and Selling Stockholders and
                        AST Records of Shares Registered in the Name of Cede & Co. ............. 38

                4.      DTC Participant Position Reports............................................. 42

                5.      Bria Declaration ...................................................................... 44

VIII.   Conclusion ................................................................................................... 44

i

Exhibit 1
8

## I.    ASSIGNMENT

1.    I have been retained in the above-captioned action (the "Action") by Ropes & Gray LLP ("Ropes & Gray" or "Counsel"), Counsel for Olaplex Holdings, Inc. ("Olaplex") and JuE Wong, Eric Tiziani, Tiffany Walden, Christine Dagousset, Tricia Glynn, Deirdre Findlay, Janet Gurwitch, Martha Morfitt, David Mussafer, Emily White, Michael White, and Paula Zusi (the "Individual Defendants," and together with Olaplex, the "Defendants"), to provide expert services.[1] I have been asked to assess whether Arkansas Teacher Retirement System ("Lead Plaintiff") or any other alleged beneficial owner in the Action can show that they can trace any specific shares of Olaplex's common stock CUSIP number 679369108 ("Olaplex Stock") held at The Depository Trust Company ("DTC") or DTC's sub-custodian, in DTC's street name, that they claim to have acquired, to the Registration Statement, of which the Prospectus was part (each, as defined below), where: (a) multiple issuances of the shares of Olaplex Stock represented by the same CUSIP number have been deposited at DTC; and (b) one or more of the issuances were not made pursuant to the Registration Statement.[2]

2.    In connection with Olaplex's initial public offering (the "IPO"), Olaplex filed offering documents with the Securities and Exchange Commission (the "SEC") that included: (a) an August 27, 2021, registration statement on Form S-1, which, following amendments on September 20, 2021, and September 28, 2021, was declared effective by the SEC on September 29, 2021 (the "Registration Statement"); and (b) a September 29, 2021, prospectus on Form 424B4 (the "Prospectus," which is considered part of the Registration Statement).[3]

---

[1]    Revised Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *Lilien v. Olaplex Holdings, Inc.*, United States District Court Central District of California, Docket No. 2:22-cv-08395, Doc. No. 123, June 22, 2023 ("Revised Consolidated Complaint").

[2]    For purposes of clarity, I wish to mention that, when a company issues shares of a security in multiple offerings, each offering of shares of that security constitutes an "issuance," and the multiple issuances collectively constitute the "issue" of the security.

[3]    Olaplex Holdings, Inc., Registration Statement (Form S-1) (Aug. 27, 2021); Olaplex Holdings, Inc., Amendment No. 1 to Form S-1 (Form S-1/A) (Sep. 20, 2021); Olaplex Holdings, Inc., Amendment No. 2 to Form S-1 (Form S-1/A) (Sep. 28, 2021); Olaplex Holdings, Inc., Registration Statement (Form S-1MEF) (Sep. 29, 2021); SEC, Notice of Effectiveness to Form S-1 (Sep. 29, 2021); Olaplex Holdings, Inc., Prospectus (Form 424B4) (dated

1

Exhibit 1

9

3.      I understand that the Lead Plaintiff claims to have purchased 73,034 shares of Olaplex Stock in the IPO from Goldman Sachs & Co. LLC ("Goldman Sachs"), one of the underwriters of the Olaplex IPO, at the IPO price of $21.00 and without commission, "pursuant and traceable to the Offering Documents."[4] The Lead Plaintiff alleged that it purchased such 73,034 shares in two transactions on September 30, 2021, as the "trade date."[5] I further understand that this Action was putatively brought on behalf of "all persons and entities who purchased or otherwise acquired Olaplex's publicly traded common stock pursuant and/or traceable to the Offering Documents for Olaplex's IPO, and who were damaged thereby (the 'Class')."[6] In connection with the alleged purchases of shares of Olaplex Stock, Lead Plaintiff asserts claims under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") against the Defendants, and under Section 15 of the Securities Act against the Individual Defendants.[7]

4.      In this report, as instructed by Counsel, when I use the term "trace" and its derivatives, I am referring to a shareholder's ability to prove that specific shares that it acquired were issued or sold under a particular registration statement. A shareholder that can do so can "trace" its shares.

5.      I have prepared my report to state my expert opinions; to describe the bases for those opinions; to disclose the facts, principles, methods, and data on which I relied in reaching my opinions; and to make all other appropriate disclosures. I do not express any legal opinions in this report. The work that I conducted in this matter has been informed by my education, specialized knowledge, training, and years of experience working in securities clearance and settlement, custody, and servicing, including as a Managing Director of DTC and as a delegate

---

Sep. 29, 2021, filed on Oct. 1, 2021). Both the Registration Statement and the Prospectus were filed under the Registration No. 333-259116. *See* Registration Statement at cover page; Prospectus at cover page.

4   Revised Consolidated Complaint ¶ 23.

5   Certification of Rod Graves, Exhibit A, *Lilien v. Olaplex Holdings, Inc.*, United States District Court Central District of California, Docket No. 2:22-cv-08395, Doc. No. 27-1, January 17, 2023, at 4. I understand that the Lead Plaintiff purchased additional shares of Olaplex Stock on a number of occasions in 2021 and 2022, starting from September 30, 2021, as the "trade date."

6   Revised Consolidated Complaint ¶ 282.

7   *Id.* ¶¶ 288–317.

2

Exhibit 1
10

representing the United States in treaty negotiations regarding securities clearance and settlement, and is meant to aid the Court in understanding the evidence here. In doing so, I methodically examine reliable principles of clearance and settlement and apply them to the facts of this case. The information in this report is based upon discovery to date and the information that is currently available to me. A list of documents I have relied upon in forming my opinions is set forth in **Appendix C**.

6.      In the course of my engagement, I reviewed the declaration of Ann Marie Bria, Managing Director for Asset Services Product Management at The Depository Trust & Clearing Corporation ("DTCC"), dated June 18, 2025 (the "Bria Declaration").[8] I will continue to review, evaluate, and analyze additional facts, data, and information as it becomes available. I reserve the right to amend or supplement my opinions based upon further information learned or produced, or relied upon, and in response to opinions raised in any expert or other reports, declarations, or depositions put forward in this Action or during expert discovery. Therefore, my analyses and opinions described herein are subject to change based upon future discovery or other developments.

7.      I am being compensated at a rate of $1,500 per hour. My compensation in this matter is not contingent on any opinion that I reach or on the outcome of this litigation. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.

## II.    QUALIFICATIONS

8.      My *curriculum vitae*, attached as **Appendix A**, describes my professional qualifications beyond the description set forth below.

9.      I graduated from Brooklyn College *summa cum laude* (B.A., Phi Beta Kappa) in 1979. I subsequently graduated from the University of Pennsylvania Law School, where I was an

---

[8]    Declaration of Ann Marie Bria (June 18, 2025) ("Bria Declaration"), Exhibit 2 to Declaration of Anne Johnson Palmer, *Lilien v. Olaplex Holdings, Inc.*, United States District Court Central District of California, Docket No. 2:22-cv-08395, June 20, 2025.

3

Exhibit 1
11

Editor of the *University of Pennsylvania Law Review*, with a J.D. in 1982. From 1982 to 1989, I practiced as a corporate and securities lawyer.

10.     From 1989 to 2005, I was an officer of and attorney for The Depository Trust & Clearing Corporation ("DTCC") and for DTC, which is DTCC's wholly owned subsidiary and the world's largest custodian of securities. I held a number of positions at these companies until I became Managing Director and Deputy General Counsel of both companies in 2001.

11.     Those nearly 17 years at DTC and DTCC constitute a significant portion of my 43 years of professional experience, which has largely focused on securities clearance and settlement, custody, and servicing, primarily as they relate to the DTC system. While my time at DTC does not cover the period under review in this Action, the fundamentals of how DTC operates have not changed in any material way with respect to the matters on which I am opining. I remain current on how DTC operates through my review of DTC rule filings and notices, SEC orders related to DTC, coverage of DTC in the press, my ongoing conversations with DTC staff, and my participation in litigation matters in which DTC appears either through an employee or through a written declaration.

12.     At DTC and DTCC, I was largely responsible for supporting the companies' operational activities in the areas of securities clearance and settlement, custody, and servicing, as well as regulatory oversight.

13.     From 2007 to 2008, I was a Managing Director of the Securities Industry and Financial Markets Association ("SIFMA"), the largest securities industry lobbying organization in the United States. In that role, I represented the 650 largest brokers, banks, and asset managers before the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the Federal Reserve Bank. One of my duties was to represent broker-dealer, bank, and asset manager members on operational matters relating to custody, clearance and settlement, and servicing of securities, especially with regard to the DTC clearance and settlement system.

14.     Since 2000, I have been a U.S. State Department-appointed Delegate negotiating

4

Exhibit 1
12

securities law treaties for the United States. I have negotiated two multilateral, 40-nation treaties on the law of the custody, transfer, and pledging of securities.

15.     Since 2009, I have been the Chief Executive Officer of Financial Services Consulting. In that capacity, I have advised clients with regard to clearance and settlement, custody, transactions, regulation, compliance, and litigation in the areas of securities, derivatives, banking, and broker-dealer law and operations, and white-collar defense. I have advised banks, investment banks, broker-dealers, hedge funds, clearing firms, investment advisors, issuers, and regulators from the United States, Canada, France, Germany, the United Kingdom, Ireland, Sweden, Israel, China, and the Cayman Islands, and others in both securities structuring and litigation matters relating to DTC's clearance and settlement system. I have also advised the Israeli Ministry of Finance on restructuring its bond offerings in the United States in a manner that would most efficiently leverage DTC's clearance and settlement system. I have represented both plaintiffs and defendants in litigation matters.

16.     I have also served as an expert witness on matters related to DTC and on the clearance, settlement, and custody of securities through DTC: (a) for the U.S. Attorney's Office, Southern District of New York, for whom I also served as an expert on international securities law; (b) for a British bank, with regard to multi-billion dollar litigation in Ireland and in the Cayman Islands related to the Madoff Ponzi scheme; (c) for a Swedish hedge fund, with regard to litigation in Sweden; (d) for two European banks, in litigation regarding the loss through fraud of $1.8 billion in asset-backed commercial paper; (e) for a U.S. clearing firm, regarding attempted manipulation of DTC's processes; (f) for a French custodian bank, regarding the theft by means of fraud of $400 million in securities that were subsequently transferred through DTC's settlement system; (g) for individuals who were beneficial owners of securities held through the DTC system; and (h) for various issuers, board members, underwriters, and auditors, regarding the ability of a shareholder to trace shares of a security held by DTC to a particular registration statement when multiple issuances of the security issued pursuant to different registration statements, but represented by

5

Exhibit 1
13

the same CUSIP number, have been deposited at DTC.

17.    I have taught as an adjunct Professor of Law at Brooklyn Law School since 2011, focusing in large part on the law of the sale, clearance and settlement, servicing, and custody of securities, especially through DTC.

18.    A list of the cases in which I have testified as an expert at trial, in an arbitration, or by deposition during the past four years is attached to this report as **Appendix B**.

### III.    SUMMARY OF OPINIONS

19.    In forming my opinions and preparing this report, I relied upon my education as well as on my expertise, specialized knowledge, and professional experience as a former managing director at DTC, United States delegate in clearance and settlement treaty negotiations, practicing securities attorney representing financial securities firms, regulators, individuals, governments, and others, and consultant on issues related to securities clearance and settlement, custody, and servicing, as well as regulatory oversight.

20.    In sum, I am not aware of, and do not believe that there exists, any method by which a beneficial owner can trace to the Registration Statement, of which the Prospectus was part, any shares of Olaplex Stock held at DTC or its sub-custodian in the street name of DTC that the beneficial owner claims to have acquired after November 12, 2021, where: (a) multiple issuances of shares of Olaplex Stock represented by the same CUSIP number have been deposited at DTC; and (b) one or more of the issuances was not made pursuant to the Registration Statement. Specifically, my principal conclusions are as follows:

    i.    All Non-IPO Shares of Olaplex Stock issued on November 12, 2021:[9] (A) bore the same CUSIP number as the shares of Olaplex Stock previously issued in connection

---

[9]    As will be explained later, I refer to shares of Olaplex Stock other than the 84,755,000 IPO Shares as "Non-IPO Shares." Specifically, Non-IPO Shares consist of Pre-IPO Shares and New Shares. I refer to shares of Olaplex Stock that were issued prior to the IPO as "Pre-IPO Shares," and to shares of Olaplex Stock that were newly issued after the completion of the IPO as "New Shares."  All such shares, upon being deposited at DTC, are commingled into a fungible bulk with any other shares of Olaplex Stock already on deposit at DTC.

6

Exhibit 1
14

with the IPO (the "IPO Shares"), which were also held at DTC; (B) were issued in book-entry-only form—without any physical certificates for beneficial owners—and were registered in DTC's street name; and (C) were blended with the IPO Shares and held at DTC in a single undifferentiated fungible aggregate bulk of identical, indistinguishable shares of Olaplex Stock.

ii.    In light of shares of Olaplex Stock from multiple issuances having been blended into a single undifferentiated fungible aggregate bulk at DTC, as of November 12, 2021, I do not believe that any method exists by which Lead Plaintiff or any other alleged beneficial owner would be able to show that the shares that they acquired of Olaplex Stock after November 12, 2021, held through DTC, are traceable to the Registration Statement, of which the Prospectus was part.

21.    Below, I further delineate my opinions, first providing background information about DTC and DTC's intermediated system of securities holdings. I then detail a methodological framework by which I engage in a traceability assessment, seeking to trace individual shares deposited into the DTC system to a particular registration statement. I then employ the analytical framework, testing whether I can trace shares of Olaplex Stock at DTC to the Registration Statement after both IPO Shares and Non-IPO Shares were deposited at DTC. In this regard, I provide background information on Olaplex's IPO as well as its common stock offerings other than the IPO.

## IV.    DTC HISTORY AND BACKGROUND

22.    DTC was established in 1973 to provide securities clearance and settlement and custody services to buyers and sellers in an efficient, cost-effective, and streamlined manner.[10] Headquartered in New York City, DTC is the world's largest custodian and securities depository.[11]

---

[10]    *See* DTCC, *The Depository Trust Company (DTC)*, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (last visited June 20, 2025).

[11]    *See* VIRGINIA B. MORRIS & STUART Z. GOLDSTEIN, LIFE CYCLE OF A SECURITY, 5 (2010), https://www.google.com/books/edition/Life_Cycle_of_a_Security/Hv8ipHbVoGUC (last visited June 20, 2025)

7

Exhibit 1
15

In 2024, DTC custodied and provided asset servicing for $99 trillion in securities, and DTCC handled $3.7 quadrillion in securities transactions.[12] The securities custodied by DTC consist of over 3.5 million securities issues.[13] The Olaplex securities issue that is the subject of this Action constitutes just one of those 3.5 million issues.

