# EXHIBIT D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE LILIEN, Individually and on Behalf of All Others Similarly Situated,<br><br>    PLAINTIFF,<br><br>v.<br><br>OLAPLEX HOLDINGS, INC., et. al.,<br><br>    DEFENDANTS. | Case No. 2:22-cv-08395-SVW-SK<br><br>CLASS ACTION<br><br>Judge: Hon. Stephen V. Wilson |

EXPERT REPLY REPORT OF PROFESSOR JOSHUA MITTS, PH.D.

JUNE 27, 2025

T<span>ABLE OF</span> C<span>ONTENTS</span>

**I.    Introduction** ........................................................................................................**2**

   A.    Qualifications .............................................................................................. 2

   B.    Summary of Conclusions ............................................................................ 4

**II.    Factual Overview** ..............................................................................................**5**

**III.    The Wiener Report is Unreliable, as it is Premised upon Demonstrably False Claims and a Fundamentally Inaccurate Theory of How DTC Functions** ...........................................**8**

   A.    The Wiener Metamorphosis Theory is fiction................................................ 10

   B.    The transactional nature of DTC records shows that DTC participant holdings are not fungible or "blended". ......................................................... 12

   C.    DTC describes its own records as differentiated and non-fungible.................... 17

   D.    The Wiener Report's opinions are also contradicted by the Wiener Report itself ........... 19

   E.    The Wiener Report repeatedly mischaracterizes commentary and secondary sources to advance the inaccurate claim that DTC holds shares in an "Undifferentiated Fungible Aggregate Bulk" ........................................................................................ 21

   F.    DTC records are analogous to an ATM machine, not a wine vat. .................... 22

**IV.    Records produced in discovery make it possible to identify which members of the Proposed Class purchased IPO Shares after November 12, 2021**..........................................**25**

   A.    The Wiener Report falsely claims that Non-IPO Shares were "held at DTC" when actually they were held by segregated DTC participant accounts............................ 25

   B.    It is logically impossible for certain DTC participants (and their customers) to have received Non-IPO Shares on certain dates prior to the Lock-Up Expiration. ................ 30

   C.    It is straightforward to trace transfers of Non-IPO Shares to other DTC participant accounts using accounting methods such as FIFO or LIFO (when required). ................ 33

**V.    It is straightforward to determine, on a Class-wide basis, which members of the Proposed Class purchased IPO Shares of Olaplex common stock. ...................................**38**

# I. INTRODUCTION

## A. Qualifications

1. I am the David J. Greenwald Professor of Law at Columbia University. I am also the principal of M Analytics LLC, a consulting firm specializing in financial economics. I hold a Ph.D. in Finance & Economics from Columbia University, a J.D. from Yale University, and a B.A. in Liberal Studies from Georgetown University.

2. I have published extensively in the fields of economics, finance, and law. My articles have appeared in peer-reviewed journals, including the *Journal of Finance* (winner of the Dimensional Fund Advisors Distinguished Paper Prize (2020)), the *Journal of Law and Economics*, the *Journal of Legal Studies*, the *Journal of Institutional and Theoretical Economics*, the *International Review of Law and Economics*, the *Journal of Financial Regulation*, the *Business Lawyer*, and the *Harvard Business Law Review*, among others.

3. I have been invited to present my research at numerous conferences and workshops in finance and law and economics, including the Annual Meeting of the American Finance Association, the Annual Meeting of the American Law & Economics Association, the Conference on Empirical Legal Studies, the Columbia Business School Conference on News and Finance, and the 8th Symposium on Intelligent Investing at Ivey Business School, and at workshops at Harvard University, Columbia University, New York University, The University of Texas at Austin, and Vanderbilt University.

4. I have reviewed articles for peer-reviewed journals in finance and law and economics, including *The Review of Financial Studies*, *The Journal of Law and Economics*, *The*

2

*Journal of Legal Studies*, *International Review of Law and Economics*, and *Journal of Empirical Legal Studies*.  My research and commentary have been featured in *The Wall Street Journal*, *Reuters*, *Bloomberg*, *The Washington Post*, *MarketWatch*, *Law360*, *Bloomberg Law*, *Bloomberg View*, *Bloomberg BNN*, and *The Globe and Mail*.

5.      In addition to my research and teaching and academic responsibilities, I advise on the analysis of trading data in connection with securities violations.  I have extensive experience supporting the U.S. Department of Justice.  My research and expert opinions have been presented to the U.S. Securities and Exchange Commission and other regulatory bodies.

6.      In the course of this professional experience, I have extensively analyzed trading records.  I have reviewed tens of thousands of pages of Daily Participant Activity Statements produced by the Depository Trust Company ("DTC"), as well as other types of DTC-produced records, in connection with my work on certain other litigation matters listed in my *curriculum vitae.*

7.      At Columbia University, I have taught courses on securities regulation, law and economics, data science, and contracts.  My courses encompass economic theory, quantitative methods of valuation, asset pricing, investments, and data analytics as well as the economics of securities fraud, market manipulation, and insider trading.

8.      My qualifications, publications, and expert witness testimony over the past five years are summarized in detail in my *curriculum vitae*, attached to this report as Exhibit A.

9.      I have been engaged by Labaton Keller Sucharow LLP, who is the Lead Counsel for Lead Plaintiff the Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff") in this matter.  In connection with this engagement, I am being compensated at a rate of $1,700 per hour for my work in this matter.  I have been assisted in this matter by my staff at M Analytics LLC working under my direction, and I receive further compensation based on those billings.  M Analytics LLC and my compensation are not in any way dependent on my opinions expressed in this report or the outcome of this Litigation.

10.     I have been asked by the Lead Counsel for Lead Plaintiff to provide opinions in response to the Expert Report of Jack R. Wiener, dated June 20, 2025 ("Wiener Report").[1]  I understand that Lead Plaintiff makes the legal argument that under the circumstances presented in this case, there is no need to separately trace any securities issued pursuant to the Form S-8 filed on October 4, 2021, issued in conjunction with the Form S-1 and which incorporated by reference the entirety of the Form S-1.  My opinion responds to the Wiener Report if the Court were to conclude that tracing is nonetheless warranted here and explains the methodology for performing that analysis.

**B.      Summary of Conclusions**

11.     I have reviewed the Wiener Report, and in this Reply Report I offer the following opinions:

i.   ***First***, the Wiener Report is unreliable as it premised on demonstrably false claims and a fundamentally incorrect understanding of how DTC operates;

---

[1] Expert Rpt. of Jack R. Wiener, June 20, 2025, ECF No. 203-1 (hereinafter "Wiener Report").

ii. **Second**, records produced in discovery make it possible to identify which members of the Proposed Class purchased IPO Shares after November 12, 2021; and

iii. **Third**, it is straightforward to determine, on a Class-wide basis, which members of the Proposed Class purchased IPO Shares of Olaplex common stock.

12. In reaching my opinions, in addition to documents from this case, I relied upon various publicly available materials, which are listed in Exhibit B and/or otherwise cited in this Reply Report.

13. The research and analysis upon which my opinions are based has been conducted by me with the assistance of personnel working under my direction and supervision. I reserve the right to modify this Reply Report and my conclusions based on additional information and materials I might review, including materials that have not yet been made available for review.

## II.   FACTUAL OVERVIEW

14. In this section, I describe a portion of the facts underlying this case that are relevant to this Report as I understand them based on Lead Plaintiff's Revised Consolidated Class Action Complaint (the "Complaint"), filed on June 22, 2023,[2] Lead Plaintiff's Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, filed May 30, 2025,[3] and

---

[2] Revised Consolidated Class Action Compl. for Violations of the Federal Securities Laws, June 22, 2023, ECF No. 123 (hereinafter "Compl."). Unless otherwise noted, emphasis is in the original of all cited sources.

[3] Mem. of Law in Supp. of Lead Pl.'s Mot. for Class Certification, May 30, 2025, ECF No. 199-1 (hereinafter "Mot.").

the February 7, 2025 Order of the U.S. District Court for the Central District of California on Defendants' Motions to Dismiss Lead Plaintiff's Section 11 claims.[4]

15.   On or about September 29, 2021, Olaplex Holdings, Inc. ("Olaplex" or the "Company") conducted an Initial Public Offering ("IPO") of its common stock.[5]   Pursuant to the Registration Statement,[6] filed on August 27, 2021 and declared effective by the SEC on September 29, 2021, Olaplex sold 84,755,000 shares of its common stock (the "IPO Shares") in its IPO at a price of $21 per share.[7]   Olaplex's IPO raised a total of $1.6 billion.[8] The Company's IPO was facilitated by "various investment banks that served as underwriters for the IPO, assisted in the preparation and dissemination of the Offering Documents, and solicited investors to purchase Olaplex stock in the IPO."[9]

16.   I understand Lead Plaintiff has alleged that in the run-up to its IPO, Olaplex made false and misleading statements, as well as material omissions, concerning "risks posed by the

---

[4] *Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993 (C.D. Cal. 2025).

[5] Compl. at ¶ 2 n.1.

[6] *See* Compl. at ¶ 155 for Lead Plaintiff's comprehensive definition of the IPO "Offering Documents" (explaining that the "IPO was conducted pursuant to, and the sale of Olaplex stock was solicited by, several documents filed by Defendants with the SEC and disseminated to the investing public, including (i) an August 27, 2021 registration statement on Form S-1, which, following amendment, was declared effective by the SEC on September 29, 2021 (the "Registration Statement"), and (ii) an October 1, 2021 prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus," and, together with the Registration Statement, the "Offering Documents").").

[7] Compl. at ¶ 154.   The 84,755,000 shares of common stock sold by the Company in its IPO includes "an underwriter overallotment of 11,055,000 shares." *Id.*

[8] Mot. at *2.

[9] *Olaplex*, 765 F. Supp. 3d at 1003.   *See id.* at 1000 n.3 for the list of individual underwriters for the IPO who collectively constitute the "Underwriter Defendants. ("The underwriter defendants are: Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., BofA Securities, Inc., Evercore Group L.L.C., Jeferies LLC, Raymond James & Associates, Inc., Cowen and Company, LLC, Piper Sandler & Co., Truist Securities, Inc., Telsey Advisory Group LLC, Drexel Hamilton, LLC, Loop Capital Markets LLC.").

