**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (SBN 270796)
rprongay@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495

*Liaison Counsel for Lead Plaintiff Arkansas Teacher Retirement System and the Proposed Class*

**LABATON KELLER SUCHAROW LLP**
LAUREN A. ORMSBEE (*pro hac vice*)
lormsbee@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff Arkansas Teacher Retirement System and Lead Counsel for the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LESLIE LILIEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>OLAPLEX HOLDINGS, INC., et al.,<br><br>Defendants. | Case No. 2:22-cv-08395-SVW(SKx)<br><br>CLASS ACTION<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**<br><br>Hearing Date: December 1, 2025<br>Time: 1:30 p.m.<br>Courtroom: 10A<br>Judge: Hon. Stephen V. Wilson |

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

PRELIMINARY APPROVAL AND THE NOTICE PROGRAM .......... 3

ARGUMENT .......... 5

I. THE SETTLEMENT WARRANTS FINAL APPROVAL .......... 5

A. Standards Governing Approval of Class Action Settlements .......... 5

B. Rule 23(e)(2)(A): The Class Has Been Adequately Represented .......... 7

C. Rule 23(e)(2)(B): The Settlement Is the Product of Arm's-Length Negotiations Between Experienced Counsel .......... 9

D. Rule 23(e)(2)(C): The Relief Provided by the Settlement Is Adequate .......... 11

1. Rule 23(e)(2)(C)(i): Risks of Continued Litigation .......... 11

2. Rule 23(e)(2)(C)(ii): Effective Process for Distributing Relief to the Settlement Class .......... 17

3. Rule 23(2)(C)(iii): Anticipated Legal Fees and Expenses .......... 18

E. Rule 23(e)(2)(D): Settlement Class Members Are Treated Equitably Relative to One Another .......... 19

II. THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION .......... 19

III. NOTICE PROGRAM AND REACTION OF THE SETTLEMENT CLASS TO DATE .......... 21

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Banc of Cal. Sec. Litig.*,
2019 WL 6605884 (C.D. Cal. Dec. 4, 2019) .......... 10

*In re Biolase, Inc. Sec. Litig.*,
2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) .......... 16

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) .......... 9

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .......... 5

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) .......... 6, 11, 22

*Ciuffitelli v. Deloitte & Touche LLP*,
2019 WL 1441634 (D. Or. Mar. 19, 2019) .......... 20

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) .......... 19

*In re Extreme Networks, Inc. Sec. Litig.*,
2019 WL 3290770 (N.D. Cal. July 22, 2019) .......... 9, 11

*Ferreira v. Funko, Inc.*,
2022 WL 22877154 (C.D. Cal. Dec. 13, 2022) .......... 10, 11

*Garner v. State Farm Mut. Auto Ins. Co.*,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .......... 5

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .......... 6, 7, 9, 11

*Jiangchen v. Rentech, Inc.*,
2019 WL 5173771 (C.D. Cal. Oct. 10, 2019) .......... 8, 11, 16, 21

*LeFrano v. Loandepot, Inc.*,
2023 WL 12023569 (C.D. Cal. Dec. 8, 2023) .......... 10

*In re LinkedIn User Priv. Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015) ............................................................16, 17

*Nat'l Rural Telecomm. Coop. v. DirectTV, Inc.*,
221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................9

*Nguyen v. Radient Pharms. Corp.*,
2014 WL 1802293 (C.D. Cal. May 6, 2014)...................................................15

*Officers for Justice v. Civil Serv. Comm'r*,
688 F.2d 615 (9th Cir. 1982).........................................................................5

*Redwen v. Sino Clean Energy, Inc.*,
2013 WL 12303367 (C.D. Cal. July 9, 2013) ............................................12, 20

*Roberti v. OSI Sys., Inc.*,
2015 WL 8329916 (C.D. Cal. Dec. 8, 2015) ....................................................9

*In re Snap Inc. Sec. Litig.*,
2021 WL 667590 (C.D. Cal. Feb. 18, 2021)...............................................9, 16

*In re Stable Rd. Acquisition Corp. Sec. Litig.*,
2024 WL 3643393 (C.D. Cal. Apr. 23, 2024)......................................... *passim*

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008).........................................................................5

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1993)...........................................................................16

**Docketed Cases**

*Yan Wang v. Dada Nexus Ltd. et al.*,
No. 2:24-cv-00239-SVW-BFM, slip op. (C.D. Cal. Mar. 14, 2025) ................11

**Statutes**

15 U.S.C §77k(e) ......................................................................................13, 20

15 U.S.C.§ 77z-1(a)(4) ....................................................................................19

15 U.S.C.§77z-1(a)(7) ....................................................................................22

**Rules**

Fed. R. Civ. P. 23 ....................................................................................6, 7, 21

