**GLANCY PRONGAY & MURRAY LLP**
ROBERT V. PRONGAY (SBN 270796)
rprongay@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495

*Liaison Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement*
*System and the Proposed Class*

**LABATON KELLER SUCHAROW LLP**
LAUREN A. ORMSBEE (*pro hac vice*)
lormsbee@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiff*
*Arkansas Teacher Retirement System*
*and Lead Counsel for the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE LILIEN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OLAPLEX HOLDINGS, INC., et al., <br><br> Defendants. | Case No. 2:22-cv-08395-SVW(SKx) <br><br> **DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND <u>PAYMENT OF EXPENSES</u>** <br><br> Hearing Date: December 1, 2025 <br> Time: 1:30 p.m. <br> Courtroom: 10A <br> Judge: Hon. Stephen V. Wilson |

I, Lauren A. Ormsbee, declare under penalty of perjury, pursuant to 28 U.S.C. §1746:

1.    I am a member of the law firm of Labaton Keller Sucharow LLP ("Labaton" or "Lead Counsel"), which serves as Lead Counsel for court-appointed Lead Plaintiff Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff") and all other members of the proposed Settlement Class in the above-captioned litigation (the "Action").[1] I am admitted to practice before this Court *pro hac vice* and have been actively involved throughout the prosecution and resolution of the Action, am familiar with the proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision of and participation in the Action.

2.    I respectfully submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed class action settlement with Olaplex Holdings, Inc. ("Olaplex" or the "Company"), JuE Wong, Eric Tiziani, Tiffany Walden, Christine Dagousset, Tricia Glynn, Deirdre Findlay, Janet Gurwitch, Martha Morfitt, David Mussafer, Emily White, Michael White, and Paula Zusi (the "Individual Defendants," and, together with Olaplex, the "Defendants"),[2] for $47,500,000 in cash.

3.    If approved, the Settlement will resolve all claims in the Action, and related claims, on behalf of the Settlement Class, which consists of all persons and entities that purchased or otherwise acquired Olaplex publicly traded common stock on or before November 12, 2021, pursuant and/or traceable to the Offering Documents for Olaplex's initial public offering ("IPO"), and who were allegedly damaged

---

[1] All capitalized terms herein that are not otherwise defined have the same meanings as provided in the Stipulation and Agreement of Settlement, dated as of August 1, 2025 (the "Stipulation"). ECF No. 224-3.

[2] The defined term "Defendants" refers to the remaining Defendants in this Action, whereas any mention of "defendants" generally is intended to include those defendants named in the Action that were subsequently dismissed pursuant to a Court order.

thereby.[3] The Court preliminarily approved the Settlement and directed notice to the Settlement Class by Order dated August 8, 2025 ("Preliminary Approval Order"). ECF No. 229.

4.     I also respectfully submit this Declaration in support of: (i) approval of the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class Members ("Plan of Allocation"); and (ii) Lead Counsel's motion for an award of attorneys' fees of 25% of the Settlement Fund, which includes accrued interest; payment of Litigation Expenses incurred by Lead Counsel in the total amount of $771,674.27, plus accrued interest; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), reimbursed of $10,006.63 to Lead Plaintiff in connection with the time it dedicated to representing the Settlement Class ("Fee and Expense Application").

5.     For the reasons discussed below and in the accompanying memoranda of law,[4] I respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, adequate and should be approved by the Court; and (iii)

---

[3] Excluded from the Settlement Class are: (i) Defendants and the Individual Defendants' Immediate Family Members; (ii) the officers, directors, and subsidiaries of Olaplex, at all relevant times; (iii) Olaplex's affiliates and employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired Olaplex's common stock pursuant or traceable to the Offering Documents through any such plan(s); (iv) any person and entity that had or has a controlling interest in Olaplex, at all relevant times; (v) the underwriters of Olaplex's IPO, provided, however, that any "Investment Vehicle" (as defined in the Stipulation) shall not be excluded from the Settlement Class; (vi) any entity in which any of the Defendants have or had a controlling or beneficial interest; (vii) the legal representatives, heirs, successors, or assigns of any such excluded person or entity, in their capacity as such; and (viii) any persons or entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court.

[4] In conjunction with this Declaration, Lead Plaintiff and Lead Counsel are submitting the Memorandum of Points and Authorities in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation ("Settlement Memorandum") and the Memorandum of Points and Authorities in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Fee and Expense Memorandum").

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKx)

2

the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in all respects. Moreover, the Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Lead Plaintiff—a sophisticated, institutional investor that has actively supervised the Action since its inception. *See* Declaration of Mark White in Support of (I) Final Approval of Class Action Settlement and (II) An Award of Attorneys' Fees and Payment of Expenses, dated October 20, 2025, attached hereto as Exhibit 1.[5]

## I. PRELIMINARY STATEMENT

6. The proposed Settlement now before the Court provides for the full resolution of the Action, and related Released Plaintiffs' Claims, in exchange for a cash payment of $47,500,000. As detailed herein, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents an excellent result for the Settlement Class, particularly in light of the significant risks of continuing to litigate the Action.

7. In choosing to settle, Lead Plaintiff and Lead Counsel took into consideration the substantial challenges associated with advancing the claims through trial, as well as the duration and complexity of the legal proceedings that remained ahead. As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all. The decision to settle was informed by a comprehensive investigation into the claims and defenses in the Action, substantive motion practice and discovery, as well as vigorous arm's-length negotiations, based upon adequate information after consultation with experienced legal counsel.

8. The case—which was litigated efficiently and aggressively until the agreement to settle—was settled only after Lead Plaintiff, among other things: (i) conducted a rigorous investigation of the claims at issue, including contacting and

---

[5] All exhibits to the Motions are annexed hereto. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached hereto and the second reference is to the exhibit designation within the exhibit itself.

interviewing former employees of Olaplex; (ii) prepared and filed a detailed amended complaint, which expanded the scope of the initial complaint by adding additional misrepresentations, disclosures, and other allegations in support of the claims at issue; (iii) responded to four extensive motions to dismiss and argued against dismissal in two in-person oral arguments; (iv) moved for class certification, which included serving two expert reports; (v) researched, drafted, and propounded discovery requests on defendants; (vi) served subpoenas on at least 13 third-parties; (vii) reviewed approximately 50,000 documents, totaling approximately 412,000 pages produced by Defendants and third parties; (viii) took or defended four depositions and prepared for the imminent scheduled depositions of 16 individuals, including three of the Individual Defendants; (ix) negotiated discovery disputes; (x) consulted with experts in the fields of negative causation, damages, tracing, reformulation, and corporate brand reputation and image; and (xi) exchanged extensive mediation briefing and participated in a mediation.

9. Lead Plaintiff and Lead Counsel believe the $47.5 million recovery is also fair and reasonable when considering other securities class action recoveries. According to Cornerstone Research, the median dollar settlement amount for all cases, of all sizes, that only alleged Securities Act claims, from 2015 through 2024, was $10.3 million, or 7.9% of statutory damages. *See* Laarni T. Bulan and Eric Tam, *Securities Class Action Settlements – 2024 Review and Analysis* (Cornerstone Research 2025), Ex. 2, at 8-9 (also noting that the median percentage recovery in such cases with more than $150 million in statutory damages was 5.7% of statutory damages).

10. Lead Plaintiff consulted with experts in the fields of damages and loss causation who analyzed class-wide damages in light of the facts and circumstances presented in the case and developed through the discovery process to date. Lead Plaintiff's consulting damages expert has estimated that maximum statutory damages were $753 million. However, Defendants would have tenaciously argued that any

recoverable damages should be much lower, if not zero because of negative causation. Recoverable damages based on only price declines allegedly related to the remaining risk factor statements were estimated to be approximately $390 million, and could have been reduced to approximately $41.5 million to $96 million, if losses beyond March 1, 2022 could not be proven. If limited to the February 28, 2022 and March 1, 2022 disclosure dates, Defendants would also likely argue that Lead Plaintiff and the class still had no recoverable damages because there were no statistically significant residual stock price declines on these dates. Accordingly, the Settlement recovers a range of approximately 6.3% ($753 million in damages) to more than 100% ($41.5 million in damages) of likely recoverable potential damages.

11.    In addition to seeking approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation governing the calculation of claims and the distribution of the Settlement proceeds. As discussed below, the proposed Plan of Allocation was developed with the assistance of Lead Plaintiff's damages expert and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the claims.

12.    With respect to Lead Counsel's request for an award of attorneys' fees and payment of expenses on behalf of itself and Liaison Counsel Glancy Prongay & Murray LLP, the requested fee of 25% would be fair both to the Settlement Class and counsel, and warrants the Court's approval. The fee request is within the range of fee percentages frequently awarded in connection with similar settlements and, under the facts of this case, is justified considering the benefits that Plaintiff's Counsel conferred on the Settlement Class, the risks it undertook, the quality of the representation, the nature and extent of the legal services, and the fact that Lead Counsel pursued the case at its own financial risk. Lead Counsel also seeks expenses in the amount of $771,674.27, plus reimbursement to Lead Plaintiff, pursuant to the PSLRA, for its

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-cv-08395-SVW(SKx)

5

efforts on behalf of the Settlement Class in the amount of $10,006.63. The expense amounts are less than the maximum amount of expenses of $875,000 provided for in the notices.

13. Lead Counsel has worked with the Court-authorized Claims Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq" or "Claims Administrator"), to disseminate notice of the Settlement to Settlement Class Members as directed in the Preliminary Approval Order. In this regard, Epiq has provided 18,978 copies of the Postcard Notice to Settlement Class Members and their nominees.[6] Additionally, Epiq has posted the Postcard Notice, Claim Form, and long-form Notice, along with other relevant documents, on the website www.OlaplexSecuritiesSettlement.com, and has caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire. See* Ex. 3, Mailing Decl., ¶¶16-19. As ordered by the Court and stated in the notices, objections and requests for exclusion from the Settlement Class are due no later than November 10, 2025. To date, there have been no objections to any aspect of the Settlement and no requests for exclusion.[7]

## II.    SUMMARY OF LEAD PLAINTIFF'S CLAIMS

14. Lead Plaintiff's claims in this Action are set forth in the Revised Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed on June 22, 2023 (ECF No. 123) (the "Complaint"), which asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77o (the "Securities Act") against Defendants, the Underwriters, and the Selling Stockholders.

---

[6] *See* Declaration of Eric Blow Regarding (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion, dated October 27 2025, attached hereto as Exhibit 3 ("Mailing Decl."), ¶¶7-15.

[7] Lead Plaintiff and Lead Counsel will report on any objections and requests for exclusion that may be received after this submission in their reply submission to be filed with the Court on or before November 24, 2025.