23.     DTC has approximately 236 Participants, which in turn act both for themselves and for their customers.[14] A DTC "Participant" is an entity that DTC has admitted to be a member of the depository and to maintain a securities account at DTC.[15]

24.     As of May 30, 2025, there were 889 DTC Participant accounts listed in DTC's member directory.[16] But some entities have multiple DTC Participant accounts. For example, Goldman Sachs—one of the lead underwriters for Olaplex's IPO—is a DTC Participant, and the Goldman Sachs affiliates have 11 Participant accounts.[17] My above tally of 236 Participants nevertheless counts Goldman Sachs as only one Participant and does the same for other entities

---

("MORRIS & GOLDSTEIN (2010)") (referring to DTC as "the largest central securities depository in the world"); NASDAQ, *The Depository Trust Company*, https://www.nasdaq.com/glossary/d/depository-trust-company (last visited June 20, 2025) (defining DTC as "the world's largest central securities depository."); DTCC, *Blanket Issuer Letter of Representations Template*, https://www.dtcc.com/-/media/Files/Downloads/legal/issue-eligibility/eligibility/BLOR-Template.pdf (last visited June 20, 2025) ("DTCC, *Blanket Issuer Letter of Representations Template*").

[12] DTCC Press Release, *DTCC Announces the Appointment of Laura Deaner as Chief Information Security Officer* (June 2, 2025), https://www.dtcc.com/news/2025/june/02/dtcc-announces-the-appointment-of-laura-deaner-as-chief-information-security-officer (last visited June 20, 2025) ("DTCC Press Release, *DTCC Announces the Appointment of Laura Deaner as Chief Information Security Officer*").

[13] DTCC, *Blanket Issuer Letter of Representations Template*.

[14] For a list of DTC Participants, *see* DTCC, *DTC Member Directories* (updated May 30, 2025), http://www.dtcc.com/client-center/dtc-directories (last visited June 20, 2025) ("DTCC, *DTC Member Directories*").

[15] DTC Participants include banks, broker-dealers, and other firms that act as underwriters of new issues, as well as other types of financial service institutions. *See* DTCC, *Issuer Services Frequently Asked Questions (FAQs)*, https://dtcclearning.com/products-and-services/asset-services/issuer-services/8674-issuer-services-frequently-asked-questions-faqs.html (last visited June 20, 2025) ("DTCC, *Issuer Services Frequently Asked Questions (FAQs)*"). Applicants need to be approved to become a DTC Participant pursuant to DTC's bylaws. *See* DTCC, *Rules, By-Laws, Organization Certificate, The Depository Trust Company* (Apr. 2025), at 11, 21–26, https://www.dtcc.com/~/media/Files/Downloads/legal/rules/dtc_rules.pdf (last visited June 20, 2025). DTC sometimes refers to Participants as DTC's "Direct Participants," "customers," "clients," and "members." To avoid confusion, I refer to them in this report simply as Participants in order to draw a clear distinction between a DTC account holder (*i.e.*, a Participant) and any person who holds interests in securities indirectly through a Participant, such as the Participant's customers.

[16] *See* DTCC, *DTC Member Directories*.

[17] *See* DTCC, *DTC Member Directories*.

8

Exhibit 1
16

with multiple Participant accounts.[18]

25.     For a sense of scale in the industry, while only about 236 institutions are DTC Participants, there are approximately 3,300 broker-dealer firms registered with FINRA, and approximately 32,000 additional investment advisor firms overseen by the SEC or state regulators.[19] Many broker-dealers in turn act on behalf of independent investment advisors to clear trades. For example, Fidelity Institutional Wealth Management Services (a division of Fidelity Investments) provides such services to thousands of institutional clients that, in turn, service more than 9.1 million investor (beneficial owner) accounts.[20] The equity stockholdings of most beneficial owner accounts in the country today are held either through a series of intermediaries, or directly, with those approximately 236 DTC Participants.[21] The Participants, in turn, typically hold those securities with DTC.[22] That system was created to provide an efficient means of clearing and settling securities transactions.

26.     Since the 1700s, the most common way in which an interest in securities, such as shares of stock of an issuer, was transferred in the United States was by transferring a paper securities certificate that represented a beneficial interest in the stock. The certificate was evidence that the person whose name was reflected on the certificate as the shareholder was listed on the records of the issuer (or the records of the issuer's registrar) as a security holder, holding rights

---

[18]   *See* DTCC, *DTC Member Directories*.

[19]   *See* FINRA, *2024 FINRA Industry Snapshot Report* at 15 (Oct. 2024), https://www.finra.org/sites/default/files/2024-07/2024-Industry-Snapshot.pdf (last visited June 20, 2025).

[20]   *See* Fidelity Investments, *About Us*, https://clearingcustody.fidelity.com/app/item/RD_13569_42626/fiws/about-us-iwms.html (last visited June 20, 2025). Throughout this report, I use the term "beneficial owner" to refer to an individual or entity that has the ultimate ownership interest in shares of a company's stock. Beneficial owners may be shareholders and/or investors.

[21]   *See, e.g.*, SEC, *Investor Bulletin: DTC Chills and Freezes* (May 2012), https://www.sec.gov/investor/alerts/dtcfreezes.pdf (last visited June 20, 2025) ("Most large U.S. broker- dealers and banks are DTC participants, meaning that they deposit and hold securities at DTC.").

[22]   *See* DTCC*, Issuer Services Frequently Asked Questions (FAQs)* ("When an investor holds shares [in street name], the investor's name is listed on its brokerage firm's books as the beneficial owner of the shares. The brokerage firm's name is listed in DTC's ownership records. DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent. DTC holds legal title to the securities and the ultimate investor is the beneficial owner.").

9

Exhibit 1
17

represented by the certificate.[23]

27.     A sharp increase in the late 1960s and early 1970s in the volume of securities traded prompted the creation of DTC.[24] Daily trade volumes on the New York Stock Exchange ("NYSE") increased from an average of 3 million shares in 1960 to daily average volumes of around 20 million shares in some weeks in 1971.[25] Each purchase and sale required the cancellation, creation, signing, and handling of engraved stock certificates and, typically, over 30 associated paper forms (including a transmittal letter, receipt, transfer instructions, power of attorney or stock power, guarantee, and transfer journal).[26] Those documents were generally carried by messengers from the seller to the seller's broker, to the issuer's transfer agent, to the issuer's registrar, and from the issuer's transfer agent, to the buyer's broker, and eventually to the buyer. It was a cumbersome and time-consuming process.[27]

28.     What became known as the "paperwork crisis" developed.[28] Banks, broker-dealers, and transfer agents and their messengers were unable to move and manually process the stock certificates and paper forms necessary to effect changes in ownership from seller to buyer in a timely manner. Stock certificates and associated documents "were piled 'halfway to the ceiling'

---

[23] SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at 11–13 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited June 20, 2025) ("SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15").

[24] *See* DTC, *1997 Annual Report* (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101_DTCAR.pdf (last visited June 20, 2025) ("DTC, *1997 Annual Report*"). *See also* DTCC Press Release, *DTCC Celebrates 40 Years of Service* (June 3, 2013), https://web.archive.org/web/20210507040651/https://www.dtcc.com/news/2013/june/03/dtcc-celebrates-40-years-of-service (last visited June 20, 2025).

[25] *See* NYSE, *Crisis in the Securities Industry, A Chronology: 1967–1970* at 31 (1971), https://www.sechistorical.org/collection/papers/1970/1971_0730_NYSECrisis.pdf (last visited June 20, 2025) ("NYSE, *Crisis in the Securities Industry, A Chronology: 1967–1970*") ("Nevertheless, February's volume outstripped January's by a considerable margin - over 371 million shares traded, with a daily average of 19.5 million."); Terry Robards, *Stocks: Dam Is Holding*, N.Y. TIMES (Feb. 14, 1971), https://www.nytimes.com/1971/02/14/archives/stocks-dam-is-holding-this-time-so-far-trading-flood-is-controlled.html (last visited June 20, 2025) ("For several weeks now, volume has been averaging over 20 million shares a day.").

[26] *See* SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at 13–17; Larry E. Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*, Speech by SEC Staff: International Securities Settlement Conference (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm (last visited June 20, 2025) ("Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*").

[27] SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at 13–17; Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*.

[28] Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*.

10

Exhibit 1
18

in some offices."[29] Between 1968 and 1970, approximately 100 financial firms went out of business because they were not able to keep up with their paperwork, and thus failed to settle many of their trades.[30] The crisis compelled the NYSE to shorten its trading hours, and even to close completely on some days, so that the paper could be processed, and the clearance and settlement of securities could catch up with the trading volume.[31]

29.    To put this in historical perspective—and to illustrate how the old 1970s method of securities clearance and settlement could not have handled the dramatic increases in trading that were to come—on October 11, 2008, the *Wall Street Journal* reported that the total trading volume of stocks listed on the NYSE hit a record of 11.16 billion shares—almost 400 times 1971's then-record high daily trading volume of 28 million shares.[32]

30.    In response to this crisis, the U.S. government and the banking and securities industries launched an initiative to reduce reliance on paper certificates that were being delivered to settle securities transactions, and to thereby increase the speed, safety, and accuracy of the clearance and settlement of securities. They created a new system of clearance and settlement.[33]

---

[29]    Suellen M. Wolfe, *Escheat and the Challenge of Apportionment: A Bright Line Test to Slice a Shadow*, 27 Ariz. St. L.J. 173, 181 (1995) (citation omitted).

[30]    DTC, *1997 Annual Report*; SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), at 28, http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn .com/collection/papers/1970/1971_1201_SECUnsafe_01.pdf (last visited June 20, 2025) ("SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*").

[31]    SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers* at 28. In 1971, the SEC described the crisis as "the most prolonged and severe crisis in the securities industry" since the Great Depression. *See* SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers* at 1, 27.

[32]    *See* E.S. Browning et al., *Wild Day Caps Worst Week Ever for Stocks*, Wall Street J. (Oct. 11, 2008), https://www.wsj.com/articles/SB122368071064524779; NYSE, *Crisis in the Securities Industry, A Chronology: 1967–1970*, at 31 ("A new record for a single day's trading was set on February 2, [1971,] when more than 22 million shares changed hands. That record fell on February 8, when volume soared to 25.6 million shares which, in turn, was eclipsed the next day by volume of more than 28 million shares.").

[33]    NYSE, *Crisis in the Securities Industry, A Chronology: 1967–1970*. *See also* DTC, *1989 Annual Report* (1989), at 6–10, http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/ papers/1980/1989_0101_DTCAR.pdf (last visited June 20, 2025).

11

Exhibit 1
19

## V.    DTC'S INTERMEDIATED SYSTEM OF SECURITIES HOLDING

### A.    Overview of the DTC System

31.    ***The System***. DTC was created to address this paperwork crisis. Rather than physically move paper securities certificates from seller to buyer, as had historically been done, certificates were immobilized at DTC through an intermediated system of securities holding (also known as the "indirect holding system").[34] Today, DTC holds the vast majority of stock and corporate bonds issued in the United States, and nearly all U.S. municipal securities.[35] The benefit of the United States' system of intermediated securities holding is that it allows for the efficient and accurate clearance and settlement of more than three quadrillion dollars' worth of securities transactions a year.[36] Securities trading had ground to a halt and the NYSE was actually closed for periods of time half a century ago, because the then-existing system of direct certificated holding of securities could not handle the volume of securities transactions—even when transaction volumes were just a small fraction of those in today's market. The recasting of securities settlement into the intermediated system of holdings that I discuss below has allowed the United States not only to solve the paperwork crisis of the late 1960s and early 1970s, but also to handle massively larger volumes of transactions today. It has also enabled the United States to net transactions at the end of each day as discussed above, and to shorten the securities clearance and settlement time cycle,[37] thereby reducing risk in the financial markets.

32.    **Figure 1** illustrates the structure of DTC's intermediated system of securities holding.

---

[34]   DTCC, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures* (Mar. 2023), https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf (last visited June 20, 2025).

[35]   *See* MORRIS & GOLDSTEIN (2010), 5 (2010).

[36]   DTCC Press Release, *DTCC Announces the Appointment of Laura Deaner as Chief Information Security Officer*.

[37]   SEC, *Shortening the Securities Transaction Settlement Cycle*, Final Rule, Exchange Act Release No. 34-96930 (Feb. 15, 2023), https://www.sec.gov/rules-regulations/2023/02/34-96930 (last visited June 20, 2025).

12

Exhibit 1
20

**Figure 1 – DTC's Intermediated System of Securities Holding**



33.     In DTC's intermediated system of securities holding, one or more securities certificates (sometimes referred to as global certificates) are typically issued by an issuer registered in DTC's "street name"—that is, in the name of DTC's limited partnership nominee, Cede & Co.[38]

34.     A security held in "street name" is a security that is registered not in the name of the beneficial owner, but rather in the nominee name of DTC, a brokerage firm, or another

---

[38] *See, e.g.*, JOHN C. WILCOX ET AL., *"Street Name" Registration & The Proxy Solicitation Process*, in A PRACTICAL GUIDE TO SEC PROXY AND COMPENSATION RULES (Lisa A. Fontenot & Michael A. Titera ed., 6th ed., 2025), 11-3, https://www.google.com/books/edition/_/4FOEDwAAQBAJ (last visited June 20, 2025) ("WILCOX (2025)") ("The vast majority of publicly traded shares in the United States are registered on companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.,' the nominee name used by [DTC]. Shares registered in this manner are commonly referred to as being held in 'street name.'"). *See also, e.g.*, SEC, *Investor Bulletin: Holding Your Securities* (July 12, 2023), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-97 (last visited June 20, 2025) ("SEC, *Investor Bulletin: Holding Your Securities*") ("Many investors today hold securities in street name with a broker-dealer. With street name registration, the securities you purchase are registered on the issuer's books in the name of an intermediary (such as your broker-dealer, a clearing agency, or a nominee affiliated with the broker-dealer or clearing agency), but your broker-dealer will maintain records showing you as the real or 'beneficial' owner.").

13

Exhibit 1
21

nominee.[39] The practice of issuers issuing and registering securities in "street name" has been a common one for well over a century. It goes back to at least World War I, long preceding the 1933 enactment of the Securities Act.[40]

35.     Thus, Cede & Co. becomes the registered owner of these securities on the books of the company (whose books are maintained by the company's registrar/transfer agent).[41] For example, when a company issues new shares of common stock of a book-entry-only issue[42] and delivers them to DTC or DTC's sub-custodian in the form of one or more global certificates (or by increasing the face amount(s) of the existing global certificate(s) by issuing replacement global

---

[39] "Street name" ownership of securities "has existed for nearly as long as the equity markets themselves." Securities Industry and Financial Markets Association (SIFMA), *Report on the Shareholder Communications Process with Street Name Holders, and the NOBO-OBO Mechanism* at 1 (June 10, 2010), https://www.sec.gov/comments/s7-14-10/s71410-1.pdf. *See also* LEGISLATIVE HISTORY OF THE REVENUE ACT OF 1932: P.L. 72-154: 47 STAT. 169, 1229 (1932), https://www.google.com/books/edition/Revenue_Act_of_1932/BCjVAAAAMAAJ (last visited June 20, 2025) ("LEGISLATIVE HISTORY OF THE REVENUE ACT OF 1932: P.L. 72-154: 47 STAT. 169, 1229 (1932)") (discussing scenarios in which "it is necessary for the broker to transfer the certificate into a street name before he delivers it on a contract of sale"); MILTON N. NELSON, READINGS IN CORPORATION FINANCE 338 (1926), https://www.google.com/books/edition/Readings_in_Corporation_Finance/IQdDAAAAIAAJ (last visited June 20, 2025) ("NELSON (1926)") (noting that "no inconvenience results from leaving [an investor's] stock in 'street name'").