Company's use of toxic chemical lilial in its key haircare product" and that when, after the IPO, those risks "and the impact of the revelation of those risks" was disclosed, Olaplex's stock price dropped dramatically, down to a November 17, 2022 closing price of just $5.75 per share (a 72.6% decline from its IPO price).[10]  I further understand that Lead Plaintiff has brought claims against the Company as well as various Individual Defendants[11] under Section 11 of the Securities Act of 1933 based on allegations that the Registration Statement for Olaplex's IPO (1) contained untrue statements of material fact; (2) omitted material facts necessary to make statements in the Registration Statement not misleading; and (3) omitted material facts that were required by federal regulations to be included in the Registration Statement.[12]

17.     I understand that this Court ruled against attempts by Defendant Olaplex and the Individual Defendants to dismiss Lead Plaintiff's Section 11 claims.[13]  I further understand that Lead Plaintiff has brought, and the Court has denied attempts by the relevant Defendants to dismiss, additional claims under the Securities Act of 1933, specifically Section 12(a)(2)

---

[10] Mot. at *2.

[11] The individuals who collectively comprise the "Individual Defendants" are "Jue Wong, Eric Tiziani, Tiffany Walden, Christine Dagousset, Tricia Glynn, Deirdre Findlay, Janet Gurwitch, Martha Morfitt, David Mussafer, Emily White, Michael White, and Paula Zusi." *Olaplex*, 765 F. Supp. 3d at 1000 n.2.  For a comprehensive discussion of each Individual Defendant's background and role *see* Compl. ¶¶ 25-38.  I also understand that Lead Plaintiff brought Section 11 claims against the Underwriter Defendants but that this Court dismissed those claims, holding that Lead Plaintiff's Section 11 claims against the Underwriter Defendants "fail because they are time-barred." *Olaplex*, 765 F. Supp. 3d at 1021.

[12] *Olaplex*, 765 F. Supp. 3d at 1005-1006.

[13] *See Olaplex*, 765 F. Supp. 3d at 1023 ("Defendants' motion to dismiss the Section 11 and 12 claims against Olaplex and the Individual Defendants is DENIED.").

against Defendant Olaplex and the Individual Defendants, and under Section 15 against the Individual Defendants.[14]

18.     I further understand that Lead Plaintiff has moved to certify a proposed Class of investors for its Securities Act claims consisting of "all persons and entities that purchased or otherwise acquired Olaplex common stock pursuant and/or traceable to the Offering Documents issued in connection with Olaplex's initial public offering", with Lead Counsel Labaton Keller Sucharow LLP appointed as Class Counsel.[15]

## III.     THE WIENER REPORT IS UNRELIABLE, AS IT IS PREMISED UPON DEMONSTRABLY FALSE CLAIMS AND A FUNDAMENTALLY INACCURATE THEORY OF HOW DTC FUNCTIONS

19.     The Wiener Report articulates two opinions: (i) shares of Olaplex common stock registered under a Form S-8 which incorporated by reference the Form S-1 filed in connection with the IPO ("Non-IPO Shares"[16]) were sold prior to the expiration of the Lock-Up agreements (the "Lock-Up Expiration")[17] and "were blended with IPO Shares and held at DTC in a

---

[14] See id.

[15] Mot. at *1.  See id. at **1-2 for the full definition of the proposed Class ("All persons and entities that purchased or otherwise acquired Olaplex's publicly traded common stock pursuant and/or traceable to the Offering Documents for Olaplex's IPO, and who were damaged thereby. Excluded from the Class are: (i) Defendants and the Individual Defendants' immediate family members; (ii) the officers, directors, and subsidiaries of Olaplex, at all relevant times; (iii) Olaplex's affiliates and employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired Olaplex's common stock pursuant or traceable to the Offering Documents through any such plan(s); (iv) any person and entity that had or has a controlling interest in Olaplex, at all relevant times; (v) the underwriters of Olaplex's IPO, provided, however, that any "Investment Vehicle" shall not be excluded from the Class;2 (vi) any entity in which any of the Defendants have or had a controlling or beneficial interest; and (vii) the legal representatives, heirs, successors, or assigns of any such excluded person or entity, in their capacity as such.").

[16] In this Reply Report I use the term "Non-IPO Shares" to refer all shares of Olaplex common stock other than the 84,755,000 shares sold in the IPO.

[17] As is commonly the case with IPOs, many shares of already-issued Olaplex common stock were, subject to certain exceptions, not permitted to be sold (i.e., were "restricted" shares) until 180 days after the date of the IPO's Prospectus. Therefore, the lock-up period for Olaplex's IPO expired on March 29, 2022.

single undifferentiated fungible aggregate bulk of, identical, indistinguishable shares of Olaplex Stock"; and (ii) that because of this "blend[ing]" of IPO Shares and Non-IPO Shares at the DTC level, it is impossible for any Proposed Class member to "show that the shares they acquired of Olaplex Stock, [after this blending occurred] held through DTC, are traceable to the [IPO] Registration Statement."[18]

20.    The crux of both of the Wiener Report's opinions is a belief that once any Non-IPO Shares "are deposited at DTC, [they] are ***commingled into a fungible bulk*** with any other shares of Olaplex" – in this case, the IPO Shares – "already on deposit at DTC."[19]  The basis for this central premise is Mr. Wiener's dogmatic conviction that each security with the same CUSIP that is custodied at DTC is held by the DTC in a "***fungible, aggregate bulk***"[20] and that all the securities in that "fungible bulk [] are commingled and are not capable of being distinguished from one another."[21]

21.    In this Reply Report, I use the term "Wiener Metamorphosis Theory" to refer to Mr. Wiener's assertion that deposits of shares to DTC undergo a kind of transformation into an undifferentiated fungible bulk.   It is this Wiener Metamorphosis Theory that is the fundamental basis for the Wiener Report's analysis and resulting opinions.

---

[18] Wiener Report, ¶ 20.

[19] *Id*. n.9 (emphasis added).

[20] *Id*. ¶ 40 (emphasis in original).

[21] *Id*. ¶ 46.  The dogmatic nature of Mr. Wiener's conviction is evident not only in the way in which the Wiener Report ignores evidence inconsistent with his beliefs, ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ emphasis added).

22.     The Wiener Metamorphosis Theory, however, is demonstrably false and contradicted by the very records upon which an expert analysis should rely.  Completely undermined by DTC's actual records and processes, DTC's own descriptions of its records and processes, and even at times by Mr. Wiener's own observations, the Wiener Metamorphosis Theory is little more than a dogmatic philosophy with no connection to reality.

**A.      The Wiener Metamorphosis Theory is fiction.**

23.     The Wiener Report's discussion of the DTC is mostly imaginary.  Mr. Wiener claims that "once shares are deposited into [DTC's] fungible bulk, [the shares] are commingled and are not capable of being distinguished from one another."[22]  But that is incorrect.  As I will explain in detail, individual and differentiated (*i.e.*, non-fungible) share ownership is recorded and maintained prior to the shares being deposited at DTC ***and remains individual and differentiated after being deposited and held at DTC***.

24.     As the Wiener Report acknowledges, companies generally do not issue paper certificates.[23]  A company's transfer agent records the issuance of shares to specific parties, typically on a "transfer journal."  A transfer journal lists both issuances by the company to a party as well as transfers of shares between parties.  In my experience, transfer journals are

---

[22] *Id.*

[23] Mr. Wiener explains that while some companies "still offer physical paper stock certificates to beneficial owners" *Wiener Report* ¶ 62, the DTC was created to address, and largely obviated, the cumbersome practice of "physically mov[ing] paper securities certificates from seller to buyer" *Id*. at ¶ 31.  To that end, the DTC settles "book-entry" (*i.e.,* paperless or electronic) transactions in securities. *See* Virginia B. Morris*, Guide to Clearance & Settlement: An Introduction to DTCC* (2021) at 7, https://static1.squarespace.com/static/5afc7c9d12b13fd2d1e912bb/t/632090504d38ae2ecc5709f2/1663078486818/DTCC-ClearanceSettlement_2021.pdf (explaining that at the DTC "transfers are handled electronically through a book-entry accounting system . . . The certificates themselves never leave DTC and the name of the registered owner never changes either. Instead, every trade is handled electronically as the record on DTC's book entry system is updated to show that a security sold by a client of one broker/dealer has been debited from that firm's account with DTC and credited to the account of a firm whose client has purchased the security.").

generally maintained as electronic book entries rather than physical stock certificates.  In the SEC's words: "When securities are referred to as being in "book-entry" form, it means that the investor does not receive a certificate. Instead, a custodian, usually a broker *or transfer agent*, maintains *electronic records* showing that the investor owns the particular security."[24]

25.    As the Wiener Report also acknowledges, for shares to be eligible for clearing and settlement in modern markets, they must be deposited into DTC participant accounts.[25] This occurs through two simultaneous steps.  *First*, the transfer agent electronically records a book-entry transfer to Cede & Co.  *Second*, and at the same time, a corresponding electronic "direct deposit" book entry is recorded into a participant account for the benefit of a depositing DTC participant.[26]  That is, share ownership is recorded as electronic book entries before they are registered to Cede & Co. and remain as electronic book entries thereafter.  Each deposit is credited to one DTC participant and that participant alone.[27]

---

[24] SEC, Transfer Agent Regulations, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at *7 n.3 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited July 25, 2024) (emphasis added); *see also* DTCC, *Cross-Business Glossary of Terms*, https://dtcclearning.com/helpfiles/cross_bus/glossary/Content/Topics/gloss.htm (last visited June 22, 2025) (describing how under the Fast Automated Securities Transfer Program ("FAST"), "transfer agents of issuers also act as agents of DTC … [and] *electronically* reconcile securities holdings daily." (emphasis added); *see also* DTCC, *From Physical to Digital: Advancing the Dematerialization of U.S. Securities*, at *8 (Sept. 2020), https://www.dtcc.com/-/media/Files/PDFs/DTCC-Dematerialization-Whitepaper-092020.pdf (last visited June 22, 2025) ("Transfer agents play a central role in driving dematerialization" of the securities marketplace).