Fed. R. Civ. P. 23(2)(C)(iii) ..... 18

Fed. R. Civ. P. 23(c)(2)(B) ..... 22

Fed. R. Civ. P. 23(e)(1)(B) ..... 21

Fed. R. Civ. P. 23(e)(2) ..... 5, 6

Fed. R. Civ. P. 23(e)(2)(A) ..... 7, 9

Fed. R. Civ. P. 23(e)(2)(B) ..... 9

Fed. R. Civ. P. 23(e)(2)(C) ..... 11

Fed. R. Civ. P. 23(e)(2)(C)(i) ..... 11

Fed. R. Civ. P. 23(e)(2)(C)(ii) ..... 17

Fed. R. Civ. P. 23(e)(2)(C)(iii) ..... 18

Fed. R. Civ. P. 23(e)(2)(C)(iv) ..... 6

Fed. R. Civ. P. 23(e)(2)(D) ..... 19

Fed. R. Civ. P. 23(e)(3) ..... 6

## PRELIMINARY STATEMENT

Lead Plaintiff, Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff"), respectfully submits this memorandum of law in support of its motion for final approval of the proposed Settlement of the above-captioned class action (the "Action") in the amount of $47,500,000, in cash, pursuant to the terms of the Stipulation and Agreement of Settlement, dated August 1, 2025 (the "Stipulation").[1] The Settlement is with Olaplex Holdings, Inc. ("Olaplex" or the "Company"), JuE Wong, Eric Tiziani, Tiffany Walden, Christine Dagousset, Tricia Glynn, Deirdre Findlay, Janet Gurwitch, Martha Morfitt, David Mussafer, Emily White, Michael White, and Paula Zusi (the "Individual Defendants" and, together with Olaplex, the "Defendants").

As described below and in the accompanying Declaration of Lauren A. Ormsbee, dated October 27, 2025 (the "Ormsbee Decl."), the Settlement is a very favorable result for the Settlement Class. Facing significant challenges with respect to obtaining a greater recovery after summary judgment and trial, Lead Plaintiff and Lead Counsel, being fully informed by substantial discovery and litigation efforts, negotiated a very favorable recovery for the Settlement Class. The Settlement was reached after more than two and a half years of vigorously contested litigation in which all Parties strongly advanced their positions. During the course of the litigation, Lead Plaintiff, among other things: (i) conducted a rigorous investigation of the claims at issue, including consulting with experts and interviewing former employees of Olaplex; (ii) drafted a detailed amended complaint; (iii) responded to four extensive motions to dismiss and argued against dismissal in two in-person oral arguments; (iv) moved for class certification; (v) researched, drafted, propounded and responded to document requests and interrogatories; (vi) reviewed approximately 50,000 documents (approximately 412,000 pages); (vii) took or

[1] All capitalized terms used herein that are not defined have the same meanings as in the Stipulation, previously filed with the Court, ECF No. 224-3.

defended four depositions and prepared for the imminent scheduled depositions of 16 individuals, including the Individual Defendants; (viii) negotiated discovery disputes; (ix) consulted with experts in the fields of negative causation, damages, tracing, reformulation, and corporate brand reputation and image; and (x) exchanged extensive mediation briefing and participated in a mediation overseen by a highly respected mediator, David M. Murphy. Indeed, at the time of settlement, the Parties had completed contested class certification proceedings and were thoroughly engaged in fact discovery. *See generally* Ormsbee Declaration, filed herewith.[2] As a result of these efforts, Lead Plaintiff and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the claims at issue in the Action. Lead Plaintiff litigated the Action with persistence and tenacity and was prepared to take its claims to trial.

While Lead Plaintiff believes the Settlement Class's claims are meritorious and strong, it recognizes there were substantial risks to continued litigation and trial. As discussed in detail in the Ormsbee Declaration and summarized below, among other things, Defendants would likely argue in future dispositive motions and at trial that, for example, the categories of false and misleading statements and omissions sustained by the Court concerning the risks to Olaplex's business posed by the March 2022 E.U. ban of an ingredient in one of its key products (No. 3 Hair Perfector) and the related risks posed to the business of using an allegedly unsafe

---

[2] The Ormsbee Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the litigation efforts; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation, among other things. Citations to "¶" in this memorandum refer to paragraphs in the Ormsbee Declaration.

All exhibits herein are annexed to the Ormsbee Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - __." The first numerical reference is to the designation of the entire exhibit attached to the Declaration and the second reference is to the exhibit designation within the exhibit itself.

All internal quotations and citations are omitted unless otherwise noted.

ingredient in its product, were not actionable. Defendants would likely put forward facts and several highly qualified experts in support of numerous affirmative defenses, such as due diligence and negative causation, which could potentially absolve Defendants from liability or drastically reduce the size of the Settlement Class and the amount of recoverable damages.

The Settlement avoids these risks (and others), as well as the further delay and expense of continued litigation – while providing a substantial and certain benefit to the Settlement Class. Lead Plaintiff was actively involved throughout the litigation, diligently representing the Settlement Class, and has approved the Settlement. *See* Declaration of Mark White, dated October 20, 2025, Ex. 1. The Settlement Class's reaction to date similarly reflects approval of the Settlement. Notice was provided to the Settlement Class beginning on August 25, 2025. *See* Declaration of Eric Blow Regarding (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion, dated October 27, 2025 ("Mailing Decl."), Ex. 3. While the November 10, 2025 deadline to object to the Settlement or request exclusion from the Settlement Class has not yet passed, to date, no objections or requests for exclusion have been received.

In addition, the Plan of Allocation for the distribution of the proceeds of the Settlement, which was developed by Lead Counsel with the assistance Lead Plaintiff's damages expert, is a fair and reasonable method for distributing the Net Settlement Fund to eligible claimants and should also be approved by the Court.

## PRELIMINARY APPROVAL AND THE NOTICE PROGRAM

On August 11, 2025, the Court entered an order preliminarily approving the proposed Settlement, preliminarily certifying the Settlement Class, and approving the forms and methods of providing notice to the Settlement Class (the "Preliminary Approval Order," ECF No. 229). Pursuant to and in compliance with the

Preliminary Approval Order, beginning on August 25, 2025, the Court-appointed Claims Administrator Epiq Class Action & Claims Solutions, Inc. ("Epiq"), caused the Postcard Notice to be mailed by first-class mail to potential Settlement Class Members and banks, brokers, and other nominees ("Nominees"). *See* Mailing Decl., Ex. 3 at ¶¶7-15. To date, a total of 18,978 Postcard Notices have been mailed to Settlement Class Members or their Nominees. *Id*. at ¶15. On September 4, 2025, the Summary Notice was published in *The Wall Street Journal* and was disseminated over the internet using *PR Newswire*. *Id*. at ¶¶16-17 and Ex. B attached thereto.