15.    Olaplex is a hair care brand founded in 2014. ¶83.[8] The Company went public in 2021, when, on September 29, 2021, it conducted its IPO, selling 84,755,000 shares of Olaplex common stock to investors at a price of $21 per share. ¶154. In connection with the IPO, Olaplex filed a registration statement and prospectus (together, the "Offering Documents"), which were disseminated to the investing public. ¶155. According to Lead Plaintiff's Complaint, Olaplex's IPO Offering Documents allegedly contained false and misleading statements and omissions in violation of the Securities Act.

16.    Specifically, Lead Plaintiff alleged in the Complaint that Defendants made false and misleading statements and omissions in the Offering Documents relating to risks to the Company posed by the inclusion of lilial, an ingredient that had recently been banned by the European Union ("E.U.")—a ban that would take effect in March 2022—as unsafe, in one of Olaplex's best-selling, key products: its No. 3 Hair Perfector. ¶¶130-141. Lead Plaintiff alleged that the Offering Documents contained general risk disclosures about, *e.g.*, the potential "impact" of "laws and regulations" that "may" require Olaplex to "reformulate" its products and "remove" ingredients that might be deemed "unsafe," but failed to disclose (a) the Company's prior and present use of the ingredient, (b) the E.U. ban and its relevance to Olaplex, or (c) the No. 3 product's reformulation to remove the ingredient. ¶¶164, 166. The Complaint also alleges that the Offering Documents contained other misstatements of material fact and material omissions, including regarding the risk that an Olaplex product may be found unsafe (¶167); the risk of reputational damage (¶¶166, 173, 180), and the strength of Olaplex's brand reputation and social media engagement (¶¶170-76, 178). Moreover, the Complaint alleges that the Offering Documents contained actionable omissions by failing to comply with (a) Item 303 of Regulation S-K, 17 C.F.R. § 229.303, by failing to disclose events and uncertainties, including any known trends that have had or are

---

[8] References to "¶" or "¶¶" are to paragraphs in the Complaint.

reasonably likely to cause the issuer's financial information not to be indicative of future operating results, and (b) Item 105 of Regulation S-K, 17 C.F.R. § 229.105 by failing to disclose most significant factors that made the Offering speculative or risky. ¶¶160-61.

17. The Complaint alleges that approximately five months after the IPO, in late February 2022, a TikTok "influencer" discussed Olaplex's use of lilial on social media, prompting widespread backlash against Olaplex online and in media. ¶¶197-206. The Complaint alleges that while Olaplex tried to counter the negative news, Olaplex's stock declined following the TikTok and media posts. ¶207. The Complaint further alleges that when the Company reported its 1Q 2022 financial results, on May 11, 2022, it reported slowing growth in net sales and admitted that Olaplex had reformulated its No. 3 product to remove the ingredient in June 2021—three months *before* the IPO. ¶¶219-20. On this news, Olaplex's stock declined 6.03 percent. ¶¶221-22. The following quarter, on August 9, 2022, Olaplex reported its 2Q 2022 financial results disclosing further slowing growth in net sales, down 57.6% from the prior quarter. ¶230. On this news, Olaplex's stock price fell 9.99%. ¶¶233-35. On October 18, 2022, the Company announced preliminary 3Q 2022 results in which it revealed the sales slowdown had worsened and revised its guidance for 2022 fiscal year downward by more than $100 million. ¶¶243-46. On this news, the Company's stock price fell 56.69%. ¶250. On November 17, 2022, the date this Action was filed, the stock closed at $5.75 per share, nearly a 73% decrease from its IPO price of $21 per share. ¶258.

## III. RELEVANT PROCEDURAL HISTORY OF THE ACTION AND LEAD COUNSEL'S LITIGATION EFFORTS

### A. Commencement of the Action

18. On November 17, 2022, the Action was commenced by the filing of an initial complaint in the United States District Court for the Central District of California, asserting violations of Sections 11, 12(a)(2), and 15 of the Securities Act

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKX)

8

for alleged misstatements and omissions in the Offering Documents for Olaplex's IPO against Olaplex and the Individual Defendants. ECF No. 1.

19. The selection of lead plaintiff was initially contested. On January 17, 2023, ATRS filed a motion seeking to be appointed Lead Plaintiff and seeking appointment of its counsel, Labaton Sucharow LLP (n/k/a Labaton Keller Sucharow LLP). ECF No. 25. Four other class members filed motions for lead plaintiff appointment. ECF Nos. 23, 32, 35, 38. The four other class members subsequently withdrew their motion or filed notices of non-opposition. By Order dated February 27, 2023, Judge Christina A. Snyder appointed ATRS as Lead Plaintiff and approved its selection of Labaton as Lead Counsel and Glancy Prongay & Murray LLP as Liaison Counsel. ECF. No. 59.

20. On March 10, 2023, this Court entered and so-ordered a joint stipulation filed by the parties on that date ordering Lead Plaintiff to file its amended complaint on April 28, 2023. ECF No. 63.

**B.      Lead Plaintiff and Lead Counsel's Investigation and Filing of the Complaint**

21. Prior to filing the amended complaint, Lead Counsel conducted an extensive investigation relating to the claims, defenses, and underlying events and transactions that are the subject of the Action. This process included reviewing and analyzing: (i) regulatory filings made by Olaplex with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company website and marketing materials; (iv) price and volume data for Olaplex common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) other publicly available material and data; and (viii) the applicable law governing the claims and potential defenses. Lead Counsel also identified, located, and interviewed former Olaplex employees regarding the facts and events at issue in this litigation.

22.   In addition, Lead Counsel engaged experts to assist with its investigation of the claims asserted in the Complaint. For example, Lead Counsel engaged a digital marketing and reputation expert who analyzed Olaplex's online presence and the negative impact of the news to Olaplex's reputation and business after Olaplex's IPO. This involved extensive research into the ingredient controversy, customer reactions, and the correlation to brand reputation through the analysis of Google searches, Google news, domain positioning, and Olaplex's reputation based on an analysis of posts on Facebook, Twitter, Instagram, and TikTok.

23.   Lead Counsel also conducted extensive legal research before filing the Complaint to determine which theories of liability to allege. For example, Lead Counsel comprehensively researched the law in the Ninth Circuit relating to pertinent legal issues, such as pleading standards for allegations based on confidential witnesses, statutory standing for Securities Act claims, and the materiality of allegedly false and misleading statements and omissions of material facts required to be stated under the federal securities laws.

24.   After Lead Counsel's thorough investigation, on April 28, 2023, Lead Plaintiff filed a detailed Consolidated Class Action Complaint for Violations of the Securities Laws (ECF No. 72) asserting claims for violations of the Securities Act against the Defendants, and added the IPO Underwriters[9] and the IPO Selling Stockholders[10] as defendants.

[9] The "Underwriters" refers collectively to: Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., BofA Securities, Inc., Evercore Group L.L.C., Jefferies LLC, Raymond James & Associates, Inc., Cowen and Company, LLC, Piper Sandler & Co., Truist Securities, Inc., Telsey Advisory Group LLC, Drexel Hamilton, LLC, and Loop Capital Markets LLC.

[10] The "Selling Stockholders" refers collectively to: Advent International GPE IX Limited Partnership, Advent International GPE IX-B Limited Partnership, Advent International GPE IX-C Limited Partnership, Advent International GPE IX-F Limited Partnership, Advent International GPE IX-G Limited Partnership, Advent International GPE IX-H Limited Partnership, Advent International GPE IX-I Limited Partnership, Advent International GPE IX-A SCSp, Advent International GPE IX-D SCSp, Advent International GPE IX-E SCSp, Advent International GPE IX Strategic Investors SCSp, Advent Partners GPE IX Limited Partnership, Advent Partners GPE IX-A Limited

25. On June 22, 2023, Lead Plaintiff filed the operative Revised Consolidated Class Action Complaint for Violations of the Federal Securities Laws, removing some factual allegations but alleging the same claims against the same defendants.

26. As discussed below, throughout the litigation, Defendants vehemently denied the claims, including that any of the alleged disclosures were corrective or provided any basis for the Settlement Class to recover damages.

**C.    Defendants' Motions to Dismiss the Complaint and Lead Plaintiff's Opposition Briefs**

27. On July 19, 2023, Defendants, the Underwriters and the two groups of Selling Stockholders filed four respective motions to dismiss the Complaint, pursuant to Rule 12(b)(6), totaling 63 pages of briefing and eight exhibits totaling over 820 pages. ECF Nos. 127, 129, 130, 132 (the "Motions to Dismiss"). Defendants and one of the Selling Stockholders—Mousserena, L.P.— also filed requests for judicial notice. ECF No. 128, 31.

28. In their Motions to Dismiss, Defendants, the Underwriters and the Selling Stockholders argued that the Complaint should be dismissed on numerous grounds, including, among others, the following:

29. Defendants argued that the Complaint failed to allege any statement in the Offering Documents was false or misleading. Defendants' arguments included: (1) Lead Plaintiff failed to identify false or misleading statements about the impact of laws and regulations on Olaplex's business and (2) Lead Plaintiff failed to identify false or misleading statements about risks related to product safety. ECF No. 130.  Also:

   i.    The Selling Stockholders and Underwriters argued the claims against them should be dismissed as time-barred under the applicable statute of limitations grounds. ECF Nos. 127, 129, 132.

   ii.   Defendants contended that the Individual Defendants were not statutory sellers under Section 12(a)(2). ECF No. 130. The Selling Stockholders and

Partnership, Advent Partners GPE IX Cayman Limited Partnership, Advent Partners GPE IX-A Cayman Limited Partnership, Advent Partners GPE IX-B Cayman Limited Partnership, (together, the "Advent Funds") and Mousserena, L.P. ("Mousserena").

Underwriters also argued they were not statutory sellers under Section 12(a)(2). ECF Nos. 127, 132.

iii.    Defendants contended that Lead Plaintiff's control person claims against the Individual Defendants should be dismissed. ECF No. 130.

30.    Lead Counsel reviewed and analyzed the Motions to Dismiss, and the legal authority cited therein. Lead Counsel also conducted extensive legal research into defendants' arguments and potential responses thereto. On August 14, 2023, Lead Plaintiff filed four oppositions to the Motions to Dismiss (ECF Nos. 133-136) totaling 80 pages and a response to Defendants' request for judicial notice. ECF No. 137.

31.    Because the Motions to Dismiss arguments were wide ranging and fact intensive, Lead Counsel had to devote substantial time and resources to researching and drafting its opposition briefs. Lead Plaintiff rebutted the arguments and authorities in the Motions to Dismiss and argued that the Complaint adequately alleged all elements of its Securities Act Claims.