[40] *See, e.g.*, LEGISLATIVE HISTORY OF THE REVENUE ACT OF 1932: P.L. 72-154: 47 STAT. 169, 1229 (1932) (discussing scenarios in which "it is necessary for the broker to transfer the certificate into a street name before he delivers it on a contract of sale"); NELSON (1926) at 338; U.S. Congress, *Trading with the Enemy: Hearings before the Subcommittee of the Committee on Commerce, United States Senate*, Sixty-Fifth Congress, First Session on H. R. 4960, 67 (1917), https://www.google.com/books/edition/Trading_with_the_Enemy/pQgQAAAAIAAJ (last visited June 20, 2025) ("For convenience, the stocks, when bought, are generally registered in a street name, as we call it, either the name of a brokerage house or of some clerk in a brokerage house."); *Reichard v. Hutton*, 142 N.Y.S. 935, 941 (App. Div. 1913) (noting that certain stocks "stood in 'street names,' indorsed in blank, and were transferrable by delivery under the sage of Wall street."); William V. Holohan, *Contribution Among Securities Pledged by a Defaulting Stock Broker*, 4 S. CAL. L. REV. 1, 3 (1930) ("Frequently it happens that a broker has simply for safekeeping, and as bailee for a customer who has paid in full and owes the broker nothing, securities that are either in a 'street name' or in the customer's name and endorsed in blank by him. The broker's dealing with these securities other than as bailee, his exercising any dominion over them, or his using them for his own purposes is a conversion."); SEC, *Final Report of the Securities and Exchange Commission on the Practice of Recording the Ownership of Securities in the Records of the Issuer in Other Than the Name of the Beneficial Owner of Such Securities*, No. 80-014 (Dec. 3, 1976), at 1, https://ia803200.us.archive.org/22/items/fsec00unit/fsec00unit.pdf (last visited June 20, 2025) ("American institutions first began extensively to register securities in nominee name in the 1930's in an effort to escape onerous transfer requirements placed on corporations and fiduciaries by issuers seeking to protect themselves from judicially imposed liability for improper transfers.").

[41] *See* DTCC, *Issuer Services Frequently Asked Questions (FAQs)* ("When an investor holds shares [in street name] . . . DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.").

[42] In a "book-entry-only" issue, beneficial owners do not receive certificates. Instead, they receive only statements containing "book entries" reflecting their position.

14

Exhibit 1
22

certificates reflecting the increased amount(s)), the books and records of the issuer (or its registrar/transfer agent) reflect that the sole owner of all shares represented by that global certificate is Cede & Co.

36.     The global certificates are then typically custodied (*i.e.*, held) either by DTC or by a sub-custodian of DTC. As a result, DTC directly or indirectly holds the global certificates for those DTC Participants who are in turn holding positions in the issue of securities through DTC. A DTC Participant's position in the securities issue is sometimes referred to as a "book entry" position, reflecting the fact that the Participant's position is reflected only on the books and records of DTC, rather than in the form of a paper certificate made available to the Participant or its customer.

37.     The issuer (in this Action, Olaplex) and its transfer agent have no visibility via DTC into the identities of the beneficial owners whose securities are held at DTC in the name of DTC's partnership nominee, Cede & Co. Positions in securities held by DTC are in turn credited by DTC to DTC Participants. Those Participants hold positions in the securities that are held by DTC, in the DTC partnership nominee name, either for themselves or for beneficial owners or intermediaries, with positions in the securities potentially being held through a series of intermediaries before they reach the beneficial owner.

38.     Similarly, DTC has no visibility into the identities of its Participants' customers, on whose behalf interests in the securities may be held. Nor can DTC tell how many of the shares owned by a Participant are held for that Participant's own account, as opposed to being held by the Participant on behalf of the Participant's customers.

39.     ***CUSIP***. Each issue of securities held by DTC bears a CUSIP number.[43] A CUSIP

---

[43] CUSIP's database contains issue identifiers and related data for millions of issues of securities, including corporate securities. In 1964, the New York Clearing House Association asked the American Bankers Association ("ABA") to develop a standard method of identifying securities in order to improve securities clearance and settlement operating efficiencies. The Committee on Uniform Security Identification Procedures ("CUSIP") was created, the CUSIP system was developed, the CUSIP Service Bureau was formed to administer the system, and now CUSIP Global Services ("CGS") is the overarching entity for CUSIP. CGS is managed on behalf of the ABA by FactSet

15

Exhibit 1
23

number is a 9-character alphanumeric code that uniquely identifies a security issue offered in the United States or in Canada.[44] It is possible that different offerings (or "issuances") of a security, for example an IPO and a subsequent public offering made pursuant to different registration statements, are structured so that they bear different CUSIP numbers; however, the common practice—as is the case with Olaplex Stock—is for such securities to bear the same CUSIP number across multiple offerings.

40.    *A fungible, aggregate bulk*.

- DTC holds all securities that it custodies in its nominee name, that bear the same CUSIP number, in one fungible, aggregate bulk.[45]

- Participants and those holding through them hold *pro rata* interests in the issue's entire fungible bulk held by DTC.

- Participants do not own any specific shares or particular certificates held by DTC.

---

Research Systems Inc. The CUSIP system is endorsed by the SEC. *See* CUSIP Global Services, *About Us*, https://www.cusip.com/about/index.html (last visited June 20, 2025); CUSIP Global Services, *Inside the CGS Identification System* (Aug. 2010), https://web.archive.org/web/20211102145159/https://www.cusip.com/pdf/CUSIP_Intro_03.14.11.pdf (last visited June 20, 2025). When DTC holds shares as described above, it identifies them by their CUSIP number. *See* DTCC, *Operational Arrangements* (Oct. 2023), https://www.dtcc.com/~/media/Files/Downloads/legal/issue-eligibility/eligibility/operational-arrangements.pdf (last visited June 20, 2025) ("CUSIP Number Assignment").

[44] CUSIP Global Services, *Universally Recognized Identifier for Financial Instruments*, https://www.cusip.com/identifiers.html#/CUSIP (last visited June 20, 2025).

[45] *See* SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005), https://www.sec.gov/rules-regulations/2004/12/issuer-restrictions-or-prohibitions-ownership-securities-intermediaries (last visited June 20, 2025) ("SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26") ("Securities registered in the name of the securities intermediary or its nominee allows the securities to be immobilized and held in fungible bulk thereby significantly reducing the number of certificates that need to be delivered and transferred. This in turn reduces the risk and cost associated with transferring the securities. . . . The securities deposited with DTC are registered in DTC's nominee name and are held in fungible bulk for the benefit of its participants and their customers. Each participant having an interest in securities of a given issue credited to its account has a pro rata interest in the securities of that issue held by DTC.") (footnotes omitted). There are certain discrete exceptions to this general rule. For example, some securities may be restricted, and not available for open-market trading. In these instances, DTC may decide not to commingle the securities in a fungible bulk. *See also* SEC, *Rule 144: Selling Restricted and Control Securities* (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144 (last visited June 20, 2025). None of these exceptions apply to shares of Olaplex Stock that were sold in the IPO.

16

Exhibit 1
24

41.    Such was the case with the Olaplex Stock that is at issue here. As a senior operations officer at DTCC stated in the Bria Declaration:

> *At all times*, all shares of Olaplex Stock on deposit at DTC and registered in the name of Cede & Co. were held by DTC *in an undifferentiated manner known as a "fungible bulk."*
>
> Each DTC participant that has held a position in Olaplex Stock credited to its DTC participant account has held a *pro-rata beneficial interest* in Cede & Co.'s aggregate holding of Olaplex Stock.[46] (*emphasis added*)

42.    The SEC has explained, generally: "[t]he securities deposited with DTC are registered in DTC's nominee name and are held in fungible bulk for the benefit of its participants and their customers. Each participant having an interest in securities of a given issue credited to its account has a *pro rata* interest in the securities of that issue held by DTC."[47]

43.    The Commission has expounded further: "Fungible bulk means that no participant or customer of a participant has any claim or ownership rights to any particular certificate held by DTC. Rather, participants have a securities entitlement to obtain a certificate representing securities held in their DTC accounts."[48] "Consequently," the SEC has clarified, "there are *no* specific shares directly owned by either the broker-dealer participants or the underlying beneficial owner."[49]

44.    Similarly, the SEC has noted that "each customer of a DTC participant—such as an individual investor—owns a *pro rata* interest in the shares in which the DTC participant has an interest."[50] The SEC has also made clear that what Participants own are *pro rata* interests in the

---

[46]  Bria Declaration ¶¶ 6–7.

[47]  SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26.

[48]  SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26.

[49]  SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxy votingbrief.htm (emphasis added) (last visited June 20, 2025).

[50]  SEC, *Concept Release on the U.S. Proxy System,* 17 C.F.R. Parts 240, 270, 274, and 275, Release Nos. 34-62495; IA-3052; IC-29340; File No. S7-14-10 (July 14, 2010), https://www.sec.gov/files/litigation/litreleases/2010/34-62495.pdf (emphasis added) (last visited June 20, 2025) ("SEC, *Concept Release on the U.S. Proxy System,* 17 C.F.R. Parts 240, 270, 274, and 275, Release Nos. 34-62495; IA-3052; IC-29340; File No. S7-14-10").

17

Exhibit 1

25

"aggregate number of shares of a particular issuer held at DTC."[51] The SEC added that "the existing clearance and settlement system was ***not designed*** to assign particular shares of a security to a particular investor, due to netting and holding securities in fungible bulk. Thus, it is ***not currently possible*** to match a particular investor's vote to a specific securities position held at a securities depository."[52]

45.    DTC itself has made this clear as well. It has stated: "DTC maintains Deposited Securities that are eligible for book-entry services in 'fungible bulk,' meaning that each Participant whose Securities of an issue have been credited to its Securities Account has a *pro rata* interest in DTC's entire inventory of that issue, but ***none*** of the securities on Deposit are identifiable to or 'owned' by any Participant."[53]

46.    All securities in such fungible bulk share the same core characteristics—*except that* they may have been issued on different dates and may have been issued pursuant to different registration statements or exemptions—and, once deposited into the fungible bulk, are commingled and are not capable of being distinguished from one another.[54]

47.    When an issuer uses the same CUSIP number for multiple offerings of the same security, and shares bearing that same CUSIP—though from multiple offerings—are held by DTC commingled in a fungible bulk, it is impossible to identify the date that any specific share of that security held by DTC was issued. That is because the nature of any interest in the blended fungible bulk is that of a *pro rata* interest in that commingled bulk, rather than an interest in any pre-

---

[51] SEC, *Concept Release on the U.S. Proxy System,* 17 C.F.R. Parts 240, 270, 274, and 275, Release Nos. 34-62495; IA-3052; IC-29340; File No. S7-14-10 (emphasis added).

[52] SEC, *Concept Release on the U.S. Proxy System,* 17 C.F.R. Parts 240, 270, 274, and 275, Release Nos. 34-62495; IA-3052; IC-29340; File No. S7-14-10 (emphasis added).

[53] Notice of Filing and Immediate Effectiveness of a Proposed Rule Change To Amend the DTC Deposits Service Guide Relating to Procedures for the Deposit of Nontransferable Securities, 84 Fed. Reg. 48,187 (Sep. 6, 2019), https://www.federalregister.gov/documents/2019/09/12/2019-19704/self-regulatory-organizations-the-depository-trust-company-notice-of-filing-and-immediate (emphasis added) (last visited June 20, 2025).

[54] *See* SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 at n.23 ("Fungible bulk means that no participant or customer of a participant has any claim or ownership rights to any particular certificate held by DTC. Rather, participants have a securities entitlement to obtain a certificate representing securities held in their DTC accounts.").

18

Exhibit 1
26

commingling share of that security. It is likewise impossible to determine under which particular registration statement any specific share of that security held by DTC was issued, inasmuch as the originally deposited shares no longer exist in their prior form, but have instead been wholly blended with the other shares in that CUSIP (issued pursuant to different registration statements or exemptions) that are held by DTC, and beneficial owners receive a *pro rata* interest in that fungible bulk, rather than an interest in any particular shares.

48.     As an operational matter, DTC holds and transfers securities pursuant to Article 8 of the Uniform Commercial Code ("UCC"),[55] which governs the holding and transfer of securities in the United States. Under the DTC system of intermediated holding of securities, the registrar of a book-entry-only issue lists only DTC's partnership nominee Cede & Co. as an owner of position in the issue on the registrar's register.[56] DTC as a securities intermediary, in turn, maintains securities accounts for its Participants, as entries in DTC's computer system.[57] DTC knows only the identities of the DTC Participants that hold position in the issue at DTC; DTC does not know the identities of those persons or entities who in turn may hold position in the issue through those Participants.[58]

49.     Operationally, consistent with this framework, as Comment 1 to Section 8-503 of the UCC points out, "securities intermediaries generally do not segregate securities in such fashion that one could identify particular securities as the ones held for customers."[59] In DTC's indirect holding system, in accordance with DTC's operational procedures, a beneficial owner of a security

---

[55]  *See* UCC § 8, *Investment Securities*.

[56]  DTCC, *Issuer Services Frequently Asked Questions (FAQs)* ("When an investor holds shares this way, the investor's name is listed on its brokerage firm's books as the beneficial owner of the shares. The brokerage firm's name is listed in DTC's ownership records. DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.").

[57]  DTCC, *Issuer Services Frequently Asked Questions (FAQs)* ("Once a security becomes eligible, DTC, through its nominee Cede & Co., is the registered holder of the securities, routinely processing dividend and interest payments and managing the electronic "book-entry" transfer of interests in securities among participants.").

[58]  DTCC, *Issuer Services Frequently Asked Questions (FAQs)* ("DTC is able to provide position information on a security at the DTC participant level. … DTC does NOT have beneficial owner information.").

[59]  UCC § 8-503, *Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary*, Official Comment 1.

19

Exhibit 1
27

does not own any securities directly. A Participant holding position in an issue through DTC, or a beneficial owner holding position in that issue through a Participant that in turn holds position in the issue at DTC, does not own any *specific* security certificate held by DTC. Instead, the holder of such a position has a *pro rata* interest in the entire fungible bulk of securities bearing the same CUSIP that is held by DTC on behalf of various holders.[60]

50.　To understand the nature of the commingled, fungible, aggregate bulk of securities that DTC holds for each CUSIP, it may prove helpful to consider the following analogy. Let's imagine a deposit of wine, rather than a deposit of securities. It is as though an issuer, on behalf of three Participants, were to deposit with DTC 10 gallons of white wine from the same vineyard— but of different vintages—as follows:

- On behalf of Participant A – one gallon of Angeleno Vineyard Riesling 2021;

- On behalf of Participant B – two gallons of Angeleno Vineyard Riesling 2022; and

- On behalf of Participant C – seven gallons of Angeleno Vineyard Riesling 2023.

DTC, in turn, pours the aggregate 10 gallons of Angeleno Vineyard Riesling white wine, of three different vintages, into a single vat.