[25] *See* Wiener Report, ¶ 25 n.21 ("Most large U.S. broker-dealers and banks are DTC Participants, *meaning that they deposit and hold securities at DTC*.") (internal quotations and citations omitted) (emphasis added).

[26] *See infra* note 27 and accompanying text.

[27] The process for FAST transfer agent deposits, as occurred here, is given in DTCC publications.  DTCC, *Deposit/Withdrawal At Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last visited June 22, 2025) ("Participants submit their physical securities and/or transfer instructions for approval directly to their FAST transfer agent. When the transfer agent approves the transfer, the participant enters the transaction via the PDWC function on DTC's Participant Terminal System (PTS), the Part Direct Deposit/Withdrawal function on DTC's Participant Browser System (PBS), or the

26.    The Wiener Metamorphosis Theory is contradicted by these basic, objectively verifiable facts.  Instead, Mr. Wiener makes the bizarre claim that shares custodied at DTC "no longer exist in their prior form" because they are "wholly blended" with the other shares held by DTC.[28]  This metaphysical language—claiming shares are somehow "blended" out of their prior existence—bears no resemblance to reality.

27.    Even a cursory review of actual DTC records demonstrates that the Wiener Metamorphosis Theory is a figment of Mr. Wiener's imagination.  DTC records show that shares are held by individual DTC participants and the movement of these discrete, identifiable shares is tracked and maintained in detailed **transaction-based** records, which do not (as Mr. Wiener suggests) only track proportional changes in DTC participants' *pro rata* entitlements to an undifferentiated, fungible bulk of shares, as I describe in detail in Section IV *infra*.

**B.    The transactional nature of DTC records shows that DTC participant holdings are not fungible or "blended".**

28.    To elucidate the "commingled, fungible, aggregate bulk" in which the Wiener Report claims the DTC holds securities, Mr. Wiener presents the analogy of a wine vat.  In this analogy, wine stands in for shares; vineyards stand in for issuers; a specific wine "vintage" stands in for a discrete registration statement under which particular shares were issued; and the vat stands in for DTC's supposed fungible bulk holding of all of the shares.[29]

---

CF2DWX file protocol. The transfer agent then approves the transaction via the CDWC function on PTS or the TA Direct Deposit/Withdrawal function on PBS.  **For DWAC deposits, the requesting participant's position in its DTC account is increased** as is DTC's FAST balance in the issue.") (emphasis added).

[28] Wiener Report, ¶ 47.

[29] *See id*. ¶¶ 50-52.

29.     The extended analogy is helpful for vivifying how Mr. Wiener *believes* DTC holds shares – and I do not in any way question the sincerity of Mr. Wiener's dogmatic belief – but fundamentally fails to grasp how DTC actually works.  The wine vat analogy is not so much a distortion or inapt analogy as it simply a description of an entirely different entity which may or not exist somewhere in the world but is most certainly not the DTC.

30.     To appreciate the irresolvable tension between the actual DTC and the fictitious one presented in the Wiener Metamorphosis Theory, one need only examine easily accessible DTC records, many of which have already been produced in this matter.  Such an examination, as I carry out here, yields the unambiguous determination that DTC records are transactional in nature, and track the holding and movement of individual, differentiated shares across individual, differentiated DTC participant accounts.

31.     As the Wiener Report acknowledges, 73,700,000 IPO Shares of Olaplex common stock were custodied at DTC on October 4, 2021.[30]  But the DTC records of that delivery explicitly show that the IPO Shares were not "blended" an "undifferentiated fungible aggregate bulk" of Olaplex shares held in some sort of general DTC account.  Rather, the DTC Participant Daily Activity Statements records for settlement date October 4, 2021 show that the 73,700,000 IPO Shares were ***deposited into the DTC participant account of the IPO underwriter, Goldman Sachs (DTC participant #5)***.  Reproduced below is a true and correct excerpt of the DTC Participant Daily Activity Statements for October 4, 2021.[31]

---

[30] Wiener Report, ¶ 81.  The remaining 11,055,000 shares (the so-called Greenshoe Shares) out of the total 84,755,000 IPO shares were delivered to DTC on October 8, 2021.

[31] DTCC002.



32.    Emphasized in yellow is the transaction entry for the deposit of 73,700,000 IPO shares into

⬛⬛⬛⬛⬛⬛ (DTC participant number ⬛) individual, specific DTC custodial account. In other words, the IPO shares plainly did not go into a "vat" of any sort.  The shares went into a specific, individual and identified account, in complete contradiction to the Wiener Metamorphosis Theory (which bears no connection to reality).

33.    The fundamental confusion in the Wiener Report's analysis of how DTC operates is not limited to that first step of an initial deposit of shares upon their delivery to DTC.  Mr. Wiener also claims that as shares are transferred between DTC participants pursuant to purchases and sales, DTC's records of these "transfers of securities entitlements . . . reflect changes in the Participants' *pro rata* interests in what DTC holds in its fungible bulk."[32]

34.    Even beyond the fungible bulk misconception I have already addressed, Mr. Wiener's claim is fully at odds with what DTC transactional records show (indeed, it is at odds with

---

[32] Wiener Report, ¶ 52.

the very fact that DTC *records transactions*).  Reproduced below is another true and correct excerpt of the DTC Participant Daily Activity Statements record for October 4, 2021.[33]



35.     Recorded in this excerpt is the one and only DTC transaction in Olaplex shares ███ ███ (DTC participant ███) effectuated on settlement date October 4, 2021.  Even in this brief excerpt there are several data points which directly contradict the Wiener Report's analysis.  First, the most plausible and straightforward interpretation of the DTC record is that ████████ (DTC participant #██) received 6,500 *shares* of Olaplex IPO Shares, not a proportional increase in its *pro rata* security entitlement.  This is clearly indicated by the DTC Participant Daily Activity Statements record which denotes the receipt of the shares as occurring in the form of a "DELIVER ORDER."

36.     Further, as the excerpt emphasizes in yellow, the 6,500 shares received by ████████ (DTC participant #███) are identified as being delivered from ████████████ (DTC participant #██) DTC custodial account.  This is additional evidence that shares at DTC are not held in a "vat" or aggregate, undifferentiated fungible bulk but rather are held (and recorded as such) in the custodial accounts of discrete, individual DTC participants, and

---

[33] DTCC002.

when the shares are bought and sold, it is the shares which are transferred (*e.g.*, "DELIVER ORDER") between DTC participant accounts, in transactions captured in DTC records.

37.    As even further evidence that DTC records record discrete transactions of discrete, specific shares, the ███████████████████ transaction has the transactional coding "ID SYNDICATE TRADE ██", which I have emphasized in blue in the reproduced excerpt. This transaction code has a clear and specific meaning within DTC's record-keeping system.  As DTC's Settlement Service Guide explains, "SYNDICATE" refers to a "group of broker-dealers that agree to purchase a new issue of securities from the issuer for resale to the investment public."[34]  And DTC's IPO Service Guide explains that the numeric term "049" refers to an "Initial Distribution via ID."[35]  It is clear that the "ID SYNDICATE TRADE ██" transaction code is a unique DTC record-keeping designation denoting the custodial transfer of shares newly issued in an offering.

38.    The Wiener Metamorphosis Theory that all shares from a single issuer get "blended" into a "vat" where it is impossible to distinguish, *e.g.*, IPO Shares from Non-IPO Shares, is directly contradicted by the existence (and demonstrated utilization) of transactional coding in DTC records which explicitly denotes the transfer of newly issued shares.  The very existence of such a specific code for IPO distributions within DTC's system is irreconcilable with the theory that all shares are 'blended' into an indistinguishable mass.

---

[34] DTCC, *Settlement: Service Guide*, at **5-6 (Dec. 20, 2024), https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Settlement.pdf (last visited June 22, 2025).

[35] DTC, *Service Guide: About IPO*, at Appendix C https://www.dtcc.com/~/media/Files/Downloads/Settlement-Asset-Services/Underwriting/IPO.pdf (last visited June 23, 2025).  The term "ID" here refers to "institutional delivery", so this code means "initial distribution via institutional delivery".

39.     Indeed, the already-produced DTC records show that (i) 73,700,000 IPO Shares were deposited on settlement date October 4, 2021 into a specific, individual DTC participant's account ( ███████ , DTC participant # █ ), not an undifferentiated fungible bulk; and (ii) the 6,500 Olaplex shares ████████ (DTC participant # ███ ) received pursuant to its purchase with settlement date October 4, 2021 were drawn from the 73,700,000 IPO Shares which were deposited into ████████ (DTC participant number █ ) DTC custodial account, not an undifferentiated fungible bulk.

**C.    DTC describes its own records as differentiated and non-fungible.**

40.     The Wiener Report's "wine vat" analogy is contradicted by DTC's own description of how deposits work.  In a service guide, the DTC explains that "Deposit/Withdrawal at Custodian (DWAC) . . . lets Participants send requests to Fast Automated Securities Transfer (FAST) agents/custodians to deposit or withdraw securities *into or out of **their** respective DTC account(s)*."[36]  This is reflected in the excerpted DTC Participant Daily Activity Statement record reproduced at ¶ 31, *supra* showing 73,700,000 IPO shares deposited into the DTC custodial account of an underwriter for the IPO, ████████ (DTC participant # █ ).

41.     Similarly, as discussed in § III.B, *supra* while the most plausible interpretation of the DTC Participant Daily Activity Statement records is that they record discrete, identifiable transactions in specific securities being delivered out of and received into discrete, specific DTC participants' accounts, DTC's own description of these records confirms that (*i.e.*, DTC records are transactional in nature) as the only plausible interpretation.

---

[36] DTCC, *Deposits*: *Service Guide*, at *17 (Apr. 2, 2024), https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Deposits.pdf (last visited June 22, 2025) (emphasis added).