The Claim Form and the long-form Notice, along with other Settlement related documents, were posted on a website established by Epiq for purposes of the Settlement. Ex. 3 at ¶18. The website also provides important dates and deadlines in connection with the Settlement, as well as access to downloadable copies of relevant documents, including the Complaint, the Stipulation, and the Preliminary Approval Order. *Id*. Copies of the Postcard Notice, long-form Notice and Claim Form are also available on Lead Counsel's website, www.labaton.com. ¶121.

The notices collectively described, *inter alia*, the claims asserted in the Action, the contentions of the Parties, the course of the litigation, the terms of the Settlement, the maximum amounts that would be sought in attorneys' fees and expenses, the proposed Plan of Allocation, the right to object to the Settlement, and the right to seek exclusion from the Settlement Class. *See generally* Ex. 3-A to C. The notices also gave the deadlines for objecting, seeking exclusion, and submitting claims, and advised potential Settlement Class Members of the scheduled Settlement Hearing before this Court. *Id*. To date, the Settlement Class's reaction to the proposed Settlement has been positive. While the deadline (November 10,

2025) for objecting and seeking exclusion has not yet passed, to date there have been no objections to any aspect of the Settlement and no requests for exclusion.[3]

## ARGUMENT

## I. THE SETTLEMENT WARRANTS FINAL APPROVAL

### A. Standards Governing Approval of Class Action Settlements

The Ninth Circuit recognizes a "'strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020); *In re Syncor ERISA Litig.,* 516 F.3d 1095, 1101 (9th Cir. 2008). It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution." *Officers for Justice v. Civil Serv. Comm'r*, 688 F.2d 615, 625 (9th Cir. 1982). Settlements of complex cases, such as this one, greatly contribute to the efficient utilization of scarce judicial resources and achieve the speedy resolution of claims. *See, e.g.*, *Garner v. State Farm Mut. Auto Ins. Co.*, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.").

Rule 23(e)(2) provides that a court may approve a proposed settlement that would bind class members "only after a hearing and only on finding that it is fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member

[3] Should any objections or requests for exclusion be received, Lead Plaintiff will address them in its reply papers, which are due to be filed with the Court on November 24, 2025. Additionally, nothing has occurred to date to impact the Court's provisional certification of the Settlement Class.

claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3);[4] and

(D) the proposal treats class members equitably relative to each other.

Rule 23, as amended in December 2018, has not changed the established overall standard for approving a proposed class settlement, *i.e.*, evaluating whether it is fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2).

In considering final approval, the Court may also consider the Ninth Circuit's long-standing approval factors, many of which overlap with the Rule 23(e)(2) considerations: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). The Advisory Committee Notes to the 2018 amendments to Rule 23 explain that the four Rule 23(e)(2) factors are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23 Advisory Comm. Notes to 2018 Amendments, Subdivision (e)(2); *see also In re Stable Rd.*

[4] Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the parties in connection with a proposed settlement. Here, in addition to the Stipulation, on July 26, 2025 the Parties executed a settlement Term Sheet and on August 1, 2025 they entered into a Confidential Supplemental Agreement Regarding Requests for Exclusion, concerning the circumstances under which Olaplex could terminate the Settlement based upon the number of exclusion requests received. The Term Sheet, Stipulation, and the Supplemental Agreement are the only agreements concerning the Settlement entered into by the Parties.

*Acquisition Corp. Sec. Litig.*, 2024 WL 3643393, at *5 (C.D. Cal. Apr. 23, 2024). "Accordingly, the Court [should] appl[y] the framework set forth in Rule 23, while continuing to draw guidance from the Ninth Circuit's factors and relevant precedent." *Id.*

All of these factors, whether in Rule 23 or Ninth Circuit jurisprudence, favor approval of the proposed Settlement.

**B. Rule 23(e)(2)(A): The Class Has Been Adequately Represented**

In determining whether to approve a class action settlement, courts consider whether "the class representative and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 1027.

Here, Lead Plaintiff's claims are based on the same common course of alleged conduct by Defendants, are typical of all other Settlement Class Members, and Lead Plaintiff has no interests antagonistic to the Settlement Class. *See In re Stable Rd. Acquisition Corp*., 2024 WL 3643393, at *6 (finding lead plaintiff adequately represented the class where lead plaintiff's claims are typical of and coextensive with the claims of the settlement class with no antagonistic interests).

Furthermore, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class in both their vigorous prosecution of the claims and in their negotiation of the Settlement. Lead Plaintiff and Lead Counsel developed a deep understanding of the facts of the case and merits of the claims by, *inter alia*: (i) conducting an extensive investigation of the claims and defenses; (ii) drafting a detailed amended complaint; (iii) responding to four extensive motions to dismiss; (iv) moving for class certification; (v) researching, drafting, propounding and responding to document requests and interrogatories; (vi) reviewing approximately

50,000 documents totaling approximately 412,000 pages; (vii) taking three depositions, defending the deposition of ATRS, and preparing for 16 scheduled depositions; (viii) negotiating and resolving numerous discovery disputes; (ix) consulting with experts in the fields of negative causation, damages, tracing, reformulation, and corporate brand reputation and image; and (x) exchanging extensive mediation briefing and participating in a mediation. *See generally* Ormsbee Decl. at §§III.-V.