32.    Among other things, in its opposition briefs, Lead Plaintiff contended that:

(i)    the Offering Documents' risk disclosures about the impact of laws and regulations on Olaplex's business were false and misleading because they omitted then-existing material facts about the relevant ingredient, and their vague warnings about potential future risks that "could" or "may" occur were not curative when in fact such risks had either already occurred or were significantly likely to do so;

(ii)    the Offering Documents' statements that touted Olaplex's strong brand reputation and social media community as key assets for growth, while failing to mention the ingredient issue;

(iii)    the Offering Documents' hypothetical risk disclosures about competition risks were materially misleading;

(iv)    the Offering Documents' statements concerning Olaplex's "clean" products were materially false and misleading;

(v)    the Offering Documents omitted information required to comply with Items 303 and 105;

(vi)    the claims against the Underwriters and Selling Stockholders were timely and not barred by the statute of limitations;

(vii)    the Selling Stockholders were statutory sellers in accordance with the Securities Act; and

(viii)    the Individual Defendants and Selling Stockholders were control persons under Section 15 of the Securities Act.

33.     On August 28, 2023, Defendants, the Underwriters and the Selling Stockholders filed four reply briefs in further support of their respective Motions to dismiss and requests for judicial notice. ECF Nos. 138, 140-42.

34.     On October 16, 2023, the Court held an in-person oral argument on the Motions to Dismiss.

35.     On October 30, 2023, Lead Plaintiff filed a notice of supplemental authority regarding the Ninth Circuit's decision in *In re Facebook, Inc. Securities Litigation*, 87 F.4th 934 (9th Cir. 2023) ("*Facebook*"), in support of its oppositions to the Motions to Dismiss. ECF No. 152. On November 6, 2023, Defendants filed a response to Lead Plaintiff's notice of supplemental authority. ECF No. 153.

36.     On July 1, 2024, the Court held a second in-person oral argument on the Motions to Dismiss.

37.     On August 23, 2024, the Court issued an order, *sua sponte*, staying the case pending the Supreme Court's resolution of *Facebook*, after the Supreme Court granted the *Facebook* defendants' petition for *certiorari*. ECF No. 168. The Court ordered the parties to notify the Court immediately after the Supreme Court's resolution of *Facebook*.

38.     On November 22, 2024, the parties filed a joint letter notifying the Court that the Supreme Court had dismissed the appeal of the Ninth Circuit's decision in *Facebook* as improvidently granted, and requested that the stay be lifted.[11] ECF No. 169.

### D.     The Court's Opinion Granting in Part and Denying in Part Defendants' Motions to Dismiss

39.     On February 7, 2025, the Court entered a thirty-seven page Order granting in part and denying in part the Motions to Dismiss (the "MTD Order"). ECF No. 171.

---

[11] *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 951 (9th Cir. 2023), *cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank*, 144 S. Ct. 2629 (2024), *and cert. dismissed as improvidently granted*, No. 23-980, 2024 WL 4861195 (U.S. Nov. 22, 2024).

40. The MTD Order sustained Lead Plaintiff's Section 11 claims with respect to two separate allegedly false and misleading risk factor statements concerning the potential impact of laws and regulations on Olaplex's business and risks related to product safety (*id*. at 12-21). It also sustained alleged omissions of material information allegedly required to be disclosed concerning risks to Olaplex's business (*id*. at 28-31). The MTD Order also sustained claims brought against Defendants under Sections 12(a)(2) and 15 of the Securities Act. *Id*. at 32-33. The Court, however, dismissed certain categories of allegedly false and misleading statements, and further granted the Underwriters' and Selling Stockholders' Motions to Dismiss, finding that claims against those parties were time-barred, and dismissing those parties from the Action. *Id*. at 34-37.

**E.   Defendants' Answer**

41. On February 28, 2025, Defendants filed their Answer to the Complaint. ECF No. 172. In their Answer, Defendants denied that they made any material false statement or misrepresentation; denied that they omitted to state any facts the omission of which rendered any of their statements materially false or misleading; denied that they engaged in any wrongdoing; denied that any alleged statement, misrepresentation, or omission caused any damages; and denied that Lead Plaintiff or any putative class members were damaged. Defendants asserted thirty-eight affirmative or other defenses, including affirmative defenses based on the legal doctrines of negative causation (*i.e.*, any loss in the value of any Olaplex stock owned by Lead Plaintiff or the class was not caused by any alleged misstatement or omission by Defendants), truth-on-the-market (*i.e.*, Lead Plaintiff or class members knew or had constructive knowledge of any alleged untruth or omission at the time they acquired Olaplex stock), the Individual Defendants' due diligence (*i.e.*, they had reasonable grounds to believe and did believe that there were no material misstatements or omissions in connection with the IPO),

and Lead Plaintiff and the class's inability to "trace" their Olaplex shares to the shares issued in the IPO, among others. ECF No. 172.

**F.      The Court Set a Trial Date for October 14, 2025**

42.     Following resolution of the Motions to Dismiss, on March 31, 2025, the Court held a status conference, during which the Court rejected the schedule proposed by the Parties and set this case on an expedited schedule, with a trial date of October 14, 2025. ECF No. 181. To comply with that date, the Parties negotiated a pre-trial schedule whereby all fact discovery (both the production of documents and completion of fact depositions) would be completed in less than four months, by July 21, 2025; expert discovery (including the service of expert reports and expert depositions) would be completed in just over three weeks following the completion of fact discovery (by August 14, 2025); and dispositive motions would be fully briefed two weeks later, by September 1, 2025. At the status conference, the Court also set a schedule for Lead Plaintiff's motion for class certification, with Lead Plaintiff's opening motion to be filed by May 30, 2025, Defendants' opposition thereto to be filed by June 20, 2025, and Lead Plaintiff's reply to be filed by June 27, 2025. A hearing on Lead Plaintiff's motion for class certification was set for July 21, 2025. ECF No. 181.

**G.      Lead Plaintiff's Motion for Class Certification**

43.     On May 30, 2025, Lead Plaintiff filed its motion for class certification and appointment of class representative and class counsel (the "Class Certification Motion"). ECF No. 199. In support of the Class Certification Motion, Lead Plaintiff submitted an expert report authored by Chad Coffman, CFA, addressing common damages methodologies, and a Declaration of Mark White on Behalf of Arkansas Teacher Retirement System, dated May 27, 2025. ECF Nos. 199-3, 199-4.

44.     On June 9, 2025, in connection with the Class Certification Motion, Defendants took the deposition of Lead Plaintiff Arkansas Teacher Retirement System's 30(b)(6) corporate designee, Mark White.

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKX)

15

45.    On June 17, 2025, in connection with the Class Certification Motion, Lead Counsel and Defendants took the deposition of a corporate designee of T. Rowe Price Group, Inc. ("T. Rowe Price"), Christina Brathwaite.[12]

46.    On June 20, 2025, Defendants opposed the Class Certification Motion. ECF Nos. 202-204. Defendants made three primary arguments in opposition to the Class Certification Motion. First, Defendants argued that individual questions regarding proposed class members' knowledge of the ingredient ban and Olaplex's use of it prior to the IPO predominated over questions common to the proposed class prior to the IPO, requiring certification to be denied entirely. Second, Defendants argued that individual knowledge issues predominated over common issues shortly after the late February 2022 TikTok videos and ensuing media coverage, which would limit proposed class members to those who purchased Olaplex stock before that date, which would significantly reduce recoverable damages. Third, Defendants argued that any class, if certified, should be narrowed to exclude all purchases of Olaplex stock after November 12, 2021, because after that date, Lead Plaintiff would be unable to demonstrate the ability of putative class members to trace their shares to the Registration Statement and Prospectus, and therefore individualized issues regarding tracing predominated over common issues. Defendants' brief was accompanied by an expert report authored by Jack R. Wiener (the "Wiener Report"), in which Mr. Wiener opined that the proposed class definition should be narrowed to only those who purchased publicly traded Olaplex common stock from the date of the IPO through November 12, 2021, based on the argument that on November 12, 2021, non-IPO shares were deposited into the market, commingling with and becoming indistinguishable from the IPO shares. ECF No. 203-1. On June 25, 2025, Lead Plaintiff took the deposition of Mr. Wiener.

---

[12] As discussed further herein, T. Rowe Price is one of two relevant investment managers for Lead Plaintiff with respect to its investments in Olaplex common stock at issue in this Action.

47.    On June 27, 2025, Lead Plaintiff filed its reply in further support of its Class Certification Motion, in which it responded to each of Defendants' arguments. With respect to the third argument, Lead Plaintiff attached an expert report authored by Professor Joshua Mitts, Ph.D. (the "Mitts Report"), in which Professor Mitts responded to the Wiener Report by explaining how it was possible to distinguish shares issued in the IPO from those shares issued on or after November 12, 2021. ECF No. 210-2. In the Mitts Report, Mitts analyzed voluminous records produced in discovery by the Depository Trust & Clearing Company ("DTCC") and explained how one could identify which members of the proposed class purchased IPO-traceable shares after November 12, 2021 on a class-wide basis.

## IV.    THE PARTIES' DISCOVERY EFFORTS

48.    Following the issuance of the MTD Order, Lead Plaintiff undertook comprehensive discovery, which was geared to complying with the deadlines for class certification, fact discovery, expert discovery, and dispositive and pretrial motions all in advance of the October 14, 2025 trial date.

### A.    Case Management Plan, Initial Disclosures and Protective Order

49.    Beginning on February 28, 2025, the Parties engaged in discovery efforts by exchanging initial disclosures pursuant to Rule 26(a). On March 19, 2025, the Parties submitted a Joint Report Rule 26(f) Discovery Plan. ECF No. 179.

50.    Following the March 31, 2025 status conference, on April 3, 2025, the Court entered a civil trial preparation order, formally scheduling trial for October 14, 2025 and a pretrial conference for September 29, 2025. ECF No. 182. As noted above, the Parties negotiated a pre-trial schedule whereby all fact discovery (both the production of documents and completion of fact depositions) would be completed in less than four months, by July 21, 2025; expert discovery (including the service of expert reports and expert depositions) would be completed in just over three weeks following the completion of fact discovery (by August 14, 2025); and dispositive

motions would be fully briefed two weeks later, by September 1, 2025. As a result, Lead Plaintiff devoted the requisite resources to comply with this expedited schedule.

51.     The Parties engaged in a series of meet and confers to negotiate a protective order ("Protective Order") to govern the confidentiality of material produced in discovery and an electronically stored information protocol ("ESI Protocol").

52.     On April 21, 2025, the Parties filed a proposed stipulated Protective Order and proposed stipulated ESI Protocol. ECF Nos. 186-87. On April 22, 2025, Magistrate Judge Steve Kim approved and so-ordered both the proposed Protective Order and the proposed ESI Protocol. ECF Nos. 187-88.

**B.      Discovery Propounded on Defendants**

53.     Lead Plaintiff served one set of requests for the production of documents ("RFP"), one set of interrogatories, and one set of requests for admission ("RFA") on Defendants on April 7, 2025. Lead Plaintiff also served a second set of interrogatories on the Individual Defendants on April 7, 2025. Defendants served responses and objections to each of these requests on May 7, 2025.