51.　As **Figure 2** below illustrates, the 10 gallons of white wine in the vat is the fungible, aggregate bulk that DTC holds. The 10 gallons of three different vintages of wine are all commingled and blended in the vat. Each Participant has a right to its respective *pro rata* share of the contents of the vat (Participant A, for example, owns a 10% interest in the wine in the vat). But no Participant directly owns any specifically identifiable wine—indeed, due to the wine having all

---

[60] *See, e.g.*, SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26") ("The securities deposited with DTC are registered in DTC's nominee name and are held in fungible bulk for the benefit of its participants and their customers. Each participant having an interest in securities of a given issue credited to its account has a pro rata interest in the securities of that issue held by DTC."). For ease of discussion, I refer herein to Participants owning (whether as a nominee or as a beneficial owner) securities in their DTC accounts, but this refers technically to Participants having security entitlements. A "security entitlement" in the intermediated holding system is a bundle of rights in the contents of a security account that an entitlement holder—a customer of a securities intermediary, such as a Participant of DTC or a beneficial owner holding through such Participant— has with a securities intermediary.

20

Exhibit 1
28

been commingled in the vat, none of the wine is specifically identifiable to one vintage, or to one gallon that had been poured into the vat. If Participant C were to transfer one gallon of wine to Participant A, then Participant C would now own 60% of the wine in the vat, and Participant A would now own 20% of the wine in the vat. If, alternatively, Participant B seeks to withdraw from DTC its *pro rata* share of wine, DTC in effect simply dips a ladle into the vat and scoops out 20% of the wine that is in the vat—two gallons. Because the 10 gallons of Angeleno Vineyard Riesling wine were all commingled in the vat, no Participant (or any other person) is able to determine that any particular drop or glass of wine in the vat came from a particular gallon or vintage.

**Figure 2 – Illustration of the Blended Nature of DTC's Fungible Bulk**



52.    Holding securities in a fungible, aggregate bulk has allowed DTC to hold and (by electronic book-entry) transfer securities on behalf of its Participants in a manner that solved the paperwork crisis discussed above, and that provides the same benefits today. Using DTC's system, transfers of security entitlements from one Participant to another Participant are effected on DTC's

21

Exhibit 1
29

computers through "book-entry" changes reflected on the "books" of DTC, which reflect changes in the Participants' *pro rata* interests in what DTC holds in its fungible bulk.

53.     Similarly, Participants acting (whether directly or indirectly) for a seller or buyer make book-entry changes on their own records, reflecting (directly or indirectly) the positions of the seller or the buyer. In the event that there are tiers of ownership, which is common today—as where a Participant holds for a bank, which in turn holds for a prime broker, which holds for a corporation, which holds for an individual (the ultimate beneficial owner)—corresponding book-entry changes are reflected by the relevant entity on the entity's books at each tier, ultimately down to the beneficial owner.

54.     This system—in contrast to the certificated method of holding—removes the need to: (a) obtain, cancel, and then destroy the seller's physical securities certificate; (b) create, sign, and transfer another physical securities certificate for the buyer; and (c) generate, process, and deliver all the otherwise-required associated paper forms.

55.     When securities are held via DTC's intermediated system, Participants, customers of Participants, and beneficial owners holding through such customers do not have their names reflected as the owners on any share certificates. Indeed, no Participant, customer of a Participant, or beneficial owner owns any particular individual shares of a given issue. As a result of the system of intermediated securities holding described above, it is therefore impossible to identify any particular share as being owned by any individual Participant, its customer, or any underlying beneficial owner holding through such a Participant or customer.

56.     At the end of each day, DTC debits from or credits to each Participant's account the net amount of securities, and net dollar amount of payments, for all of that Participant's activities that day in each securities issue.[61] Such net end-of-day positions of each Participant reflect the net activities of the Participant at DTC, on behalf of itself and its customers, and do not

---

[61]  DTCC, *2008 Financial Report*, at 63, https://www.sechistorical.org/collection/papers/2000/2008_0101_DTCCAR_5.pdf (last visited June 20, 2025) ("All trading activities handled by DTC are settled through its end-of-day net settlement process.").

22

Exhibit 1
30

reflect principal transactions between the Participant and its customers. DTC does not know the identities of any customers of any Participant, or any lower-tier holders including beneficial owners.

57.    For example, if a Participant begins a trading day with 10 shares of Company X in its DTC account, and one customer of the Participant buys five shares of Company X that day, while another customer of the same Participant sells five shares of Company X, the Participant would still have 10 shares of Company X in its DTC account at the end of the trading day. This netting occurs at each level of DTC's intermediated system of securities holding.

58.    In addition, many large brokerage firms hold inventory of securities of multiple companies on their own balance sheets. They often do this in order to help "make a market" in the securities and support liquidity.[62] When customers of a broker seek to buy a security that the broker is already holding on its own balance sheet, the broker may engage in a "principal transaction" in which it transacts with its own client, buying or selling securities for its own account.[63] The resulting change in stock ownership is reflected only on the broker's own books between its principal account (shares that it owns for itself) and its custodial account (shares that it owns on behalf of its client). In a principal transaction, the total number of shares of a security held by the broker at DTC does not change; only the allocation on the broker's own books between its principal and custodial accounts changes. In that event, no net change in share ownership resulting from that transaction is even reported to DTC, nor of course reflected on DTC's records.

59.    Within the intermediated system of securities holding described above, an offering

---

[62]  *See* Corporate Finance Institute, *Market Maker*, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker (last visited June 20, 2025) ("Market maker refers to a firm or an individual that engages in two-sided markets of a given security. It means that it provides bids and asks in tandem with the market size of each security. A market maker seeks to profit off of the difference in the bid-ask spread and provides liquidity to financial markets."). *See also* Maureen O'Hara & George S. Oldfield, *The Microeconomics of Market Making*, 21 J. FIN. & QUANTITATIVE ANALYSIS 361, 361 (1986).

[63]  *See* Corporate Finance Institute, *Market Maker*, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker (last visited June 20, 2025). UBS, for example, explained in client materials in 2023 that, in a principal transaction, "we buy securities from you or sell securities to you from our (or our affiliate's) inventory." *See* UBS, *Your Relationship with UBS*, at 11 (Jan. 2025), https://www.ubs.com/content/dam/assets/wma/us/shared/documents/relationship-with-ubs.pdf (last visited June 20, 2025).

23

Exhibit 1
31

of book-entry-only securities made pursuant to a firm commitment underwriting and made eligible at DTC would generally proceed in the following basic steps:

Step 1: Upon receiving payment from the underwriters, the issuer authorizes the registration of the securities in DTC's street name, Cede & Co., and Cede & Co. is listed by the issuer's registrar as the registered owner of the shares on the issuer's books.

Step 2: The issuer authorizes the delivery of the Cede & Co. shares to DTC. If DTC is already holding shares in the same CUSIP, DTC adds the shares that have just been delivered to it to those shares in the same CUSIP that are already held by DTC, holding them together in a fungible bulk.

Step 3: DTC credits the DTC accounts of its Participants with position in the fungible bulk held by DTC. DTC credits the Participant accounts of the underwriters (or the lead underwriter, as representative of the underwriting syndicate, who then by book-entry in turn transfers position in appropriate numbers of shares to the other underwriters). This is effectuated through increases in the book-entry positions of the underwriters' DTC Participant accounts, not by deliveries of paper stock certificates.

Step 4: The underwriters sell shares to their customers. Deliveries to other DTC Participants who are customers of underwriters associated with those sales are effectuated by changes in the book-entry positions of Participants on DTC's electronic records. When DTC Participants then transact between themselves, either for their proprietary account or for their customers, corresponding book-entry changes are made at the DTC level. Changes are also made at every level below the DTC Participants, as appropriate, without any paper certificates changing hands.

As described in more detail below, the Olaplex IPO was as a general matter effectuated in this manner.

24

Exhibit 1
32

### B.     Way to Trace Shares

60.     In today's system, although as discussed above the vast majority of publicly traded securities in the United States are held in DTC's street name at DTC[64] (that is, in the name of Cede & Co.), there are nonetheless a number of situations—none of which are applicable here—in which shareholders might be able to trace their shares to a particular registration statement.

61.     *One Single Issuance*. First, tracing is straightforward whenever all shares in the market were issued under the same registration statement. An example is when there has only been an initial public offering, and there has not been any other issuance of the security. In such a situation, all shares—even those held in DTC's street name—are traceable to the one registration statement. This is because all shares in the market necessarily came from that single issuance of the security, under that particular registration statement.

62.     *Physical Certificates.* Second, some issuers—many of which are companies that are household names—still offer physical paper stock certificates to beneficial owners.[65] When a company issues a physical certificate reflecting a beneficial owner's name directly to the beneficial owner, and the company registers the transaction including the beneficial owner's name on the company's books at the registrar, that certificate represents the beneficial owner's ownership of the security.[66] It is therefore possible for the beneficial owner to trace its shares to a particular registration statement, if the security was not earlier part of a commingled fungible bulk that

---

[64]   *See, e.g.*, WILCOX (2025) ("The vast majority of publicly traded shares in the United States are registered on companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.,' the nominee name used by [DTC]. Shares registered in this manner are commonly referred to as being held in 'street name.'").

[65]   *See, e.g.*, Pfizer, *Stock FAQs*, https://investors.pfizer.com/Investors/Shareholder-Services/Stock-FAQs/ (last visited June 20, 2025) (explaining that a shareholder "may request stock certificates for the whole shares in your book-entry account at any time"); Amazon, *FAQs*, https://ir.aboutamazon.com/faqs/default.aspx (last visited June 20, 2025) ("Amazon's transfer agent is Computershare . . . Registered stockholders (including those who hold physical stock certificates) should contact Computershare in the event of a name change, a change of address or if their certificate has been lost or stolen."); Computershare, *Supplement to the Computershare CIP*, *A Direct Stock Purchase & Dividend Reinvestment Plan for Amazon.com, Inc.* (Mar. 6, 2020), https://cda.computershare.com/ Content/94e8615b-7cac-4062-9748-b106d035eed9 (last visited June 20, 2025) ("You may request shares in Amazon.com, Inc. be issued in certificate form in your name."); Computershare, *Supplement to the Computershare CIP, A Direct Stock Purchase & Dividend Reinvestment Plan for The Coca-Cola Company* (Nov. 11, 2019), https://cda.computershare.com/Content/9802e0f7-be88-40e4-9a3e-acef33959710 (last visited June 20, 2025) ("You may request shares in The Coca-Cola Company be issued in certificate form in your name.").

[66]   SEC, *Investor Bulletin: Holding Your Securities*.

25

Exhibit 1
33

consisted of shares issued under separate offerings, held by DTC or another intermediary.

63.    ***Direct Registration.*** Third, some issuers allow for the possibility of "direct registration." Direct registration provides beneficial owners with an alternative to holding their securities in street name. Under this method of registration, beneficial owners can elect—indirectly, through DTC's Direct Registration System—to have their securities registered in their name (or in the name of a third-party custodian, such as a broker or bank), on the issuer's (or transfer agent/registrar's) books and records.[67] It is theoretically possible that beneficial owners who have directly registered their shares of a security might be able to trace those shares to a particular registration statement, if those shares were issued under that registration statements and were never part of a fungible bulk containing shares from multiple offerings held by DTC or another intermediary. But whether someone who has directly registered their shares can in fact trace those shares to a particular registration statement depends on whether those shares were ever commingled with shares issued pursuant to a different registration statement.

64.    ***Different CUSIP Numbers.*** Fourth, an issuer may apply for a unique CUSIP number for each offering. If such a request were granted by CGS, and each offering were given a unique CUSIP, a stockholder receiving shares in an offering would be able to trace its shares to that offering by virtue of the unique CUSIP.

## VI.    BACKGROUND ON OLAPLEX'S IPO AND COMMON STOCK OFFERINGS

65.    Previously known as Penelope Holdings Corp., Olaplex was incorporated in Delaware in June 2021 as an indirect subsidiary of Penelope Group Holdings.[68] Olaplex received financing from Advent International GPE IX, LP and other investment funds affiliated with Advent International Corporation (the "Advent Funds"),[69] which collectively held more than 89%

---

[67]  SEC, *Investor Bulletin: Holding Your Securities. See also* DTCC, *Direct Registration System*, https://www.dtcc.com/asset-services/securities-processing/direct-registration-system (last visited June 20, 2025).

[68]  Registration Statement at 9, 15; Prospectus at 9, 15.

[69]  Registration Statement at ii, 146; Prospectus at ii, 146.

26

Exhibit 1
34

of Olaplex Stock prior to the IPO.[70]

66.    On August 27, 2021, Olaplex filed the Registration Statement on Form S-1, which was subsequently amended on September 20, 2021, and on September 28, 2021. The Registration Statement was declared effective by the SEC as of September 29, 2021. On October 1, 2021, Olaplex filed the Prospectus on Form 424B4 for its IPO of 73,700,000 shares (the "IPO Initial Shares") at the public offering price of $21 per share (the "Public Offering Price").[71] Olaplex Stock was listed on the Nasdaq Global Select Market ("Nasdaq") under the symbol "OLPX."[72] The first day of trading for Olaplex Stock was September 30, 2021.[73] The Olaplex IPO underwriters expected to deliver the IPO Initial Shares against payment on October 4, 2021.[74] Prior to the IPO, there was no public market for Olaplex Stock.[75]

67.    On October 4, 2021, Olaplex completed its IPO of the IPO Initial Shares. All IPO Initial Shares were sold by the Advent Funds and Mousserena LP (collectively, the "Selling Stockholders") at the Public Offering Price.[76] In the IPO, the Selling Stockholders sold a minority equity stake to the public.[77] Upon completion of the IPO, the Advent Funds beneficially owned more than 78% of Olaplex Stock.[78] Olaplex did not receive any proceeds from the sale of the IPO Initial Shares.[79]

68.    Also on October 4, 2021, Olaplex filed a Form S-8 registration statement to register

---

[70]    Registration Statement at 146; Prospectus at 146.

[71]    Prospectus at cover page; SEC, Notice of Effectiveness to Form S-1 (Sep. 29, 2021). I note that the Prospectus was dated September 29, 2021, but it was filed on October 1, 2021. Both the Registration Statement and the Prospectus were filed under the Registration No. 333-259116.

[72]    Registration Statement at cover page; Prospectus at cover page; Nasdaq, Certification Notice Letter to SEC (Sep. 30, 2021).

[73]    *See* Olaplex Holdings, Inc. Press Release, *OLAPLEX Announces Pricing of Upsized Initial Public Offering* (Sep. 30, 2021), https://finance.yahoo.com/news/olaplex-announces-pricing-upsized-initial-044300797.html (last visited June 20, 2025).

[74]    Prospectus at cover page.

[75]    Registration Statement at 163; Prospectus at 163.

[76]    Olaplex Holdings, Inc., Quarterly Report for Quarter Ended September 30, 2021 (Form 10-Q) (Nov. 10, 2021) ("Form 10-Q for Q3 2021") at 10.

[77]    Registration Statement at 146; Prospectus at 146.

[78]    Prospectus at 51.

[79]    Form 10-Q for Q3 2021 at 10; Registration Statement at cover page; Prospectus at cover page.