42.    Participant Daily Activity Statements are described in multiple DTC publications.  The

DTC Settlement Service Guide refers to these statements repeatedly:

*In addition, nothing contained in Information made available to Participants and other authorized users shall relieve them of their responsibility under DTC's Rules and Procedures or other applicable contractual obligations to check the accuracy, where applicable, of Participant Daily Activity Statements and all other statements and reports received from DTC and to notify DTC of any discrepancies.*[37]

And again:

*Investment Identification activity is recorded on your Participant Daily Activity Statement. Check your statement to be sure **your transactions** were properly processed and recorded.*[38]

And yet again:

*Warning! Under DTC's Rules and Procedures you are responsible for verifying the accuracy of your Participant Daily Activity Statement. You must report discrepancies to DTC's Reconciliation division as soon as possible after you receive the statement.*[39]

43.    Elsewhere, DTC writes: "Your activities and money involving securities are recorded by

DTC on your Participant Daily Activity Statement available from the PBS SMART/Search

facility as well as the Participant Account Statement in the Settlement Web."[40]  When

describing the software available to DTC participants to access this transactional

information, DTC writes: "The Settlement Web provides the ability to monitor ***transaction***

***activity*** and research daily position balances at the account and entity level. . . . Typical

activities are ***deliver orders, payment orders, stock loans, pledge inputs and releases, and***

---

[37] DTCC, *Settlement: Service Guide*, at *2 (Dec. 20, 2024), https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Settlement.pdf (last visited June 22, 2025).

[38] *Id*. at * 47 (emphasis added).

[39] *Id.*

[40] DTC Learning, *Viewing Activity and Position* (Oct. 18, 2021), https://dtcclearning.com/products-and-services/settlement/view-activity-position.html (last visited June 22, 2025).

*reclaims of these activities*. All activities carry with them Activity codes which describe a DTC service such as deliver orders."[41]

44.     The Wiener Report's strange silence on quite prominent elements of DTC's record-keeping, such as Participant Daily Activity Statements, which are contrary to the opinions offered in the Wiener Report is discussed in § IV.A, *infra*.

**D.      The Wiener Report's opinions are also contradicted by the Wiener Report itself**

45.     The Wiener Report's strident claim that DTC holds all shares with the same CUSIP in a "single undifferentiated fungible aggregate bulk"[42] is contradicted not only by DTC's actual records and DTC's own description of its records but is also repeatedly contradicted by Mr. Wiener himself.

46.     Mr. Wiener claims that DTC "blend[s]"[43] shares into a "fungible bulk" and DTC participants merely hold "*pro rata* interests in what DTC holds in its fungible bulk."[44]  But, strangely, just a few paragraphs later Mr. Wiener writes that "[a]t the end of each day, DTC *debits from or credits to each Participant's account the net amount of securities . . .*"[45]

---

[41] DTCC Learning, *Settlement Web*, *Viewing Activity & Position* (Apr. 26, 2024), https://dtcclearning.com/products-and-services/settlement/settlement-web.html (last visited June 22, 2025) (emphasis added).

[42] Wiener Report, ¶ 20.

[43] Wiener Report, ¶ 47

[44] *Id*. ¶ 52.

[45] *Id*. ¶ 56 (emphasis added).

47.     Similarly, Mr. Wiener explicitly acknowledges that "[i]n the case of DWAC deposits, the requesting Participant's **position in its DTC account is increased**."[46]  And in yet another instance of self-contradiction, Mr. Wiener states that "[e]ach DTC Participant Position Report recorded the position of Olaplex Stock **held by each DTC Participant account**,"[47]

48.     Each of these statements – again, statements made by Mr. Wiener himself – are clearly inconsonant with the central assumption (DTC holds shares in a blended, undifferentiated fungible bulk) upon which the Wiener Report's analysis and opinions are based.  Mr. Wiener cannot have it both ways. Either shares are held in a 'fungible bulk' where participants only have pro-rata interests, or they are held in specific participant accounts that can be individually credited and debited.  His own words concede the latter.

49.     While puzzling for the reader, the internal contradictions in the Wiener Report do illustrate an important point: once Mr. Wiener moves beyond simply repeating his dogmatic belief that tracing is impossible[48] and that DTC holds shares in undifferentiated fungible bulk and he starts to discuss, even if only in passing, actual evidence (*i.e.*, DTC records), the Wiener Metamorphosis Theory begins to collapse, as it is unable to withstand even the most glancing brush with reality.

---

[46] *Id*. ¶ 84 (emphasis added).

[47] *Id*. ¶ 102 (emphasis added).

[48] *See* Wiener Report, ¶ ¶ 60-64 (outlining his view that there are only four situations in which "shareholders might be able to trace their shares to a particular registration statement": 1.) where there all the shares in the market were issued under a single Registration Statement; 2.) where the issuers issued physical certificates to the beneficial owners; 3.) where there was a Direct Registration; or 4.) where there is a unique CUSIP for each offering.). While Mr. Wiener presents these as four scenarios in which tracing is possible, Mr. Wiener's view is in fact tantamount to claiming that tracing is impossible. Because the four scenarios Mr. Wiener permits as possible are actually scenarios in which Mr. Wiener believes tracing is *unnecessary*.

**E.**     **The Wiener Report repeatedly mischaracterizes commentary and secondary sources to advance the inaccurate claim that DTC holds shares in an "Undifferentiated Fungible Aggregate Bulk"**

50.     When discussing DTC records, the Wiener Report – perhaps unsurprisingly given the irreconcilable tension between DTC records and the Wiener Report's opinions – relies heavily on sources other than actual transaction records themselves.  For example, Mr. Wiener quotes repeatedly from SEC commentary on DTC and "fungible bulk" even though the cited passages clearly indicate that the SEC is discussing "fungible bulk" with respect to legal ownership structure not record-keeping.[49]   The Wiener Report notes that "The [SEC] has expounded . . . 'Fungible bulk means that no participant or customer of a participant has any claim or ownership rights to any particular certificate held by DTC. Rather, participants have a securities entitlement to obtain a certificate representing securities held in their DTC accounts.'"[50]   But the question of a legal entitlement to a certificate is irrelevant to whether it is possible to trace the movement of newly issued shares across deposits to and transfers within segregated, identifiable DTC accounts.

51.     Similarly, the Wiener Report refers to the Declaration of Ann Marie Bria (the "Bria Declaration")[51] for its supposed confirmation of the fact that DTC held all Olaplex shares

---

[49] *See* Wiener Report, ¶¶ 42-44.

[50] Wiener Report, ¶ 43 (citing Concept Release on the U.S. Proxy System, 75 Fed. Reg. 42,982 (July 22, 2010) (to be codified at 17 C.F.R. pts.240, 270, 274, and 275), https://www.federalregister.gov/documents/2010/07/22/2010-17615/concept-releaseon-the-us-proxy-system.")).

[51] Decl. of Ann Marie Bria (June 18, 2025), Ex. 2 to Decl. of Anne Johnson Palmer, *Lilien v. Olaplex Holdings, Inc.,* United States District Court Central District of California, Docket No. 2:22-cv-08395, June 20, 2025.

on deposit at DTC in an undifferentiated fungible bulk.[52]  But the Bria Declaration is simply providing a description of DTC's collective entitlement with the transfer agent through its nominee Cede & Co., and is not purporting to describe DTC's internal records.

**F.    DTC records are analogous to an ATM machine, not a wine vat.**

52.    The Wiener Report's dogmatic insistence that tracing is impossible, a philosophical rather than empirical view supported by the fictitious Wiener Metamorphosis Theory, produces the inapt wine vat analogy.  In this analogy Mr. Wiener asks the reader to "imagine a deposit of wine, rather than a deposit of securities. It is as though an issuer, on behalf of three Participants, were to deposit with DTC . . . white wine from the same vineyard - but of different vintages." Upon delivery to DTC all the wine is "commingled and blended in the vat," representing the "fungible, aggregate bulk" in which DTC holds shares.[53]

53.    Notwithstanding the pictorial rhetoric, the Wiener Metamorphosis Theory and its attendant wine vat imagery do not accurately reflect how DTC operates.  A more apt analogy to consider is an ATM machine.  Individual "participants" (*i.e.*, account holders) deposit fungible cash, in a literal sense, into the machine, but the deposit is nonetheless indeed credited to the participant's account ***and to that account alone***.

54.    To be sure, individual currency notes are fungible, and the physical cash deposited at the ATM machine is not transferred into a lockbox belonging to the customer.  Rather, a book entry is made for the benefit of the customer in the customer's bank account.  The theory

---

[52] *See* Wiener Report, ¶ 41.

[53] *Id.* ¶ 51-52.

advanced in the Wiener Report is akin to suggesting that deposits are made "to the ATM machine" rather than the depositor whose account is credited with the funds.  Reproduced below is an image illustrating that fairly intuitive dichotomy.



55.    In effect, Mr. Wiener appears to believe that money deposited into an individual bank account loses its traceability merely because an ATM machine commingled physical currency bills within the machine.  That is, the Wiener Report suggests that because one dollar bill cannot be distinguished from another, bank deposits are not traceable.  At his deposition, Mr. Wiener admitted as much.  When asked whether ████████████████ ████████████████████████████████████████████████:



Shortly thereafter, Mr. Wiener reiterated his view that ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████.[55]

56.    By Mr. Wiener's reasoning, no bank deposit is ever traceable.  This is absurd.  Tracing

deposits of cash into bank accounts is commonplace.  I understand that the U.S. Court of

Appeals for the Second Circuit specifically rejected Mr. Wiener's view when construing

the phrase "proceeds traceable to such an exchange [of a controlled substance]":[56]

> If the seller of drugs uses the cash he receives to buy a bar of gold or a car,
> that asset is "traceable proceeds," **and so is a credit at a bank**. Though
> emphasizing the fungibility of money, even the appellants grudgingly
> acknowledge that the credit resulting from a deposit of drug money "may
> arguably constitute 'traceable proceeds.'"[57]

It is obvious that transactions deposited into an individual bank account do not lose their

traceability merely because a bank commingles the physical notes deposited at an ATM.

The question is simply whether the bank (or DTC) maintains records of individual

---

[54] Wiener Tr. at 50:25-51:4 (emphasis added).

[55] *Id.* at 62:10-22 ███████████████████████████



(emphasis added).

[56] 21 U.S.C. § 881(a)(6). This language closely tracks that used by the U.S. Supreme Court in *Slack* which held that a Section 11 plaintiff must plead and prove that he purchased "shares traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023).

[57] *U.S. v. Banco Cafetero Panama*, 797 F.2d 1154, 1158 (2d Cir. 1986) (emphasis added).

transactions into and out of individual accounts maintained for its customers—which it does—and whether the funds (or shares) were, in fact, credited to the customer's account.