Lead Plaintiff regularly communicated with Lead Counsel and reviewed material filings in the case, such as the amended complaint, the briefing on Defendants' motions to dismiss, and the motion for class certification. Lead Plaintiff also responded to the discovery demands propounded by Defendants and worked with Lead Counsel to gather and produce documents and information responsive to the requests. Lead Plaintiff sat for a deposition on June 9, 2025 in New York and also traveled to New York to attend the June 19, 2025 mediation. *See* Ex. 1. Furthermore, Lead Plaintiff, through counsel, was involved in the ongoing settlement discussions and, with an informed understanding, agreed to the Settlement.

Likewise, Lead Counsel, who is experienced in prosecuting and trying complex class actions, had a clear view of the strengths and risks of the case and was equipped to make an informed decision regarding the reasonableness of a potential settlement. *See Jiangchen v. Rentech, Inc.,* 2019 WL 5173771, at *5 (C.D. Cal. Oct. 10, 2019) (finding this factor satisfied where counsel "has significant experience in securities class action lawsuits"). Over the course of the litigation, Lead Counsel developed a deep understanding of the facts of the case and the merits of the claims. *See generally* Ormsbee Decl. at §§III.-V. Lead Counsel is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex.7-D). Accordingly, the Settlement Class has been, and remains, well

represented.

Through their efforts on behalf of the Settlement Class, Lead Counsel and Lead Plaintiff have concluded that the proposed Settlement is fair, reasonable, and adequate. As courts have often observed, "'[g]reat weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomm. Coop. v. DirectTV, Inc.,* 221 F.R.D. 523, 528 (C.D. Cal. 2004).

Accordingly, it is respectfully submitted that this factor supports approval of the Settlement.

### C. Rule 23(e)(2)(B): The Settlement Is the Product of Arm's-Length Negotiations Between Experienced Counsel

Rule 23(e)(2)(B) asks whether "the [settlement] proposal was negotiated at arm's length." This consideration (and Rule 23(e)(2)(A) discussed above) "overlaps with certain *Hanlon* factors, such as the non-collusive nature[5] of negotiations, the extent of discovery completed, and the stage of proceedings." *In re Extreme Networks, Inc. Sec. Litig*., 2019 WL 3290770, at *7 (N.D. Cal. July 22, 2019).

"[T]he fact that the settlement was negotiated at arm's length and reached after discovery renders the agreement presumptively fair." *In re Snap Inc. Sec. Litig*., 2021 WL 667590, at *1 (C.D. Cal. Feb. 18, 2021) (J. Wilson). Indeed, courts have long recognized the importance of arm's-length negotiations. *See, e.g., Roberti v. OSI Sys., Inc*., 2015 WL 8329916, at *3 (C.D. Cal. Dec. 8, 2015) ("The arms-length nature of the negotiation resulting in the proposed Settlement supports final approval."). Moreover, "[t]he parties' use of an experienced mediator is an 'important factor' supporting a finding that a proposed settlement is the 'product of

[5] The Settlement has none of the indicia of possible collusion identified by the Ninth Circuit, *see In re Bluetooth Headset Prod. Liab. Litig.,* 654 F.3d 935, 947 (9th Cir. 2011), such as a "clear-sailing" fee agreement or a provision that would allow settlement proceeds to revert to Defendants. *See* Stipulation at ¶12 ("This is not a claims-made settlement. As of the Effective Date, Defendants, and/or any other Person funding the Settlement on a Defendant's behalf, shall not have any right to the return of the Settlement Fund or any portion thereof for any reason.").

arms-length negotiations'". *Ferreira v. Funko, Inc.*, 2022 WL 22877154, at *5 (C.D. Cal. Dec. 13, 2022)); *see also In re Stable Rd. Acquisition Corp.*, 2024 WL 3643393, at *6 (finding the settlement was achieved free of collusion where it involved a mediator with substantial experience); *In re Banc of Cal. Sec. Litig.*, 2019 WL 6605884, at *2 (C.D. Cal. Dec. 4, 2019) ("one important factor [to consider] is that the parties reached the settlement … with a third-party mediator)." Likewise, the fact that a settlement "is the result of a mediator's proposal in the context of a private mediation. . . supports the argument that [the agreement] is non-collusive." *LeFrano v. Loandepot, Inc.*, 2023 WL 12023569, at *11 (C.D. Cal. Dec. 8, 2023).

As detailed in the Ormsbee Declaration, the Settlement was achieved after a formal mediation session on June 19, 2025, which included the exchange of robust mediation materials prior to the mediation session. *See generally* Ormsbee Decl. at §V.; Declaration of David M. Murphy of Phillips ADR, dated October 27, 2025, Ex. 4. During the mediation session, Defendants, represented by a well-regarded law firm with deep expertise in the defense of securities class actions, vigorously asserted arguments against liability and damages. With the Parties still meaningfully apart in their respective settlement positions after the mediation, they agreed to continue negotiations through the Mediator. On July 1, 2025, after additional discussions between counsel, Lead Plaintiff and Defendants accepted the Mediator's proposal to resolve all claims against Defendants for $47.5 million in cash, subject to the negotiation of non-financial terms for the Settlement and Court approval. These negotiations were at all times adversarial and at arm's-length, and have produced a result that is in the best interests of the Settlement Class.