54.     The Parties engaged in multiple meet-and-confer conferences and exchanged meet-and-confer correspondence, as to the scope and manner of the requested document productions and interrogatories, including issues pertaining to search terms, relevant time periods, document custodians, and other disputes related to the requests. Through this comprehensive effort, the Parties were able to reach an understanding as to the scope of Defendants' discovery and reached many compromises without having to seek the Court's assistance.

55.     Within six weeks of the March 31, status conference, by mid-June 2025, Defendants produced, and Lead Plaintiff reviewed, approximately 408,000 pages of documents.

56.     Lead Counsel conducted an efficient review of those documents, with a team of experienced attorneys reviewing and analyzing the produced documents as

they were received. These attorneys have all worked on multiple securities cases, specialize in securities litigation, and are experienced in utilizing the latest technology with respect to document review. They were integral to the litigation team and focused on reviewing Defendants' document productions for the purpose of preparing for Lead Plaintiff's motion for class certification, which was fully briefed by June 27, 2025; for the mediation with Defendants, which was scheduled for June 19, 2025; for fact depositions, which were set to conclude by July 21, 2025; the exchange of initial expert reports, which the parties had agreed would be submitted on July 23, 2025 and August 4, 2025, respectively; dispositive motions, which the parties had agreed would be filed by August 4, 2025; and for the trial, which the Court had scheduled for October 14, 2025.

57.    To efficiently focus on the most relevant documents, Lead Counsel's attorneys used data analytic software tools housed in their Relativity eDiscovery platform to search and analyze the data produced by Defendants and third parties. While the analytics were used to target the most important communications, workpapers, and reports, it was necessary to review the results of these searches in a document-by-document, or linear, manner.

58.    The attorneys conducted targeted searching to isolate evidence and group documents by issue, potential deponent, and time period. The searches utilized text, file names, document types (*e.g.*, emails, memoranda, SEC filings, and correspondence), dates, bates numbers, etc., to identify relevant, irrelevant, and "hot" documents. Certain more complex documents were allocated and elevated to be reviewed by specific subject matter experts retained by Lead Counsel. Through experience and their increasing familiarity with the documents, the document review team, with the assistance of retained experts, identified key documents for use in connection with class certification, mediation efforts, fact and expert depositions, summary judgment, and trial preparation. The review team analyzed and coded these

documents, prepared for weekly and ad hoc "hot" document meetings, conducted privilege log review, and created deposition preparation exhibit kits for upcoming depositions, which included reviewing and coding all deponent custodial documents if practicable, or in the alternative, the use of targeted searches, and organizing the final set of documents for use at deposition.

59.     At the start of the document review, attorneys on the litigation team worked with the document review team to establish a document coding protocol, which set out the guidelines and framework within which the team would categorize each of the reviewed documents. To maintain performance standards and accuracy, the litigation and review teams held weekly document review sessions to discuss the results of their ongoing review, provide feedback, track progress on existing projects, and allocate new projects to be undertaken by specific members of the team. Throughout the case, the attorneys reviewing the documents prepared meaningful work product, including analyses of newly uncovered important documents, which updated and refined the team's knowledge and direction as to the issues and evidence in the case.

60.     Building upon the knowledge learned through the document discovery process, on June 12, 2025, Lead Plaintiff served an Omnibus Notice of Depositions on Defendants, which also attached subpoenas for depositions on non-Individual Defendants. That Notice provided for the depositions of seventeen current and former employees of Olaplex, including the Individual Defendants.

61.     On July 1, 2025, Lead Plaintiff conducted the deposition of an Individual Defendant. This deposition provided insight into events reflecting upon the allegations in the Complaint. However, as discussed below, it also provided a preview of the difficulties of proving Lead Plaintiff's case through adverse witnesses aligned with Defendants and the battle of the experts that would be on display at trial.

### C.    Discovery Propounded on Lead Plaintiff

62.    Defendants served one set of RFPs, one set of interrogatories, and a Notice of Deposition pursuant to Fed. R. Civ. P. Rule 30(b)(6) on Lead Plaintiff on April 4, 2025. Lead Plaintiff served responses and objections to each of these requests on May 7, 2025.

63.    The Parties engaged in extended meet-and-confer conferences and exchanged multiple meet-and-confer letters and emails to negotiate the scope of discovery on Lead Plaintiff. The Parties were able to reach a compromise on Lead Plaintiff's productions without seeking the Court's assistance. Lead Plaintiff produced responsive documents in connection with Defendants' discovery requests.

64.    By June 2025, Lead Plaintiff produced over 40,000 pages of documents to Defendants.

65.    On June 9, 2025, Defendants took the deposition of Lead Plaintiff Arkansas Teacher Retirement System's 30(b)(6) corporate designee, Mark White.

### D.    Discovery Propounded on Third Parties

66.    On April 16, 2025, Lead Plaintiff served a subpoena on former defendants and now third-party Advent Funds, seeking, *inter alia*, the production of documents related to purchases of common stock traceable to the Olaplex IPO, communications related to the IPO, and communications related to risks, uncertainties, and concerns about the ingredient in Olaplex's products. The Advent Funds served responses and objections to Lead Plaintiff's subpoena on May 7, 2025. On June 27, 2025, the Advent Funds produced approximately 250 documents totaling approximately 3,600 pages.

67.    On April 16, 2025, Lead Plaintiff served a subpoena on former defendant and now third-party Mousserena, seeking, *inter alia*, the production of documents related to the use of the ingredient, the E.U. ban, and any lock-up of Olaplex's common stock in connection with the IPO. Mousserena served responses and objections to Lead

Plaintiff's subpoena on May 15, 2025. Discussions about the production were ongoing at the time the Settlement was reached.

68.    On April 16, 2025, Lead Plaintiff served a subpoena on former defendants, and now third-parties, the Underwriters seeking, *inter alia*, purchases of common stock traceable to the Olaplex IPO, communications related to the IPO, and communications related to risks, uncertainties, and concerns about the ingredient in Olaplex's products. The Underwriters served responses and objections to Lead Plaintiff's subpoena on May 7, 2025. Discussions about the production were ongoing at the time the Settlement was reached.

69.    On May 16, 2025, Defendants served subpoenas on T. Rowe Price and Wellington Management Company LLP ("Wellington"), Lead Plaintiff's investment managers, with respect to its investments in the Olaplex common stock at issue in this Action, seeking the production of documents and deposition testimony. On or before June 13, 2025, T. Rowe Price produced 10 documents totaling 64 pages and Wellington produced seven documents totaling 58 pages. On June 17, 2025, in connection with the Class Certification Motion, Lead Counsel and Defendants took the deposition of T. Rowe Price's corporate designee, Christina Brathwaite.

70.    On May 21, 2025, Lead Plaintiff served a subpoena on third-party Financial Industry Regulatory Authority ("FINRA"), seeking, *inter alia*, the production of documents sufficient to show all trades in Olaplex common stock, as reported to FINRA. FINRA served responses and objections to Lead Plaintiff's subpoena on June 4, 2025. Discussions about the production were ongoing at the time the Settlement was reached.

71.    On May 21, 2025, Lead Plaintiff served a subpoena on third-party Equiniti Trust Company ("Equiniti"), Olaplex's transfer agent, seeking, *inter alia*, the production of documents, including transfer journals, depository records, and other

records maintained in connection with Olaplex's common stock. On June 6, 2025, Equiniti produced one document totaling 151 pages.

72.    On May 22, 2025, Lead Plaintiff served a subpoena on third-party Depository Trust and Clearing Corporation (the "DTCC"), seeking, *inter alia*, the production of documents concerning the clearing and settlement of securities issued by, or with the consent of, Olaplex. The DTCC served responses and objections to Lead Plaintiff's subpoena on May 30, 2025. On June 10, 2025, Lead Counsel and counsel for DTCC met and conferred over DTCC's responses, further refining the scope and costs of production. On June 20, 2025 and June 26, 2025, the DTCC produced a total of approximately 16 documents, each of which consisted of substantial electronic files containing the securities trading data requested in Lead Plaintiff's subpoena. Lead Counsel, on behalf of Lead Plaintiff and in consultation with Professor Joshua Mitts, Ph.D., the expert retained by Lead Plaintiff to demonstrate how Lead Plaintiff could determine, on a class-wide basis, which members of the class purchased IPO shares of Olaplex common stock expert, reviewed these documents.

73.    On May 29, 2025, Defendants served a subpoena on each of the two third-party Confidential Witnesses ("CWs") whose relevant information was reflected in Lead Plaintiff's Complaint. On June 19, 2025 and June 24, 2025, the third-party CWs produced a total of over 130 documents totaling 330 pages. Depositions of each of the CWs were scheduled to take place in July 2025.

74.    On May 30, 2025, Lead Plaintiff served a subpoena on third-party Lifetech Resources LLC ("Lifetech"), seeking, *inter alia*, the production of documents related to Olaplex's reformulation of its No. 3 Product. Lifetech served responses and objections to Lead Plaintiff's subpoena on June 27, 2025. Lead Plaintiff also attempted service of a subpoena on a former Lifetech employee that Lead Counsel believed to possess relevant information. Discussions about the production were ongoing at the time the Settlement was reached.

75. On June 24, 2025, Lead Plaintiff served a notice of subpoena on Jack R. Wiener, the individual retained by Defendants and who submitted an expert report on June 20, 2025, in connection with Defendants' opposition to Lead Plaintiff's Class Certification Motion. ECF No. 203-1. On June 25, 2025, Lead Counsel deposed Mr. Wiener.

**E.   Expert Discovery**

76. The complex subject matter of the Action required Lead Plaintiff to retain numerous subject-matter experts. Thus, in addition to developing their own expertise, Lead Counsel had to hire multiple experts from various fields. In that regard, Lead Plaintiff retained:

(i)   a digital marketing and brand reputation expert, who assisted Lead Counsel in analyzing the impact of Olaplex's use of lilial, and alleged concealment of its use, to the Company's brand and financial valuation and success;

(ii)   a scientific expert who researched the implications of the E,U. ban of the ingredient and the reformulation process;

(iii)   a damages expert, who worked on estimating damages and analyzing potential loss causation (or "negative causation") issues; and

(iv)   a pre-eminent securities law scholar to help rebut Defendants' novel tracing argument raised in connection with Lead Plaintiff's class certification motion.

77. These experts were essential to analyzing Lead Plaintiff's claims and defending against Defendants' class certification attacks. Moreover, given that expert reports were due to be exchanged just weeks after the Settlement was reached, the damages expert and brand reputation expert were in the process of preparing their expert reports and their anticipated responses to Defendants' reports.