27

Exhibit 1
35

a total of 92,292,025 shares of Olaplex Stock (CUSIP number 679369108),[80] of which: (a) 46,923,300 shares were issuable upon exercise or settlement of stock awards previously granted under the Penelope Holdings Corp. 2020 Omnibus Equity Incentive Plan (the "2020 Plan") that were outstanding as of the date of the Form S-8 Registration Statement;[81] and (b) 45,368,725 shares were reserved for issuance under Olaplex 2021 Equity Incentive Plan (the "2021 Plan").[82]

69.    On October 8, 2021, the Selling Stockholders sold 11,055,000 additional shares of Olaplex Stock at the Public Offering Price, in connection with the underwriters' "greenshoe option" (the "IPO Greenshoe Shares").[83] Olaplex did not receive any proceeds from the sale of the IPO Greenshoe Shares.[84]

70.    **Figure 3** reflects the number of outstanding shares of Olaplex Stock as of dates disclosed in SEC filings.[85] As shown in **Figure 3**, prior to the IPO, the number of shares outstanding of Olaplex Stock was 648,124,642 as of August 31, 2021, and it remained unchanged as of October 31, 2021, after the IPO.[86]

---

[80]    Olaplex Holdings, Inc., Registration Statement (Form S-8) (Oct. 4, 2021) ("Form S-8") at cover page. Form S-8 was filed under the Registration No. 333-260016.

[81]    Form S-8 at cover page ("To the extent that shares of Common Stock issuable upon the exercise or settlement of such awards expire or become unexercisable without the delivery of shares, are forfeited to, or repurchased for cash by, the registrant, are settled in cash, or otherwise become available again for grant under the terms of the 2020 Plan, in each case, in accordance with the terms of the 2020 Plan and on or after the date of this Registration Statement, such shares of Common Stock will be available for issuance under the Olaplex Holdings, Inc. 2021 Equity Incentive Plan (the '2021 Plan').").

[82]    Form S-8 at cover page.

[83]    Form 10-Q for Q3 2021 at 10. The phrase "greenshoe option" refers to an option in accordance with that underwriters may purchase a greater number of shares from the issuer than were originally anticipated. ANDREW M. CHISHOLM, AN INTRODUCTION TO INTERNATIONAL CAPITAL MARKETS (2009) at 42, https://www.google.com/books/edition/An_Introduction_to_International_Capital/FkkEgrXNv9AC (last visited June 20, 2025). For purposes of this report, and purely for the ease of the reader so as to distinguish between shares issued at different times, I refer to the greenshoe shares as IPO Greenshoe Shares (and to those shares and the IPO Initial Shares together as the IPO Shares), recognizing that technically some commentators may view greenshoe shares as not being part of the IPO.

[84]    Form 10-Q for Q3 2021 at 10; Registration Statement at cover page; Prospectus at cover page.

[85]    Prospectus at 145; Olaplex Holdings, Inc., Annual Report for Fiscal Year Ended December 31, 2021 (Form 10-K) (Mar. 8, 2022) ("Form 10-K for 2021") at cover page, 42; Form 10-Q for Q3 2021 at cover page, 6; Olaplex Holdings, Inc., Quarterly Report for Quarter Ended March 31, 2022 (Form 10-Q), (May 11, 2022) ("Form 10-Q for Q1 2022") at 6.

[86]    Prospectus at 145; Form 10-Q for Q3 2021 at cover page.

28

Exhibit 1
36

**Figure 3 –Number of Outstanding Shares of Olaplex Stock**

| As of Date | Shares |
|---|---|
| August 31, 2021 | 648,124,642 |
| September 30, 2021 | 648,124,642 |
| October 31, 2021 | 648,124,642 |
| December 31, 2021 | 648,794,041 |
| February 28, 2022 | 648,794,041 |
| March 31, 2022 | 648,855,977 |

71.    Specifically, the Prospectus stated that, prior to the IPO, there were 648,124,642 shares outstanding of Olaplex Stock as of August 31, 2021.[87] The outstanding Olaplex Stock was held by 26 stockholders of record.[88] Certain stockholders of record had received their securities pursuant to Olaplex's equity compensation plans in transactions exempt from registration under Rule 701 of the Securities Act.[89] Other stockholders had received their securities in private transactions exempt from registration under the Securities Act.[90]

72.    Of the 648,124,642 Olaplex Stock shares outstanding as of August 31, 2021, 84,755,000 shares (comprising the IPO Initial Shares and the IPO Greenshoe Shares; collectively, the "IPO Shares") were offered for sale by Selling Stockholders in connection with the IPO, as discussed above.[91] The IPO Shares were freely tradable in the public market immediately after the IPO.[92] In contrast, the disposition of, or hedging with respect to, the remaining 563,369,642 shares of Olaplex Stock (the "Pre-IPO Shares") were restricted for a period of 180 days from the date of the Prospectus (October 1, 2021) to March 29, 2022 (the "Lock-Up Period"),[93] subject to certain exceptions to the lock-up agreements, and subject to the provisions of Rule 144 and Rule 701 of the Securities Act.[94] Each of Olaplex's executive officers and directors, the Selling Stockholders,

---

[87]    Prospectus at 145.

[88]    Registration Statement at 158; Prospectus at 158.

[89]    Registration Statement at 146–148, 164; Prospectus at 146–148, 164.

[90]    Registration Statement at ii, iii; Prospectus at ii, iii.

[91]    Prospectus at 163.

[92]    Registration Statement at 163; Prospectus at 163.

[93]    Prospectus at 57.

[94]    Registration Statement at 57, 164; Prospectus at 57, 164.

29

Exhibit 1
37

and substantially all stockholders of Olaplex Stock[95] entered into lock-up agreements with Goldman Sachs, J.P. Morgan Securities LLC ("J.P. Morgan"), and Morgan Stanley & Co. LLC ("Morgan Stanley"), as representatives of the underwriters.[96]

73.     The Prospectus also stated that, following the completion of the IPO, as of September 30, 2021, Olaplex expected to have 648,124,642 shares outstanding, which excluded the shares issuable under the 2020 Plan and reserved for issuance under the 2021 Plan. Specifically, Olaplex stated:

> Except as otherwise indicated, the number of shares of our common stock to be outstanding after this offering excludes:
>
> - 46,923,300 shares of common stock issuable upon the exercise of stock options outstanding as of June 30, 2021 under the Penelope Holdings Corp. 2020 Omnibus Equity Incentive Plan (the "2020 Plan") at a weighted average exercise price of $1.06;
>
> - 25,029,000 shares of common stock available for future issuance as of June 30, 2021 under the 2020 Plan. No further awards will be made under the 2020 Plan; and
>
> - 45,368,725 shares of common stock that will become available for issuance under our 2021 Omnibus Equity Incentive Plan (the "2021 Plan"), which includes 351,058 shares of our common stock issuable upon the exercise of options to be granted to certain of our employees, at an exercise price per share equal to the initial public offering price in this offering, in each case to be granted in connection with this offering under our 2021 Plan.[97]

74.     As of October 31, 2021, the number of shares outstanding of Olaplex Stock was still 648,124,642, reflecting that no shares had been newly issued since the completion of the IPO.[98]

75.     As shown in **Figure 3** above, between November and December 2021, the number of Olaplex Stock shares outstanding increased by 669,399 shares (=648,794,041 − 648,124,642).

---

[95]   Registration Statement at 57, 164; Prospectus at 57, 164.

[96]   Registration Statement at 57, 164; Prospectus at 57, 164.

[97]   Prospectus at 17.

[98]   Form 10-Q for Q3 2021 at cover page.

30

Exhibit 1
38

Olaplex disclosed that the number of Olaplex Stock shares outstanding was 648,794,041 as of December 31, 2021.[99] It also disclosed, "During the fourth quarter ending December 31, 2021, additional 669,399 shares were issued as a result of exercises of stock options occurring during the same period."[100] Olaplex issued 669,399 shares upon the exercise of stock options awarded under the 2020 Plan and pursuant to Olaplex's Form S-8 registration statement.[101] Hereinafter, I refer to shares of Olaplex Stock newly issued after the completion of the IPO as "New Shares." Finally, as shown in **Figure 3**, the number of Olaplex Stock shares outstanding increased again in March 2022 by an additional 61,936 New Shares.[102] After the Lock-Up Period ended on March 29, 2022, there were 648,855,977 Olaplex Stock shares outstanding as of March 31, 2022.[103]

## VII.    TRACEABILITY OF OLAPLEX STOCK

### A.    Data and Methodology

76.    As discussed above, in the intermediated system of holding book-entry securities at DTC, one cannot identify any individual share as being owned by any individual Participant (assuming more than one Participant holds position in the issue), its customer, or any underlying beneficial owner holding through such a Participant or customer. In the DTC intermediated system, in which securities are held in the street name Cede & Co. by DTC,[104] I am not aware of any method to trace shares of a security held at DTC or its sub-custodian, in the street name of DTC, to a particular registration statement when multiple issuances of the security represented by the same CUSIP number have been deposited at DTC, where one or more of the issuances were not made pursuant to the registration statement. As discussed in Section V, there are a number of specific circumstances in which shareholders might be able to trace their position in an issue to a

---

[99]   Form 10-K for 2021 at 42.

[100]   Form 10-K for 2021 at 102.

[101]   Form S-8 at cover page; Form 10-K for 2021 at 102.

[102]   Form 10-K for 2021 at cover page; Form 10-Q for Q1 2022 at 6.

[103]   Form 10-Q for Q1 2022 at 6.

[104]   MORRIS & GOLDSTEIN, 5 (2010) ("Today, DTC acts as a [central securities depository] for virtually all US municipal securities, as well as the vast majority of equities and corporate bonds issued in the United States.").

31

Exhibit 1
39

particular registration statement. In this section, I apply the analytical framework discussed in Section V to attempt to trace the 84,755,000 shares of Olaplex Stock (CUSIP number 679369108), sold in connection with the IPO and the Registration Statement, and assess whether in the specific circumstances of the Action it is possible to trace shares to the Registration Statement.

77.     As detailed in Section VI, after the IPO, the 84,755,000 IPO Shares were freely tradable in the public market,[105] while for a time the remaining 563,369,642 shares of Olaplex Stock were subject to lock-up restrictions.[106] During the Lock-Up Period, Olaplex issued new shares of common stock in a number of issuances, largely in connection with the exercise of stock options. Hereinafter, I refer to Pre-IPO Shares and New Shares, in aggregate, as "Non-IPO Shares."

78.     As an initial matter, if Non-IPO Shares bearing the same CUSIP as the IPO Shares and registered in the name of Cede & Co. were to be deposited at DTC by book-entry on or after the date that the IPO Shares were deposited at DTC,[107] the Non-IPO Shares would be held as part of DTC's fungible bulk in the same CUSIP.[108] Inasmuch as the IPO Shares and the Non-IPO shares would commingle in DTC's fungible bulk,[109] investors would each have simply had a *pro rata* interest in that commingled bulk (consisting of a blend of shares traceable to the Registration Statement and shares not traceable to the Registration Statement),[110] and it would be impossible from that point on for an investor who acquired shares of Olaplex Stock through DTC to trace the shares that the investor acquired to the Registration Statement.

79.     As I discuss below, the IPO Shares were first commingled with Non-IPO Shares on November 12, 2021.[111] Inasmuch as the IPO Shares commingled with Non-IPO Shares in a

---

[105]  Prospectus at 163.

[106]  Prospectus at 57, 164.

[107]  I understand that no shares of Olaplex Stock were deposited at DTC prior to October 4, 2021.

[108]  Bria Declaration.

[109]  As discussed in Section VI, I understand that IPO Shares and Non-IPO Shares of Olaplex Stock had been issued pursuant to different registration statements.

[110]  Bria Declaration.

[111]  Bria Declaration.

32

Exhibit 1
40

fungible bulk, it is impossible for an investor who acquired shares of Olaplex Stock from that point in time onward through DTC to trace their shares to the Registration Statement. We know that the IPO Shares commingled with Non-IPO Shares on November 12, 2021, because, as of that date, DTC held more than 84,755,000 shares—which was the number of IPO Shares issued pursuant to the Registration Statement—in the fungible bulk of Olaplex Shares held by DTC. Starting from that date, tracing shares of Olaplex Stock held at DTC to the Registration Statement is impossible.

80.    Below, I describe the results of my traceability analysis. For this analysis, I reviewed the Registration Statement and other materials listed in **Appendix C**, and I also relied, in addition to my education and professional experience, including as a former managing director of DTC and as a U.S. Delegate in treaty negotiations on clearance and settlement, on the following information:

i.    Olaplex's authorization letter to American Stock Transfer & Trust Company, LLC ("AST" or "Transfer Agent and Registrar"), dated October 4, 2021 ("Olaplex's October 4, 2021 Authorization Letter"), by which Olaplex instructed AST to transfer and deliver an aggregate of 73,700,000 shares of common stock of the Company, par value $0.001 per share, being sold by the selling stockholders through DTC under the Full Fast Program.[112]

ii.    Olaplex's authorization letter to AST, dated October 8, 2021 ("Olaplex's October 8, 2021 Authorization Letter"), by which Olaplex instructed AST to transfer and deliver an aggregate of 11,055,000 shares of common stock of the Company, par value $0.001 per share, being sold by the selling stockholders to DTC under DTC's Deposit/Withdrawal At Custodian ("DWAC") system.[113]

iii.    Olaplex's authorization letter to AST, dated November 11, 2021 ("Olaplex's November 11, 2021 Authorization Letter"), to issue 188,375 shares of Olaplex

---

[112] OLPX-SA-0000031836–840.
[113] OLPX-SA-0000027873–877.

33

Exhibit 1
41

Stock as a result of a stock option exercise and to deposit them at DTC via DTC's DWAC system for the benefit of Morgan Stanley Smith Barney LLC ("Morgan Stanley Smith Barney").[114]

iv.    Olaplex's internal documents and correspondence related to the 188,375 shares of Olaplex Stock issued as a result of a stock option exercise under the 2020 Plan ("Olaplex's November 2021 Stock Awards").[115]

v.    Lists of registered owners of Olaplex Stock as of September 30, 2021, and November 7, 2022, provided by AST (collectively, "AST Lists of Registered Owners").[116]

vi.    List of selling shareholders of the IPO Initial Shares as of October 4, 2021, and the IPO Greenshoe Shares as of October 8, 2021, provided by AST (collectively, "AST Lists of Selling Shareholders").[117]

vii.    Number of shares of Olaplex Stock registered in the name of DTC's Cede & Co. as of October 4, 2021, October 8, 2021, November 12, 2021, November 15, 2021, November 22, 2021, November 26, 2021, December 17, 2021, January 3, 2022, January 6, 2022, March 11, 2022, April 7, 2022, May 25, 2022, June 2, 2022, June 23, 2022, August 22, 2022, October 6, 2022, October 17, 2022, October 31, 2022, and November 2, 2022, provided by AST (collectively, "AST Records for Cede & Co. as Registered Owner").[118]

viii.    Newly issued shares of Olaplex Stock registered in the name of DTC's Cede & Co. from November 12, 2021, to April 22, 2025, inclusive, provided by AST ("AST

---

[114] OLPX-SA-0000027871–872.

[115] OLPX-SA-0000408366–368; OLPX-SA-0000368863–866; OLPX-SA-0000303609–34 at 625–628.

[116] OLPX-SA-0000028262–265; OLPX-SA-0000028266–269.

[117] OLPX-SA-0000028221–257 at 221–244.

[118] OLPX-SA-000028221–257 at 232, 239, 253–257; OLPX-SA-0000028196–220.