**IV.    RECORDS PRODUCED IN DISCOVERY MAKE IT POSSIBLE TO IDENTIFY WHICH MEMBERS OF THE PROPOSED CLASS PURCHASED IPO SHARES AFTER NOVEMBER 12, 2021.**

**A.    The Wiener Report falsely claims that Non-IPO Shares were "held at DTC" when actually they were held by segregated DTC participant accounts.**

57.    Paragraph 103 of the Wiener Report states: "Figure 5 shows the total number of shares of Olaplex Stock (CUSIP number 679369108) held at DTC as of dates during the Lock-Up Period when additional shares were added to DTC's fungible bulk." Figure 5 of the Wiener Report[58] (reproduced below) lists a series of deposits under the title "Total Number of Shares of Olaplex Common Stock (CUSIP number 679369108) ***Held at DTC*** During the Lock-Up Period" (emphasis added):

| Date | Additional Shares deposited on that date | Total Shares (including Additional Shares) |
|---|---|---|
| Friday October 8, 2021 | 84,755,000 | 84,755,000 |
| Friday November 12, 2021 | 188,375 | 84,943,375 |
| Friday November 19, 2021 | 260,950 | 85,204,325 |
| Friday November 26, 2021 | 88,713 | 85,293,038 |
| Friday December 17, 2021 | 70,074 | 85,363,112 |
| Friday January 7, 2022 | 61,283 | 85,424,395 |
| Friday March 11, 2022 | 61,937 | 85,486,332 |

---

[58] Wiener Report, ¶ 103.

58.    While the terms "held at DTC" and "deposited" (nothing more) are literally true, in that the Additional Shares were deposited at DTC, these terms misleadingly omit that these deposits were made to identifiable DTC participant accounts.

59.    Here also the Wiener Report is replete with inconsistencies.  Notwithstanding Wiener Report's use of language like "**held at DTC**"—which obfuscates the fact that each deposit is made to a segregated and identifiable DTC participant account—the Wiener Report at times admits just the opposite.  For example, the Wiener Report states that "[e]ach DTC Participant Position Report recorded the position of Olaplex Stock **held by each DTC Participant account**."[59]  This admission—that Non-IPO Shares were in fact held by individual DTC participants—is inconsistent with the central thesis of the Wiener Report that shares held at DTC are fungible, undifferentiated and thus not capable of being traced.

60.    The Wiener Report also appears to be premised on a lack of records produced in discovery by the Defendants regarding the segregated positions of individual DTC participants holding Olaplex Stock.  It appears that Mr. Wiener personally directed counsel for the Defendants on which material to request.  Consider the following examples of paragraphs quoted verbatim from the Wiener Report (emphases added):

    i.    Paragraph 81: "*Through counsel, **I requested** and obtained Olaplex's authorization letters to AST regarding the deposit at DTC of the IPO Initial Shares effected on October 4, 2021, the IPO Greenshoe Shares effected on October 8, 2021, and the 188,375 New Shares effected on November 12, 2021.*"

    ii.    Paragraph 87: "*Through counsel, **I requested** and obtained Olaplex internal documents and correspondence regarding the issuance of 188,375 shares of Olaplex Stock as a result of a stock option exercise in November 2021.*"

---

[59] *Id*. ¶ 102 (emphasis added).

    iii.  Paragraph 91: "*Through counsel, **I requested** and obtained from AST the lists of registered owners of Olaplex Stock as of September 30, 2021, and as of November 7, 2022, as well as the lists of selling stockholders of the IPO Initial Shares and the IPO Greenshoe Shares.*"

    iv.  Paragraph 92: "***I also requested** and obtained through counsel AST records of the number of shares registered in the name of Cede & Co.*"

    v.  Paragraph 101: "*Through counsel, **I requested** DTC's daily Participant Position Reports for shares of Olaplex Stock (CUSIP number 679369108) in the period from September 30, 2021, to November 17, 2022, inclusive.*"

61.    On its face, Mr. Wiener requested authorization letters, internal corporate records, transfer agent records and even DTC records showing *weekly* participant balances as of the Friday of each week[60] (though no explanation was given as to why daily balances were requested while only weekly balances were returned). But it appears that Mr. Wiener did not request the detailed transactional records from DTC contained in Participant Daily Activity Statements, which would show that each of these deposits was not only "held at DTC" but recorded as separate deposits into individual DTC participant accounts.[61]

62.    It is unclear why Mr. Wiener did not request Participant Daily Activity Statements, despite requesting many other categories of documents. While at one time Mr. Wiener may have been unfamiliar with those detailed transactional records, I called his attention to their

---

[60] *Id.* ¶ 102 ("I received a total of 60 DTC daily Participant Positions Reports for shares of Olaplex Stock (CUSIP number 679369108) for each Friday from October 8, 2021, to November 25, 2022.").

[61] DTCC maintains Participant Daily Activity Statements with individual transactions for each Participant. DTCC, *Product and Services Menu*, https://dtcclearning.com/products-and-services/settlement/view-activity-position.html ("Your activities and money involving securities are recorded by DTC on your Participant Daily Activity Statement . . . ."). In addition, broker-dealers are required to maintain detailed transactional data pursuant to their regulatory reporting obligations. 17 CFR § 240.17a-3(a)(6)(i)(A) (broker-dealers maintain detailed records on individual orders including "the time the order was received, the time of entry, the price at which executed, the identity of each associated person, if any, responsible for the account . . . and, to the extent feasible, the time of execution or cancellation").

existence in an expert report dated April 22, 2024 in a prior matter involving tracing under Section 11 of the Securities Act of 1933:

> The Participant Daily Activity Statements are not mentioned at all in the Wiener Report.  This is a curious omission. Based on a review of Mr. Wiener's C.V., it appears that he has not worked at DTC since 2005. As nearly twenty years have elapsed since Mr. Wiener worked at DTC, he may have forgotten about these detailed records containing individual deposit, withdrawal, and transfer transactions for each individual DTC participant account.[62]

63.    Fourteen months later, these records are not mentioned once in the Wiener Report.  I do not understand why Mr. Wiener did not even consider or request these records.  If Mr. Wiener had requested those records, they would undermine the Wiener Metamorphosis Theory by showing that DTC records are anything but undifferentiated and fungible.

64.    I understand that counsel for the Plaintiffs requested the Participant Daily Activity Statements prior to the commencement of my engagement in this matter, and that these detailed transactional records have just been produced by DTC.  These records show, notwithstanding the Wiener Report's claims to the contrary, that each of the aforementioned direct deposits of Non-IPO Shares was made, not to some "undifferentiated fungible bulk" as Mr. Wiener bizarrely insists, but to specific, identifiable DTC participant accounts.  These individual direct deposits of Non-IPO Shares into specific, identifiable DTC participant accounts were differentiated and segregated from IPO Shares held by other DTC participant accounts.

---

[62] Expert Rep. of Joshua R. Mitts, Ph.D., Allison v. Oak Street Health, Inc., No. 1:22-cv-00149, ECF No. 162-2 (Apr. 22, 2024).  This matter settled shortly after my expert report was filed.

65.     For example, on November 12, 2021, DTC records show a direct deposit of 188,375 shares

into the account of ███████████████ (participant ID # ██):



66.     This excerpt directly contradicts the Wiener Report's claim that "*as [sic] November 12,*

*2021, the total number of shares deposited at DTC was 84,943,375, which included*

*commingled in that fungible bulk **what had been the 188,375 Non-IPO Shares***."[63]  In fact,

the deposit of Non-IPO Shares was not mixed together with other shares held by DTC.

Rather, the deposit of 188,375 shares was made into ████████████████████

account.  Because no shares were transferred out that day, out of the 496,117 shares in the

closing balance that day, 188,375 shares were Non-IPO Shares and the remaining 307,742

shares were IPO Shares.  Thus, no other DTC participant held Non-IPO Shares, and no

non-IPO Shares were commingled with IPO Shares on November 12, 2021.

67.     To repeat: the Wiener Report's claim that IPO Shares were mixed together with Non-IPO

Shares on November 12, 2021 is flatly contradicted by the evidence provided by DTC,

which shows that none of the Non-IPO Shares were transferred to any other DTC

participant on that date.  Every DTC participant other than ████████████████████

held ***only*** IPO Shares on November 12, 2021.  And because the deposit of 188,375 Non-

IPO Shares was made to a specific account belonging to an identifiable customer, it follows

---

[63] Wiener Report, ¶ 105 (emphasis added).

29

that none of the other customers of ███████████████████ held Non-IPO Shares either.  Thus, the deposit of these 188,375 Non-IPO Shares was entirely segregated from the remaining 84,755,000 IPO Shares held by identifiable DTC participants.  In short, on November 12, 2021, the Non-IPO shares were not "commingled" across the market; they were fully segregated and held within a single participant's account, a fact that flatly contradicts the Wiener Report's central premise.

68.    The same conclusion holds for the other deposits of Non-IPO Shares made into DTC participant accounts.  Every single deposit of Non-IPO Shares is segregated from the other shares held by DTC participants at the time of the deposit.  Any conclusion to the contrary is simply nonsensical.  On November 12, 2021, Non-IPO Shares were held by one DTC participant, and IPO Shares were held by all other DTC participants (and that participant).

**B.    It is logically impossible for certain DTC participants (and their customers) to have received Non-IPO Shares on certain dates prior to the Lock-Up Expiration.**

69.    Beyond simply identifying where the Non-IPO shares *were*, the DTC records also allow us to prove where they *were not*, making it logically impossible for certain members of the Proposed Class to have purchased anything other than IPO Shares.  For example, on settlement date November 12, 2021, it is logically impossible for any DTC participant (other than ███████████████████) to have purchased Non-IPO Shares.  On November 15, 2021, notwithstanding the transfer of 145,977 shares to ████████, many DTC accounts did not receive shares (directly or indirectly) from ████████.  For example, consider the ███████████████████ account (participant # ████),  which shows a transfer of 558 shares to ████████ (participant # ████) that day:



70.    This account had an opening balance of 73,273 shares on November 15, 2021.  Because no non-IPO Shares were held by any DTC participant other than ▮▮▮▮▮▮▮▮ ▮▮▮▮ prior to November 15, 2021, it is logically impossible for these 73,273 shares to be anything other than IPO Shares.  Moreover, because ▮▮▮▮▮▮▮▮▮▮▮▮ (participant # ▮▮▮) did not receive shares from any other accounts, it is not possible for that account to have held any Non-IPO Shares.  It follows that all 558 shares transferred to ▮▮▮▮ (participant # ▮▮▮) were IPO Shares, and the closing balance of 72,715 shares in the ▮▮▮▮▮▮▮▮▮▮▮▮ (participant # ▮▮▮) account were all IPO Shares as well.  In addition, every customer holding their shares in custody of ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (participant # ▮▮▮) held only IPO Shares.