Furthermore, the Parties were thoroughly absorbed in the merits of the litigation when they agreed to settle, after fact discovery was well underway with four depositions already taken and more than 50,000 documents reviewed by Lead

Plaintiff, as detailed in the Ormsbee Declaration. There can be no question that Lead Plaintiff and Lead Counsel had sufficient information to evaluate the merits of the Settlement by the time it was reached. *See Ferreira,* 2022 WL 22877154, at *7 (finding the extent of discovery completed and stage of proceedings support final approval where plaintiffs prepared and drafted amended complaints, briefed two rounds of motions to dismiss, propounded and responded to discovery requests, and prepared and participated in a mediation session).

**D. Rule 23(e)(2)(C): The Relief Provided by the Settlement Is Adequate**

In determining whether a class-action settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C). This factor overlaps with the Ninth Circuit factors that consider "the strength of the plaintiffs' case," "amount offered in the settlement," and "the risk, expense, complexity, and likely duration of further litigation" and the risk of maintaining class action status." *Churchill Vill. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004); *Hanlon*, 150 F.3d at 1026.

**1. Rule 23(e)(2)(C)(i): Risks of Continued Litigation**

"In general, securities fraud class actions are complex cases that are time-consuming and difficult to prove." *Rentech,* 2019 WL 5173771, at *6; *see also Yan Wang v. Dada Nexus Ltd. et al.*, No. 2:24-cv-00239-SVW-BFM, slip op. at 10 (C.D. Cal. Mar. 14, 2025) (J. Wilson) (Ex. 6)[6] ("Plaintiffs' cause of action is a securities action, and such actions are generally highly complex, notably difficult, and notoriously uncertain."); *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *8 ("It is well-recognized that securities actions in particular are often long, hard-fought, complicated, and extremely difficult to win."). Although Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants

---

[6] Exhibit 6 is a compendium of unreported cases.

remain strong, they recognize the significant challenges and risks they would face moving forward, as well as the expense and length of continued litigation through the completion of fact discovery, expert discovery, class certification, summary judgment motions, trial, and undoubtedly appeals. *See, e.g., Redwen v. Sino Clean Energy, Inc.*, 2013 WL 12303367, at *6 (C.D. Cal. July 9, 2013) ("Courts experienced with securities fraud litigation 'routinely recognize that securities class actions present hurdles to proving liability that are difficult for plaintiffs to clear.'").

As set forth below, the benefits conferred on the Settlement Class by the $47.5 million Settlement far outweigh the costs, risks, and delay of further litigation, and confirm the adequacy of and reasonableness of the Settlement.

**Falsity, Materiality, and Investor Knowledge:** Defendants would have sought to convince the Court and a jury that the remaining narrow categories of statements and omissions sustained by the Court concerning the risks to Olaplex's business posed by the E.U. ban of the ingredient in its No. 3 hair care product and the related risks posed to the business by using allegedly unsafe ingredients in its product, were not false and misleading statements. In particular, Defendants would likely seek to establish that, at the time of the IPO, Olaplex had already reformulated the No. 3 product to remove the ingredient in advance of and in compliance with the E.U.'s ban on March 1, 2022. Defendants would likely argue that the Company did not view the reformulation to be a major change and did not expect the change to have a material adverse impact on Olaplex's performance, and the reformulation did not impact Olaplex sales or otherwise affect Olaplex's financial results prior to the IPO. Defendants would also have argued that the risk disclosure about Olaplex's products being found "unsafe" was not materially misleading because the No. 3 product was not found to be unsafe in the years before the IPO, and that the facts adduced in evidence would corroborate Defendants' argument. ¶¶100-101.

Defendants would have also likely continued to argue at summary judgment

and trial, as they had in opposing class certification, an "actual knowledge" affirmative defense on the ground that reasonable investors knew of the alleged truth at the time of their purchases. Defendants would likely continue to argue that prior to Olaplex's IPO, the EU's ban of the relevant ingredient was in the public record such that information regarding the EU ban could be found in public regulatory filings, scientific studies, product labels, and online sources, all of which were available to shareholders and the broader market. Defendants would also likely continue to argue that the ingredients in Olaplex's No. 3 hair care product were also publicly available information. Olaplex's "actual knowledge" defense, if believed by the Court or a jury, could have ultimately resulted in no liability. ¶102.

**Due Diligence:** Each of the Individual Defendants likely would have raised a due diligence defense as to their liability. While Lead Plaintiff would have worked extensively with a due diligence expert in an effort to show that these Defendants were negligent in connection with the IPO, these Defendants would have also put forth evidence showing that they conducted a reasonable investigation at the time of the IPO and had reasonable grounds for believing in the truthfulness and completeness of the Offering Documents. ¶103.

**Damages:** Finally, another principal challenge to continuing the litigation was the difficulty of overcoming Defendants' tracing and anticipated negative causation defense, particularly the "disaggregation" of confounding or unrelated information from the stock price declines. *See* 15 U.S.C § 77k(e). ¶¶104-110.

As the Court made clear during the July 7, 2025 status conference about the Settlement, the Court was highly likely—if not certain—to accept Defendants' tracing arguments with respect to purchases after November 12, 2021. Specifically, as argued in opposition to Lead Plaintiff's Class Certification Motion, tracing investors' purchases to Olaplex's late September 2021 IPO after November 12, 2021 would have become increasingly difficult because non-IPO shares entered the

market after November 12, 2021. Although Lead Plaintiff's tracing expert had responses to Defendants' arguments regarding how these purchasers could trace their shares, the Court informed the Parties that it was strongly inclined to only certify a settlement class that was limited to investors that purchased or otherwise acquired Olaplex's common stock pursuant and/or traceable to the Offering Documents through November 12, 2021, due to concerns regarding traceability after this date. *See* Tr. of Status Conference 6:3-7, Ex. 5. Limiting the class of investors entitled to a recovery in this Action to those before November 12, 2021 significantly reduced the amount of recoverable damages by more than half. ¶105.