**F.   Depositions**

78. When the Settlement in principle was reached on July 1, 2025, Lead Counsel had just completed the first fact witness deposition of one of the Individual Defendants. Three depositions related to the Class Certification Motion had already been taken in June, that of: ATRS's Executive Director; a representative of T. Rowe Price, one of Lead Plaintiff's external investment managers; and Defendants' tracing

expert, Mr. Wiener. Moreover, Lead Counsel had noticed and had begun to prepare for sixteen additional fact depositions that would have otherwise begun immediately and concluded within the next several weeks, in addition to at least two depositions noticed by Defendants. Lead Counsel had prepared substantial deposition preparation materials and was ready to continue taking those depositions if the proposed Settlement had not been reached.

79.     Prior to and after noticing these depositions, Lead Counsel first developed a detailed deposition plan as part of their comprehensive document review, prepared witness memoranda and document compendia (and held numerous meetings) to identify key witnesses in the case and correlate anticipated testimony needed to prove the elements of Lead Plaintiff's claims. Lead Counsel carefully evaluated the merits of each witness as a deposition target in formulating its detailed deposition plans.

## V.     THE SETTLEMENT

### A.     The Parties' Settlement Negotiations

80.     In April 2025, as fact discovery was underway, the Parties began exploring the possibility of a negotiated resolution of the claims through telephonic conferences and written correspondence, ultimately agreeing that the Parties' counsel would meet in person to discuss a potential resolution. Specifically, the Parties retained David Murphy of Phillips ADR Services to act as the mediator in the case (the "Mediator"). Mr. Murphy is a skilled mediator and former litigator with decades of experience in complex commercial litigation and mediating securities class actions and related cases. Attached as Exhibit 4 is the Declaration of David M. Murphy, dated October 27, 2025, which provides an overview of the mediation process and supports approval of the proposed Settlement.

81.     In preparation for their mediation, both Lead Counsel and Defendants' Counsel prepared and exchanged detailed mediation briefs addressing both liability and damages issues. The Parties also engaged in separate question-and-answer sessions

with an attorney assisting Mr. Murphy in the mediation efforts, who questioned both sides on their positions and arguments.

82.    On June 19, 2025, Lead Counsel and Defendants' Counsel, among others, participated in a full-day, in-person mediation session before the Mediator. During the meditation, the Parties weighed the risks and benefits of settlement, including Lead Plaintiff's pending Class Certification Motion, which had not yet been fully briefed. Lead Plaintiff Arkansas Teacher Retirement System's Executive Director, Mark White, participated in this in-person mediation session.

83.    The June 19, 2025 mediation session ended without any agreement being reached. The Parties continued discussions with the Mediator in the days following the mediation to further explore the possibility of a settlement. In the interim, the Class Certification Motion was fully briefed, with Defendants filing their opposition on June 20, 2025 and Lead Plaintiff filing its reply on June 27, 2025.

84.    On June 28, 2025, the Mediator issued a mediator's recommendation to the Parties to settle the claims for $47,500,000, and that recommendation was accepted on July 1, 2025, subject to the execution of a formal settlement agreement. *See* Ex. 4, ¶¶8-9.

85.    On July 2, 2025, the Parties filed a Joint Stipulation Regarding Settlement, informing the Court that they had reached a settlement in principle to resolve all claims in the litigation on a class-wide basis, and requesting that the Court vacate all deadlines, hearings, and the October 14, 2025 trial date to allow the Parties to finalize documentation of the Settlement and file for preliminary approval of the Settlement. ECF No. 215.

86.    On July 3, 2025, the Court scheduled a Status Conference for July 7, 2025, to discuss the proposed Settlement. At the July 7, 2025 Status Conference, the Parties informed the Court of their agreement to settle the Action. The Court ordered Lead Plaintiff to file for preliminary approval of the Settlement on or before August 7, 2025.

ECF No. 222. At the Status Conference, the Court also provided guidance concerning the scope of the class the Court would be prepared to certify as part of the Settlement. Specifically, the Court informed the Parties that it was strongly inclined to only certify a settlement class that was limited to investors that purchased or otherwise acquired Olaplex's common stock pursuant and/or traceable to the Offering Documents through November 12, 2021, due to concerns regarding traceability after this date based on the issues raised in the briefing of the Class Certification Motion. *See* Tr. of Status Conference 6:3-7, attached hereto as Exhibit 5.

87. On July 16, 2025, the Court vacated the July 21, 2025 hearing on Lead Plaintiff's Class Certification Motion. ECF No. 223. The Court also vacated the pretrial conference scheduled for September 29, 2025, and the jury trial scheduled for October 14, 2025. *Id*. In addition, the Court revised the deadline for the filing of the motion for preliminary approval, moving the deadline to August 1, 2025. *Id.*

88. The Parties' settlement in principle was subsequently memorialized in a confidential term sheet executed and finalized on July 26, 2025 (the "Term Sheet"), subject to the execution of a formal settlement agreement, related papers, and approval by the Court.

**B. Preparation of Settlement Documentation and Preliminary Approval Motion**

89. Once the Parties agreed in principle to settle the Action, they worked diligently to negotiate the full settlement terms set forth in the Stipulation and its exhibits, as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement"). On August 1, 2025, the Parties executed the Stipulation setting forth the full terms and conditions of the Settlement, ECF No. 224-3, and the Supplemental Agreement.

90. The Settlement provides for, among other things, the payment of $47.5 million in cash into an interest-bearing Escrow Account, *see* Stipulation at ¶6, which

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKX)

27

has been deposited. The Settlement Amount, plus accrued interest, after the deduction of Court-awarded attorneys' fees and Litigation Expenses, Notice and Administration Expenses, Taxes, and any other costs or fees approved by the Court (the "Net Settlement Fund"), will be distributed to Settlement Class Members who submit timely and valid Claims, in accordance with a plan of allocation approved by the Court.

91. In exchange for payment of the Settlement Amount, on the Effective Date of the Settlement, Lead Plaintiff and the Settlement Class will release the Released Defendant Parties from all of the Released Plaintiffs' Claims, and Defendants will release the Released Plaintiff Parties from all of the Released Defendants' Claims. *See* Stipulation ¶¶1(ee)-(ii), 4, and 5. The Settlement is not "claims-made" and there is no reversion of unclaimed funds to Defendants. *See* Stipulation ¶12.

92. On August 1, 2025, Lead Plaintiff submitted its unopposed motion for an order preliminarily approving the Settlement, approving the manner and form of notice to be sent to Settlement Class Members, and scheduling a hearing for final approval of the Settlement ("Preliminary Approval Motion"). ECF No. 224.

93. On August 11, 2025, the Court issued an order granting Lead Plaintiff's Preliminary Approval Motion and scheduled the final settlement hearing for December 1, 2025. ECF No. 229.

## VI.   THE SIGNIFICANT RISKS OF CONTINUED LITIGATION

94. The Settlement provides an immediate and certain benefit to the Settlement Class in the form of an upfront $47,500,000 cash payment. The merits of the $47.5 million Settlement must be considered in the context of the risks presented by continued litigation of the Action. Having considered the risks of continued litigation, in light of all proceedings and discovery performed in the Action, it is the informed judgment of Lead Plaintiff and Lead Counsel that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKX)

28

95.     The Settlement is the result of extensive arm's-length negotiations by fully informed Lead Plaintiff and Lead Counsel, resolves this hard-fought litigation, and represents a very favorable result for the Settlement Class when considered on its own and when evaluated in light of the risks and challenges of continued litigation. Lead Plaintiff and Lead Counsel understood that while Lead Plaintiff's claims were strong and Lead Plaintiff believes it had adduced substantial evidence to support the Settlement Class's claims at class certification, summary judgment and trial, there were a number of factors that made the outcome of continued litigation uncertain, weighing in favor of a settlement.

96.     Overall, the considerable factual record developed through document discovery, the briefing of the Class Certification Motion, and the Parties' settlement negotiations, allowed Lead Plaintiff and Lead Counsel to undertake a comprehensive evaluation of the strengths and weaknesses of the claims. Based on that evaluation, Lead Counsel (a firm with extensive experience in the prosecution and trial of complex securities litigation) together with Lead Plaintiff (a sophisticated institutional investor with billions of dollars in assets under management for the benefit of more than 124,000 active and retired members and beneficiaries) determined that the Settlement was in the best interests of the Settlement Class.

97.     Moreover, Lead Counsel respectfully submits that it assumed significant risk in prosecuting this Action on an entirely contingent basis. From the time that Lead Counsel agreed to take on the case, settlement was by no means guaranteed and certainly not at the level ultimately achieved. Lead Counsel faced the significant risks faced in any securities class action—particularly so here given the complex nature of the dispute—as well as unique risks in seeking to prove Defendants' liability and damages.

## A.     Lead Plaintiff Faced Substantial Risks in Proving Liability

98.     While Lead Plaintiff and Lead Counsel believe that the claims asserted here are strong, they recognize that this Action presented substantial risks to proving liability. Indeed, at the motion to dismiss stage, this Court dismissed three categories of false statements, finding that they could not serve as the basis of a Section 11 claim (*Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993, 1012-17 (C.D. Cal. 2025)), and further entirely dismissed the Underwriters and Selling Stockholders as defendants, finding that Lead Plaintiff's claims against them were time-barred (*id.* at 1023).

99.     As a threshold matter, despite the Order on the Motions to Dismiss, Lead Plaintiff faced substantial ongoing challenges with respect to proving that Defendants made materially false and misleading statements, an essential element of the Securities Act claims. As noted above, Lead Plaintiff alleged, and the Court sustained, two categories of false and misleading statements, as well as omissions related to the risks to Olaplex's business posed by the E.U. ban of the ingredient (set to take effect in March 2022), and the related risks posed to the business of using allegedly unsafe ingredients in its product. Each category of allegedly false statements and omissions faced serious counterarguments from Defendants that the statements were not actionable, as described below. Any failure to maintain the actionability of these misstatements and omissions would have had significant consequences with respect to the damages available to the class.

100.     Defendants would have likely argued that the factual record refutes Lead Plaintiff's claims that Olaplex materially misled investors about the risks of the potential impact of the EU's ban or the future risk of Olaplex products being found unsafe. As Lead Plaintiff alleges, at the time of the IPO, Olaplex had already reformulated the No. 3 product to remove the ingredient in advance of and in compliance with the E.U.'s ban on March 1, 2022. Defendants would argue that the Company did not view the reformulation to be a major change and did not expect the

change to have a material adverse impact on Olaplex's performance, and that the reformulation did not impact Olaplex's sales or otherwise affect Olaplex's financial results prior to the IPO.

101. Defendants would also have likely argued that the risk factor disclosure in the Offering Documents about Olaplex's products being found "unsafe" was not materially misleading. Defendants would have continued to argue that the risk factor disclosure was accurate, because the No. 3 product was not found to be unsafe in the years before the IPO, and that the facts adduced in evidence would corroborate Defendants' argument, rendering the statement not false and misleading.