34

Exhibit 1
42

Records of New Shares Registered in the Name of Cede & Co.").[119]

ix.    DTC's daily "Participant Positions Reports" for Olaplex Stock (CUSIP number 679369108), reporting the total number of shares of Olaplex Stock held at DTC by DTC's Participants as of each Friday from October 8, 2021, to November 25, 2022, inclusive ("DTC Participant Positions Reports").[120]

x.    Declaration of Ann Marie Bria, Managing Director for Asset Services Product Management at DTCC, dated June 18, 2025 ("Bria Declaration").[121]

### B.    Analysis

#### 1.    Olaplex Authorization Letters

81.    Through counsel, I requested and obtained Olaplex's authorization letters to AST regarding the deposit at DTC of the IPO Initial Shares effected on October 4, 2021, the IPO Greenshoe Shares effected on October 8, 2021, and the 188,375 New Shares effected on November 12, 2021.

82.    *First*, as reflected in the Registration Statement, the IPO Initial Shares were expected to be distributed on Monday October 4, 2021, which was two business days after trading of Olaplex Stock had started on the Nasdaq on Thursday September 30, 2021.[122] Effective as of September 16, 2021, Olaplex and AST entered into a transfer agency and service agreement under which AST would provide services as the transfer agent and registrar of Olaplex Stock.[123] On October 4, 2021, by Olaplex's October 4, 2021 Authorization Letter, Olaplex instructed AST as the Transfer Agent and Registrar of Olaplex Stock to transfer and deliver an aggregate of 73,700,000 shares of common stock of the Company, par value $0.001 per share, being sold by

---

[119]  OLPX-SA-0000028259−261.

[120]  OLPX-SA-0000027878−8195.

[121]  Bria Declaration.

[122]  Prospectus at cover page.

[123]  OLPX-SA-000032802−819.

35

Exhibit 1
43

the selling stockholders through DTC under the FAST Program.[124]

83.    The DTC Fast Automated Securities Transfer ("FAST") program is a contract between DTC and transfer agents that eliminates the movement of physical securities for transfers of securities registered in the name of DTC's nominee, Cede & Co by allowing transfer agents to act as custodians for DTC, reducing the costs associated with printing, processing, and shipping certificates to and from agents.[125] Introduced in 1975, today more than 100 agents use the FAST program to transfer over 1.1 million issues valued at over $41 trillion.[126] By Olaplex's October 4, 2021 Authorization Letter, Olaplex instructed AST to transfer the IPO Initial Shares to DTC in electronic form, not in physical certificate form.[127]  I understand that none of the IPO Initial Shares were physical securities certificates.

84.    *Second*, on October 8, 2021, by Olaplex's October 8, 2021 Authorization Letter, Olaplex instructed AST to transfer and deliver an aggregate of 11,055,000 shares of common stock of the Company, par value $0.001 per share, being sold by the selling stockholders to DTC under DTC's DWAC system.[128] DWAC is a service provided by DTC that allows DTC Participants to instruct DTC regarding deposit and withdrawal transactions into and out from their DTC book-entry accounts that hold *pro rata* interests in fungible securities that are part of the fungible bulk in an issue held by DTC. For securities to be eligible for deposit or withdrawal via the DWAC service, a Participant must use the services of a transfer agent that participates in DTC's FAST program. In the case of DWAC deposits, the requesting Participant's position in its DTC account is increased; and in the case of DWAC withdrawals, the requesting Participant's position in its DTC account is debited. DTC and FAST transfer agents reconcile the results of Participants' deposit and withdrawal activities electronically on a daily basis, so that the Participants' positions

---

[124] OLPX-SA-0000031836–840 at 836.

[125] DTC, *The FAST Program*, https://www.dtcc.com/asset-services/agent-services/fast (last visited June 20, 2025).

[126] DTC, *The FAST Program*, https://www.dtcc.com/asset-services/agent-services/fast (last visited June 20, 2025).

[127] OLPX-SA-0000031836–840 at 836.

[128] OLPX-SA-0000027873–887 at 873.

36

Exhibit 1
44

reflect a *pro rata* interest in DTC's fungible bulk.[129]

85.    *Third*, on November 11, 2021, by Olaplex's November 11, 2021 Authorization Letter, Olaplex instructed AST to issue 188,375 Olaplex New Shares as a result of a stock option exercise, and to deposit them at DTC via DTC's DWAC system for the benefit of Morgan Stanley Smith Barney's account number 15.[130]

86.    Importantly, Olaplex instructed AST to deposit 188,375 New Shares "via DTC," meaning that such New Shares would be deposited in DTC's fungible bulk and Morgan Stanley Smith Barney would be credited with an equivalent *pro rata* interest in DTC's entire fungible bulk of Olaplex Stock. As described below, records obtained from AST and DTC both indicate that the deposit of the 188,375 shares of Olaplex Stock at DTC was effected on November 12, 2021.[131]

### 2.    Olaplex's November 2021 Stock Awards

87.    Through counsel, I requested and obtained Olaplex internal documents and correspondence regarding the issuance of 188,375 shares of Olaplex Stock as a result of a stock option exercise in November 2021. Such shares were issued upon the stock option exercise by two grantees (whom I will refer to as "Grantee A" and "Grantee B") pursuant to the 2020 Plan.[132]

88.    On September 27, 2021, Olaplex's Board of Directors of then-Penelope Holdings Corp., and the Compensation Commission of then-Penelope Group Holdings GP, LLC approved the conversion of the 2020 Plan in "partnership interest" in Olaplex Stock.[133] Each outstanding vested option to purchase shares of Olaplex Stock was converted into a vested option to purchase 675 shares of Olaplex Stock.[134] The 675 conversion rate meant that, for example, if an employee or grantee held time-based options to purchase 100 shares of Olaplex Stock at the exercise price or grant price of

---

[129] DTCC, *Deposit/Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last visited June 20, 2025).

[130] OLPX-SA-0000027871–872 at 871.

[131] OLPX-SA-0000028221–257 at 253; OLPX-SA-0000027878–8195 at 897–902.

[132] OLPX-SA-0000408366–368 at 368.

[133] OLPX-SA-0000368863–866 at 863.

[134] OLPX-SA-0000368863–866 at 863.

37

Exhibit 1
45

$510.35, after conversion, that employee/grantee held time-based options to purchase 67,500 shares of Olaplex Stock (=100×675) at the exercise price or grant price of $0.76 (=$510.35 ÷ 675).[135]

89.    Grantee A, held stock options granted on July 8, 2020, to purchase 40,436 shares of Olaplex Stock at $0.76 per share as a grant price, after conversion.[136] Grantee B, held stock options granted on September 22, 2020, to purchase 147,939 shares of Olaplex Stock at $1.65 per share as a grant price, after conversion.[137] Grantee B was advised about the equity awards resulting from the conversion after the completion of the IPO, on October 20, 2021.[138] Grantee A and Grantee B exercised their stock options on November 11, 2021 as the "sale date."[139]  On that day, Morgan Stanley Smith Barney provided Olaplex with a summary of the trades related to the sale of 188,375 shares to cover the exercise price.[140] Morgan Stanley Smith Barney advised Olaplex that the "[t]otal DWAC quantity for today's trades [was] 188,375,"[141] meaning that Olaplex should issue an authorization letter to instruct AST to issue 188,375 shares of Olaplex Stock and deposit such shares at DTC via DTC's DWAC system and credit Morgan Stanley Smith Barney via DTC, which Olaplex did on November 11, 2021.[142]

90.    The 188,375 New Shares of Olaplex Stock were issued pursuant to the Form S-8 registration statement, and not pursuant to the Registration Statement under which the IPO Shares were sold.[143]

### 3.    AST Lists of Registered Owners and Selling Stockholders and AST Records of Shares Registered in the Name of Cede & Co.

91.    Through counsel, I requested and obtained from AST the lists of registered owners

---

[135] OLPX-SA-0000368863–866 at 864.

[136] OLPX-SA-0000408366–368 at 368.

[137] OLPX-SA-0000408366–368 at 368.

[138] OLPX-SA-0000303609–34 at 625–628.

[139] OLPX-SA-0000408366–368.

[140] OLPX-SA-0000408366–368.

[141] OLPX-SA-0000408366–366.

[142] OLPX-SA-0000027871.

[143] Form S-8 at cover page.

38

Exhibit 1
46

of Olaplex Stock as of September 30, 2021, and as of November 7, 2022, as well as the lists of selling stockholders of the IPO Initial Shares and the IPO Greenshoe Shares.[144] Specifically, the September 30, 2021, list of registered owners shows a total of 26 stockholders, including the Advent Funds, Mousserena LP, Anthos Capital IV LP, Anthos Tribe LP, and a number of Olaplex's directors and officers, and their holdings of Olaplex Stock.[145] The AST lists of selling stockholders show the number of IPO Initial Shares sold by each of the Selling Stockholders on October 4, 2021, as well as the number of IPO Greenshoe Shares sold by each of the Selling Stockholders on October 8, 2021.[146]

92.    I also requested and obtained through counsel AST records of the number of shares registered in the name of Cede & Co.[147] **Figure 4** reflects the number of shares of Olaplex Stock registered to Cede & Co. during the Lock-Up Period, as shown in the AST records.

**Figure 4 – Total Number of Shares of Olaplex Common Stock Registered to Cede & Co. During the Lock-Up Period[148]**

| Date | Additional Shares deposited on that date | Total Shares (including Additional Shares) |
|---|---|---|
| Monday October 4, 2021 | 73,700,000 | 73,700,000 |
| Friday October 8, 2021 | 11,055,000 | 84,755,000 |
| Friday November 12, 2021 | 188,375 | 84,943,375 |
| Monday November 15, 2021 | 260,950 | 85,204,325 |
| Monday November 22, 2021 | 88,297 | 85,292,622 |
| Friday November 26, 2021 | 416 | 85,293,038 |
| Friday December 17, 2021 | 70,074 | 85,363,112 |
| Monday January 3, 2022 | 61,287 | 85,424,399 |
| Thursday January 6, 2022 | -4 | 85,424,395 |
| Friday March 11, 2022 | 61,937 | 85,486,332 |

---

[144] OLPX-SA-0000028262–265; OLPX-SA-0000028266–269.

[145] OLPX-SA-0000028266–269.

[146] OLPX-SA-0000028221–257 at 221–244. After the deposit of IPO Greenshoe Shares in DTC's fungible bulk on October 8, 2021, IPO Greenshoe Shares commingled with IPO Initial Shares already deposited in DTC's fungible bulk on October 4, 2021, such that a shareholder who acquired shares of Olaplex Stock after October 8, 2021 received a *pro rata* interest in the fungible bulk and was not able to distinguish between IPO Shares and IPO Greenshoe Shares.

[147] OLPX-SA-0000028221–257 at 232, 239, 253–257; OLPX-SA-0000028196–220.

[148] OLPX-SA-000028221–257 at 232, 239, 253–257; OLPX-SA-0000028196–220 at 196–198.

39

Exhibit 1
47

93.     Cede & Co. first appeared as a registered owner of shares of Olaplex Stock on October 4, 2021. On that date, it became the registered owner of 73,700,000 shares of Olaplex Stock.[149] That matched the number of IPO Initial Shares. As of October 8, 2021, Cede & Co. was the registered owner of 84,755,000 shares of Olaplex Stock.[150] The 84,755,000 shares registered to Cede & Co. was a fungible bulk formed by the deposit at DTC and commingling of the 73,700,000 IPO Initial Shares and the 11,055,000 IPO Greenshoe Shares.

94.     On November 12, 2021, Cede & Co. was the registered owner of 84,943,375 shares of Olaplex Stock, following the deposit of 188,375 Non-IPO Shares issued as a result of a stock option exercise. I understand that the 188,375 Non-IPO Shares were shares of Olaplex Stock that were registered under the October 4, 2021, Form S-8 registration statement, not under the Registration Statement.[151]

95.     As of November 12, 2021, the number of shares of Olaplex Stock registered in the name of Cede & Co. exceeded the number of shares that were issued pursuant to the Registration Statement. Based on the AST records, 84,943,375 shares of Olaplex stock (*i.e.*, more than the 84,750,000 shares issued pursuant to the Registration Statement) were on deposit at DTC in the name of Cede & Co. as of November 12, 2021.[152]

96.     As such, a commingled blend of IPO Shares and Non-IPO Shares was registered to Cede & Co. and on deposit in DTC's fungible bulk on November 12, 2021, making it impossible to trace shares of Olaplex Stock held by DTC to the Registration Statement as of November 12, 2021.

---

[149]  OLPX-SA-0000028221−257 at 232.

[150]  OLPX-SA-0000028221−257 at 239.

[151]  Form S-8 at cover page.

[152]  OLPX-SA-000028221−257 at 253.

40

Exhibit 1
48

97.     Likewise, to the extent that any financial intermediary between any beneficial owner plaintiff and DTC held Olaplex Stock both before November 12, 2021, and on or after that date, commingling may well have taken place at the level of that financial intermediary as well.

98.     As shown in **Figure 4**, during the Lock-Up Period, additional Non-IPO Shares were deposited at DTC and registered in the name of Cede & Co. as of November 15, 2021, November 22, 2022, November 26, 2021, December 17, 2021, January 3, 2022, and March 11, 2022.[153] Throughout the Lock-Up Period, the total number of Non-IPO Shares registered in the name of Cede & Co. was 731,332 shares of Olaplex Stock, which included 669,399 shares newly issued in the fourth quarter of 2021 as a result of stock option exercises, which Olaplex disclosed in its Form 10-K for 2021.[154] I understand that the Non-IPO Shares were issued under the October 4, 2021, Form S-8 registration statement, not under the Registration Statement.[155]

99.     In sum, on November 12, 2021, in addition to 84,755,000 IPO Shares having been registered to Cede & Co. and deposited at DTC, 188,375 Non-IPO Shares had been registered to Cede & Co. and deposited at DTC, where they were all held commingled together in a fungible bulk. As such, as of November 12, 2021, a blend of IPO Shares and Non-IPO Shares was registered to Cede & Co. and deposited with DTC. Further, throughout the Lock-up Period, additional Non-IPO Shares, issued pursuant to Olaplex's October 4, 2021, Form S-8 registration statement, were registered to Cede & Co. and deposited with DTC, commingling with the already previously commingled 84,755,000 IPO Shares.

100.     It is thus impossible to trace Olaplex Shares held by DTC to the Registration

---

[153] OLPX-SA-0000028221–257 at 254–257; OLPX-SA-0000028196–220 at 196–198. As shown in **Figure 4**, on January 6, 2022, one registered owner registered on AST's books four shares, which had been initially registered in the name of Cede & Co. Given that his shares were registered on AST's books only after first being deposited in DTC's fungible bulk where the IPO Shares and Non-IPO Shares commingled as of November 2021, this owner cannot trace these shares of Olaplex Stock to the Registration Statement.

[154] Form 10-K for 2021 at 102.

[155] As will be discussed later, I understand that, on October 4, 2021, Olaplex registered on Form S-8 the shares issuable upon exercise of the stock options awarded under the 2020 Plan.

41

Exhibit 1
49

Statement after November 12, 2021.