71.    The DTC records contain examples similar to this one.  For example, the following excerpt shows the Participant Daily Activity Statement for ▮▮▮▮▮▮▮ (participant # ▮▮▮) on November 15, 2021, which shows a transfer of 157 to ▮▮▮▮ (participant # ▮▮▮):





31

72.     As this excerpt shows, ███████████ (participant # █████ ) had an opening balance of 38,157 shares on November 15, 2021.  Because no non-IPO Shares were held by any DTC participant other than ███████████████████ prior to November 15, 2021, *it is logically impossible for these 38,157 shares to be anything other than IPO Shares.* Moreover, because ██████████ (participant # █████ ) did not receive shares from any other accounts, it is not possible for that account to have received Non-IPO Shares.  It thus follows that all 157 shares transferred to ████████ (participant # ██████ ) were IPO Shares, and the closing balance of 38,000 shares in the ████████████ (participant # ████ ) account were all IPO Shares as well.  In addition, every customer holding shares at ████ ████████ (participant # █████ ) on November 15, 2021 must have held only IPO Shares.

73.     To be sure, many DTC participants received some quantity of Non-IPO Shares, whether directly from ████████████████ or indirectly from another DTC participant who received Non-IPO Shares from █████████████████ (directly or indirectly), at various points in time during the Class Period.  I explain below that it is straightforward to trace those Non-IPO Shares to various DTC participants (and their customers), wherever those shares may be.

74.     But it is also the case that some DTC participants *never* received Non-IPO Shares on additional days.  For example, from November 15, 2021 to December 1, 2021—a period of ten (10) trading days—DTC records indicate that ███████████ did not receive *any* shares from other market participants in purchases.[64]  Every customer of ████████████

---

[64] While ████████████ did receive shares in the form of stock loan returns, there were no delivery transactions, *i.e.*, delivery order or delivery vs. payment, to ████████ over that period.

who purchased shares over that period necessarily received IPO Shares. It is thus plainly incorrect to infer, as the Wiener Report does, that "[no] method exists by which Lead Plaintiff or any other alleged beneficial owner would be able to show that the shares that they acquired of Olaplex Stock after November 12, 2021, held through DTC, are traceable to the Registration Statement, of which the Prospectus was part."[65] I have just applied such a method and identified purchasers of Olaplex Stock who necessarily purchased IPO Shares after November 12, 2021—namely, all those who acquired shares from the period November 15, 2021 to December 1, 2021 and held their shares at ███████████[66]

## C.  It is straightforward to trace transfers of Non-IPO Shares to other DTC participant accounts using accounting methods such as FIFO or LIFO (when required).

75.  Using these detailed transaction records contained in DTC Participant Daily Activity Statements, it is straightforward to trace transfers of Non-IPO Shares to other DTC participant accounts. For example, on November 15, 2021, DTC records for ████████ ████████████ show an additional deposit of 260,950 Non-IPO Shares and two withdrawals of 44,943 and 101,034 shares, respectively:



---

[65] Wiener Report, ¶ 20.

[66] While ████████ did not receive incoming delivery transactions over this period, it does not follow that there were no purchasers of Olaplex Shares who held their shares at ████████. For example, a purchase by a PNC Bank, N.A. customer from a seller who also held their shares at ████████ would not produce a delivery between DTC accounts, but such a purchaser must have received IPO Shares for the reasons given above.

76.    While I have not been asked to engage in a complete and comprehensive tracing analysis at this time, it is straightforward to follow the transfer of those 145,977 shares to the destination account (███████) and from there to other DTC participant accounts. Moreover, because the total volume of shares transferred out of the ████████████ ████ account on November 15, 2021 (145,977 shares) exceeds the total share volume of the two deposits of Non-IPO Shares (449,325 shares), it follows logically that █████ █████████████ retained some Non-IPO Shares on November 15, 2021.

77.    The determination of exactly how many Non-IPO Shares were retained by ██████████ █████, and how many were transferred to the destination account (█████████) on November 15, 2021 requires a complete tracing analysis which comprehensively examines the totality of the available evidence, which I have not been asked to perform at this time. However, in my professional experience, broker-dealers, exchanges, and FINRA maintain additional detailed, time-stamped transactional records of trading activity.  To the extent that those records are necessary to track the flow of Non-IPO Shares between DTC participant accounts, those records can be obtained through discovery.

78.    Regardless, it is necessarily the case that a tracing analysis will lead to the simple and straightforward conclusion that just as on November 12, 2021, there were 188,375 Non-IPO Shares held by █████████████████, so also on November 15, 2021, there were 449,325 Non-IPO Shares held by one or more identifiable DTC participants accounts. Which accounts hold how many of those Non-IPO Shares depends on a tracing analysis, but because the DTC participant holding of each of these Non-IPO Shares can be identified

using DTC records, there is no basis for the Wiener Report's conclusion that the Non-IPO Shares are "undifferentiated" or "fungible" with the IPO Shares.

79.     At times, it may be necessary to employ standard accounting methods like first in-first out (FIFO) or last in-first out (LIFO) to determine whether a given DTC participant (or their customers) received IPO or Non-IPO Shares.  Accounting methods like FIFO and LIFO do not amount to "statistical tracing" nor do they involve probabilistic reasoning.  They do not make inferences regarding specific purchases from statistics about the population as a whole.  Rather, the application of an accounting method yields a single conclusion regarding who owns each share at each point in time.  Nor is it the case that every aftermarket purchaser would have standing for every share—rather, only those who purchased the IPO Shares, as determined by a deterministic tracing analysis.

80.     Indeed, Mr. Wiener appears unaware of the fact that tracing through commingled accounts is commonplace.[67]  Depositing collateral or trust property into a bank account does not prevent lenders and beneficiaries from tracing those deposits.[68]  In criminal forfeiture, the proceeds of illegal activity are regularly traced through commingled accounts.  In fact, I understand that courts have rejected Mr. Wiener's theory that the "fungibility of money makes it impossible to consider any portion of the depositor's credit balance to be 'traceable proceeds' because the credit balance does not represent just the proceeds of drug

---

[67] *See* Br. for *Amicus Curiae* Law and Business Professors in Supp. of Resp't, at *11, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433 (2023), https://www.supremecourt.gov/DocketPDF/22/22-200/256386/20230306171423271_22-200%20Amicus%20Brief.pdf ("Using accounting methods to trace assets through commingled accounts is commonplace.").

[68] Brown & Williamson Tobacco Corp. v. First Nat. Bank of Blue Island, 504 F.2d 998, 1002 (7th Cir. 1974); Restatement (Second) of Trusts § 202 cmt. j (1959).

sales but is instead the net result of various deposits and withdrawals."[69]  Rather, "the Government . . . can establish a prima facie case for forfeiture in the context of bank accounts by relying on either the 'drugs-in, last-out' [i.e., LIFO] approach or the 'drugs-in, first-out' [i.e., FIFO] approach."[70]  I also understand that similar principles are applied in divorce proceedings when tracing assets through commingled joint accounts.[71]  Thus, the commingling of assets in a single account (whether a bank account or a DTC participant account) does not create an insurmountable barrier to tracing, as established accounting conventions like FIFO and LIFO are routinely used in these kinds of situations.

81.    At his deposition, Mr. Wiener ████████████████████████████ ████████████"[72]  When asked to explain ████████████████████████████ ██████████████████████████████████████████████, Mr. Wiener claimed that ███████████████████████████████████:



---

[69] *U.S. v. Banco Cafetero Panama*, 797 F.2d at 1159.

[70] *Id.* at 1160 (clarifying parentheticals added).

[71] *See, e.g.*, California Community Property Law § 6:22 (2022 ed.).

[72] *See* Wiener Tr. at 95:14-16 ("████████████████████████████ ██████████████").

[73] ████████████████████.

82. In my professional experience, it is uncommon to give terms like "tracing" an entirely different meaning in one context than another. At the very least, that raises a concern that one may be redefining terms to justify one's conclusion, rather than evaluating a hypothesis based on the evidence. That is, it appears that Mr. Wiener may have adopted a "definition of tracing" in such a way that it is "completely different" from any other field only because that novel, arbitrary definition leads to the conclusion he has predetermined to be correct.

83. And while Mr. Wiener (wrongly) claims that widely accepted tracing methodologies like FIFO and LIFO are "█████████████████████,"[74] it is certainly the case that conjuring up arbitrary definitions of words to reach predetermined conclusions bears no connection to reality whatsoever. Neither does Mr. Wiener's view that it is "impossible" to trace purchases of Olaplex shares to the registration statement as soon as Non-IPO Shares were deposited. Mr. Wiener asks this court to find that not a single purchaser of Olaplex shares acquired an IPO Share[75] (and thus none have Section 11 standing) notwithstanding that 84,755,000 IPO Shares were sold in the IPO. This is a far more absurd exercise in denying reality than using standard accounting methodologies which are regularly employed to trace the flow of commingled assets elsewhere.

84. It is often not necessary to choose an accounting method if the DTC records yield the same, unambiguous conclusion regarding each member of the Class, regardless of which method is chosen. In that case, the choice of accounting methods is irrelevant to the determination

---

[74] *Id.* at 97:4.

[75] *Id.* at 58:11-20 ("██████████████████████████████████████████████
██████████████████████████████ (emphasis added).

of whether a particular purchase of Olaplex Stock consisted of IPO Shares. In other cases, it may be necessary to choose an accounting method to answer that question. The choice of an accounting method is not arbitrary but rather turns on an expert evaluation of the transactional data. Moreover, as I explain next, the choice of an accounting method is a Class-wide determination and does not require an individualized examination into the facts and circumstances of each purchase of Olaplex Shares.