While Lead Plaintiff's consulting damages expert has estimated that maximum recoverable statutory damages for purchases of Olaplex common stock from the IPO through November 12, 2021, inclusive, were approximately $753 million, Defendants and their experts would have also pursued several credible arguments that any recoverable damages should be much lower, if not zero, because of negative causation (*i.e.*, the decline in stock price was caused by something other than the alleged misstatements or omissions). ¶106.

In particular, Defendants would likely seek to establish that almost half of the class's statutory damages did not occur as the result of abnormal price declines resulting from the disclosure of information related to the sustained risk factor statements. According to Lead Plaintiff's consulting damages expert, damages based on only price declines allegedly related to the risk factor statements (on 2/28/22, 3/1/22, 3/3/22, 3/7/22, 3/8/22, 8/9/22, and 10/19/22) could have totaled approximately $390 million, half of Lead Plaintiff's expert's statutory damages estimate. ¶107.

Additionally, Defendants would likely have put forward additional negative causation arguments with respect to the price declines on each of these dates. For example, Defendants would likely argue that social media posts and press coverage

about Olaplex's use of the ingredient at issue, the ingredient's potential safety risks, the EU ban on the ingredient, and the ingredients in the No. 3 product had been fully disclosed on February 28, 2022 and March 1, 2022, such that losses after March 1, 2022 could not be proven. If successful, this argument could have reduced maximum statutory damages to between approximately $41.5 million and $96 million, depending on the modeling assumptions used. ¶108.

However, Defendants would have also likely further argued that, if limited to the February 28, 2022 and March 1, 2022 disclosure dates, Lead Plaintiff would have ***no recoverable damages*** because there were no statistically significant residual stock price declines on these dates. ¶109.

Issues relating to damages would have come down to an unpredictable and hotly disputed "battle of the experts." The uncertainty as to which side's expert's view might be credited by the jury, or the Court, presents a formidable litigation risk in securities actions. *See, e.g.*, *Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *2 (C.D. Cal. May 6, 2014) (approving settlement in securities case where "[p]roving and calculating damages required a complex analysis, requiring the jury to parse divergent positions of expert witnesses in a complex area of the law" and "[t]he outcome of that analysis is inherently difficult to predict and risky").

**<u>Favorable and Timely Recovery:</u>** Based on the analyses above, assuming liability were established, the Settlement recovers approximately 6.3% of maximum statutory damages ($753 million), at least 12.2% of Lead Plaintiff's expert's estimate of likely recoverable damages if Lead Plaintiff succeeded in retaining all allegedly related stock price drops ($390 million) and more than 100% of Lead Plaintiff's expert's lower bound of estimated recoverable damages ($41.5 million), without any risk to the Settlement Class's ability to recover. In the sphere of securities class actions, Lead Plaintiff and Lead Counsel believe this is an excellent outcome.

According to Cornerstone Research, for Securities Act cases with total estimated damages of $150 million or more, the median percentage of recovery from 2015 to 2024 was 5.7% of total estimated damages, and the median percentage of recovery for all Securities Act cases from 2015 to 2024 was 7.9%. *See* Laarni T. Bulan and Eric Tam, *Securities Class Action Settlements – 2024 Review and Analysis* (Cornerstone Research 2025), Ex. 2 at 9. Courts also regularly approve settlements with comparable or lower percentage recoveries than obtained here. *See, e.g., In re Snap Inc. Sec. Litig*., 2021 WL 667590, at *1 (finding the relief adequate where the settlement amount represents 7.8% of class's maximum potential aggregate damages, which is "similar to the percent recovered in other court-approved securities settlements"); *Rentech,* 2019 WL 5173771, at *9 (finding settlement that represented approximately 10% of total maximum potential damages to be a "favorable outcome in light of the challenging nature of securities class action cases" and supporting the fee award); *In re Biolase, Inc. Sec. Litig*., 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").

Lead Plaintiff and Lead Counsel also believe the $47.5 million recovery is fair and reasonable when considering the median recovery in other securities class actions that settled in 2024, as well as those from 2015 to 2024, that, like this Action, alleged only Securities Act claims, which for all cases, of all sizes, was $10.3 million. Ex. 2 at 8.

Lastly, the Settlement also comes without the considerable risk, expense, and delay of summary judgment, trial, and post-trial litigation. *See, e.g.*, *Torrisi v. Tucson Elec. Power Co*., 8 F.3d 1370, 1376 (9th Cir. 1993) ("the cost, complexity and time of fully litigating the case all suggest that this settlement was fair"); *In re LinkedIn User Priv. Litig*., 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Generally,

unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.”).

Accordingly, in light of all the substantial risks and expense of continued litigation, and compared to the certain and prompt recovery of $47,500,000, Lead Plaintiff and Lead Counsel believe the Settlement is an excellent result.

#### 2. Rule 23(e)(2)(C)(ii): Effective Process for Distributing Relief to the Settlement Class

Rule 23(e)(2)(C)(ii) instructs courts to consider whether the relief provided to the class is adequate in light of the “effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims.”

Here, the proceeds of the Settlement will be distributed with the assistance of an experienced claims administrator, Epiq. The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Specifically, a claimant will submit, either by mail or online using the case website, the Court-approved Claim Form. Based on the trade information provided by claimants, the Claims Administrator will determine each claimant’s eligibility to recover by, among other things, calculating their respective “Recognized Claims” based on the Court-approved Plan of Allocation, and ultimately determine each eligible claimant’s *pro rata* portion of the Net Settlement Fund. *See* Stipulation at ¶24. Lead Plaintiff’s claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. Stipulation at ¶30(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court. *Id*.