102. Moreover, as argued in opposition to the Class Certification Motion, Defendants would have likely continued to argue at summary judgment that relevant information about the EU's ban was in the public domain. In support of this "actual knowledge" affirmative defense, Defendants would argue that reasonable investors knew of the alleged truth at the time of their purchases and are therefore not entitled to recover under the Securities Act. Defendants would likely present evidence that prior to Olaplex's IPO, information regarding the EU ban could be found in public regulatory filings, scientific studies, product labels, and online sources, all of which were available to shareholders and the broader market. Defendants would likely continue to argue that the ingredients in Olaplex's No. 3 hair care product were also publicly available information. Olaplex's "actual knowledge" defense, if believed by the Court or a jury, could have ultimately resulted in findings of no liability.

103. Finally, each of the Individual Defendants would likely have raised a due diligence defense at summary judgment and trial. While Lead Plaintiff would have worked extensively with a due diligence expert in an effort to show that these Defendants were negligent in connection with the IPO, these Defendants would have also put forth evidence showing that they conducted a reasonable investigation at the

time of the IPO and had reasonable ground for believing in the truthfulness and completeness of the Offering Documents.

### B.    Lead Plaintiff Faced Substantial Risks in Proving Damages

104.    Even if Lead Plaintiff convinced a jury to render a unanimous verdict on liability, Lead Plaintiff also faced challenges and uncertainty with respect to proving damages. Indeed, as this Court made clear during the July 7, 2025 status conference, the Court was highly likely—if not certain—to accept Defendants' tracing arguments with respect to purchases after November 12, 2021, which significantly reduced recoverable damages in this Action.

105.    Specifically, as argued in opposition to Lead Plaintiff's Class Certification Motion, tracing investors' purchases to Olaplex's IPO after November 12, 2021 would have become increasingly difficult because non-IPO shares entered the market after November 12, 2021. Although Lead Plaintiff's tracing expert had responses to Defendants' arguments regarding how these purchasers could trace their shares, the Court informed the Parties that it was strongly inclined to only certify a settlement class that was limited to investors that purchased or otherwise acquired Olaplex's common stock pursuant and/or traceable to the Offering Documents through November 12, 2021, due to concerns regarding traceability after this date. *See* Tr. of Status Conference 6:3-7, Ex. 5. Limiting the class of investors entitled to a recovery in this Action similarly reduced the amount of recoverable damages by more than half.

106.    Lead Plaintiff's consulting damages expert has estimated that maximum recoverable statutory damages for purchases of Olaplex common stock from the IPO through November 12, 2021, inclusive, were approximately $753 million. However, Defendants and their experts would have pursued several credible arguments that any recoverable damages should be much lower, if not zero, because of Defendants' affirmative defense of negative causation (*i.e.*, that the decline in stock price was caused by something other than the alleged misstatements or omissions).

107.   In particular, Defendants would likely seek to establish that nearly half of the remaining damages did not occur as the result of abnormal price declines resulting from the disclosure of information related to the sustained risk factor statements. According to Lead Plaintiff's consulting damages expert, recoverable damages based on only price declines allegedly related to the sustained risk factor statements (on 2/28/22, 3/1/22, 3/3/22, 3/7/22, 3/8/22, 8/9/22, and 10/19/22) could have totaled approximately $390 million, half of Lead Plaintiff's expert's statutory damages figure.

108.   Defendants also would have likely put forward additional negative causation arguments with respect to the price declines on each of these dates. For example, Defendants would likely argue that social media posts and press coverage about Olaplex's use of the ingredient at issue, the ingredient's potential safety risks, the EU ban on the ingredient, and the ingredients in the No. 3 product had been fully disclosed on February 28, 2022 and March 1, 2022, such that losses past March 1, 2022 could not be proven. If successful, this argument could have reduced maximum recoverable damages to approximately $41.5 million to $96 million, depending on the modeling assumptions used.

109.   Defendants would have also likely argued that, if damages were limited to losses related to the February 28, 2022 and March 1, 2022 disclosure dates, Lead Plaintiff and the Class would have ***no recoverable damages*** because there were no statistically significant residual stock price declines on these dates.

110.   Accordingly, based on the likely recoverable damages of between $390 million and $41.5 million, this Settlement recovers between 12.2% of likely recoverable damages assuming Lead Plaintiff succeeded in retaining all allegedly related stock drops, and potentially 100% of damages under other scenarios.

**C.    Lead Plaintiff Faced Additional Risk Due to Defendants' Vigorous Challenge to Class Certification**

111.   As noted above, Class Certification in this case was also contested. For example, in the wake of the Supreme Court decision in *Slack Techs., LLC v. Pirani*,

598 U.S. 759, 770 (2023), where the Supreme Court "now made clear, traceability is an element of a Section 11 claim," *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1191 (9th Cir. 2025), Defendants argued that Lead Plaintiff would be unable to establish tracing with respect to any purchases of Olaplex common stock after November 12, 2021, just six weeks after the IPO. In that regard, Defendants contended that the IPO shares were "commingled" with non-IPO shares as of November 13, 2021, thereby making it impossible for any class member after November 12, 2021 to definitively trace shares they had purchased to the IPO. Lead Plaintiff believed that it should prevail on this argument, including based on its rebuttal expert affidavit from a pre-eminent law scholar, Professor Joshua Mitts. But, as the Court made clear at the July 7, 2025 conference to discuss the Parties' settlement, the Court was highly likely to agree with Defendants and limit any class to one that was limited to those who purchased Olaplex common stock on or before November 12, 2021. Defendants' tracing arguments served to reduce the class's recoverable damages by more than 50%.

112. Moreover, Defendants raised other challenges to Lead Plaintiff's Class Certification Motion, including that no class could be certified at all because individual knowledge of the ingredient ban and its impact on Olaplex prior to the IPO predominated over any common issues. If accepted, that argument would have resulted in a complete denial of Lead Plaintiff's Class Certification Motion.

**D.    Lead Plaintiff Faced Risk at Summary Judgment, Trial, and on Appeal**

113. Given the arguments outlined above, Lead Plaintiff plainly faced substantial risks at summary judgment and trial, which would have occurred within four months from the date of Settlement. Even if Lead Plaintiff surmounted those obstacles and prevailed at summary judgment and trial, Defendants would undoubtedly have appealed the judgment and the amount of any damages award—leading to many additional months, if not years, of further litigation—and exposing Lead Plaintiff and

the class to the risk of having even a favorable judgment reversed or reduced below the Settlement Amount.

### E.    General Risks Involved in Prosecuting Securities Class Actions

114.    In addition to the specific litigation risks summarized above, it is worth noting that securities class actions in general involve significant inherent risk. For example, many securities class actions have been dismissed at summary judgment. *See, e.g., In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd*, *Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014). Indeed, on August 15, 2025, the Court in *Homyk v. ChemoCentryx, Inc.* granted defendants' motion for summary judgment and dismissed all claims just months prior to trial, finding that certain statements initially sustained by the court at the motion to dismiss stage, were no longer actionable following the completion of fact and expert discovery. *See Homyk v. ChemoCentryx* No. 21-CV-03343-JST, 2025 WL 2505483 (N.D. Cal. Aug. 15, 2025), slip op (Ex. 6).[13]

115.    Moreover, even cases that have survived summary judgment have been dismissed before trial as a result of successful *Daubert* motions by defendants. For example, in *In re Pfizer Inc. Sec. Litig.*, the court granted the defendants' motion *in limine* to exclude the testimony of the plaintiffs' proffered damages expert, and then granted their renewed motion for summary judgment based on the plaintiffs' failure to proffer admissible loss causation and damages evidence. *See In re Pfizer Inc. Sec. Litig.*, No. 04–CV–9866, 2014 WL 3291230 (S.D.N.Y. July 8, 2014); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Securities (USA) LLC,* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment for defendants *sua sponte* after finding that plaintiffs' event study was

---

[13] Unreported cases cited herein, in the Settlement Memorandum, and in the Fee and Expense Memorandum are submitted herewith in a compendium attached as Exhibit 6.

unreliable and that there was accordingly no evidence that the market reacted negatively to alleged corrective disclosures).

116.   Even when securities class action plaintiffs are successful in getting a class certified, prevail at summary judgment, overcome *Daubert* motions, and go to *trial*, there are still real risks on appeal that there will be no recovery or substantially less recovery for class members. For example, in *In re BankAtlantic Bancorp, Inc.*, tried by Labaton, a jury rendered a verdict in plaintiffs' favor on liability in 2010. However, in 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of defendants on all claims. *See* No. 07–61542–CIV, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011). In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation. *See In re BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012).

117.   Yet another example of the risk inherent in securities class actions is *Jaffe v. Household Int'l,* where a jury returned a verdict for plaintiffs in May 2009, and the district court (four years later) entered a post-verdict judgment of $2.45 billion. In 2015, however, the Seventh Circuit reversed and ordered a new trial on loss causation and damages. *See* 787 F.3d 408 (7th Cir. 2015); *see also, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal and judgment entered for defendant).

## VII.   COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

118.   As required by the Court's Preliminary Approval Order, Epiq, working at Lead Counsel's direction, began disseminating notice of the Settlement on August 25, 2025. Ex. 3 at ¶¶5-15. Specifically, Epiq has: (i) mailed by First-Class Mail a copy of the Postcard Notice to potential Settlement Class Members using information gathered to date; (ii) mailed a copy of the Postcard Notice to brokers and nominees that may

have purchased Olaplex publicly traded common stock on behalf of Settlement Class Members ("Nominees"), contained in Epiq's Nominee database; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted it over *PR Newswire*; and (iv) created a website, www.OlaplexSecuritiesSettlement.com, to provide information about the Action and the Settlement. *Id*. at ¶¶5-19.

119.   Collectively, the Settlement notices contain important information about the Action and the Settlement, including, among other things, the definition of the Settlement Class, a description of the proposed Settlement, information regarding the claims asserted in the Action, Settlement Class Members' options in connection with the Settlement, and the deadlines for objecting, seeking exclusion, and submitting claims. *See generally id*., Ex. 3-A to C. The long-form Notice, available on the website or from Epiq upon request, provides more detail about the Action and Settlement, including the Plan of Allocation. The notices also inform recipients of Lead Counsel's intent to apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for payment of Litigation Expenses incurred by Lead Counsel in an amount not to exceed $875,000. *Id*.

120.   In accordance with the Preliminary Approval Order, as of October 27, 2025, Epiq has provided 18,978 copies of the Postcard Notice to potential Settlement Class Members and their Nominees. *Id*. at ¶15. In addition, Epiq caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on September 4, 2025. *Id*. at ¶¶16-17.

121.   In connection with the notice dissemination, Epiq developed a website for the Settlement in order to provide information concerning the case and important dates and deadlines in connection with the Settlement, as well as access to an online claim portal and downloadable copies of the notices, Claim Form, Stipulation, Preliminary Approval Order, and other relevant documents. *Id*. at ¶¶18-19. Copies of the notices and Claim Form are also available on Lead Counsel's website, www.labaton.com.