### 4.    DTC Participant Position Reports

101.    Through counsel, I requested DTC's daily Participant Position Reports for shares of Olaplex Stock (CUSIP number 679369108) in the period from September 30, 2021, to November 17, 2022, inclusive. DTC's daily Participant Position Reports show the total number of shares of an issuer's securities (identified by a CUSIP number) held at DTC on a certain date. They also detail the number of an issuer's securities (identified by a CUSIP number) held on that date by DTC's Participants in their accounts at DTC.[156] For Participant Positions Reports older than two years from the date of the request, DTC provides Participant Positions Reports as of each Friday.

102.    Overall, I received a total of 60 DTC daily Participant Positions Reports for shares of Olaplex Stock (CUSIP number 679369108) for each Friday from October 8, 2021, to November 25, 2022. No Participant Positions Report was returned, though it was requested, as of Friday October 1, 2021, indicating that there were no shares of Olaplex Stock deposited at DTC on that date, which was prior to the IPO closing date of October 4, 2021.[157] Each DTC Participant Position Report recorded the position of Olaplex Stock held by each DTC Participant account, and also the total positions across all DTC Participant accounts holding Olaplex Stock as of that Friday.[158]

103.    **Figure 5** shows the total number of shares of Olaplex Stock (CUSIP number 679369108) held at DTC as of dates during the Lock-Up Period when additional shares were added to DTC's fungible bulk.

---

[156] DTC provides the Participant Positions Reports via its security position report ("SPR") service. *See* DTCC, *Security Position Reports*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/security-position-reports (last visited June 20, 2025); DTCC, *Security Position Reports Guide* (Jan. 2016), at 3, 5, https://www.dtcc.com/-/media/Files/Downloads/Settlement-Asset-Services/Issuer-Services/New-SPR-Web-User-Guide.pdf (last visited June 20, 2025).

[157] OLPX-SA-0000027878−8195.

[158] OLPX-SA-0000027878−8195.

42

Exhibit 1
50

**Figure 5 – Total Number of Shares of Olaplex Common Stock (CUSIP number 679369108) Held at DTC During the Lock-Up Period[159]**

| Date | Additional Shares deposited on that date | Total Shares (including Additional Shares) |
|---|---|---|
| Friday October 8, 2021 | 84,755,000 | 84,755,000 |
| Friday November 12, 2021 | 188,375 | 84,943,375 |
| Friday November 19, 2021 | 260,950 | 85,204,325 |
| Friday November 26, 2021 | 88,713 | 85,293,038 |
| Friday December 17, 2021 | 70,074 | 85,363,112 |
| Friday January 7, 2022 | 61,283 | 85,424,395 |
| Friday March 11, 2022 | 61,937 | 85,486,332 |

104.    As shown in **Figure 5**, the first DTC Participant Position Report reported that 84,755,000 shares of Olaplex Stock (which included a commingled fungible bulk of what had originally been 73,700,000 IPO Initial Shares and 11,055,000 IPO Greenshoe Shares) were on deposit at DTC as of October 8, 2021. This number matched the number of shares of Olaplex Stock in AST's records as of October 8, 2021, confirming that 84,755,000 shares were registered to Cede & Co. and on deposit at DTC.[160] Among the DTC Participants holding an interest in the shares of Olaplex Stock held at DTC as of October 8, 2021, the three Olaplex underwriters, Morgan Stanley (DTC Participant account number 0050), J.P. Morgan (DTC Participant account number 0352), and Goldman Sachs (DTC Participant account number 0005), held an interest in 8.7 million, 4.4 million, and 3.0 million shares, respectively. Morgan Stanley Smith Barney (DTC Participant account number 0015) held an interest in 199,358 shares of Olaplex Stock as of October 8, 2021.[161]

105.    DTC Participant Position reports confirm that, as November 12, 2021, the total number of shares deposited at DTC was 84,943,375, which included commingled in that fungible bulk what had been the 188,375 Non-IPO Shares.[162] Based on Olaplex's November 11, 2021 Authorization Letter, the 188,375 Non-IPO Shares were deposited at DTC via DTC's DWAC system, and  Morgan Stanley Smith Barney was to be credited with a *pro rata* interest in that

---

[159]  OLPX-SA-0000027878–8195.

[160]  OLPX-SA-0000028221–257 at 239; OLPX-SA-0000027878–8195 at 921–926.

[161]  OLPX-SA-0000027878–8195 at 921–926.

[162]  OLPX-SA-0000027878–8195 at 897–902.

43

Exhibit 1
51

number of shares in the commingled fungible bulk held by DTC.[163] As of November 12, 2021, Morgan Stanley Smith Barney (DTC Participant account number 0015) held an interest in 496,117 shares of Olaplex Stock.[164]

106.    Overall, throughout the Lock-Up Period, DTC Participant Position reports show that a total of 731,332 Non-IPO Shares were deposited at DTC, confirming AST's records.[165]

107.    As of April 8, 2022, a total of 85,558,557 Olaplex shares were held at DTC—compared to the 84,755,000 held as of October 8, 2021.[166]

108.    After the Lock-Up Period, DTC Participant Position Reports show that the total number of shares of Olaplex Stock held at DTC increased by approximately 39 million shares, to 123.9 million shares, as of November 25, 2022.[167]

### 5.    Bria Declaration

109.    Ann Marie Bria, Managing Director for Asset Services Product Management at DTCC, provided a declaration, dated June 18, 2025.[168] The Bria Declaration confirms (emphasis added), *inter alia*, that:

> ***At all times,*** all shares of Olaplex Stock on deposit at DTC and registered in the name of Cede & Co. were held by DTC ***in an undifferentiated manner known as a "fungible bulk."***
>
> Each DTC participant that has held a position in Olaplex Stock credited to its DTC account has held a pro-rata beneficial interest in Cede & Co.'s aggregate holding of Olaplex Stock.[169]

## VIII.  CONCLUSION

110.    My principal conclusion based on the above, as well as my expertise, experience,

---

[163]  OLPX-SA-0000027871.

[164]  OLPX-SA-0000027878–8195 at 897.

[165]  OLPX-SA-0000027878–8195.

[166]  OLPX-SA-0000027878–8195 at 8026–8031.

[167]  OLPX-SA-0000027878–8195 at 8119–8124.

[168]  Bria Declaration.

[169]  *Id.* ¶¶ 6–7.

44

Exhibit 1
52

including as a former managing director at DTC, United States delegate in clearance and settlement treaty negotiations, and in-depth understanding of DTC and its processes, as well as the intermediated system of securities holdings, is that I am not aware of, and do not believe that there exists, any method by which a beneficial owner can trace to the Registration Statement, of which the Prospectus was part, any shares of Olaplex Stock held at DTC or its sub-custodian in the street name of DTC that the beneficial owner claims to have acquired after November 12, 2021, where: (a) multiple issuances of shares of Olaplex Stock represented by the same CUSIP number have been deposited at DTC; and (b) one or more of the issuances was not made pursuant to the Registration Statement.

111.    Additionally, it is my opinion that:

i.      All Non-IPO Shares of Olaplex Stock issued on November 12, 2021:  (A) bore the same CUSIP number as the shares of Olaplex Stock previously issued in connection with the IPO (the "IPO Shares"), which were also held at DTC; (B) were issued in book-entry-only form—without any physical certificates for beneficial owners—and were registered in DTC's street name; and (C) were blended with the IPO Shares and held at DTC in a single undifferentiated fungible aggregate bulk  of identical, indistinguishable shares of Olaplex Stock.

ii.     In light of shares of Olaplex Stock from multiple issuances having been blended into a single undifferentiated fungible aggregate bulk at DTC, as of November 12, 2021, I do not believe that any method exists by which Lead Plaintiff or any other alleged beneficial owner would be able to show that the shares that they acquired of Olaplex Stock after November 12, 2021, held through DTC, are traceable to the Registration Statement, of which the Prospectus was part.

45

Exhibit 1
53

Executed this 20th day of June, 2025

Jack R. Wiener

46

Exhibit 1
54

**Appendix A**

## JACK R. WIENER

300 E. 74th St.; 19G                                                      C:  (917) 626-0154
NY, NY 10021-3715                                           Jackrwiener@gmail.com


**EXPERIENCE:**

**FINANCIAL SERVICES CONSULTING,** New York, NY                          2009-present
    **Chief Executive Officer**

> Founded consulting firm that provides advice and expert witness support with regard to transactions, clearance & settlement, custody, regulation, compliance, and litigation in the areas of securities, derivatives, banking, and white collar defense.  Advise banks, investment banks, broker-dealers, hedge funds, investment advisors, clearing firms, regulators, governments, individuals, and issuers from the US, Canada, France, Germany, the United Kingdom, Sweden, Israel, China, and the Cayman Islands in structuring and litigation matters.  Serve as expert witness for US Attorney's Office (SDNY) on clearance & settlement and international securities law, for law firms and global custodian banks at trials in Ireland and the Cayman Islands in multi-billion dollar Madoff-related litigation, for European banks in litigation regarding loss of $1.8 billion in asset-backed commercial paper, for clearing firm in dividend litigation, and for various parties in Section 11 securities class action litigation.  Advise Israel Ministry of Finance on restructuring bond offerings. In addition, represent athletes in sports law and SafeSport matters.

- **US Delegate**.  Represent the US in two multi-lateral, 40-nation treaty negotiations on the law of custody and transfer of securities.  Negotiating the Hague Securities Convention (cross-border pledging of securities) and the Unidroit Securities Convention (harmonizing substantive international securities law/regulation).  Appointed by US State Department.

- **Adjunct Professor of Law** at Brooklyn Law School, 2012-present. Teach International Securities Regulation & Compliance, International Sales of Securities and Goods, and the Law of War.

**SECURITIES INDUSTRY & FINANCIAL MARKETS ASSN,** New York, NY          2007-08
    **Managing Director & Associate General Counsel**

> **Legal, Regulatory, Compliance, Advocacy, and Market Practice Activities:**  Headed securities, fixed income, and derivatives market practice, legal, regulatory, and compliance initiatives of corporate credit market, primary market, and money market divisions for the largest securities industry lobby organization in the US. Advised the general counsels and investment advisors committees on securities and custody law, practice, regulation, and compliance.  Represented interests of 650 largest global underwriters and asset managers

1

Exhibit 1
55

**Appendix A**

with the Federal Reserve Bank, CFTC, SEC, FINRA, and European Commission.  Liaised with ISDA on derivatives matters.  Led various international initiatives.

**Credit Rating Agencies, Rule 144A, and MAAU:**  Led global industry task force that developed credit rating agency recommendations agreed upon by underwriters, buy-side firms, banks, and issuers.  Recommendations have driven global advocacy in the US and Europe, and are Presidents Working Group-endorsed.  Liaised with senior members of the PWG, Treasury Department, and US and European regulators.  Led task force of 16 largest global underwriters that developed an industry Guidance for Rule 144A issues, and an industry-wide Master Agreement Among Underwriters.

**THE DEPOSITORY TRUST & CLEARING CORPORATION,** New York, NY

| | |
|---|---:|
| **Deputy General Counsel & Managing Director** | 2001-05 |
| **General Counsel, Global Asset Solutions LLC** | 2003-05 |
| **Senior Counsel & Vice President** | 1999-2001 |
| **Associate Counsel & Vice President** | 1995-99 |
| **Associate Counsel** | 1989-95 |

*DTCC is the parent company of DTC, GSCC, NSCC, and GAS.  Custodies $87 trillion in securities, handles $2.4 quadrillion in transactions annually, and operates Deriv/SERV for derivative.*
*Regulated by the Fed, SEC, and NYS Banking Dept.*

**Corporate Support:**  Responsible for the company's activities in the areas of securities custody and transfer. Provided strategic legal counsel to senior management, the Board of Directors, and the Underwriting, Operations, Derivatives, Compliance, Risk, Internal Audit, International, Strategy, Dividends, Reorganization, Membership, Human Resources, and Systems Departments, and to subsidiaries (DTC, Deriv/SERV, GSCC, NSCC, and GAS).  Structured broad range of transactions.  Negotiated and drafted various agreements, including custodian and sub-custodian agreements with some of the world's largest custodians of securities, and MOUs and membership, joint venture, acquisition, and technology agreements.  Represented DTC on the Securities Clearing Group and the Unified Clearing Group, comprised of the US clearance and settlement self-regulatory organizations, which focus on identifying and minimizing risk. Participated in the design and implementation of several systems critical to the custody and processing of securities. Managed 12 staff members.

**Regulatory:**  Liaised with regulators on application of existing and proposed banking and securities laws and regulations, risk, compliance, audits, reviews, company practices, clearance-and-settlement offerings, changes in services, regulatory filings, derivatives, and anti-money-laundering.  Responsible for regulatory examinations and investigations. Interfaced with the SEC, Federal Reserve Bank of NY, and NY State Banking Dept., as well as the Treasury Department, OFAC, NASD, NYSE, GAO, and the UK's Financial Services Authority ("FSA").  Submitted comment letters to and worked closely with regulators on revisions, relating to the custody of securities, to the '40 Act (Rule 17f) and the '34 Act (Section 17A).  Advised management on existing and proposed SEC, Fed, and CFTC rules and regulations.

2

Exhibit 1
56

**Appendix A**

**Compliance/Risk:**   Developed and oversaw the enforcement of compliance and risk management rules, controls, policies, and procedures for securities custody and transactions, haircuts, underwritings, counter-party exposure, capital requirements, credit risk, stress-testing, Basel II, and membership. Performed investigations of fraud and breaches of compliance policies. Liaised with regulators as to appropriate risk control measures, including standards for Participant admissions.

**International:**  Headed international clearance-and-settlement law practice.  Structured and negotiated cross-border links and transactions with U.S. and non-US regulators, and with non-US custodian banks, broker-dealers, and depositories, supporting global trading for issues such as ordinary shares of UBS and DaimlerChrysler. Established, obtained regulatory approval of, and handled legal issues for UK and China offices.  Negotiated new international securities processing standards to standardize global practices, as a member of the G-30 Legal Working Group.

**Underwriting:**  Headed staff providing counsel on securities law aspects of debt and equity global offerings.  Advised with regard to clearance & settlement, including IPOs, exchanges, book-entry-only and uncertificated issues, and private placements.

**General Counsel of Global Asset Solutions LLC:**  General Counsel to major operating subsidiary handling all start-up business of parent, including a corporate actions validation service.

**Treaty Negotiations:**   Serve on US Delegations negotiating the Hague Securities Convention and the Unidroit Securities Convention with 40 nations. Appointed by the US State Department.

**WEBSTER & SHEFFIELD,** New York, NY                                            1987-89

**WILLKIE FARR & GALLAGHER,** New York, NY                                    1985-87

**PEPPER, HAMILTON & SCHEETZ,** Philadelphia, PA                            1982-85

As a securities associate, negotiated and drafted agreements for a wide range of securities, banking, and corporate transactions.  Worked primarily on mergers & acquisitions, leveraged buy-outs, and divestitures.  Represented bidders, purchasers, and sellers.  Drafted and filed a variety of SEC filings, including '33 & '34 Act filings.