V.    **IT IS STRAIGHTFORWARD TO DETERMINE, ON A CLASS-WIDE BASIS, WHICH MEMBERS OF THE PROPOSED CLASS PURCHASED IPO SHARES OF OLAPLEX COMMON STOCK.**

85.    Accounting methods like FIFO and LIFO can be applied on a Class-wide basis using data readily available in discovery and do not require an individualized inquiry into the circumstances of each purchase and sale. For example, a number of Participant Daily Activity Statements have already been produced by DTC. In my experience, related records are regularly produced by the NSCC in discovery as well. Similarly, time-stamped transactional records are maintained by FINRA, exchanges and broker-dealers, which are also regularly produced in discovery.[76] These records may be used to determine who holds the registered shares without engaging in an individualized inquiry into the facts and circumstances of purchases by individual members of the Proposed Class.

86.    Moreover, accounting methods like FIFO and LIFO do not depend on facts and circumstances which are unique to each Class member. In my professional experience,

---

[76] As discussed throughout this Report, DTC maintains Participant Daily Activity Statements with individual transactions for each participant, which have already been produced in this matter. As also previously discussed, broker-dealers maintain detailed transactional records pursuant to their regulatory reporting obligations. 17 CFR § 240.17a-3(a)(6)(i)(A) (broker-dealers maintain detailed records on individual orders including "the time the order was received, the time of entry, the price at which executed, the identity of each associated person, if any, responsible for the account . . . and, to the extent feasible, the time of execution or cancellation").

records produced in discovery are likely to show that no matter which accounting method is chosen, a given member of the Class holds IPO Shares. Even if different methods yield different conclusions regarding who holds those shares, the choice of an appropriate tracing methodology is a Class-wide determination which does not turn on individualized facts and circumstances of each member of the Proposed Class because the same data and the same accounting conventions would be applied uniformly to all Class members. The result is a single, deterministic conclusion for each member of the Proposed Class as a whole, not a series of individualized inquiries.

87. On this point, Mr. Wiener appears to agree. Nothing in the Wiener Report even suggests, much less establishes, that tracing requires individualized evidence of purchases by individual members of the Proposed Class. Nor am I aware that Mr. Wiener has *ever* suggested that tracing requires individualized evidence. While the Wiener Report is replete with imaginary fictions, demonstrably false assertions and internal inconsistencies, these are all Class-wide questions amendable to common proof.

88. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


JOSHUA R. MITTS, PH.D.

JUNE 27, 2025

# EXHIBIT A

# JOSHUA R. MITTS

435 West 116 Street • New York, NY 10027 • (202) 460-0003 • joshua.mitts@law.columbia.edu

Professor Joshua Mitts uses advanced data science for his research on corporate and securities law. Mitts employs empirical methods, including statistical analysis and machine learning, to study short selling, insider trading on cybersecurity breaches and corporate disclosures, and information leakage following hedge-fund activism. Professor Mitts also advises on the analysis of trading data in connection with high-frequency market manipulation and securities violations. He has extensive experience supporting the U.S. Department of Justice.

## ACADEMIC APPOINTMENTS

**Columbia University**, New York, NY
*David J. Greenwald Professor of Law* (July 1, 2023 – present)
*Professor of Law* (July 1, 2022 – June 30, 2023)
*Associate Professor of Law* (2017 – 2022)
*Milton Handler Fellow* (2020-22)
Member, *Advisory Committee on Socially Responsible Investing* (2021-2023)
        Subcommittees: Racial Justice, Fossil Fuels

## EDUCATION

**Columbia Business School**, Ph.D. in Finance & Economics, 2018

**Yale Law School**, J.D., 2013

**Georgetown University**, B.A in Liberal Studies, *summa cum laude*, 2010

## PUBLICATIONS & WORKING PAPERS

Post-Appointment (2017 – present)

***Can Section 11 Be Saved?: "Tracing" A Path to its Survival*** (with John C. Coffee, Jr.) (15 HARV. BUS. L. REV. 1, 2025), https://ssrn.com/abstract_id=4644888

***Trading on Terror*** (with Robert J. Jackson, Jr.) (working paper, 2023), https://ssrn.com/abstract_id=4652027

***Passive Exit***, 28 STAN. J.L. BUS. & FIN. 155 (2023), https://ssrn.com/abstract_id=3716249

***Calamity: Event-Driven Suits and the Rethinking of Securities Litigation*** (with Merritt B. Fox), 78 BUS. LAW. 1 (2023).

***Index-Fund Governance: An Empirical Study of the Lending-Voting Tradeoff*** (revise & resubmit, J. LEG. STUD., 2021) (with Edwin Hu & Haley Sylvester), https://ssrn.com/abstract_id=3673531

***Insider Trading and Strategic Disclosure*** (working paper, 2020), https://ssrn.com/abstract_id=3741464

***Short and Distort,*** 49 J. LEG. STUD. 287 (2020), https://ssrn.com/abstract_id=3198384

***A Legal Perspective on Technology and the Capital Markets: Social Media, Short Activism and the Algorithmic Revolution*** (conference article, COLUM. / FINRA TECH. CONF., 2019), https://ssrn.com/abstract_id=3447235

***Trading Against the Random Expiration of Private Information: A Natural Experiment***, 75 J. FIN. 5 (2020) (with Mohammadreza Bolandnazar, Robert J. Jackson, Jr. & Wei Jiang), https://ssrn.com/abstract_id=2544128

    *Winner, Journal of Finance Dimensional Fund Advisors Distinguished Paper Prize (2020)*

***Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets***, 74 BUS. LAW. 1015 (2019) (with Jonathan R. Macey), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3279838

    Cited and relied upon by the Delaware Supreme Court in *Fir Tree v. Jarden* (2020).

*I Promise to Pay*, 62 J. L. & ECON. 117 (2019), https://ssrn.com/abstract_id=2994192

*What Can we Learn from Stock Prices?: Cash Flow, Risk and Shareholder Welfare,* 175 J. INST. & THEO. ECON. 178 (2019) (conference issue), https://ssrn.com/abstract_id=3285605

*Trial by Skype: A Causality-Oriented Replication Exploring the Use of Remote Video Adjudication in Immigration Removal,* 59 INT'L REV. L. & ECON. 82 (2019) (with Dane Thorley) (replication issue), https://www.sciencedirect.com/science/article/abs/pii/S0144818818303326

*Informed Trading and Cybersecurity Breaches*, 9 HARV. BUS. L. REV. 1 (2019) (with Eric Talley), https://www.hblr.org/wp-content/uploads/sites/18/2019/11/Final_MittsTalley.pdf

*Activist Directors and Agency Costs: What Happens When an Activist Director Goes on the Board?*, 104 CORNELL L. REV. 381 (2019) (with Robert Bishop, John C. Coffee, Jr. & Robert J. Jackson, Jr.), https://www.cornelllawreview.org/2019/01/15/activist-directors-and-agency-costs-what-happens-when-an-activist-director-goes-on-the-board/

    One of the Top 10 Corporate and Securities Articles of 2019 Chosen By *Corporate Practice Commentator*

*The Cost of Transparency* (2019) (with Yifeng Guo)

Pre-Appointment (2012-2017)

*The 8-K Trading Gap* (2016) (with Alma Cohen & Robert J. Jackson, Jr.)

*Systemic Risk and Managerial Incentives in the Dodd-Frank Orderly Liquidation Authority*, 1 J. FIN. REG. 51 (2015)

*Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 CORNELL L. REV. 99 (2014) (with Jonathan R. Macey)

*Anti-Herding Regulation*, 5 HARV. BUS. L. REV. 1 (2014) (with Ian Ayres)

*Mechanism Design in M&A Auctions*, 38 DEL. J. CORP. L. 873 (2014) (with Steven J. Brams), *cited in* In re *Appraisal of Dell Inc.*, C.A. No. 9322-VCL (Del. Ch., May 31, 2016)

*Three Proposals for Regulating the Distribution of Home Equity*, 31 YALE J. ON REG. 77 (2014) (with Ian Ayres)

*Law and Mechanism Design: Procedures to Induce Honest Bargaining*, 68 NYU ANN. SURV. AM. L. 729 (2013) (with Steven J. Brams)

*Snake Oil Salesmen or Purveyors of Knowledge: Off-Label Promotions and the Commercial Speech Doctrine*, 23 CORNELL J. L. & PUB. POL'Y 337 (2013) (with Constance E. Bagley & Richard Tinsley)

*A Private Ordering Solution to Blockholder Disclosure*, 35 N.C. CENT. L. REV. 203 (2013)

Comment, *Recoupment Under Dodd-Frank: Punishing Financial Executives and Perpetuating "Too Big to Fail,"* 122 YALE L.J. 507 (2012)

## RULEMAKING PETITIONS

*SEC Rulemaking Petition on Short and Distort* (filed on February 12, 2020) (co-drafted with John C. Coffee, Jr.), https://www.sec.gov/rules/petitions/2020/petn4-758.pdf

**Other Signatories: James D. Cox**, Brainerd Currie Professor of Law, Duke University School of Law; **Edward F. Greene**, General Counsel, Securities & Exchange Commission (1981-82); Director, Division of Corporation Finance (1979-81); Senior Counsel, Cleary Gottlieb Steen & Hamilton, Co-Director, Program on Law, Economics & Capital Markets, Columbia Law School; **Meyer Eisenberg**, Deputy General Counsel and Acting Director, Division of Investment Management Securities & Exchange Commission (1998-2006); **Colleen Honigsberg**, Associate Professor of Law, Stanford Law School; **Donald Langevoort**, Thomas Aquinas Reynolds Professor of Law, Georgetown University Law Center; **Peter Molk**, Associate Professor of Law, University of Florida Levin College of Law; **Randall Thomas**, John S. Beasley II Chair in Law and Business, Vanderbilt Law School, Professor of Management. Owen Graduate School of Management; **Robert B. Thompson**, Peter P. Weidenbruch, Jr. Professor of Business Law, Georgetown University Law Center; **Andrew Verstein**, Professor of Law, Wake Forest University School of Law; and **Charles K. Whitehead**, Myron C. Taylor Alumni Professor of Business Law, Cornell Law School.