After the Settlement reaches its Effective Date (*id*. at ¶39) and the claims process is completed, Authorized Claimants will be issued payments in the form of checks and wire transfers. If there are unclaimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims

Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, Lead Plaintiff recommends that any *de minimis* balance that remains in the Net Settlement Fund, after payment of any outstanding Notice and Administration Expenses and Taxes, be donated to the Consumer Federation of America ("CFA"), a non-profit, non-sectarian organization, or such other private, non-sectarian, 501(c)(3) organization designated by Lead Plaintiff and approved by the Court.[7] *Id* at ¶27; Ex. 3-C at ¶75.

### 3. Rule 23(2)(C)(iii): Anticipated Legal Fees and Expenses

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). As discussed in the Memorandum of Points and Authorities in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, submitted herewith, Lead Counsel seeks an award of attorneys' fees of 25% of the Settlement Fund, the Ninth Circuit benchmark, and Litigation Expenses of $771,674.27. Lead Counsel's Fee Memorandum also includes a request by Lead Plaintiff for $10,006.63 in connection with its work in the litigation, pursuant to the PSLRA.

[7] CFA is a non-profit, consumer advocacy organization established in 1968 to advance consumer interests through policy research, advocacy, and education. Provides reports and testimony to the judiciary, Congress, the White House, federal and state regulatory agencies, and state legislatures. *See* www.consumerfed.org. With respect to victims of financial fraud, CFA has an Investor Protection program and a newly established Investment Research Center that works nationwide to promote consumer-oriented policies that safeguard investors against fraud through: (i) the development of educational material for investors; (ii) drafting policies and legislation; (iii) and providing testimony and comments on legislation and regulations. www.consumerfed.org/issues /investor-protection. CFA has been approved in numerous securities cases, including *Hatamian v. Advanced Micro Devices, Inc,* No. 14-cv-00226 YGR (ND Cal), *In re Extreme Networks, Inc. Sec. Litig.*, Case No. 3:15-cv-04883-BLF (N.D. Cal.), *In re Broadcom Corp. Sec. Litig.*, No. 01-CV-00275-MLR (C.D. Cal.). Neither Lead Plaintiff nor Lead Counsel have a relationship with CFA.

The attorneys' fee and expense request is not part of any agreement with Defendants, and the Settlement cannot be terminated based on any ruling on the fees or expenses.

### E. Rule 23(e)(2)(D): Settlement Class Members Are Treated Equitably Relative to One Another

The Settlement does not improperly grant preferential treatment to either Lead Plaintiff or any segment of the Settlement Class. Rather, all members of the Settlement Class, including Lead Plaintiff, will receive a distribution from the Net Settlement Fund pursuant to the Plan of Allocation approved by the Court, which is discussed below.[8] All Settlement Class Members that were allegedly harmed as a result of the alleged violations of the Securities Act, and that submit an eligible claim pursuant to the Plan of Allocation, will receive their *pro rata* share of the Net Settlement Fund based on their "Recognized Claim" under the plan. *See generally* long-form Notice at ¶¶64-67, Ex. 3-C.

## II. THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

In addition to seeking final approval of the Settlement, Lead Plaintiff also seeks final approval of the Plan of Allocation. The Plan of Allocation, drafted with the assistance of Lead Plaintiff's consulting damages expert, is a fair, reasonable, and adequate method for allocating the proceeds of the Settlement among eligible claimants and treats all Settlement Class Members equitably, as required by Rule 23(e)(2)(D). The standard for approval of a plan of allocation in a class action is the same as the standard applicable to approval of the settlement as a whole – the plan must be fair, reasonable, and adequate. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992); *see also In re Stable Rd. Acquisition Corp.*, 2024

[8] Lead Plaintiff's request for reimbursement of its reasonable costs and expenses directly related to its participation in the Action, noted above, would not constitute preferential treatment. *See* 15 U.S.C. §15 U.S.C. § 77z-1(a)(4) (reimbursement of plaintiffs' costs explicitly contemplated by the PSLRA in addition to receiving their *pro rata* recovery).

WL 3643393, at *10. An allocation formula "need only have a reasonable and rational basis." *Id*.

Each Authorized Claimant, including Lead Plaintiff, will receive a distribution pursuant to the Plan, and Lead Plaintiff will be subject to the same formula for distribution of the Settlement as other class members. *See Ciuffitelli v. Deloitte & Touche LLP*, 2019 WL 1441634, at *18 (D. Or. Mar. 19, 2019) ("[t]he Proposed Settlement does not provide preferential treatment to Plaintiffs or segments of the class" where "the proposed Plan of Allocation compensates all Class Members and Class Representatives equally in that they will receive a pro rata distribution based [sic] of the Settlement Fund based on their net losses"). "[A] plan of allocation . . . fairly treats class members by awarding a pro rata share to every Authorized Claimant, even as it sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue." *Redwen*, 2013 WL 12303367, at *8.

Claimants' Recognized Loss Amounts per share will be calculated using the transactional information provided by claimants in their Claim Forms. Authorized Claimants will recover their proportional "*pro rata*" amount of the Net Settlement Fund based on the sum of their Recognized Loss Amounts per share, *i.e.*, their total Recognized Claims.