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKx)

37

Additionally, Epiq maintains a toll-free telephone number and email for inquiries regarding the Settlement. *Id*. at ¶¶20-21.

122.    The deadline for Settlement Class Members to file an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion is November 10, 2025. To date, not a single objection to any aspect of the Settlement has been received. In addition, Epiq has received no requests for exclusion. *Id*. at ¶22.

123.    Lead Counsel will file reply papers on or before November 24, 2025 that will address any objections and report on requests for exclusion and claims received.

## VIII.    THE PLAN FOR ALLOCATING THE NET SETTLEMENT FUND TO THE SETTLEMENT CLASS IS FAIR, REASONABLE, AND ADEQUATE

124.    In accordance with the Preliminary Approval Order, and as explained in the notices, Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Expenses; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim Form and all required supporting documentation to the Claims Administrator by mail or online at www.OlaplexSecuritiesSettlement.com. As provided in the long-form Notice, the Net Settlement Fund will be distributed to Authorized Claimants in accordance with the plan for allocating the Net Settlement Fund approved by the Court. The plan of allocation proposed by Lead Plaintiff (*i.e.*, the "Plan of Allocation" or "Plan") is set forth on pages 12-15 of the Notice. *See* Ex. 3-C.

125.    The objective of the Plan is to distribute the Net Settlement Fund equitably among those Settlement Members who suffered economic losses as a result of the alleged violations of the federal securities laws with respect to shares of Olaplex's publicly traded common stock purchased or otherwise acquired pursuant and/or

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKx)

38

traceable to the Offering Documents for Olaplex's IPO on or before November 12, 2021.

126.    Lead Counsel developed the Plan in consultation with Lead Plaintiff's consulting damages expert. The Plan, however, is not a formal damages analysis. The calculations made pursuant to the Plan are not intended to estimate, or be indicative of, the amounts that Settlement Class Members might have been able to recover as damages at trial. Nor are the calculations, including the Recognized Loss formulas, intended to estimate the amounts that will be paid to Authorized Claimants. The computations under the Plan are only a method to weigh the claims of Authorized Claimants against one another for purposes of making *pro rata* allocations of the Net Settlement Fund, and the Recognized Claim amounts are the basis upon which the Net Settlement Fund will be proportionately allocated to Authorized Claimants.

127.    Lead Plaintiff's claims asserted in the Action under Section 11 of the Securities Act serve as the basis for the calculation of the Recognized Loss Amounts under the Plan. Section 11 provides a statutory formula for the calculation of damages and the formulas set forth in paragraph 67 of the long-form Notice, which were developed by Lead Plaintiff's consulting damages expert, generally track the statutory formula.

128.    Epiq, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (*i.e.*, the sum of the Claimant's Recognized Loss Amounts for each purchase, as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Lead Plaintiff's losses will be calculated in the same manner.

129.    Once Epiq has processed all submitted Claim Forms and provided claimants with an opportunity to cure any deficiencies in their claims or challenge the rejection of their claims, processed responses, and made claim determinations,

distributions will be made to Authorized Claimants in the form of checks and wire transfers.

130. As set forth in the Plan, if there is any balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), after at least six (6) months after the initial distribution, and after payment of any unpaid fees and expenses incurred in administering the Settlement, and Taxes, the Claims Administrator will, if feasible, reallocate such balance among Authorized Claimants who have cashed their initial distribution checks in an equitable and economic fashion. Redistributions will be repeated until the balance in the Net Settlement Fund is no longer feasible or economical to distribute. Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not feasible or economical to reallocate, after payment of Notice and Administration Expenses and Taxes, shall be contributed to the Consumer Federation of America, a non-profit, non-sectarian organization, or such other organization approved by the Court. *See* Ex. 3-C at ¶75.

131. The structure of the Plan is similar to that of numerous other plans of allocation that have been used in other class actions under the Securities Act.

132. To date, no objections to the Plan have been filed.

133. In sum, the proposed Plan of Allocation, developed in consultation with Lead Plaintiff's consulting damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Lead Counsel respectfully submits that the proposed Plan is fair, reasonable, and adequate and should be approved.

**IX.    THE FEE AND EXPENSE APPLICATION**

134. In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel, on behalf of itself and Liaison Counsel, is applying to the Court for an award of attorneys' fees and payment of expenses incurred during

the course of the Action.[14] Specifically, Lead Counsel is applying for attorneys' fees in the amount of 25% of the Settlement Fund, or $11,875,000 plus interest earned at the same rate as earned by the Settlement Fund, and for Litigation Expenses in the amount of $771,674.27.[15] Lead Counsel also seeks reimbursement in the amount of $10,006.63 to Lead Plaintiff for its costs (including lost wages) incurred in connection with its representation of the Settlement Class in accordance with the PSLRA, 15 U.S.C. §77z-1(a)(4). *See* Ex. 1 at ¶¶3-4, 7-15. Lead Counsel's Fee and Expense Application is consistent with the amounts set forth in the notices and, to date, not one objection regarding the maximum fee and expense amounts set forth in the notice have been received.

135.   Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in the Ninth Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.

### A.   Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval

#### 1.   The Result Achieved

136.   Here, the Settlement provides for a recovery of $47,500,000 in cash for the benefit of the Settlement Class. For the reasons set forth above and given the challenges and obstacles in this case, Lead Counsel believes that the Settlement represents an excellent result for the Settlement Class.

---

[14]  Any determination with respect to Lead Counsel's application for an award of attorneys' fees and Litigation Expenses will not affect the Settlement, if approved.

[15]  The time and expense detail for Lead Counsel is set forth in the Declaration of Lauren A. Ormsbee on behalf of Labaton Keller Sucharow LLP ("Labaton Fee and Expense Decl."), attached hereto as Exhibit 7 and the Declaration of Charles H. Linehan on behalf of Glancy Prongay & Murray LLP ("Glancy Fee and Expense Decl."), attached hereto as Exhibit 8. The declarations set forth the names of the attorneys and professional support staff members who worked on the Action, their hourly rates, the lodestar value of the time expended by such attorneys and professional support staff, the expenses incurred, and the background and experience of the firms.

137. As discussed above, the Settlement recovers approximately 6.3% of maximum statutory damages and a range of approximately 12.2% to 100% of likely recoverable potential damages. This recovery falls above the range of reasonableness courts regularly approve in similar circumstances. *See, e.g., Jiangchen v. Rentech Inc.*, No. CV 17-1490, 2019 WL 5173771, at *9 (C.D. Cal. Oct. 10, 2019) (finding settlement that represented approximately 10% of total maximum potential damages to be a "favorable outcome in light of the challenging nature of a securities class action case" and supporting the fee award); *In re Stable Rd. Acquisition Corp. Sec. Litig.,* No. 2:21-CV-5744, 2024 WL 3643393, at *12 (C.D. Cal. Apr. 23, 2024) (approving requested attorneys' fee and noting that a recovery approximately 10.5% of class-wide damages is more than two and a half times the typical recovery for cases of a similar magnitude). According to Cornerstone Research, for Securities Act cases with total estimated damages of $150 million or more, the median percentage of recovery from 2015 to 2024 was 5.7% of total estimated damages, and the median percentage of recovery for all Securities Act cases from 2015 to 2024 was 7.9%. Ex. 2 at 9.

138. The $47.5 million recovery is also more than the median recovery in class actions that allege only Securities Act claims, like this case, from 2015 to 2024. *See* Ex. 2 at 8.

139. Here, as a result of the Settlement, numerous Settlement Class Members will benefit and receive compensation for their losses and avoid the substantial risks of a lesser, or no, recovery in the absence of settlement.

### 2. The Risks of Litigation and the Contingent Nature of the Fee

140. The risks faced by Plaintiffs' Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any liability and, if the Action had continued, would have aggressively litigated their defenses through dispositive motions, a complex trial, and the appeals that would inevitably follow. As

detailed in Section VI. above, notwithstanding that certain claims survived Defendants' Motions to Dismiss, Lead Counsel and Lead Plaintiff faced significant risks with respect to obtaining class certification, surviving summary judgment challenges and actually proving Defendants' liability and damages at each of the future stages of the litigation.

141. These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that this Action is governed by stringent case law interpreting the federal securities laws and was undertaken on a contingent-fee basis. From the outset, Lead Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Counsel have dedicated more than 10,000 hours to prosecuting the Action for the benefit of the Settlement Class yet have received no compensation for their efforts.

142. Plaintiffs' Counsel also bore the risk that no recovery would be achieved. Lead Counsel is aware that despite the most vigorous and competent efforts, a law firm's success in contingent litigation such as this is never guaranteed. Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels. As mentioned above,

Lead Counsel is aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts by a plaintiff's counsel produced no fee for counsel.

143.   Successfully opposing a motion to dismiss or even for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, No. 02-cv-1486, slip op. (N.D. Cal. Nov. 27, 2007) (tried by Labaton), and *In re Tesla, Inc. Sec. Litig.*, No. 18-cv-4865, slip op. (N.D. Cal. Feb. 3, 2023), or substantially lost as to the main case, such as *In re Clarent Corp. Sec. Litig.*, No. 01-cv-3361, slip op. (N.D. Cal. Feb. 16, 2005).

144.   Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2010) (in case tried by Labaton, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd,* 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice). And, the path to maintaining a favorable jury verdict can be arduous and time consuming. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKX)

44

PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-cv-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (unanimous verdict for plaintiffs rejected by trial court and later reinstated by the Ninth Circuit Court of Appeals).

145. The United States Supreme Court and numerous other courts have repeatedly recognized that the public has a strong interest in having experienced and able counsel enforce the federal securities laws through private actions. *See, e.g.*, *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (Private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to [SEC] action.'") (citations omitted). Vigorous private enforcement of the federal securities laws can only occur if private investors can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action as well as the economics involved.

146. Plaintiffs' Counsel's efforts, in the face of substantial risks and uncertainties, have resulted in what Lead Counsel believes is a significant (and certain) recovery for the Settlement Class. In these circumstances, and in consideration of their hard work and the excellent result achieved, Lead Counsel believes the 25% fee request is fair and reasonable and should be approved.

### 3. The Skill Required and Quality of Counsel's Representation

147. The skill and diligence of Lead Counsel also support the requested fee. As demonstrated by the firm biography included as Exhibit D to the Labaton Fee and Expense Declaration, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country.

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKX)

45

148.   The substantial result achieved for the Settlement Class here also reflects the superior quality of this representation.

149.   The quality of the work performed in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by experienced counsel that vigorously and ably defended the Action on behalf of Defendants.

### 4.   The Time and Labor Devoted to the Action

150.   As more fully described above, Lead Counsel: (i) engaged in a thorough pre-discovery investigation; (ii) drafted a detailed amended complaint; (iii) opposed four extensive Motions to Dismiss; (iv) moved for class certification; and (v) engaged in fact discovery, which included the review of approximately 50,000 documents (408,000 pages) from Defendants and approximately 400 documents (4,600 pages) from third parties, and taking three depositions and defending one. In connection with class certification, Lead Plaintiff submitted two expert reports. The Parties exchanged extensive mediation briefing and participated in a full-day mediation. *See supra* Sections III.-V.