**EDUCATION:**

**J.D., UNIVERSITY OF PENNSYLVANIA LAW SCHOOL,** Philadelphia, PA          1982

Honors:     Editor, **University of Pennsylvania Law Review**
Activities:  Morris Fellow; Phi Delta Phi

3

Exhibit 1
57

**Appendix A**

**B.A., BROOKLYN COLLEGE,** Brooklyn, NY                                          1979

| | |
|---|---|
| Class Standing: | 3.98 G.P.A.; *summa cum laude* |
| Double Major: | Political Science & Psychology (with honors) |
| Honors: | Phi Beta Kappa; Dean's List; Scholars Program |
| Awards: | Sive Award; Regents Scholarship; Social Science Scholarship |
| Activities: | Fencing – NCAA épée semi-finalist 1977, 1979; Team MVP Captain, 1978-79 |

**ADMITTED:** New York, DC, and Pennsylvania

**PRESENTATIONS:**

Presented speeches in the US, United Kingdom, Germany, Switzerland, Israel, China, Peru, and Argentina on various topics, including on the custody and transfer of securities, derivatives, Rule 144A/Reg. S offerings, Rule 17f of the '40 Act, credit ratings, bitcoins, and international legal harmonization.

4

Exhibit 1
58

# Appendix B

### List of Deposition, Trial, and Arbitration Testimony

I have not provided trial or arbitration testimony in the last four years. I have provided deposition testimony in the last four years as follows:

1. Deposition testimony in *Berner v. Getty Images Holdings, Inc.* and *Lapp v. Getty Images Holdings, Inc.*, Cases No.1:24-cv-04483 and 1:24-cv-05129 (S.D.N.Y.) (October 31, 2024).

2. Deposition testimony in *In re Valeant Pharmaceuticals International Inc. Securities Litigation*, Master No. 3:15-cv-07658-MAS-RLS (N.J.) (July 9-10, 2024).

3. Deposition testimony in *Boston Retirement System v. Uber Technologies, Inc.,* No. 3:18-cv-06361 (N.D. Cal) (April 3 & April 4, 2024).

4. Deposition testimony in *In re Talis Biomedical Securities Litigation*, Case No. 3:22-cv-00105-SI (Class Action) (N.D. Cal) (February 5, 2024).

5. Deposition testimony in *In re AdaptHealth Corp. Securities Litigation*, Case No. 2:21-cv-03382-HB (E.D. Pa.) (May 8, 2023).

6. Deposition testimony in *In re Cloudera, Inc. Securities Litigation*, Case No.: 19CV348674 (Superior Ct. Cal., Santa Clara) (August 1 & August 3, 2022).

7. Deposition testimony in *Hound Partners Offshore Fund LP et al v. Valeant Pharmaceuticals International, Inc.*, Case No. 18-8705 (D. NJ.) (June 24 & June 27, 2022).

8. Deposition testimony in *Hayden v. Portola Pharm.*, Case No. 20-cv-00367-VC (N.D. Cal) (May 18, 2022).

9. Deposition testimony in *In re Evoqua Water Technologies Corp. Securities Litigation*, Case No. 1:18-cv-10320-JPC (S.D.N.Y.) (March 25, 2021).

Exhibit 1
59

**Appendix C**

## List of Documents and Materials Relied Upon

**Pleadings**

- Certification of Rod Graves, Exhibit A, *Lilien v. Olaplex Holdings, Inc.*, United States District Court Central District of California, Docket No. 2:22-cv-08395, Doc. No. 27-1, January 17, 2023.
- Revised Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *Lilien v. Olaplex Holdings, Inc.*, United States District Court Central District of California, Docket No. 2:22-cv-08395, Doc. No. 123, June 22, 2023.

**Declaration**

- Declaration of Ann Marie Bria (June 18, 2025), Exhibit 2 to Declaration of Anne Johnson Palmer, *Lilien v. Olaplex Holdings, Inc.*, United States District Court Central District of California, Docket No. 2:22-cv-08395, June 20, 2025.

**Academic Sources**

- ANDREW M. CHISHOLM, AN INTRODUCTION TO INTERNATIONAL CAPITAL MARKETS (2009), https://www.google.com/books/edition/An_Introduction_to_International_Capital/FkkEgrXNv9AC.
- JOHN C. WILCOX ET AL., *"Street Name" Registration & The Proxy Solicitation Process*, in A PRACTICAL GUIDE TO SEC PROXY AND COMPENSATION RULES (Lisa A. Fontenot & Michael A. Titera ed., 6th ed., 2025), https://www.google.com/books/edition/_/4FOEDwAAQBAJ.
- Maureen O'Hara & George S. Oldfield, *The Microeconomics of Market Making*, 21 J. FIN. & QUANTITATIVE ANALYSIS 361 (1986).
- MILTON N. NELSON, READINGS IN CORPORATION FINANCE (1926), https://www.google.com/books/edition/Readings_in_Corporation_Finance/IQdDAAAAIAAJ.
- Suellen M. Wolfe, *Escheat and the Challenge of Apportionment: A Bright Line Test to Slice a Shadow*, 27 ARIZ. ST. L.J. 173 (1995).
- VIRGINIA B. MORRIS & STUART Z. GOLDSTEIN, LIFE CYCLE OF A SECURITY (2010), https://www.google.com/books/edition/Life_Cycle_of_a_Security/Hv8ipHbVoGUC.
- William V. Holohan, *Contribution Among Securities Pledged by a Defaulting Stock Broker*, 4 S. CAL. L. REV. (1930).

**SEC Filings**

- Olaplex Holdings, Inc., Amendment No. 1 to Form S-1 (Form S-1/A) (Sep. 20, 2021).
- Olaplex Holdings, Inc., Amendment No. 2 to Form S-1 (Form S-1/A) (Sep. 28, 2021).

1

Exhibit 1
60

**Appendix C**

- Olaplex Holdings, Inc., Annual Report for Fiscal Year Ended December 31, 2021 (Form 10-K) (Mar. 8, 2022).
- Olaplex Holdings, Inc., Registration Statement (Form S-8) (Oct. 4, 2021).
- Olaplex Holdings, Inc., Prospectus (Form 424B4) (dated Sep. 29, 2021, filed on Oct. 1, 2021).
- Olaplex Holdings, Inc., Quarterly Report for Quarter Ended March 31, 2022 (Form 10-Q) (May 11, 2022).
- Olaplex Holdings, Inc., Quarterly Report for Quarter Ended September 30, 2021 (Form 10-Q) (Nov. 10, 2021).
- Olaplex Holdings, Inc., Registration Statement (Form S-1) (Aug. 27, 2021).
- Olaplex Holdings, Inc., Registration Statement (Form S-1MEF) (Sep. 29, 2021).
- Nasdaq, Certification Notice Letter to SEC (Sep. 30, 2021).
- SEC, Notice of Effectiveness to Form S-1 (Sep. 29, 2021).

**Websites and Publicly Available Documents (Last Visited June 20, 2025)**

- AMAZON, *FAQs*, https://ir.aboutamazon.com/faqs/default.aspx.
- Corporate Finance Institute, *Market Maker*, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker.
- Computershare, *Supplement to the Computershare CIP*, *A Direct Stock Purchase & Dividend Reinvestment Plan for Amazon.com, Inc.* (Mar. 6, 2020), https://cda.computershare.com/Content/94e8615b-7cac-4062-9748-b106d035eed9.
- Computershare, *Supplement to the Computershare CIP*, *A Direct Stock Purchase & Dividend Reinvestment Plan for The Coca-Cola Company* (Nov. 11, 2019), https://cda.computershare.com/Content/9802e0f7-be88-40e4-9a3e-acef33959710.
- CUSIP Global Services, *About Us*, https://www.cusip.com/about/index.html.
- CUSIP Global Services, *Inside the CGS Identification System* (Aug. 2010), https://web.archive.org/web/20211102145159/https://www.cusip.com/pdf/CUSIP_Intro_03.14.11.pdf.
- CUSIP Global Services, *Universally Recognized Identifier for Financial Instruments*, https://www.cusip.com/identifiers.html#/CUSIP.
- DTC, *The FAST Program*, https://www.dtcc.com/asset-services/agent-services/fast.
- DTC, *1989 Annual Report* (1989), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1980/1989_0101_DTCAR.pdf.
- DTC, *1997 Annual Report* (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101_DTCAR.pdf.
- SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01.pdf.

2

Exhibit 1
61

**Appendix C**

- DTCC, *2008 Financial Report* (2008), https://www.dtcc.com/-/media/Files/Downloads/About/Annual-Reports/2008_report.pdf.

- DTCC, *Blanket Issuer Letter of Representations Template*, https://www.dtcc.com/-/media/Files/Downloads/legal/issue-eligibility/eligibility/BLOR-Template.pdf.

- DTCC, *Deposit/Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian.

- DTCC, *Direct Registration System*, https://www.dtcc.com/asset-services/securities-processing/direct-registration-system.

- DTCC, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures* (Mar. 2023), https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf.

- DTCC, *DTC Member Directories* (updated May 30, 2025), http://www.dtcc.com/client-center/dtc-directories.

- DTCC, *Issuer Services Frequently Asked Questions (FAQs)*, https://dtcclearning.com/products-and-services/asset-services/issuer-services/8674-issuer-services-frequently-asked-questions-faqs.html.

- DTCC, *Operational Arrangements* (Oct. 2023), https://www.dtcc.com/~/media/Files/Downloads/legal/issue-eligibility/eligibility/operational-arrangements.pdf.

- DTCC, *Rules, By-Laws, Organization Certificate, The Depository Trust Company* (Apr. 2025), https://www.dtcc.com/~/media/Files/Downloads/legal/rules/dtc_rules.pdf.

- DTCC, *Security Position Reports Guide* (Jan. 2016), https://www.dtcc.com/-/media/Files/Downloads/Settlement-Asset-Services/Issuer-Services/New-SPR-Web-User-Guide.pdf.

- DTCC, *Security Position Reports*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/security-position-reports.

- DTCC, *The Depository Trust Company (DTC)*, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc.

- Fidelity Investments, *About Us*, https://clearingcustody.fidelity.com/app/item/RD_13569_42626/fiws/about-us-iwms.html.

- FINRA, *2024 FINRA Industry Snapshot Report* (Oct. 2024), https://www.finra.org/sites/default/files/2024-07/2024-Industry-Snapshot.pdf.

- Larry E. Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*, Speech by SEC Staff: International Securities Settlement Conference (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm.

- LEGISLATIVE HISTORY OF THE REVENUE ACT OF 1932: P.L. 72-154: 47 STAT. 169, 1229 (1932), https://www.google.com/books/edition/Revenue_Act_of_1932/BCjVAAAAMAAJ.

- NASDAQ, *The Depository Trust Company*, https://www.nasdaq.com/glossary/d/depository-trust-company

- NYSE, *Crisis in the Securities Industry, A Chronology: 1967–1970* (1971), https://www.

3

Exhibit 1
62

**Appendix C**

sechistorical.org/collection/papers/1970/1971_0730_NYSECrisis.pdf.

- PFIZER, *Stock FAQs*, https://investors.pfizer.com/Investors/Shareholder-Services/Stock-FAQs/.

- SEC, *Final Report of the Securities and Exchange Commission on the Practice of Recording the Ownership of Securities in the Records of the Issuer in Other Than the Name of the Beneficial Owner of Such Securities*, No. 80-014 (Dec. 3, 1976), https://ia803200.us.archive.org/22/items/fsec00unit/fsec00unit.pdf.

- SEC, *Investor Bulletin: DTC Chills and Freezes* (May 2012), https://www.sec.gov/investor/alerts/dtcfreezes.pdf.

- SEC, *Investor Bulletin: Holding Your Securities* (July 12, 2023), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-97.

- SIFMA, *Report on the Shareholder Communications Process with Street Name Holders, and the NOBO-OBO Mechanism* (June 10, 2010), https://www.sec.gov/comments/s7-14-10/s71410-1.pdf.

- UBS, *Your Relationship with UBS* (Jan. 2025), http://ubs.com/relationshipwithubs#:~:text=%E2%80%93%20Principal%20trading%3A%20As%20principal%20in,securities%20we%20buy%20from%20you.

- U.S. Congress, *Trading with the Enemy: Hearings before the Subcommittee of the Committee on Commerce, United States Senate*, Sixty-Fifth Congress, First Session on H. R. 4960, 67 (1917), https://books.google.com/books?id=pQgQAAAAIAAJ&printsec=frontcover#v=onepage&q&f=false.


**Public Press and Press Releases (last visited June 20, 2025)**

- E.S. Browning et al., *Wild Day Caps Worst Week Ever for Stocks*, WALL STREET J. (Oct. 11, 2008), https://www.wsj.com/articles/SB122368071064524779.

- DTCC Press Release, *DTCC Celebrates 40 Years of Service* (June 3, 2013), https://web.archive.org/web/20210507040651/https://www.dtcc.com/news/2013/june/03/dtcc-celebrates-40-years-of-service.

- DTCC Press Release, *DTCC Announces the Appointment of Laura Deaner as Chief Information Security Officer* (June 2, 2025), https://www.dtcc.com/news/2025/june/02/dtcc-announces-the-appointment-of-laura-deaner-as-chief-information-security-officer.

- Olaplex Holdings, Inc. Press Release, *OLAPLEX Announces Pricing of Upsized Initial Public Offering* (Sep. 30, 2021), https://finance.yahoo.com/news/olaplex-announces-pricing-upsized-initial-044300797.html.

- Terry Robards, *Stocks: Dam Is Holding*, N.Y. TIMES (Feb. 14, 1971), https://www.nytimes.com/1971/02/14/archives/stocks-dam-is-holding-this-time-so-far-trading-flood-is-controlled.html.


**Rules and Case Law**

- SEC, *Concept Release on the U.S. Proxy System,* 17 C.F.R. Parts 240, 270, 274, and 275,

4

Exhibit 1
63

**Appendix C**

Release Nos. 34-62495; IA-3052; IC-29340; File No. S7-14-10 (July 14, 2010), https://www.sec.gov/files/litigation/litreleases/2010/34-62495.pdf.

- SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005), https://www.sec.gov/rules-regulations/2004/12/issuer-restrictions-or-prohibitions-ownership-securities-intermediaries.

- SEC, *Rule 144: Selling Restricted and Control Securities* (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144.

- SEC, *Shortening the Securities Transaction Settlement Cycle*, Final Rule, Exchange Act Release No. 34-96930 (Feb. 15, 2023), https://www.sec.gov/rules-regulations/2023/02/34-96930.

- SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf.

- SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm.

- Notice of Filing and Immediate Effectiveness of a Proposed Rule Change To Amend the DTC Deposits Service Guide Relating to Procedures for the Deposit of Nontransferable Securities, 84 Fed. Reg. 48,187 (Sep. 6, 2019), https://www.federalregister.gov/documents/2019/09/12/2019-19704/self-regulatory-organizations-the- depository-trust-company-notice-of-filing-and-immediate.

- *Reichard v. Hutton*, 142 N.Y.S. 935 (App. Div. 1913).

- UCC § 8, *Investment Securities*.

- UCC § 8-503, *Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary*.

**Case Materials**
- OLPX-SA-0000027871.
- OLPX-SA-0000027873.
- OLPX-SA-0000031836.
- OLPX-SA-0000032802.
- OLPX-SA-0000303609.
- OLPX-SA-0000368863.
- OLPX-SA-0000408366.

**Case Materials Received by Olaplex from AST and DTC**
- OLPX-SA-0000027878.
- OLPX-SA-0000028196.
- OLPX-SA-0000028221.
- OLPX-SA-0000028259.
- OLPX-SA-0000028262.

5

Exhibit 1
64

**Appendix C**

- OLPX-SA-0000028266.

6

Exhibit 1
65