OTHER PUBLICATIONS

*Petition for Rulemaking on Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Feb. 18, 2020) (with John C. Coffee, Jr.)

*Long-Run Short Selling*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 9, 2019) (with John C. Coffee, Jr.)

*Short Selling and the New Market Manipulation*, COLUM. LAW SCH. BLUE SKY BLOG (Mar. 18, 2019) (with John C. Coffee, Jr.)

*Why Investors Pay So Much for Dual Class Firms*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 2, 2019)

*What Can We Learn From Stock Prices?*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 18, 2018)

*Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Nov. 13, 2018)

*Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Nov. 12, 2018) (with Jonathan Macey)

*A Data-Driven Defense to "Short and Distort"*, NEW YORK LAW JOURNAL (Sep. 13, 2018)

*Quarterly Reporting and Market Liquidity*, COLUM. LAW SCH. BLUE SKY BLOG (Aug. 27, 2018)

*What Happens When an Activist Goes on the Board?*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 29, 2018) (with John C. Coffee, Jr.)

*Informed Trading and Cybersecurity Breaches*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Jan. 26, 2018) (with Eric Talley)

*Proactive Regulation*, REGBLOG: PENN PROGRAM ON REGULATION (Jun. 23, 2014)

*The Three Justifications for Piercing the Corporate Veil*, HARV. L. SCH. FORUM ON CORP. GOV. & FIN. REG. (Mar. 27, 2014) (with Jonathan R. Macey)

*Why the CFPB's Qualified Mortgage Rule Misses the Mark*, FREAKONOMICS BLOG (Jan. 17, 2014), *republished in* COLUM. L. SCH. BLUE SKY BLOG (Feb. 10, 2014) (with Ian Ayres)

*An Incentive-Compatible Alternative to "Don't Ask Don't Waive" Standstills*, COLUM. L. SCH. BLUE SKY BLOG (May 28, 2013) (with Steven J. Brams)

TEACHING EXPERIENCE

**Columbia Law School**, New York, NY                                                    2017 – present
*Data and Predictive Coding for Lawyers (January 2018, January 2019, May 2021)*
*Corporations (Fall 2022, Fall 2023)*
*Securities Regulation (Spring 2018, Spring 2019, Spring 2020, Spring 2021, Spring 2022)*
*Contracts (Fall 2018, Fall 2019)*

PROFESSIONAL EXPERIENCE

**Sullivan & Cromwell LLP**, New York, NY                                               2013 – 2014
*Associate*

PRESENTATIONS

**2021-present**

Conference on Empirical Legal Studies Harvard Law School and the Program on International Financial Systems (PIFS) for Comissão de Valores Mobiliários (CVM); IOSCO/PIFS-Harvard Law School Global Certificate Program for Regulators of Securities Markets (GCP); Reichman University (Israel); Regulatory Fundamentals Group; Ira M. Millstein Center for Global Markets and Corporate Ownership

**2019-20**

2020 UF Business Law Conference; 2020 George A. Leet Symposium, Columbia Law School Blue Sky Workshop; Harvard-NYU Corporate Law Academic Workshop Series; Junior Corporate Law Academic Workshop; Columbia Law School Faculty Workshop; American Law & Economics Association Annual Meeting; Cornell Law & Tech Workshop; Cadwalader, Wickersham & Taft, New York, NY; Richards, Layton & Finger, Wilmington, DE; Columbia Business School News and Finance Conference, New York, NY; Texas Law & Economics Workshop, Austin, TX; Securities Law Roundtable at Tulane Corporate Law Institute, New Orleans, LA; Vanderbilt Law & Economics Workshop, Nashville, TN; 8th Symposium on Intelligent Investing at Ivey Business School, Toronto, Canada

**2017-18**

Conference on Empirical Legal Studies; Junior Corporate Law Scholars Workshop at Columbia Law School; American Law & Economics Association Annual Meeting; Securities & Exchange Commission; Seminar on Corporate and Capital Markets Law and Policy at Harvard Law School (February 2018 and October 2018); Experimental Methods in Legal Scholarship III Conference at Columbia Law School; Law, Economics & Organization Workshop at Harvard Law School; Penn Law School Corporate Roundtable; Symposium of Journal of Institutional and Theoretical Economics; UVA/Santa Fe. Institute Conference on Computational Study of the Law; Columbia Law Faculty Workshop; Columbia Law Blue Sky Workshop; Journal Corporate Law Scholars Workshop at NYU Law School

**2013-16**

American Law & Economics Association Annual Meeting (2016, 2015, 2014, 2013); Conference on Empirical Legal Studies (2015, 2014, 2013); Columbia Finance Faculty Workshop (2016); American Finance Association Annual Meeting (2016); Minnesota Law & Economics Seminar (2015); Georgetown Law & Economics Workshop (2014); Virginia Law Symposium on Disclosure (2014); Federal Reserve Conference on Community Banking in the 21st Century (2014); Symposium on Crises-Driven Regulation, University of St. Thomas School of Law (2014); University of Connecticut School of Law, Junior Scholars Workshop (2013)

## EXPERT TESTIMONY (PUBLIC)

*In re Valeant Pharmaceuticals International, Inc. Securities Litigation* (D.N.Y. Jul. 29, 2024)
*Cupat v. Palantir Technologies Inc. et al* (D. Colo. May 24, 2024)
*Allison v. Oak Street Health, Inc. et al* (N.D. Ill. Jan 10, 2022)
*USA v. Berman* (D.D.C., 2024)
*In re The RealReal, Inc. Securities Litigation* (Ca. Sup. Ct., County of Marin, 2024)
*In re Talis Biomedical Securities Litigation* (C.D. Ca., 2023)
*Crews v. Rivian* (C.D. Ca., 2023)
In re *Hewlett Packard Enterprise Co. Shareholder Litigation* (Ca. Sup. Ct., County of Santa Clara, 2023)
In re *Turquoise Hill Resources Securities Litigation* (S.D.N.Y., 2023)
In re *Bayer Securities Litigation* (N.D.C.A., 2022)
*Set Capital v. Credit Suisse* (S.D.N.Y., 2022)
In re *Tesla Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC (N.D.C.A)
*Brookfield v. IPL*, Alberta Securities Commission (2021)
*Burford v. LSE*, CL-2019-000604 (Business and Property Courts of England and Wales Commercial Court (QBD))
*Farmland Partners v. Fortunae*, No. 1:18-cv-02351-KLM (D. Colo.)
Additional nonpublic matters

## PEER REVIEW

Journal of Legal Studies
Journal of Law, Economics & Organization
International Review of Law & Economics
Review of Law & Economics
Review of Financial Studies
Conference on Empirical Legal Studies

## BAR ADMISSION

New York

4

# EXHIBIT B

**DOCUMENTS CITED AND/OR RELIED UPON IN EXPERT REPLY REPORT OF PROFESSOR JOSHUA MITTS, PH.D.**
**June 27, 2025**

1. Expert Report of Jack R. Wiener, June 20, 2025, ECF No. 203-1

2. Revised Consolidated Class Action Complaint for Violations of the Federal Securities Laws, June 22, 2023, ECF No. 123

3. Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, May 30, 2025, ECF No. 199-1

4. Lilien v. Olaplex Holdings, Inc., 765 F. Supp. 3d 993 (C.D. Cal. 2025)

5. [Transcript of] Remote Oral and Videotaped Deposition of Jack R. Wiener, June 25, 2025

6. Declaration of Ann Marie Bria (June 18, 2025), ECF No. 203-2, June 20, 2025

7. Expert Report of Joshua R. Mitts, Ph.D., Allison v. Oak Street Health, Inc., No. 1:22-cv-00149, April 22, 2024, ECF No. 162-2

8. Olaplex Holdings, Inc., Prospectus (Form 424B4) (dated Sept. 29, 2021), October 1, 2021

9. DTCC001-DTCC013

10. JW-0000041-JW-00000422

11. 21 U.S.C. § 881(a)(6)

12. 17 CFR § 240.17a-3(a)(6)(i)(A)

13. SEC, Transfer Agent Regulations, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf

14. California Community Property Law § 6:22 (2022 ed.)

15. Restatement (Second) of Trusts § 202 cmt. j (1959)

16. U.S. v. Banco Cafetero Panama, 797 F.2d 1154 (2d Cir. 1986)

17. Brown & Williamson Tobacco Corp. v. First Nat. Bank of Blue Island, 504 F.2d 998 (7th Cir. 1974)

18. Slack Techs., LLC v. Pirani, 598 U.S. 759 (2023)

19. Brief for *Amicus Curiae* Law and Business Professors in Support of Respondent, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433 (2023), https://www.supremecourt.gov/DocketPDF/22/22-200/256386/20230306171423271_22-200%20Amicus%20Brief.pdf

20. Virginia B. Morris*, Guide to Clearance & Settlement: An Introduction to DTCC* (2021), https://static1.squarespace.com/static/5afc7c9d12b13fd2d1e912bb/t/632090504d38ae2ec c5709f2/1663078486818/DTCC-ClearanceSettlement_2021.pdf

21. DTCC, *Cross-Business Glossary of Terms*, https://dtcclearning.com/helpfiles/cross_bus/glossary/Content/Topics/gloss.htm

22. DTCC, *From Physical to Digital: Advancing the Dematerialization of U.S. Securities*, (Sept. 2020), https://www.dtcc.com/-/media/Files/PDFs/DTCC-Dematerialization-Whitepaper-092020.pdf

23. DTCC, *Deposit/Withdrawal At Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian

24. DTCC, *Settlement: Service Guide* (Dec. 20, 2024), https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Settlement.pdf

25. DTC, *Service Guide: About IPO*, https://www.dtcc.com/~/media/Files/Downloads/Settlement-Asset-Services/Underwriting/IPO.pdf

26. DTCC, *Deposits*: *Service Guide* (Apr. 2, 2024), https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Deposits.pdf

27. DTCC Learning, *Viewing Activity and Position* (Oct. 18, 2021), https://dtcclearning.com/products-and-services/settlement/view-activity-position.html

28. DTCC Learning, *Settlement Web*, *Viewing Activity & Position* (Apr. 26, 2024), https://dtcclearning.com/products-and-services/settlement/settlement-web.html