Here, the objective of the Plan of Allocation is to distribute the Net Settlement Fund equitably among those Settlement Class Members who suffered economic losses with respect to shares of Olaplex publicly traded common stock purchased or otherwise acquired pursuant and/or traceable to the Offering Documents for Olaplex's IPO on or before November 12, 2021. In general, the Recognized Loss Amounts per share calculated under the Plan are based principally on the statutory formula for damages under Section 11(e) of the Securities Act, 15

U.S.C. §77k(e). The Plan of Allocation was fully described in the long-form Notice and, to date, there has been no objection to the proposed plan. *See* Ex. 3-C at ¶¶58-75.

It is respectfully submitted that the proposed Plan of Allocation will result in a fair distribution of the available proceeds among Settlement Class Members who submit valid claims.

## III. NOTICE PROGRAM AND REACTION OF THE SETTLEMENT CLASS TO DATE

Notice of a class action settlement must be directed "in a reasonable manner to all class members who would be bound" by the Settlement. Fed. R. Civ. P. 23(e)(1)(B). In granting preliminary approval of the Settlement, the Court approved Lead Plaintiff's proposed notice plan. *See* ECF No. 229. The notice program's combination of individually mailed Postcard Notices to all Settlement Class Members who could be identified with reasonable effort, supplemented by the Summary Notice in a widely circulated publication, transmission over a business newswire, and publication on internet websites, satisfied all requirements of Rule 23, due process, and the PSLRA. *See, e.g., Rentech,* 2019 WL 5173771, at *8 (approving similar notice program that included mailing postcard notices to potential class members and nominees followed by publication notice and posting notice on a settlement website).

As detailed in the accompanying Mailing Declaration, as of October 27, 2025, 18,978 Postcard Notices have been mailed to potential Settlement Class Members, brokers, and nominees. *See* Ex. 3 at ¶15. In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over *PR Newswire* on September 4, 2025. *Id.* at ¶¶16-17. The Claims Administrator also continues to maintain a dedicated settlement website, www.OlaplexSecuritiesSettlement.com. *Id.* at ¶18. Claim Forms can be submitted to the Claims Administrator by mail or using the settlement website. *Id.*

Notice of a class action settlement "is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill*, 361 F.3d at 575. The contents of the notices here provided the necessary information for Settlement Class Members to make an informed decision regarding the Settlement and contained all of the information required by Rule 23(c)(2)(B) and the PSLRA, 15 U.S.C. §77z-1(a)(7).

While the objection and exclusion deadline – November 10, 2025 – has not yet passed, to date, no objections have been received by Lead Counsel or docketed by the Court, and no requests for exclusion have been received. The reaction to date supports approval of the Settlement and the proposed Plan of Allocation. Lead Plaintiff will address any objections and exclusion requests, if any, in its reply submission.

## CONCLUSION

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant final approval to the proposed Settlement and approve the Plan of Allocation for the distribution of the Net Settlement Fund. Proposed orders are filed herewith.

Dated: October 27, 2025

**LABATON KELLER SUCHAROW LLP**

By: */s/ Lauren A. Ormsbee*

Lauren A. Ormsbee (*pro hac vice*)
Lisa Strejlau (*pro hac vice*)
Charles Stiene (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
lormsbee@labaton.com
lstrejlau@labaton.com
cstiene@labaton.com

*Attorneys for Lead Plaintiff Arkansas Teacher Retirement System and the Proposed Settlement Class*

**Certificate of Word Count Compliance**

I, Court-appointed Lead Counsel, hereby certify that this memorandum of law contains 6,963 words, which complies with the 7,000 word limit of L.R. 11-6.1.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 27, 2025

/s/ *Lauren A. Ormsbee*
Lauren A. Ormsbee

# **Certificate of Service**

I hereby certify that on October 27, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List served via ECF on all registered participants only.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 27, 2025

/s/ *Lauren A. Ormsbee*
Lauren A. Ormsbee

**Mailing Information for *Leslie Lilien v. Olaplex Holdings, Inc. et al.*,**

**Case 2:22-CV-08395-SVW(SKX)**

**Electronic Mail Notice List:**

**The following are those who are currently on the list to receive e-mail notices for this case.**

Eric J. Belfi - ebelfi@labaton.com

Brian R. Blais - Brian.blais@ropesgray.com

John L. Brennan - jbrennan@willkie.com

James C. Dugan - jdugan@willkie.com

Kathryn C. Garrett - kgarrett@willkie.com

Matthew M. Gurvitz - mgurvitz@willkie.com

Adam M. Harris - adam.harris@davidllc.com

Danielle Izzo - dizzo@labaton.com

Philip G. Kraft - phillip.kraft@ropesgray.com

Charles Henry Linehan - clinehan@glancylaw.com

Francis P. McConville - fmcconville@labaton.com

Lauren Amy Ormsbee - lormsbee@labaton.com

Jennifer Pafiti - jpafiti@pomlaw.com

Anne Johnson Palmer- anne.johnsonpalmer@ropesgray.com

Kevin M Papay - kevin.papay@morganlewis.com

Robert Vincent Prongay - rprongay@glancylaw.com

John Warren Rissier - warren.rissier@morganlewis.com

Charlene Sachi Shimada - charlene.shimada@morganlewis.com

Charles J. Stiene - cstiene@labaton.com

Naomi Rose Strauss - nstrauss@willkie.com

Lisa Marie Strejlau - lstrejlau@labaton.com

Irina Vasilchenko - ivasilchenko@labaton.com

Carol C. Villegas - cvillegas@labaton.com

Nicole M. Zeiss – nzeiss@labaton.com
Peter L. Welsh - peter.welsh@ropesgray.com
Daniel A. Yanofsky - daniel.yanofsky@ropesgray.com