151.   These efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means possible. Throughout the litigation, Lead Counsel implemented effective project management and sought to maintain an appropriate level of staffing on all tasks.

152.   The time devoted to this Action by Plaintiffs' Counsel is set forth in the Labaton Fee and Expense Declaration, Exhibit 7 hereto, and the Glancy Fee and Expense Declaration, Exhibit 8 hereto. Included with the declarations are schedules that summarize the time expended by the attorneys and professional support staff at the firms, as well as expenses ("Fee and Expense Schedules"). *See also* Exhibit 9 (Summary Table of Lodestars and Expenses). The Fee and Expense Schedules report

DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES - CASE NO. 2:22-CV-08395-SVW(SKx)

46

each person's resulting "lodestar," *i.e.*, their hours multiplied by their current hourly rates, and their time broken down into different categories of work.

153.   Over the course of the Litigation, the hourly rates of Plaintiffs' Counsel here ranged from $875 to $1,375 per hour for partners, $750 to $975 per hour for of counsels, $350 to $700 for associates, $355 to $500 for staff attorneys, and $175 to $415 for paralegals. *See* Exs. 7-A, 8-A. These hourly rates are reasonable for this type of complex litigation. Exhibit 10, attached hereto, is a table of hourly rates for defense firms compiled by Lead Counsel from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2024. The analysis shows that across all types of attorneys, Plaintiffs' Counsel's hourly rates here are consistent with, or lower than, the firms surveyed.

154.   In total, Plaintiffs' Counsel have expended 10,815 hours on the investigation, prosecution, and resolution of the claims against Defendants representing a total lodestar of $5,786,259.50.[16] Thus, pursuant to a lodestar "cross-check," Lead Counsel's fee request of 25% of the Settlement Fund (or $11,875,000, plus interest), if awarded, would yield a reasonable multiplier of approximately 2.05 on Plaintiffs' Counsel's lodestar, which is within the range of fee multipliers awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere. *See* Fee and Expense Memorandum, §I.E.

### 5.   Lead Plaintiff's Endorsement of the Fee Application

155.   Lead Plaintiff has closely monitored and actively participated in the prosecution and settlement of the Action and has evaluated and fully supports Lead Counsel's fee request. As set forth in its declaration (Ex. 1), Lead Plaintiff has concluded that the requested fee has been earned based on the efforts of Plaintiffs'

---

[16] Plaintiffs' Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

Counsel and the excellent recovery obtained for the Settlement Class in a difficult and challenging case. Accordingly, Lead Plaintiff's endorsement of the fee request further demonstrates its reasonableness, and this endorsement should be given meaningful weight in the Court's consideration of the fee award.

### B. Lead Counsel's Request for Litigation Expenses Warrants Approval

#### 1. Lead Counsel Seeks Payment of Reasonable and Necessary Litigation Expenses from the Settlement Fund

156. Lead Counsel seeks payment from the Settlement Fund of $771,674.27 for expenses that were reasonably and necessarily incurred in connection with the Action. The Postcard Notice and long-form notice inform the Settlement Class that Lead Counsel would be applying for payment of Litigation Expenses in an amount not to exceed $875,000, which may include a request for reimbursement of the reasonable costs and expenses (including lost wages) incurred by Lead Plaintiff directly related to its representation of the Settlement Class in accordance with 15 U.S.C. § 77z-1(a)(4). The amount of Litigation Expenses requested by Lead Counsel, along with the amount requested by Lead Plaintiff, is below the maximum set forth in the notices.

157. Plaintiffs' Counsel's expenses are detailed in the Labaton Fee and Expense Declaration and the Glancy Fee and Expense Declaration. *See* Exs. 7-C, 8-C. As explained, the expenses incurred are reflected on the books and records maintained by the firms. These books and records were prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.

158. From the inception of the Action, Lead Counsel was aware that Plaintiffs' Counsel might not recover any of the expenses incurred in prosecuting the claims against Defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved. Lead Counsel also understood that, even if the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants.

Thus, we were motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.

159. Plaintiffs' Counsel's expenses include fees and costs for, among other things: (i) experts in connection with various stages of the litigation; (ii) mediation; (iii) litigation support related to electronic discovery; (iv) transcript and deposition-related expenses; (v) work-related travel; and (vi) online factual and legal research. Courts have consistently found that these types of expenses are payable from a fund recovered by counsel for the benefit of a class.

160. The largest component of Plaintiffs' Counsel's expenses (*i.e.*, $596,341.24, or approximately 77% of total expenses) was incurred for experts. As noted above, Lead Counsel retained experts to provide merits expert reports and opinion on issues related to the elements of the Lead Plaintiff's claims (damages, tracing, falsity, and materiality) and Defendants' defenses (negative causation and falsity). These experts were essential to the prosecution of the Action. *See* Ex. 7 at ¶6(b).

161. Another component of the expenses ($34,717.46, or approximately 4.5% of the total) was for document hosting and management related to electronic discovery. Lead Counsel retained third-party vendors to process and host documents produced in the Action. *See* Ex. 7 at ¶6(f). Lead Counsel used these vendors and the Relativity Database to, among other things: (i) maintain potentially relevant documents collected from Lead Plaintiff for review and production in response to Defendants' discovery demands, (ii) maintain the approximately 412,000 pages of documents produced by Defendants and third parties for review; (iii) process documents so that they would be in a searchable format, including the conversion and upload of any hard copy documents; and (iv) apply data analysis tools to focus the review on the most significant documents to efficiently target information counsel needed to support their allegations.

Declaration of Lauren A. Ormsbee in Support of (i) Motion for Final Approval of Class Action Settlement and Plan of Allocation and (ii) Motion for an Award of Attorneys' Fees and Payment of Expenses - Case No. 2:22-cv-08395-SVW(SKx)

49

162.    Another component of counsel's Litigation Expenses ($13,081.93) was the cost of court reporters, videographers, and transcripts in connection with the four depositions and the hearings before the Court. Ex. 7 at ¶6(e).

163.    Lead Plaintiff's share of the fees of the Mediator in connection with the mediation process totaled $42,345.00 or 5% of the total. Ex. 7 at ¶6(d).

164.    The Litigation Expenses also include approximately $28,514.10 for work-related transportation expenses, meals, and lodging related to, among other things, traveling in connection with court hearings, the depositions, working late hours, and the mediation. (Any first-class airfare has been reduced to be comparable to economy rates.) Ex. 7 at ¶6(g).

165.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in complex commercial litigation and routinely paid in non-contingent cases. These expenses include, among others, online legal and factual research, court and service fees, duplicating costs, and overnight delivery expenses. All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary for the successful litigation of the Action.

### 2.    PSLRA Reimbursement to Lead Plaintiff Is Fair and Reasonable

166.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 77z-1(a)(4). Accordingly, Lead Plaintiff seeks reimbursement of $10,006.63 for the cost of the time it incurred in connection with its efforts on behalf of the Settlement Class. Lead Plaintiff was deposed and engaged in discovery. It was in regular contact with counsel, reviewed court filings and submitted declarations in support of motions, attended the mediation and consulted with counsel during the course of the lengthy mediation process and approved of the Settlement. *See* Ex. 1 at ¶¶4, 8-14. Lead

Plaintiff's efforts required it to devote time and resources to this Action that would otherwise have been devoted to the retirement system and its beneficiaries.

167.   As discussed in the Fee and Expense Memorandum and in Lead Plaintiff's supporting declaration, Lead Plaintiff has been fully committed to pursuing the Settlement Class's claims. Lead Plaintiff provided valuable assistance to Lead Counsel during the prosecution and resolution of the Action. The efforts expended by Lead Plaintiff during the course of this Action, as set forth in its declaration, including communicating with counsel, reviewing pleadings and motion papers, gathering and reviewing documents in response to discovery requests, responding to written interrogatories, responding to requests for admissions, preparing for a deposition and being deposed, and communicating with counsel regarding the mediation and settlement negotiations are precisely the types of activities courts have found to support reimbursement to representatives, and fully support the request for reimbursement here.

## X.   CONCLUSION

168.   For all the reasons set forth above, Lead Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the requests for payment of Litigation Expenses in the amount of $771,674.27, plus interest, and reimbursement of Lead Plaintiff's costs in the amount of $10,006.63 should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed in New York, New York this 27th day of October, 2025.

 */s/ Lauren A. Ormsbee*
LAUREN A. ORMSBEE

**Certificate of Service**

I hereby certify that on October 27, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List served via ECF on all registered participants only.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 27, 2025

/s/ *Lauren A. Ormsbee*
Lauren A. Ormsbee

CERTIFICATE OF SERVICE
CASE NO. 2:22-CV-08395-SVW(SKX)

**Mailing Information for *Leslie Lilien v. Olaplex Holdings, Inc. et al.*, Case 2:22-CV-08395-SVW(SKX)**

**Electronic Mail Notice List:**

**The following are those who are currently on the list to receive e-mail notices for this case.**

Eric J. Belfi - ebelfi@labaton.com

Brian R. Blais - Brian.blais@ropesgray.com

John L. Brennan - jbrennan@willkie.com

James C. Dugan - jdugan@willkie.com

Kathryn C. Garrett - kgarrett@willkie.com

Matthew M. Gurvitz - mgurvitz@willkie.com

Adam M. Harris - adam.harris@davidllc.com

Danielle Izzo - dizzo@labaton.com

Philip G. Kraft - phillip.kraft@ropesgray.com

Charles Henry Linehan - clinehan@glancylaw.com

Francis P. McConville - fmcconville@labaton.com

Lauren Amy Ormsbee - lormsbee@labaton.com

Jennifer Pafiti - jpafiti@pomlaw.com

Anne Johnson Palmer- anne.johnsonpalmer@ropesgray.com

Kevin M Papay - kevin.papay@morganlewis.com

Robert Vincent Prongay - rprongay@glancylaw.com

John Warren Rissier - warren.rissier@morganlewis.com

Charlene Sachi Shimada - charlene.shimada@morganlewis.com

Charles J. Stiene - cstiene@labaton.com

Naomi Rose Strauss - nstrauss@willkie.com

Lisa Marie Strejlau - lstrejlau@labaton.com

Irina Vasilchenko - ivasilchenko@labaton.com

Carol C. Villegas - cvillegas@labaton.com

Nicole M. Zeiss – nzeiss@labaton.com

Peter L. Welsh - peter.welsh@ropesgray.com

Daniel A. Yanofsky - daniel.yanofsky@ropesgray.com

MAILING LIST
CASE NO. 2:22-CV-08395-SVW(SKX)